No. 22-1478

# United States Court of Appeals
## for the First Circuit

STEFANO GRANATA; JUDSON THOMAS; COLBY CANNIZZARO; CAMERON PROSPERI; THE GUNRUNNER, LLC; FIREARMS POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

*v.*

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; TERRENCE REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,

*Defendants-Appellees.*

APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF THE DEFENDANTS-APPELLEES**

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
Timothy J. Casey, 1st Cir. No. 123832
Grace Gohlke, 1st Cir. No. 1204282
  *Assistant Attorneys General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
timothy.casey@mass.gov
grace.gohlke@mass.gov

January 30, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ...................................................................................1

QUESTION PRESENTED.........................................................................2

STATEMENT OF THE CASE.....................................................................3

    Statutory and Regulatory Background ............................................3

        1.    The Attorney General's Regulations ..........................3

        2.    Codification of Section 123 and the Approved Firearms Roster ................................................................8

    Statement of Facts.......................................................................11

        1.    Individual Plaintiffs .................................................11

        2.    Retailer and Organizational Plaintiffs.......................13

    The District Court's Decision........................................................14

SUMMARY OF THE ARGUMENT ...........................................................16

ARGUMENT .......................................................................................18

    I.    The Second Amendment Framework..........................................19

    II.    Plaintiffs Cannot Establish That the Handgun Safety Regulations Burden Conduct Protected by the Plain Text of the Second Amendment. ..........................................................25

        A.    Plaintiffs Bear the Initial Burden of Demonstrating That Their Proposed Conduct Falls within the Text of the Second Amendment. .................................................26

        B.    Plaintiffs Cannot Establish that the Handgun Safety Regulations Burden Their Second Amendment Right to "Keep and Bear" Arms. ...........................................28

C.    Likewise, As Presumptively Lawful Qualifications on the Commercial Sale of Firearms, the Handgun Safety Regulations Do Not Burden the Right to "Keep and Bear Arms." ................................................................................33

III.    The Handgun Safety Regulations Are Consistent with the Historical Tradition of Regulating Firearms for Public Safety ..........37

A.    State Laws Dating Back to the Colonial Period Regulated Firearms Safety to Prevent Accidental Injury and Death. ........37

1.    Laws Requiring the Inspection or "Proving" of Firearms and Ammunition ...........................................39

2.    Firearms and Gunpowder Safe Storage Laws ...............43

3.    Law Banning Sales of Firearms to Minors ....................46

4.    Dangerous and Unusual Weapons Bans—Trap Guns ..........................................................................48

CONCLUSION ................................................................................52

ADDENDUM ....................................................................................1

Mass. Gen. Laws ch. 140, § 122 .......................................... Add. 2
Mass. Gen. Laws ch. 140, § 123 .......................................... Add. 4
501 C.M.R. §§ 7.01 et seq. ................................................. Add. 11
940 C.M.R. §§ 16.01 et seq. ............................................... Add. 19
Records of the Colony of New Plymouth in New England: Laws, 1623-1682 ...................................... Add. 25
1713-14 Mass. Province Laws 720, ch. 6 ............................. Add. 28
1771-72 Mass. Province Laws 167, ch. 9 ............................. Add. 29
1782 Mass. Acts. 119, ch. 46 .............................................. Add. 32
1804 Mass. Acts 111, ch. 81 ............................................... Add. 34
1808 Mass. Acts 444 ch. 52 ................................................ Add. 37
1814 Mass. Acts 464, ch. 192 ............................................. Add. 40
1882 Mass. Acts. 212, ch. 269 ............................................ Add. 43
1884 Mass. Acts 57, ch. 76 ................................................. Add. 45
1878 Cal. Stat. 117, ch. 299 ............................................... Add. 46
1832 Conn. Acts 391, ch. 25 ............................................... Add. 48

1882 Ga. Laws 131, No. 378 ...............................................................Add. 50

1821 Me. Laws 98, ch. 25 ..................................................................Add. 52

1821 Me. Laws 546, ch. 162 ..............................................................Add. 56

1875 Mich. Pub. Acts 136, § 1 ...........................................................Add. 57

1869 Minn. Laws 50, ch. 39 ...............................................................Add. 59

1775 New Hampshire House of Representatives Resolution –
    Plan for Providing Fire-Arms for the Colony ...........................Add. 65

1820 N.H. Laws 274, ch. 25 ..............................................................Add. 67

1825 N.H. Laws 73, ch. 61 ................................................................Add. 70

1763-1775 N.J. Laws 346, ch. 539, § 10 ...........................................Add. 73

1776-77 N.J. Laws 6-7, ch. 6.............................................................Add. 78

1882 N.J. Acts 52, ch. 44 ..................................................................Add. 81

1772 N.Y. Laws 682, ch. 1549...........................................................Add. 83

1877 Ohio Laws 278, ch. 8, § 60.......................................................Add. 87

1794 Pa. Laws 764, ch. 337 ..............................................................Add. 90

1776 R.I. Laws 25 (Oct. Sess)...........................................................Add. 96

1884 Vt. Acts & Resolves 74, § 1 ......................................................Add. 98

iii

# TABLE OF AUTHORITIES

## Cases

*American Shooting Sports Council, Inc. v. Attorney Gen.*,
    429 Mass. 871, 711 N.E.2d 899 (1999)......................................................3

*Azurity Pharms., Inc. v. Edge Pharama, LLC*,
    45 F.4th 479 (1st Cir. 2022) .........................................................18

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)..................................................32n

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984)........................................................................28

*Cole v. Fisher*, 11 Mass. 137 (1814).........................................................46

*Coleman v. State*, 32 Ala. 581 (1858).........................................................48

*Dandridge v. Williams*, 397 U.S. 471 (1970) .........................................................18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016).........................................................12

*Draper v. Healey*, 98 F. Supp. 3d 77 (D. Mass. 2015).............................................36

*Gazzola v. Hochul*, No. 122CV1134BKSDJS,
    2022 WL 17485810 (N.D.N.Y. Dec. 7, 2022) .............................................27

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ......................................................14

*In re Montreal, Maine & Atlantic R'way, Ltd.*,
    888 F.3d 1 (1st Cir. 2018)...............................................................18

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2021) ......................................28

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ......................................50n

*McDonald v. City of Chicago*, 561 U.S. 741 (2010) .......................................*passim*

*Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942
 (Fed. Cir. 2016)...........................................................................19

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
 No. 22-cv-501-BLF, 2022 WL 3083715
 (N.D. Cal. Aug. 3, 2022) ..............................................................27

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022)...........................................................*passim*

*New York State Rifle & Pistol Ass'n v. Cuomo*,
 804 F.3d 242 (2d Cir. 2015) ........................................................33n

*Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) ..........................................37

*Ocean State Tactical, LLC v. State of Rhode Island*,
 No. 22-CV-246 JJM-PAS, 2022 WL 17721175
 (D.R.I. Dec. 14, 2022) ................................................................27

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) ...........................................26, 34, 43

*Phelps-Roper v. Troutman*, 712 F.3d 412 (8th Cir. 2013).......................................19

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) .........................................34

*State v. Callicut*, 69 Tenn. 714 (1878) ...................................................48

*Teixeira v. Cty. of Alameda*, 873 F.3d 670
 (9th Cir. 2017) (en banc) ..........................................................29n, 37

*Watterson v. Page*, 987 F.2d 1 (1st Cir. 1993) .........................................4n

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019)..........................................32

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009).................................35, 47, 48

**Statutes**

42 U.S.C. § 1983 ...................................................................................11

Mass. Gen. Laws ch. 93A, § 2(c)........................................................3, 35

Mass. Gen. Laws ch. 140, § 121 ..............................................................4n

Mass. Gen. Laws ch. 140, § 122 ........................................................8, 35

Mass. Gen. Laws ch. 140, § 123 .............................. 1, 3, 8-11, 35, 36

Mass. Gen. Laws ch. 140, § 123, cl. 18-21 ...............................................8

Mass. Gen. Laws ch. 140, § 123, cl. 18 .....................................................8

Mass. Gen. Laws ch. 140, § 123, cl. 19 .....................................................8

Mass. Gen. Laws ch. 140, § 123, cl. 20 .....................................................8

Mass. Gen. Laws ch. 140, § 128 .........................................................9, 11

Mass. Gen. Laws ch. 140, § 128A .....................................................10, 30

Mass. Gen. Laws ch. 140, § 128B .....................................................10, 30

Mass. Gen. Laws ch. 140, § 131 .......................................................11, 35

Mass. Gen. Laws ch. 140, § 131¾ .............................................................9

Mass. Gen. Laws ch. 140, § 131E(b)........................................................11

Mass. Gen. Laws ch. 140, § 131F..............................................................11

Mass. Gen. Laws ch. 140, § 131K ..............................................................6

Mass. Gen. Laws ch. 269, § 10(a)............................................................11

1713-14 Mass. Province Laws 720, ch. 6 ................................................................46n

Act of May 28, 1746, ch. X, Acts and Law of Mass. Bay ......................................46n

1771-72 Mass. Province Laws 167, ch. 9 ........................................................ 45-46

1782 Mass. Acts 119, ch. 46 ..............................................................................44

1804 Mass. Acts 111, ch. 81 ..............................................................................39

1804 Mass. Acts 111, ch. 81, § 1 .......................................................................40

1804 Mass. Acts 111, ch. 81, §§ 2-3 ..................................................................40

1804 Mass. Acts 111, ch. 81, § 3 .......................................................................40

1804 Mass. Acts 111, ch. 81, § 4 .......................................................................40

1808 Mass. Acts 444, ch. 52 ..............................................................................42

1814 Mass. Acts 464, ch. 192 ............................................................................40n

1882 Mass. Acts. 212, ch. 269 ...........................................................................45

1884 Mass. Acts 57, ch. 76 ................................................................................48

1878 Cal. Stat. 117, ch. 299 ..............................................................................46n

1832 Conn. Acts 391, ch. 25 ..............................................................................46

1882 Ga. Laws 131, No. 378 .............................................................................46n

1821 Me. Laws 98, ch. 25 ..................................................................................46

1821 Me. Laws 546, ch. 162 ..............................................................................40

1875 Mich. Pub. Acts 136, No. 97 ......................................................................49

1869 Minn. Laws 50, ch. 39 ......................................................................49

1820 N.H. Laws 274, ch. 25 ......................................................................42

1825 N.H. Laws 73, ch. 61 ........................................................................46

1763-1775 N.J. Laws 346, ch. 539, § 10 ..................................................49

1776-77 N.J. Laws 6-7, ch. 6 ....................................................................42

1882 N.J. Acts 52, ch. 44 ..........................................................................48

1772 N.Y. Laws 682, ch. 1549 ..................................................................46

1877 Ohio Laws 278, ch. 8, § 60 ............................................................46n

1794 Pa. Laws 764, ch. 337 .......................................................................42

1776 R.I. Pub. Laws 25 (Oct. Sess.) .........................................................42

1884 Vt. Acts & Resolves 74, § 1 ..............................................................49

## Constitutional Provisions

U.S. Const. amend. I ..................................................................................27

U.S. Const. amend. II ...........................................................................*passim*

Mass. Const. Pt. 1, Art. XVII (1780) ........................................................47

## Rules and Regulations

Fed. R. Civ. P. 12(b)(6) .............................................................................18

501 C.M.R. §§ 7.01 *et seq.* .........................................................................9

501 C.M.R. § 7.02 .....................................................................................10

501 C.M.R. § 7.03(1) ...................................................................9n

501 C.M.R. § 7.04(1) ..................................................................10n

501 C.M.R. § 7.05 .......................................................................10

501 C.M.R. §§ 7.12-7.15 .............................................................10n

940 C.M.R. § 16.00 ......................................................................9

940 C.M.R. §§ 16.01 *et seq.* ................................................1, 3, 4

940 C.M.R. § 16.01 .........................................4n, 6, 7n, 8, 36

940 C.M.R. § 16.03 ......................................................................7

940 C.M.R. § 16.04 .................................................................6, 11

940 C.M.R. § 16.04(1) ..................................................................6

940 C.M.R. § 16.04(2) ..................................................................6

940 C.M.R. § 16.04(3) ..................................................................6

940 C.M.R. § 16.05(1) ..................................................................6

940 C.M.R. § 16.05(2) ..................................................................7

940 C.M.R. § 16.05(3) .............................................................7, 12

940 C.M.R. § 16.05(4) .............................................................7, 12

940 C.M.R. §§ 16.06(1)-(3) .........................................................7n

940 C.M.R. § 16.07 ......................................................................8

**Miscellaneous**

4 William Blackstone, Commentaries on the Laws of England
(1769)..........................................................................................................50n

Approved Firearms Roster: 06/2021,
https://www.mass.gov/doc/approved-firearms-roster-
7/download. ................................................. 10, 11, 12, 13, 25, 30

Enforcement Notice:  Attorney General's Handgun Safety
Regulations, https://www.mass.gov/doc/attorney-
generals-handgun-regulation-enforcement-
notices/download ........................................................................4

Enforcement Notice #2: Attorney General's Handgun Safety
Regulations, https://www.mass.gov/doc/attorney-
generals-handgun-regulation-enforcement-
notices/download ........................................................................8

Enforcement Notice #3: Attorney General's Handgun Sales
Regulations (940 Code Mass. Regs. 16.00), February
2002, https://www.mass.gov/doc/attorney-generals-
handgun-regulation-enforcement-notices/download.....................................9

July 16, 2004 Consumer Advisory on Glock Handguns,
https://www.mass.gov/doc/attorney-generals-handgun-
regulation-enforcement-notices/download ...............................................4, 12

National Archives, Washington's Sentiments on a Peace
Establishment (May 1, 1783),
https://founders.archives.gov/documents/Washington/99-
01-02-11202...............................................................................41

National Park Serv., Springfield Armory,
http://npshistory.com/publications/spar/index.htm .......................................41

Records of the Colony of New Plymouth in New England:
Laws, 1623-1682 ..........................................................................49n

Robert J. Spitzer, *Gun Law History in the United States
        and Second Amendment Right*,
        80 Law & Contemp. Probs. 55 (2017) ........................ 38, 42, 43, 46n, 48, 49

Saul Cornell & Nathan DeDino, *A Well Regulated Right:
        The Early American Origins of Gun Control*,
        73 Fordham L. Rev. 487 (2004) ......................................................37, 41, 43

U.S. General Accounting Office, Report to the Chairman,
        Subcommittee on Antitrust, Monopolies, and Business
        Rights, Committee on the Judiciary, U.S. Senate,
        *Accidental Shootings:  Many Deaths and Injuries Caused
        by Firearms Could be Prevented* (1991),
        http://www.gao.gov/assets/160/150353.pdf. ..................................................5

## INTRODUCTION

Massachusetts law protects consumers from the sale of unsafe handguns that are prone to malfunction or accidental discharge during normal use or are not equipped with basic safety features. Together, the requirements for the commercial sale of handguns codified in Mass. Gen. Laws ch. 140, § 123, and the Attorney General's handgun sales regulations, 940 Code Mass. Regs. §§ 16.01 *et seq.* (together, the "handgun safety regulations"), ensure that handguns sold in the Commonwealth are not defective and protect handgun users and their families against accidental injury or death. In this case, the plaintiffs claim that Massachusetts's handgun safety regulations infringe their Second Amendment rights because, even though there are hundreds of handgun models that plaintiffs can lawfully buy, keep, and carry in Massachusetts, the handgun safety regulations prevent them from buying 18 specific handgun models that are not compliant with the regulations. In effect, plaintiffs claim that they have "a right to keep and carry any weapon whatsoever," in contravention of *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

The District Court properly dismissed plaintiffs' complaint because it fails to state a claim upon which relief can be granted. This Court may affirm for any or all of three independent reasons. *First*, the handgun safety regulations do not run

afoul of the text of the Second Amendment, because they do not meaningfully infringe plaintiffs' right to keep and bear arms for lawful self-defense. Plaintiffs retain the ability to purchase, possess, and carry hundreds of handgun models that are approved for sale in Massachusetts; their claimed deprivation is the inability to purchase 18 models of handguns that are not approved for sale in Massachusetts because they have not satisfied the minimum safety requirements imposed by the state. *Second*, the challenged regulations are valid because they are conditions and qualifications on the commercial sale of arms that are presumptively lawful under *Heller* and *Bruen*. *Third*, the challenged regulations are consistent with the Nation's historical tradition of firearms regulation, and thus do not violate the Second Amendment.

## QUESTION PRESENTED

Do the handgun safety regulations—which prohibit the commercial sale of handgun models that have not met minimum safety requirements imposed by Massachusetts to protect against accidents like explosion or unintended discharge, but which do not interfere with plaintiffs' ability to purchase, keep, and carry hundreds of other handgun models—violate the Second Amendment?

## STATEMENT OF THE CASE

This is an appeal from a judgment of the U.S. District Court for the District of Massachusetts (Zobel, J.) dismissing plaintiffs' complaint for failure to state a claim upon which relief can be granted.

### Statutory and Regulatory Background

To protect Massachusetts consumers and their families, two sets of safety requirements establish minimum standards for handguns sold by licensed retailers in the Commonwealth: (1) regulations promulgated pursuant to the Attorney General's authority under Mass. Gen. Laws ch. 93A, § 2(c), and codified at 940 Code Mass. Regs. §§ 16.01 *et seq.*; and (2) statutory requirements at Mass. Gen. Laws ch. 140, § 123, that form the basis for the Approved Firearms Roster.

#### 1.    The Attorney General's Regulations

Under Mass. Gen. Laws ch. 93A, § 2(c), the Attorney General has the authority to "prevent the deceptive or unfair sale or transfer of defective products which do not perform as warranted." *American Shooting Sports Council, Inc. v. Attorney Gen.*, 429 Mass. 871, 875, 711 N.E.2d 899, 902 (1999). Pursuant to this authority, in October 1997, the Attorney General of Massachusetts promulgated a set of regulations deeming it an unfair or deceptive trade practice for a "handgun-

purveyor"[1] to "transfer"[2] a handgun within the Commonwealth that does not meet certain minimum safety and performance standards. 940 Code Mass. Regs. §§ 16.01 *et seq.* (the "Attorney General's regulations"); *see also* Enforcement Notice: Attorney General's Handgun Safety Regulations.[3] The Attorney General's regulations "are intended to protect responsible gun owners and their families from firearms[4] that are unsafe by design or manufacture." July 16, 2004 Consumer Advisory on Glock Handguns ("Consumer Advisory").[5]

---

[1] A "handgun-purveyor" is defined to exclude those who transfer fewer than five handguns per year, those who transfer handguns to law enforcement, military personnel, or museums, and those who transfer antique weapons or weapons used for target shooting competitions. 940 Code Mass. Regs. § 16.01.

[2] "Transfer" is defined as "sell, rent, or lease" and excludes sales to firearm wholesalers who do not intend to sell the handguns to Massachusetts retailers or consumers. *Id.*

[3] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 1-2. The Attorney General's Enforcement Notices, as well as other sources cited in this section, are "official public records" that the Court may properly consider on a motion to dismiss. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

[4] Massachusetts law defines the term "firearm" such that it encompasses all handguns. *See* Mass. Gen. Laws ch. 140, § 121. A firearm is distinct from a "rifle" or "shotgun," which are separately defined. *See id.*

[5] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 8.

The Attorney General's regulations came in the wake of national research on preventing fatalities from accidental firearm discharges. In 1991, the United States General Accounting Office ("GAO") conducted a study at the request of Congress that found that two basic safety features—child proofing and a load indicator—could prevent one third of all accidental gun deaths in the United States. *See* U.S. General Accounting Office, Report to the Chairman, Subcommittee on Antitrust, Monopolies, and Business Rights, Committee on the Judiciary, U.S. Senate, *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could be Prevented* 3 (1991) ("GAO Report").[6] At the time, firearms were the fourth leading cause of accidental deaths among children aged 5 to 14 and third among 15- to 24-year-olds. *Id.* at 2. The report noted that the two studied features would not prevent deaths caused by a gun that "discharge[d] when it [was] accidentally dropped or [fell] from its storage location"; thus, the prevention of such deaths fell outside the scope of the study. *Id.* at 4. The GAO Report recommended that "all possible efforts be made to reduce the number of accidental shootings" in light of the devastating "human, economic, and public health costs of these shootings to the victims, their families, and society[.]" *Id.* at 5.

The Attorney General's regulations make it an unfair and deceptive practice, and therefore a violation of state law, for a purveyor to transfer a handgun that is

---

[6] *See* http://www.gao.gov/assets/160/150353.pdf.

defective or lacks certain safety features.  First, handguns sold by retailers cannot be "made from inferior materials."  940 Code Mass. Regs. § 16.04.  To satisfy this requirement, a handgun must be made of materials that meet a specified minimum melting point, tensile strength, and density, or the gun must pass a performance test to show it can be fired repeatedly with only a limited number of malfunctions and without breaking.  *Id.* §§ 16.01; 16.04(1), (3).  Next, the handgun must not be "prone" to either repeated firing upon a single trigger pull or explosion upon firing.  *Id.* § 16.04(2).  The handgun must also pass a "drop test" to show it is not "prone to accidental discharge."  *Id.* §§ 16.01; 16.04(2).  Further, the handgun must have a "safety device," as defined by statute, that prevents the firing of the gun by an unauthorized user.  *Id.* § 16.05(1) (citing Mass. Gen. Laws ch. 140, § 131K (providing examples of safety devices)).[7]  The handgun must also have a form of childproofing, defined as any mechanism that "effectively precludes an average five year old child from operating the handgun when it is ready to fire."  *Id.* § 16.05(2).  Examples of adequate child-proofing mechanisms include a ten-pound trigger pull or a firing mechanism that cannot be operated by the smaller hands of

---

[7] Such safety devices include, but are not limited to, "mechanical locks or devices designed to recognize and authorize, or otherwise allow the firearm to be discharged only by its owner or authorized user, by solenoid use-limitation devices, key activated or combination trigger or handle locks, radio frequency tags, automated fingerprint identification systems or voice recognition."  Mass. Gen. Laws ch. 140, § 131K.

an average five-year-old. *Id.* A "hammer deactivation device" also meets the child-proofing requirement. *Id.* § 16.05(4).[8] For semi-automatic handguns, the regulations further require either a load indicator or a magazine safety disconnect. *Id.* §§ 16.05(3); 16.05(4).[9] Finally, handguns must have a tamper resistant serial number. *Id.* § 16.03.[10]

The Attorney General's regulations do not apply to all handgun sales in Massachusetts. As noted above, the regulations apply only to transfers by "handgun-purveyors,"[11] defined to exclude (among others) sellers who transfer fewer than five handguns per year. *Id.* § 16.01. These private sales are therefore not subject to the Attorney General's regulations. Furthermore, most of the

---

[8] A "hammer deactivation device" is "a built-in device (or an extension of the hammer) which allows a user manually to lower the handgun's hammer into a deactivated position, and which must be manually re-toggled in order to re-cock the hammer before the handgun can be fired." 940 Code Mass. Regs. § 16.01.

[9] A "load indicator" is a "device which plainly indicates that a cartridge is in the firing chamber within the handgun." A "magazine safety disconnect" is a "device that prevents the firing of the handgun when the magazine is detached from the handgun." 940 Code Mass. Regs. § 16.01.

[10] In addition to these safety features, the Attorney General's regulations also require licensed retailers to make certain safety disclosures at the time of sale. 940 Code Mass. Regs. § 16.06(1)-(3). Those provisions were not challenged in this complaint and are not at issue in this appeal.

[11] Because plaintiffs use the term "licensed retailer" in their complaint, this brief uses that term interchangeably with "handgun-purveyor," as well as "dealer," another term commonly used in guidance related to these regulations.

regulations do not apply to handguns that were manufactured on or before October 21, 1998.  *Id.* § 16.07; Enforcement Notice #2: Attorney General's Handgun Safety Regulations.[12]

### 2. Codification of Section 123 and the Approved Firearms Roster

In 1998, soon after the promulgation of the Attorney General's regulations, the Legislature codified several overlapping provisions at Mass. Gen. Laws ch. 140, § 123, cl. 18-21 ("Section 123"), which impose conditions on a license to sell, rent, or lease firearms, rifles, or shotguns granted under Mass. Gen. Laws ch. 140, § 122.  Specifically, the Attorney General's regulations and Section 123 share minimum safety standards relating to: the material composition of the handgun, Mass. Gen. Laws ch. 140, § 123, cl. 18; whether the handgun is prone to accidental discharge, *id.* § 123, cl. 19; and whether the handgun is prone to repeated firing or explosion, *id.* § 123, cl. 20.  It is unlawful for a retailer to sell a handgun that does not comply with Section 123's safety requirements.  Mass. Gen. Laws ch. 140, § 128.

In conjunction with Section 123, the Legislature directed the Secretary of the Executive Office of Public Safety and Security ("Secretary") to "compile and publish a roster" of handguns that meet Section 123's requirements.  Mass. Gen.

---

[12] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 3-4.

Laws ch. 140, § 131¾.  This roster is known as the "Approved Firearms Roster."

501 Code Mass. Regs. §§ 7.01 *et seq.*; *see also* Enforcement Notice #3: Attorney

General's Handgun Sales Regulations (940 Code Mass. Regs. § 16.00), February

2002.[13]

As of its June 2021 update,[14] the Approved Firearms Roster listed over

1,000 handgun models that have been shown by independent testing[15] to meet

Section 123's requirements.  *See* Approved Firearms Roster: 06/2021 ("June 2021

Roster").[16]  The June 2021 Roster includes handguns from 29 manufacturers, often

---

[13] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 5-7.

[14] At the time of briefing below, the most recent update to the Approved Firearms Roster was in June 2021.  Since that time, the Approved Firearms Roster has been further updated, in February 2022 and October 2022.  Those updates have placed over two dozen additional handgun models on the roster.  *See* https://www.mass.gov/doc/approved-firearms-roster-9/download; https://www.mass.gov/doc/approved-firearms-roster-10/download.

[15] A handgun may be placed on the Approved Firearms Roster "only after the Secretary has received a final test report from an approved independent testing laboratory" certifying that the handgun make and model meets the requirements of Section 123.  501 Code Mass. Regs. § 7.03(1).  To have a particular handgun placed on the roster, a manufacturer or other entity can submit the handgun for testing at an approved laboratory and then send the final test report to the Secretary and the Gun Control Advisory Board.  *Id.* § 7.04(1).  Thus, the fact that a particular handgun is not included on the roster could mean that it has failed the requisite testing, or it could mean that the requisite testing has never been performed and/or submitted to the Secretary.

[16] *See* https://www.mass.gov/doc/approved-firearms-roster-7/download.

with multiple models for each manufacturer. *See id.* For example, 66 Sig Arms models appear on the June 2021 Roster, representing numerous styles across six different calibers. *See id.* at 10-12.

Like the Attorney General's regulations, Section 123 does not regulate private sales; those sales are governed separately by Mass. Gen. Laws ch. 140, §§ 128A and 128B, which authorize a private seller to transfer up to four guns per year. Only "firearms dealer[s] licensed in Massachusetts" are prohibited from selling handguns that do not appear on the Approved Firearms Roster. 501 Code Mass. Regs. § 7.02. In addition, licensed retailers may sell handguns that do not appear on the Approved Firearms Roster if the gun was lawfully owned or possessed in Massachusetts prior to October 21, 1998. *Id.* § 7.05.[17]

The Attorney General's regulations related to childproofing, load indicators, and tamper-resistant serial numbers have not been codified at Section 123 and so are not tested for inclusion on the Approved Firearms Roster. To be sold by a retailer in Massachusetts, a handgun that appears on the roster also must comply with the Attorney General's regulations. Mass. Gen. Laws ch. 140, § 128; 940 Code Mass. Regs. § 16.04.

---

[17] A separate roster lists handguns that may be sold for formal target shooting and that are subject to a separate set of requirements. 501 Code Mass. Regs. §§ 7.12-7.15.

**Statement of Facts**

The plaintiffs, four individuals, one gun retailer, and one organization, filed the underlying complaint in this matter on June 8, 2021. Plaintiffs bring a single claim under 42 U.S.C. § 1983 and the United States Constitution, alleging that Massachusetts's handgun safety regulations deprive them of their right to keep and bear arms under the Second Amendment. Compl. ¶¶ 56-73, Appendix ("App.") 19-22.

### 1.    Individual Plaintiffs

All four individual plaintiffs allege that they have a valid license to carry ("LTC"). Compl. ¶¶ 47-50, App. 16-18. Among other things, an LTC authorizes the licensee to purchase handguns, keep them in their homes, and carry them in public. Mass. Gen. Laws ch. 269, § 10(a); *id.* ch. 140, §§ 131, 131E(b), 131F. These four plaintiffs together identify 18 models of handguns they would purchase "new from a licensed retailer" but for Massachusetts's handgun safety regulations. Compl. ¶¶ 47-50, App. 16-18.[18] The complaint does not indicate what handguns, if any, the plaintiffs already purchased and own with their LTCs.

---

[18] The makes and models of these 18 handguns are: Beretta 92X Performance; CZ-USA DW Kodiak 10mm; CZ-USA 75 Compact 9mm; CZ P-09; CZ P-10F; CZ-USA P-10 9mm; CZ Tactical Sport; CZ Tactical Sport Orange; fifth generation Glock 19 or 17; Kimber Ultra carry II .45; Kimber KHX custom .45; Kimber Desert Warrior .45; Magnum Research Desert Eagle XIX.50AE; Nighthawk Custom Heinie Signature Recon; Sig Arms Model 1911 "We the People" edition;
(footnote continued)

Of the 18 models the individual plaintiffs seek to purchase, two of the models—both manufactured by Glock—appear on the Approved Firearms Roster. *See* Compl. ¶¶ 47-48, App. 16-17; June 2021 Roster, *supra*. Those models nonetheless cannot be sold by retailers in Massachusetts because they fail to comply with the Attorney General's regulation that requires either a load indicator or magazine safety disconnect on semi-automatic handguns. *See* Consumer Advisory, *supra*; 940 Code Mass. Regs. §§ 16.05(3), (4). In an earlier constitutional challenge, this Court upheld that regulation, as applied to Glock handguns, against a due process challenge based on vagueness. *See Draper v. Healey*, 827 F.3d 1, 5 (1st Cir. 2016).[19]

The remaining 16 models the individual plaintiffs desire to purchase do not appear on the Approved Firearms Roster. *See* Compl. ¶¶ 47-50, App. 16-18; June 2021 Roster, *supra*. Plaintiffs make no factual allegations as to why these models are not on the roster. The complaint does not explain, for example, whether these models have failed one or more of the required safety and performance tests, or

Sig Arms Model 1911 "TacOps" edition; and the Sig P365XL. Compl. ¶¶ 47-50, App. 16-18.

[19] Although the *Draper* plaintiffs had also raised a challenge under the Second Amendment in the District Court, they stipulated before this Court that dismissal of the vagueness due process challenge "require[d] dismissal of their Second Amendment claim as well" and so the Court did not reach the merits of the Second Amendment claim. *Draper*, 827 F.3d at 4-5.

whether manufacturers have simply failed to make the models available for independent testing and submit the results to the Secretary. *See generally* Compl.; *see also* note 15, above. Further, the individual plaintiffs make no allegations about what features, if any, are unique to any of the 18 models that cannot be found in one or more of the hundreds of models of handguns that are available for purchase in Massachusetts. *See generally* Compl.

### 2. Retailer and Organizational Plaintiffs

The retailer plaintiff, The Gunrunner, LLC ("Gunrunner"), alleges that, but for Massachusetts's handgun sales regulations, it would "make available for sale to all of its law-abiding customers all commercially available handguns" that it is now barred from selling by the handgun safety regulations. Compl. ¶ 51, App. 18. Beyond this general allegation, Gunrunner makes no allegation of concrete harm to its business due to Massachusetts's handgun safety regulations. Neither does Gunrunner allege it is unable to sell operational handguns to properly licensed Massachusetts consumers. *See id.*

The organizational plaintiff, the Firearms Policy Coalition, Inc. ("FPC"), alleges harm to itself and on behalf of its members, which include the four individual plaintiffs. Compl. ¶¶ 52-55, App. 18-19. FPC does not allege that any of its members who are properly licensed in Massachusetts are unable to purchase

or possess an operational handgun for self-defense or other lawful purposes. *See id.*

## The District Court's Decision

Following briefing and argument on the defendants' motion to dismiss, the District Court issued a Memorandum & Order ("Order") on May 19, 2022, allowing defendants' motion and dismissing the complaint.[20]

At the time of the opinion, the prevailing framework for reviewing Second Amendment challenges within the First Circuit (and all other circuits) was a two-step approach. *See* Order 7. At step one, courts looked at whether the "challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee" and, if it did, courts proceeded to step two, which applied an appropriate level of means-ends scrutiny based on the severity of the challenged law's burden on the plaintiff's Second Amendment right. *See, e.g.*, *Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018).

Although the defendants briefed below the arguments that the challenged regulations were consistent with the text and historical tradition of firearms regulation, and constituted presumptively lawful conditions and qualifications on the commercial sale of arms, *see* App. 38-43, the District Court—consistent with

---

[20] The District Court's Order is reprinted at pages A-1 to A-16 of the Addendum to plaintiffs' brief. It is cited in this brief as "Order [page number]."

many decisions issued under the prior framework—assumed without deciding that the handgun safety provisions burden conduct within the historical scope of the Second Amendment. Order 8. The court nonetheless found that burden to be "modest" "at most" because "[e]ligible individuals within Massachusetts can freely choose from over a thousand handguns" approved for commercial sale within the state under the challenged provisions. *Id.* at 10-11. The District Court noted that the regulations do not restrict handgun possession in any manner and, further, do not even apply to all handgun sales, given the carve-out for private sales. *Id.* As a result, the regulations do not constitute the "total prohibition against keeping a handgun for self-defense within the home" that was at issue in *Heller*. *Id.* at 10.

The District Court squarely rejected the plaintiffs' argument that the regulations are a "total ban on the sale and thus possession of [the] specific makes and models" that the plaintiffs seek to acquire and so are unconstitutional under *Heller*. *Id.* at 11. Instead, the court explained, the plaintiffs' argument "stretches *Heller* beyond the plain meaning of its text without any authority for doing so." *Id.* The District Court continued, "[p]rohibiting the sale of specific makes and models of handguns for safety reasons is not the same as a total prohibition of the sale of handguns." *Id.* In particular, the "fact that [the plaintiffs] cannot purchase every single handgun that may be in common use and available for purchase in other states, does not transform the regulations into a total ban on a category of class of

firearms (i.e., handguns in this case)." *Id.* at 11. "To conclude otherwise," the court explained, "would eviscerate *Heller*'s holding that some regulation of firearm possession is permissible." *Id.* Moreover, the court emphasized that the plaintiffs had not alleged "the handguns available for purchase in Massachusetts are inadequate to exercise their core Second Amendment right," and so they had failed to show that striking down the regulations would in any way "enable or enhance an individual's exercise of their right to possess a handgun" for the purpose of self-defense. *Id.* at 12.

Having concluded that the regulations "do not impose a substantial burden" on the core of plaintiffs' Second Amendment rights, *id.* at 12, the District Court applied intermediate scrutiny and held that the handgun safety provisions were "well supported and reasonable" and "pass intermediate scrutiny." *Id.* at 16. The District Court accordingly dismissed the complaint. *Id.* This appeal followed.

## SUMMARY OF THE ARGUMENT

The judgment should be affirmed, and the handgun safety regulations should be upheld, because the regulations do not violate the Second Amendment. Although the District Court resolved the case using intermediate scrutiny as directed by this Court's pre-*Bruen* precedents, this Court may affirm the judgment below under the new framework established by *Bruen* for analyzing Second Amendment claims.

There are three reasons, all raised below and all central considerations under *Bruen*, why the handgun safety regulations are constitutional. *First*, plaintiffs have failed to meet their burden of demonstrating that the handgun safety regulations— which allow them to purchase, keep, and carry over 1,000 handgun models for lawful self-defense, in the home and in public—violate the text of the Second Amendment. Plaintiffs have not, in any meaningful way, had their right to "keep and bear arms" infringed, where they retain the right to engage in lawful, armed self-defense, in the home and in public, which is the "central component" of the Second Amendment right. *Bruen*, 142 S. Ct. at 2133. *Second*, the handgun safety regulations are undeniably "conditions and qualifications on the commercial sale of arms" that the Court in *Heller* said were "presumptively lawful," 554 U.S. at 626-27 & n.26—an exclusion the Court did not disturb in *Bruen*—and nothing in plaintiffs' complaint has, or could, rebut that presumption, where, again, they retain the ability to purchase hundreds of handgun models in Massachusetts for use in armed self-defense. *Third*, the handgun safety regulations are fully consistent with the Nation's historical tradition of firearms regulation, as evidenced by historical laws throughout the states, from the colonial period through the end of the 19th century, that (1) required the inspection or "proving" of firearms and ammunition before they could be sold; (2) required the safe storage of firearms and ammunition to reduce the risk of fire and explosion; (3) banned the sale of firearms

to minors; and (4) prohibited the configuration of otherwise lawful weapons as "trap" or "spring" guns, which rendered them unusually dangerous.

## ARGUMENT

On de novo review of the District Court's dismissal of the case under Fed. R. Civ. P. 12(b)(6), *see Azurity Pharms., Inc. v. Edge Pharma, LLC*, 45 F.4th 479, 489 (1st Cir. 2022), this Court may affirm the judgment below on any ground apparent from the record, regardless of whether it was presented to, or considered by, the lower court. *E.g.*, *In re Montreal, Maine & Atlantic R'way, Ltd.*, 888 F.3d 1, 8 n.4 (1st Cir. 2018); *accord Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970). Although the District Court upheld the challenged regulations under intermediate scrutiny using the pre-*Bruen* framework applicable to such claims, Order 7-9, the arguments briefed here were all presented to the District Court. *See* App. 38-43.

Further, where the alternative arguments presented by defendants are purely legal issues regarding whether the handgun safety regulations comport with the text and history of the Second Amendment, this Court may proceed to adjudicate the case itself, rather than ordering a remand that would only pointlessly prolong the litigation. *See Phelps-Roper v. Troutman*, 712 F.3d 412, 417 (8th Cir. 2013) (where appeal "raises purely legal issues," the court may "reach the merits of th[e] case in the interest of judicial economy" despite an intervening change in the legal

standard) (internal citation omitted); *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 948 (Fed. Cir. 2016) (if remand would merely result in "a pointless prolonging of litigation," the Court may apply intervening legal authority on appeal in the first instance).[21]

Below, after summarizing the new Second Amendment framework established by *Bruen*, the defendants explain the three independently sufficient grounds upon which the handgun safety regulations should be upheld: (1) plaintiffs' failure to meet their burden of demonstrating that the handgun safety regulations violate the text of the Second Amendment; (2) the fact that the regulations are "presumptively lawful" "conditions and qualifications on the commercial sale of arms," and plaintiffs have not rebutted that presumption; and (3) defendants' demonstration that the regulations are fully consistent with our Nation's historical tradition of firearms regulation.

## I.  The Second Amendment Framework.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *Heller v. District of Columbia*, 554 U.S. 570 (2008), the Supreme Court held that a "ban on handgun

---

[21] *See also* Defendants-Appellees' Opposition to Plaintiffs-Appellants' Motion for Vacatur and Remand (filed with this Court on Sept. 16, 2022).  The defendants incorporate by reference here all of the arguments they made in that filing.

possession in the home violates the Second Amendment, as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. Two years later, the Court ruled that the Second Amendment applies to the States, in striking down ordinances that likewise banned handgun possession. *McDonald v. City of Chicago*, 561 U.S 742, 750 (2010).

*Heller* made clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. "[N]othing in our opinion," the Court emphasized, "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And these were merely "examples" of "presumptively lawful regulatory measures"; the Court's list did "not purport to be exhaustive." *Id.* at 627 n.26. The Court "repeat[ed] those assurances" in *McDonald*. 561 U.S. at 786 (plurality opinion).

Shortly after the District Court issued its order dismissing plaintiffs' complaint in this case, the Supreme Court issued its opinion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022), which sets forth

the current framework for analyzing Second Amendment claims. In *Bruen*, the

Supreme Court addressed the constitutionality of the State of New York's

requirement that individuals show "proper cause" as a condition of securing a

license to carry a concealed firearm in public. *Bruen*, 142 S. Ct. at 2123. The

Court struck down the law after concluding that law-abiding citizens have a right

to carry a firearm in public for self-defense, and that the law in question, which did

not derive from a comparable historical tradition, made it "virtually impossible"

for most citizens to exercise this right. *Id.* at 2156; *id.* at 2159 (Alito, J.,

concurring).

In its decision, the Court announced the proper methodology for analyzing

Second Amendment claims. The Court declined to adopt the two-step approach

that included mean-ends scrutiny and that had prevailed throughout the lower

courts since *Heller*, including in this Court. *Id.* at 2126-29. Instead, the Court

described the test that it derived from *Heller* as follows: "When the Second

Amendment's plain text covers an individual's conduct, the Constitution

presumptively protects that conduct. The government must then justify its

regulation by demonstrating that it is consistent with the Nation's historical

tradition of firearm regulation." *Id.* at 2129-30.

The *Bruen* Court began with the "plain text" analysis by looking at the

"'textual elements' of the Second Amendment's operative clause," *i.e.*, that "the

right of the people to keep and bear arms shall not be infringed." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592; U.S. Const. amend. II). In analyzing the meaning of the term "'bear' arms" within the text of the Second Amendment, the Court reiterated that "self-defense is 'the *central component* of the Second Amendment right.'" *Id.* at 2133 (emphasis in original) (quoting *McDonald*, 561 U.S. at 767, and *Heller*, 554 U.S. at 599). And where the parties did not dispute that the New York law applied to all handguns, and that the petitioners had a right to carry handguns in public for self-defense, the Court had "little difficulty" concluding that the text of the Second Amendment extended to petitioners' proposed course of conduct. *Id.* at 2134-35.

Having determined that the plain text of the Second Amendment covered the petitioners' conduct, the *Bruen* Court moved on to the historical analysis. *Id.* at 2134-35. There, the burden shifted to the government to show that the challenged law was consistent with "the Nation's historical tradition of firearm regulation." *Id.* at 2135. The Court explained that in some cases, this inquiry would be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131. In such instances, the lack of a "distinctly similar" historical analogue, or if earlier generations addressed the problem through "materially different means," or if analogous laws were enacted but then struck down by courts on "constitutional grounds," that

would be evidence that the modern regulation is inconsistent with the historical tradition of firearms regulations. *Id.*

But in other cases—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—this historical analysis requires a "more nuanced approach." *Id.* at 2132. Governments can justify regulations of that sort by "reasoning by analogy," showing that the challenged regulation is "'relevantly similar'" to a "well-established and representative historical analogue." *Id.* at 2133 (citation and emphasis omitted). Because such analogical reasoning under the Second Amendment is not intended to be a "regulatory straightjacket," the modern-day regulation need not be a "dead ringer" for or a "historical *twin*" to its historical precursors to pass constitutional muster. *Id.* (emphasis in original). And even where "the historical record yields relatively few" examples of a particular type of restriction, if there were "no disputes regarding the lawfulness of such prohibitions," then a court can "assume it settled" that the restriction could be imposed "consistent with the Second Amendment." *Id.* at 2133. While the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did identify "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Ultimately, "whether modern and historical regulations impose a comparable burden on the right of

armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* (emphasis in original) (internal quotation marks omitted).

Importantly, *Bruen* did not purport to overturn or call into question any aspect of *Heller*. To the contrary, the Court described the analytical approach articulated in *Bruen* as the same "test … set forth in *Heller*." *Id.* at 2131; *see also id.* at 2134 ("Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.") The *Bruen* Court cited approvingly language from *Heller* that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Similarly, Justice Kavanaugh's concurrence in *Bruen*, joined by Chief Justice Roberts, reiterated that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the non-exhaustive litany of "presumptively lawful regulatory measures" identified in *Heller*, such as "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626-27 & n.26). And Justice Alito, in his concurrence in *Bruen*, likewise emphasized the limits of the Court's decision, writing, "Our holding decides nothing … about the *kinds of weapons that people may possess.* Nor have we disturbed anything that

24

we said in *Heller* or [*McDonald*], about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157 (emphasis added).

## II. Plaintiffs Cannot Establish That the Handgun Safety Regulations Burden Conduct Protected by the Plain Text of the Second Amendment.

The handgun safety regulations should be upheld, first, because they do not violate the text of the Second Amendment. The regulations do not remotely prevent the plaintiffs from keeping and carrying a handgun, in their homes and in public, for lawful self-defense. The plaintiffs, who hold licenses to carry, can purchase, keep, and carry over 1,000 handgun models that appear on the Approved Firearms Roster and meet the requirements of the Attorney General's Regulations. And, even with the respect to the 18 specific models that plaintiffs cannot purchase from a retailer, they can acquire those models through a private sale with a party who sells fewer than five handguns per year. *See* note 1, above.

As the Supreme Court has thrice confirmed, "the right secured by the Second Amendment is not unlimited," and it "does not confer 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bruen*, 142 S. Ct. at 2128; *McDonald*, 561 U.S. at 786 (plurality opinion); *Heller*, 554 U.S. at 626. Regulations like Massachusetts's that do not ban an "entire class of 'arms'" like handguns,[22] but instead regulate their use to

---

[22] *See* pages 30-33, below (rebutting plaintiffs' inaccurate claim that the handgun safety regulations constitute a "Handgun Ban").

25

further interests like "fire-safety" and "prevent[ing] accidents," "do not remotely burden the right of self-defense." *Id.* at 628, 632; *see also Pena v. Lindley*, 898 F.3d 969, 978 (9th Cir. 2018) (similar handgun safety regulations in California placed "almost no burden on the physical exercise of Second Amendment rights").

A.     **Plaintiffs Bear the Initial Burden of Demonstrating That Their Proposed Conduct Falls within the Text of the Second Amendment.**

Under *Bruen*'s text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction must first demonstrate that the law regulates conduct protected by the "plain text" of the Second Amendment. *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2130, 2135. The Second Amendment "presumptively protects that conduct" only if covered by the plain terms of the amendment. *Id.* at 2126; *see also id.* at 2129-30 (same). To establish that the plain text applies, a plaintiff must demonstrate that each of the "textual elements" of the Second Amendment's operative clause covers the proposed course of conduct. *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592); *cf. Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *2 (D.R.I. Dec. 14, 2022) ("[T]he plaintiffs have *failed in their burden* to demonstrate that [large-capacity magazines] are 'Arms' within the meaning of the Second Amendment's text.") (emphasis added); *Gazzola v. Hochul*, No. 122CV1134BKSDJS, 2022 WL 17485810, at *14 (N.D.N.Y. Dec. 7, 2022) ("Plaintiffs fail to demonstrate that the

Second Amendment's plain text covers the conduct regulated by the statutory provisions at issue."); *National Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-501-BLF, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then *shifts* to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation.") (emphasis added).

That the plaintiff bears the initial burden in the Second Amendment context is consistent with how the Supreme Court "protect[s] other constitutional rights." *Bruen*, 142 S. Ct. at 2130. As explained in *Bruen*, in free speech cases under the First Amendment, "to which *Heller* repeatedly compared the right to keep and bear arms," the government bears the burden of justifying its actions only "[w]hen the Government restricts speech." *Id.* at 2130 (quotation marks and citation omitted). Plaintiffs who assert free speech claims are "oblig[ed]" to first "demonstrate that the First Amendment even applies" to the "assertedly expressive conduct" in which they wish to engage. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). And when scrutinizing Free Exercise claims, the Court first asks whether the plaintiff has shown that the government "has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2021). "Should a plaintiff make a showing like that," the burden then shifts to the

government to justify its action.  *Id.* at 2422.  *Bruen* confirms that this same approach applies in the Second Amendment context.

Under this approach, therefore, plaintiffs have the burden of establishing that the handgun safety regulations burden their right to "keep and bear" arms.  U.S. Const. amend. II.  Because they cannot meet this burden, their claim should be rejected based on the text of the Second Amendment alone.

**B.    Plaintiffs Cannot Establish that the Handgun Safety Regulations Burden Their Second Amendment Right to "Keep and Bear" Arms.**

Under *Bruen*, the constitutional inquiry begins with whether the Second Amendment's plain text protects the plaintiffs' "proposed course of conduct." *Bruen*, 142 S. Ct. at 2134.  Here, the plaintiffs' proposed course of conduct is to purchase particular handgun models that have not been shown to include certain basic safety features intended to protect handgun operators and bystanders, even while hundreds of other handgun models are authorized for commercial sale by retailers in Massachusetts.[23]  Plaintiffs' proposed conduct is not protected by the

---

[23] Gunrunner, a business that proposes to *sell* handgun models that do not comply with Massachusetts law, cannot assert Second Amendment rights.  *See Teixeira v. County of Alameda*, 873 F.3d 670, 683-87 (9th Cir. 2017) (en banc) (conducting exhaustive textual and historical analysis).  The Second Amendment guarantees only an "an *individual* right to *keep and bear* arms for self-defense."  *Bruen*, 142 S. Ct. at 2125 (emphasis added); *see also Heller*, 554 U.S. at 592 (the Second Amendment guarantees an "*individual* right to *possess* and *carry* weapons in case of confrontation" (emphasis added)).  The Second Amendment "does not confer a
(footnote continued)

Second Amendment's guarantee of an individual's right to either "keep" or "bear" arms.

As explained in *Bruen*, the "central component" of the Second Amendment's guarantee is "self-defense." *Id.* at 2135 (quoting *Heller*, 554 U.S. at 599). To that end, the term "keep and bear" means that the Second Amendment text protects individuals' rights to "'keep' firearms in their home, at the ready for self-defense," *id.* at 2135, and to carry arms on one's person in and outside the home in case of confrontation, *id*. at 2136. Nothing in the handgun safety regulations prevents the individual plaintiffs from purchasing, keeping, and carrying a functional handgun for the purpose of self-defense, in the home and in public.

Plaintiffs label the handgun safety regulations as a "Handgun Ban," *see* Plaintiffs'-Appellants' Opening Brief ("Br.") at 5, 25-26, but this is patently wrong. Plaintiffs identify no more than 18 models of handgun that they cannot purchase from dealers in Massachusetts because of the challenged handgun safety regulations. Compl. ¶¶ 47-50, App. 16-18; Br. at 7-8. But there are over 1,000

---

freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Teixeira*, 873 F.3d at 682. To the extent Gunrunner contends it has third-party standing to assert the rights of its customers, *see* Plaintiffs'-Appellants' Opening Brief ("Br.") at 22-23, that argument is beside the point where the plaintiffs include individuals who have asserted their own Second Amendment claims.

models of handguns on the Approved Firearms Roster, spanning 29 different manufacturers. *See* June 2021 Roster. If these models also satisfy the Attorney General's additional requirements, they may be sold by any licensed retailer in Massachusetts. Furthermore, because the handgun safety regulations do not apply at all to private sales, the plaintiffs may be able to purchase any of the 18 models of handguns they wish to acquire through a private sale. *See* Mass. Gen. Laws ch. 140, §§ 128A and 128B (authorizing individuals to transfer up to four firearms per year without a license). As a result, plaintiffs have their choice of a diverse range of hundreds of handguns from retailers and private sellers and, with their LTCs, they may lawfully possess and carry those handguns, in the home and in public, in Massachusetts. And the plaintiffs make no allegations whatsoever that the handgun models they seek to purchase are better suited for self-defense than the over 1,000 models of handguns that are available for purchase in Massachusetts. *See generally* Compl., App. 1-23.

Contrary to plaintiffs' characterization, the handgun safety regulations do not "target" "handguns" as a "category of arms." Br. at 25. Instead, the handgun safety regulations restrict the commercial sale of only the narrow subset of handguns that do not comply with the Commonwealth's basic safety regulations. Plaintiffs seek to have it both ways—arguing, on the one hand, that "the function of the arm is what matters" in applying *Bruen*'s protections for arms in "'common

use' for self-defense," Br. at 24; while, on the other, arguing that their Second Amendment rights are burdened despite the availability under the handgun safety regulations of hundreds of models of functional handguns.

The challenged handgun safety regulations are a far cry from the laws invalidated by the Supreme Court in *Heller*, *McDonald*, and *Bruen*. In *Heller*, the Supreme Court struck down a District of Columbia law that "totally ban[ned] handgun possession in the home." *Heller*, 554 U.S. at 628. Similarly, the Court in *McDonald* struck down municipal laws that "effectively bann[ed] handgun possession by almost all private citizens." *McDonald*, 561 U.S. at 750. Finally, in *Bruen*, the Court struck down New York's proper-cause requirement for obtaining a license to carry a firearm in public on the understanding that it prohibited the plaintiffs in that case (and most other citizens) from carrying *any* handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2134, 2156; *see also id.* at 2159 (Alito, J., concurring) (New York licensing law made it "virtually impossible" for most law-abiding citizens to carry a handgun in public). Unlike the laws at issue in *Heller*, *McDonald*, and *Bruen*, the handgun safety regulations do not infringe the individual plaintiffs' ability to "keep and bear" "handguns" as a category of arms.[24]

---

[24] The analysis in Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), related to a "categorical ban" on stun guns as a category of arms, is inapposite for the same reason. *See* Br. at 26.

In essence, plaintiffs seek to define the "protected category of arms" in this case as only the subset of handguns that are unavailable for commercial sale due to the handgun safety regulations. But this Court has "squarely reject[ed]" the "suggestion that whatever group of weapons a regulation prohibits may be deemed a class," because "[b]y this logic, … virtually any regulation could be considered an 'absolute prohibition' of a class of weapons." *Worman v. Healey*, 922 F.3d 26, 32 n.2 (1st Cir. 2019). The District Court below similarly wrote that the "fact that [the plaintiffs] cannot purchase every single handgun that may be in common use and available for purchase in other states, does not transform the regulations into a total ban on a category of class of firearms (i.e., handguns in this case)," in part because "[t]o conclude otherwise would eviscerate *Heller*'s holding that some regulation of firearm possession is permissible." *See* Order 11; *accord Heller*, 554 U.S. at 626 (Second Amendment right is "not a right to keep and carry any weapon whatsoever"). Nothing in *Bruen* calls into question this sound logic. Indeed, like *Heller*, *Bruen* made assurances that "the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626).[25]

---

[25] Plaintiffs' reliance on *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), for the proposition that a ban on a single model of weapon may be unconstitutional, is misplaced. *See* Br. at 27, 38. At issue there was Connecticut's assault weapons ban, which had been amended after the Sandy Hook massacre to ban 183 specific models of weapon, all of which were semi-automatic except for one, the Remington Tactical Rifle Model 7615. 804 F.3d at 250 & n.17.

(footnote continued)

Because plaintiffs cannot establish that the handgun safety regulations interfere with their ability to keep or carry an operational handgun for the purpose of lawful self-defense, they have not met their burden to show that the text of the Second Amendment covers their proposed conduct. *See Bruen*, 142 S. Ct. at 2135. The dismissal of their complaint should be affirmed on this basis alone.

### C. Likewise, As Presumptively Lawful Qualifications on the Commercial Sale of Firearms, the Handgun Safety Regulations Do Not Burden the Right to "Keep and Bear Arms."

Plaintiffs' Second Amendment claim also fails because the handgun safety regulations are presumptively lawful conditions and qualifications on the commercial sale of firearms, which do not burden the right to "keep and bear" arms.

---

Connecticut defended its law by emphasizing the unusual dangers posed by semi-automatic weapons; it failed to present "any argument" to support banning a non-semi-automatic weapon like the Remington 7615. *Id.* at 257 n.73. The court therefore concluded that the Connecticut statute failed intermediate scrutiny as to that weapon alone, while also stating: "We do not foreclose the possibility that states could in the future present evidence to support such a prohibition." *Id.*; *see also id.* at 262 n.112. Not only was this mode of analysis abrogated by *Bruen*, but, if anything, *Cuomo* supports the defendants' position here. The Second Circuit upheld the remainder of Connecticut's (and New York's) ban on "assault weapons," concluding that it did not ban an "entire class" of arms, but instead "only a limited subset of semiautomatic firearms, which contain one or more enumerated military-style features," and thus did not impose a "severe" burden on Second Amendment rights. *Id.* at 260. Here, the burden on Second Amendment rights is even smaller, and indeed negligible, where plaintiffs have identified only 18 handgun models that are not available for commercial sale in Massachusetts, but they retain the ability to purchase over 1,000 other models.

*Heller* set forth non-exhaustive categories of "presumptively lawful regulatory measures" that are "presumed to be consistent with the historical scope of the Second Amendment." *Pena*, 898 F.3d at 975; *see also Silvester v. Harris*, 843 F.3d 816, 829-30 (9th Cir. 2016) (Thomas, C.J., concurring) (if a law constitutes a condition or qualification on the commercial sale of firearms, it presumptively does not burden conduct protected by the Second Amendment). *Heller* stressed that it was not "cast[ing] doubt" on "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (plurality opinion) (quoting the same from *Heller* and "repeat[ing] those assurances here"). Justice Kavanaugh, joined by Chief Justice Roberts, reiterated in his concurrence in *Bruen* that both *Heller* and *McDonald* were careful not to "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms," among other "presumptively lawful regulatory measures." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Nothing in *Bruen* purported to overturn this critical language in *Heller*, and, indeed, the majority opinion in *Bruen* described its opinion as "apply[ing]" "[t]he test that we set forth in *Heller*." *Id.* at 2131.

The handgun safety regulations fall squarely within the category of "laws imposing conditions and qualifications on the commercial sale of arms" that, like the other "presumptively lawful" measures that are "similarly rooted in history, were left intact by the Second Amendment and by *Heller.*" *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (quoting *Heller*, 554 U.S. at 626-27 & n.26). Indeed, the handgun safety regulations function solely and exclusively as a regulation of the commercial sale of handguns. Section 123 is a series of conditions placed on a license issued to a retailer to engage in the commercial sale, rental, or leasing of handguns, rifles, and shotguns. *See* Mass. Gen. Laws ch. 140, § 123; *see also id.* § 122 (license to sell, rent, or lease firearms, rifles, and shotguns). It does not impact an individual's LTC issued under Mass. Gen. Laws ch. 140, § 131. Similarly, the Attorney General's regulations are issued under her authority to declare that certain activity—here, the selling of handguns that lack minimum safety features—constitutes an unfair and deceptive act or practice in the conduct of trade or commerce. *See* Mass. Gen. Laws ch. 93A, § 2(c). The structure and function of these provisions make clear that they are consumer product regulations requiring that firearms commercially sold in Massachusetts (1) are not defective; (2) contain safety mechanisms; (3) have childproofing features; and (4) have tamper-resistant serial numbers. And all of these requirements apply only to dealers offering firearms for sale in commerce, not to individual gun

owners. 940 Code Mass. Regs. § 16.01; *accord* Mass. Gen. Laws ch. 140, § 123.

The regulations do not prohibit the possession or carrying of a firearm in any way.

The handgun safety regulations are therefore "presumptively lawful" as "conditions and qualifications on the commercial sale of arms" under *Heller*, 554 U.S. at 626-27 & n.26, an exclusion from the scope of the Second Amendment that the Court did not disturb in *Bruen*. *See* 142 S. Ct. at 2131, 2134; *id.* at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring). Indeed, in an earlier challenge to one aspect of the handgun safety regulations, the District Court held that the requirement that handguns sold by retailers contain load indicators or magazine safety disconnects "fits comfortably among the categories of regulation that *Heller* suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the commercial sale of arms.'" *Draper v. Healey*, 98 F. Supp. 3d 77, 85 (D. Mass. 2015) (alteration in original) (quoting *Heller*, 554 U.S. at 626-27), *aff'd on other grounds*, 827 F.3d 1 (1st Cir. 2016). Where the plaintiffs' complaint fails to make any plausible allegations that could rebut the presumption that the handgun safety regulations impose no burden on the right to keep and bear arms, the District Court's dismissal should be affirmed. *Cf. Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) (en banc) (Owens, J., concurring) ("The ordinance at issue here falls within that category of 'presumptively lawful regulatory measures,' *Heller*, 554 U.S. at 627 n.26, and

plaintiffs therefore 'cannot state a viable Second Amendment claim.' *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc).").

## III. The Handgun Safety Regulations Are Consistent with the Historical Tradition of Regulating Firearms for Public Safety.

### A. State Laws Dating Back to the Colonial Period Regulated Firearms Safety to Prevent Accidental Injury and Death.

Although plaintiffs' challenge to the handgun safety regulations founders on the text of the Second Amendment, the regulations are also fully consistent with the Nation's historical tradition of firearms regulation. Massachusetts, like many other states, has long had laws in place to reduce the dangers posed by firearms and ammunition—including but not limited to firearms and ammunition inspection or "proving" laws; laws strictly regulating the safe storage of firearms and gunpowder; laws prohibiting the sale of weapons to minors; and laws banning configurations of otherwise-lawful weapons that rendered them unusually dangerous, such as "trap guns." *See generally* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 502-16 (2004) (describing early laws from Massachusetts and other states regulating firearms by, for example, requiring militia to muster periodically to inspect and register citizens' weapons; and regulating gunpowder and firearm storage); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Right*, 80 Law & Contemp. Probs. 55, 62-81 (2017) (summarizing, by category, various forms of firearms regulations, from the colonial era to the early

20th century). Regardless of whether the historical inquiry is deemed to be "fairly straightforward" or to require "a more nuanced approach," *Bruen*, 142 S. Ct. at 2131-32; *see* pages 22-24, above, the result is the same: the handgun safety regulations pass constitutional muster because they are "relevantly similar" to historical analogues. *Bruen*, 142 S. Ct. at 2132.

To be sure, the problems of firearms safety and their fitness for their intended purpose have existed for as long as firearms have. So it is noteworthy that historical laws and rules, particular regarding inspection and testing of firearms and ammunition, are "distinctly similar to," and not "materially different" from, Massachusetts's current approach—even if these older laws are understandably less detailed than the current approach, given the vast technological developments in firearms over three centuries. *Id.* at 2131. And defendants have not found any judicial decisions invalidating these historical laws as violating citizens' right to keep and bear arms. *See id.* (under "straightforward" approach, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality"). Below, defendants summarize several categories of historical laws that are "relevantly similar" to the handgun safety regulations: firearms and ammunition "proving" or inspection laws; laws strictly regulating the storage of firearms and

gunpowder; laws barring the sale of firearms to minors; and laws banning unusually dangerous configurations of otherwise-lawful firearms, like "trap guns."

**1.     Laws Requiring the Inspection or "Proving" of Firearms and Ammunition**

In 1805, Massachusetts enacted a law requiring the "proof," or satisfactory inspection, of all firearms before they could be sold in the Commonwealth. "Whereas no provision hath been made by law for the proof of Fire Arms manufactured in this Commonwealth by which it is apprehended that many may be introduced into use which are unsafe and thereby the lives of the Citizens be exposed, to prevent which" the Legislature enacted a firearms inspection law. 1804 Mass. Acts. 111, ch. 81, Add. 34-36.[26]  The law authorized the appointment of up to two persons per county to be "provers of firearms," "whose duty it shall be to prove all Musket Barrels and Pistol barrels which being sufficiently ground bored and breeched shall be offered to him to be proved." *Id.* § 1, Add. 34.  The law specified in detail the manner in which provers were to test and inspect the weapons, *id.*, and if the weapons passed inspection, the prover was to stamp the weapon with the inspector's initials and the year, "so deeply impressed on said barrel as that the same cannot be erased or disfigured." *Id.*, Add. 34-35.

---

[26] All of the historical sources cited in this brief are either included in the Addendum ("Add.") to this brief, and thus will include a parallel cite to that Addendum, or are cited with a link to a publicly available database or repository where they can be found.

Weapons that failed this inspection, such that they were "unfit for use," were not to be stamped, but instead returned to the owner, and they could not be sold in the Commonwealth. *Id.* §§ 1, 3, Add. 35. The manufacture or sale of weapons that did not contain these stamps subjected the owner to a fine. *Id.* §§ 2-3, Add. 35. The law also made it unlawful to "forge or alter" the stamp of any prover. *Id.* § 4, Add. 35-36.[27] Maine passed a similar law in 1821. 1821 Me. Laws 546, ch. 162, Add. 56.

It is not surprising that proving laws originated in Massachusetts, which was home to significant firearms manufacturing. Massachusetts's Springfield armory, for example, was a major source of firearms fabrication and became one of the two official armories for the federal government. *See, e.g.*, National Park Serv., Springfield Armory.[28] Though not all States passed firearms proving laws like Massachusetts's and Maine's, there certainly was concern elsewhere that firearms be inspected and approved before they were used by militia units. Cornell & DeDino, *supra*, at 509-10. The New Hampshire House of Representatives, for example, passed a resolution in 1775 calling for the creation of a "stock" of

---

[27] This law was amended in 1814 to add additional requirements, 1814 Mass. Acts 464, ch. 192; Add. 41-42; and was updated in 1881, *see* https://tinyurl.com/3w657rjh.

[28] http://npshistory.com/publications/spar/index.htm.

firearms for the militia in that colony, which set the specifications for such firearms and required that they be tested in the presence of a state "Receiver-General" before they were added to the stock. Add. 65. And George Washington, in a letter to Congress in 1783 regarding the organization of a postwar militia, recommended that militia members be regularly mustered and trained, and "have their Arms and Accoutrements inspected at certain appointed times, not less than once or twice in the course of every year." National Archives, Washington's Sentiments on a Peace Establishment (May 1, 1783).[29, 30]

Even more prevalent were laws requiring the inspection of gunpowder. *See* Spitzer, *supra*, at 74 (gunpowder regulation was "of great concern because early firearms operated with the addition of loose gunpowder to serve as the igniting or explosive force to propel a projectile, so [firearms and gunpowder regulations] were inextricably linked."). An 1809 Massachusetts law set requirements for the

---

[29] https://founders.archives.gov/documents/Washington/99-01-02-11202.

[30] In any event, even where "the historical record yields relatively few" examples of a particular type of restriction, if there were "no disputes regarding the lawfulness of such prohibitions," then a court can "assume it settled" that the restriction could be imposed "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133. Defendants found no indication of any challenge to the lawfulness of these firearms proving laws, much less any court ruling deeming them to violate the right to keep and bear arms. This Court may therefore "assume it settled" that regulations of this kind are consistent with the Second Amendment. *Id.*; *cf. Heller*, 554 U.S. at 632 ("fire-safety" laws and regulations intended to "prevent accidents" with firearms do not "remotely burden the right of self-defense").

quality and composition of gunpowder; authorized the appointment of provers to inspect gunpowder before it was placed in any public magazine; required provers to place gunpowder that passed inspection in casks marked with the inspector's initials; authorized inspectors to mark as "condemned" gunpowder that failed inspection; and forbade the sale of gunpowder that was marked condemned or that had not yet passed inspection. 1808 Mass. Acts 444, ch. 52, Add. 37-39. A number of other states likewise adopted gunpowder inspection regulations during this era. *See* 1776 R.I. Pub. Laws 25 (Oct. Sess.), Add. 97; 1776-77 N.J. Laws 6-7, ch. 6, Add. 79-80; 1820 N.H. Laws 274, ch. 25, Add. 62-64; 1794 Pa. Laws 764, ch. 337, Add. 90-95.

These inspection laws are "distinctly similar" to, and certainly "relevantly similar" to, the handgun safety regulations in the "central" way that matters under *Bruen*: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 142 S. Ct. at 2133. These historical laws, like the handgun safety regulations, did not limit citizens' ability to keep and carry weapons for self-defense; instead, they merely prohibited the sale or availability of particular firearms and ammunition that did not pass safety inspections, in the interest of eliminating the safety dangers of weapons and gunpowder that were unfit for their intended purpose. Such laws, like the handgun safety regulations, do not "remotely" burden the right of law-

abiding citizens to engage in armed self-defense. *Heller*, 554 U.S. at 632; *see also*

*Pena*, 898 F.3d at 978 (California's similar regulations placed "almost no burden

on the physical exercise of Second Amendment rights").

### 2. Firearms and Gunpowder Safe Storage Laws

A host of laws from the colonial period through the end of the 19th century

imposed requirements on the storage of weapons and gunpowder to minimize the

risk of fire, accidental discharge, and explosion. Cornell & DeDino, *supra*, at 510-

12 (surveying gunpowder storage and transportation laws, which were intended to

"protect communities from fire and explosion."); Spitzer, *supra*, at 80-81 (similar).

These laws are relevantly similar because they did not ban an "entire class of

arms," as did the complete handgun bans at issue in *Heller* and *McDonald*, nor did

they prohibit most law-abiding citizens from carrying a firearm in public, as did

the law at issue in *Bruen*. Instead, these laws merely limited the storage or

configuration of certain weapons to minimize the risk of fire, accidental discharge,

and explosion. As noted, the Court in *Heller* stated that "fire-safety" gun storage

laws, and regulations intended to "prevent accidents," do not "remotely burden the

right of self-defense," and thus are valid. 554 U.S. at 632. The same is true of the

challenged regulations.

For example, a 1783 Massachusetts law imposed a fine on "any Person" who

"shall take into any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store,

Shop, or other Building, within the Town of *Boston*, any ... Fire-Arm, loaded with, or having Gun-Powder." 1782 Mass. Acts 119, ch. 46, Add. 32-34. This law was discussed in *Heller*, with Justice Breyer observing in dissent that the law "would, as a practical matter, have prohibited the carrying of loaded firearms anywhere in the city, unless the carrier had no plans to enter any building or was willing to unload or discard his weapons before going inside," 554 U.S. at 684. The majority nonetheless characterized it as a "fire-safety law" that did not "remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 632. The Court added that "laws regulating the storage of firearms to prevent accidents" were permissible. *Id.*

The challenged handgun safety regulations are much closer to the 1783 firearms storage law than to the absolute ban on all handguns in the home that was at issue in *Heller*. Indeed, this historical law is relevantly similar to the challenged regulations in the two "metrics" that the Supreme Court deemed important in *Bruen*: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 142 S. Ct. at 2133. Both laws restricted certain types of weapons (loaded firearms carried inside a building in the historical law vs. handgun models that lack certain safety features or have not passed required safety testing in the challenged regulations), but did not ban an "entire class of 'arms'" like the complete handgun

ban at issue in *Heller*. 554 U.S. at 628. And both were intended to reduce what might be called the collateral dangers of firearms—*i.e.*, those separate and apart from the intended function of the weapons, such as fire, explosion, and accidental discharge. It is thus significant that the Court in *Heller* deemed this historical analogue to not "remotely burden the right of self-defense." *Id.* at 632. Neither do the challenged regulations here.

Other similar laws abound, particularly with regard to gunpowder, and the defendants are not aware of any court decisions invalidating them. *E.g.*, 1882 Mass. Acts 212, ch. 269, Add. 43-44 (requiring registration of any gunpowder in excess of one pound stored in any building); 1771-72 Mass. Province Laws 167, ch. 9, Add. 29-31 (requiring all gunpowder imported into Massachusetts to be stored in two public magazines, in Boston and Watertown); *see also* 1832 Conn. Acts 391, ch. 25, Add. 48-49; 1825 N.H. Laws 73, ch. 61, Add. 71-72; 1821 Me. Laws 98, ch. 25, Add. 53-55; 1772 N.Y. Laws 682, ch. 1549, Add. 83-86. The only judicial decision from Massachusetts that comes close to addressing this issue concerned the firing of weapons on or near highways.[31] In *Cole v. Fisher*, 11

---

[31] Massachusetts, like some other states, had laws prohibiting the discharge of weapons in major cities (like Boston), and on or near public highways. A 1746 Massachusetts law, for example, prohibited "discharg[ing] any Gun or Pistol charged with Shot or Ball in the Town of *Boston*." *Heller*, 554 U.S. at 633 (quoting Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay, p. 208); *see also* 1713-14 Mass. Province Laws 720, ch. 6, Add. 28 (prohibiting firing weapons

(footnote continued)

Mass. 137 (1814), the Supreme Judicial Court held that a defendant could be held liable in tort for wanton or negligent discharge of a firearm near a highway that caused damage to plaintiff's property. *Id.* at 139. In so holding, the court noted that "discharges of guns in or near the highways … are to be corrected and punished," not only through tort claims but also, where appropriate, through indictment "as an offender against the public peace and security." *Id.* The court made no mention of the right to keep and bear arms, *see id.*, despite Massachusetts's constitutional provision that *Heller* recognized as a close analogue and predecessor to the Second Amendment. 554 U.S. at 601-02; *see* Mass. Const. Pt. I, Art. XVII (1780). This suggests that the regulation, and punishment, of the collateral effects of wanton or careless use or discharge of a firearm was perfectly consistent with the right to keep and bear arms for self-defense. *See Bruen*, 142 S. Ct. at 2131, 2133 (courts may look to whether historical analogues were invalidated by courts on constitutional grounds, and to whether there was "no dispute" regarding the lawfulness of such provisions).

### 3. Law Banning Sales of Firearms to Minors

Also significant were laws banning the sales of firearms to minors. Part of the impetus for the challenged Massachusetts scheme is a desire to reduce harm to

---

on or near highways around Boston); *accord* 1882 Ga. Laws 131, No. 378, Add. 51; 1878 Cal. Stat. 117, ch. 299, Add. 47; 1877 Ohio Laws 278, ch. 8, § 60, Add. 89; Spitzer, *supra*, at 79.

children from the accidental discharge of weapons. *See* pages 5-7, above. Most of the historical sources cited in plaintiffs' brief consist of colonial-era newspaper articles reporting that children had been injured or killed by the accidental firing of weapons. Br. at 30-31. Plaintiffs seem to cite these sources to suggest that our ancestors were aware of the problem of harm to children from the accidental discharge of firearms, but chose not to address it through laws.

While the former is undoubtedly true, the latter is indisputably false. As this Court has explained, there exists "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns." *Rene E.*, 583 F.3d at 12; *see id.* at 12-16 (canvassing Founding-era, 19th-century, and 20th-century laws and judicial decisions). In addition to the laws cited above and below, which were intended to make firearms safer by reducing the risk of fire, accidental discharge, and explosion, many states outright banned the sale of firearms to minors. *E.g.*, 1884 Mass. Acts. 57, ch. 76, Add. 45 (banning the sale or furnishing of firearms to children under 15 years old, except by instructors furnishing military weapons to train for militia service); 1882 N.J. Acts 52, ch. 44, Add. 82; *see also State v. Callicut*, 69 Tenn. 714, 716-17 (1878) (state law making it a misdemeanor to sell, give, or loan a pistol to a minor was "not only constitutional as tending to prevent crime but wise and salutary in all its provisions"); *Coleman v. State*, 32 Ala. 581, 582-53 (1858) (upholding indictment under 1856 state law making it a crime to

sell, give, or lend a pistol to a minor); Spitzer, *supra*, at 76 ("Numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one … arose in the late 1800s."). These laws are relevantly similar in their recognition that children should not be allowed to possess, or fire, guns, and that restrictions should be placed on their ability to do so in order to limit the risk of harm posed by firearms to children. And yet these laws do not restrict the ability of law-abiding adults to keep and carry a firearm for lawful self-defense. *See Rene E.*, 583 F.3d at 15-16 (describing the "evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms").

### 4. Dangerous and Unusual Weapons Bans—Trap Guns

From the colonial period through the end of the 19th century (and beyond), states enacted restrictions on "trap guns" (also known as "spring guns" and "infernal machines"), which were firearms that were configured in a way to fire remotely (without the user operating the firearm), typically by rigging the firearm to be fired by a string or wire when tripped. Trap guns were used to hunt wildlife and to protect personal or commercial property against intruders. In 1771, New Jersey passed a law banning trap guns, noting that they represented "a most dangerous Method of setting Guns [that] has too much prevailed in this Province."

1763-1775 N.J. Laws 346, ch. 540, § 10, Add. 76.[32]  Other states followed.  1884

Vt. Acts & Resolves 74, No. 76, § 1, Add. 99-100; 1875 Mich. Pub. Acts 136,

No. 97, § 1, Add. 58; 1869 Minn. Laws 50, ch. 39, Add. 60-61; *see* Spitzer, *supra*,

at 67 (surveying these laws).

These laws are relevantly similar because they did not ban a class of

weapons *per se*; instead they banned the *configuration* of otherwise-common

weapons in a certain way that rendered them unusually dangerous.  Citizens

remained free to keep and carry a rifle or musket, but they were barred from setting

those weapons so that they could be fired remotely with a string or wire on their

property, because of the unacceptable risk of harm to others.  Similarly under the

handgun safety regulations, Massachusetts residents with LTCs remain free to keep

and carry handguns, they are simply barred from purchasing through a commercial

retailer particular models that pose an undue risk of collateral harm.  Both in terms

of the "how" and "why" of these laws' impact on Second Amendment rights, they

are relevantly similar to the challenged regulations.

Plaintiffs argue that, because the Supreme Court in *Heller* observed that

handguns are "the most popular weapon chosen by Americans for self-defense,"

---

[32] Even earlier, Plymouth Colony enacted a law in 1671 that restricted the setting
of trap guns, after finding that "severall p[er]sons have b[een] greatly Indangered
by [the] seting of Guns."  Records of the Colony of New Plymouth in New
England: Laws, 1623-1682, at 230, Add. 27.

49

554 U.S. at 629, then by definition they cannot be "dangerous and unusual"[33] and thus particular models of handguns "cannot be banned, period." Br. at 25-29. This argument proves far too much, as it would prohibit states from imposing *any* regulations on handguns, including those that are patently unsafe.[34] While the complete ban on handguns at issue in *Heller* and *McDonald* were struck down, the Court emphasized that the Second Amendment does not guarantee a "right to keep and carry any weapon whatsoever in any manner whatsoever." 554 U.S. at 626. Just as states could permissibly outlaw the configuration of otherwise common

---

[33] *Heller* used both a disjunctive and a conjunctive formulation of this phrase, *see Heller*, 554 U.S. at 623 ("dangerous *or* unusual weapons"); *id.* at 627 ("dangerous *and* unusual weapons"). The phrase was often rendered disjunctively as "dangerous *or* unusual" throughout American history. *See Kolbe v. Hogan*, 849 F.3d 114, 131 n.9 (4th Cir. 2017) (en banc) ("Although the Supreme Court invoked Blackstone for the proposition that "'dangerous and unusual' weapons have historically been prohibited, Blackstone referred to the crime of carrying 'dangerous *or* unusual weapons.'" (emphasis in original) (quoting 4 Blackstone 148-49 (1769))).

[34] By plaintiffs' logic, any regulation that rendered a single handgun model unavailable for purchase would constitute a "handgun ban" that violates the Second Amendment. But *Heller* and *McDonald* were concerned with bans on "an *entire class* of 'arms.'" *Heller*, 554 U.S. at 628 (emphasis added); *see also id.* at 629 (a "complete prohibition" on handguns is invalid). Plaintiffs' argument, if accepted, could lead to a "class of one" Second Amendment claim anytime a single model of handgun preferred by a plaintiff, or indeed even an individual handgun of choice, were not available. Surely the Second Amendment does not constrain states in this way, especially where the Court in *Heller* stated that "fire-safety laws" and laws intended to "prevent accidents" with firearms "do not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.* at 632.

muskets and rifles as trap guns based on the unusual danger that they posed, so too can states like Massachusetts limit the sale of a small subset of handguns that pose an unusual danger based on the absence of basic safety features, while otherwise leaving hundreds of models of handguns available for purchase and possession by law-abiding, responsible citizens.

*     *     *

The historical record amply demonstrates that the handgun safety regulations are consistent with the Nation's historical tradition of firearms regulation. This is true whether the question is viewed as a "straightforward" one involving the consideration of the "distinctly similar" firearms and ammunition inspection laws, or one requiring a "more nuanced approach" due to "dramatic technological changes" that entails analysis of additional "relevantly similar" analogues. *Bruen*, 142 S. Ct. at 2131-32. Either way, the result is the same: the handgun safety regulations are fully consistent with the historical understanding, no less than the text, of the Second Amendment.

## **CONCLUSION**

For the reasons set forth above, the judgment of the District Court should be affirmed.

Respectfully submitted,

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; TERRENCE M. REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,

By their attorneys,

*/s/ Timothy J. Casey*
Timothy J. Casey (First Circuit No. 123832)
Grace Gohlke (First Circuit No. 1204282)
Assistant Attorneys General
Government Bureau
Office of the Attorney General of Massachusetts
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
timothy.casey@mass.gov
grace.gohlke@mass.gov

January 30, 2023

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that:

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because the brief contains 12,547 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point, Times New Roman font.

*/s/ Timothy J. Casey*
Counsel for the Defendants-Appellees
January 30, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this brief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on January 30, 2022.

*/s/ Timothy J. Casey*
Counsel for the Defendants-Appellees

# ADDENDUM

Because this Addendum consists exclusively of statutes and regulations, including historical statutory material, submitted to the Court in accordance with Fed. R. App. P. 28(f), it is not subject to the 25-page limit set forth in First Circuit Local Rule 28.0(a)(2).

Mass. Gen. Laws ch. 140, § 122 ..................................................................Add. 2
Mass. Gen. Laws ch. 140, § 123 ..................................................................Add. 4
501 C.M.R. §§ 7.01 et seq. ........................................................................Add. 11
940 C.M.R. §§ 16.01 et seq. ......................................................................Add. 19
Records of the Colony of New Plymouth in New
    England: Laws, 1623-1682 ..................................................................Add. 25
1713-14 Mass. Province Laws 720, ch. 6 ....................................................Add. 28
1771-72 Mass. Province Laws 167, ch. 9 ....................................................Add. 29
1782 Mass. Acts. 119, ch. 46 .....................................................................Add. 32
1804 Mass. Acts 111, ch. 81 ......................................................................Add. 34
1808 Mass. Acts 444 ch. 52 .......................................................................Add. 37
1814 Mass. Acts 464, ch. 192 ....................................................................Add. 40
1882 Mass. Acts. 212, ch. 269 ...................................................................Add. 43
1884 Mass. Acts 57, ch. 76 ........................................................................Add. 45
1878 Cal. Stat. 117, ch. 299 .......................................................................Add. 46
1832 Conn. Acts 391, ch. 25 ......................................................................Add. 48
1882 Ga. Laws 131, No. 378 ......................................................................Add. 50
1821 Me. Laws 98, ch. 25 ..........................................................................Add. 52
1821 Me. Laws 546, ch. 162 ......................................................................Add. 56
1875 Mich. Pub. Acts 136, § 1 ..................................................................Add. 57
1869 Minn. Laws 50, ch. 39 .......................................................................Add. 59
1775 New Hampshire House of Representatives Resolution – Plan for
    Providing Fire-Arms for the Colony ................................................Add. 65
1820 N.H. Laws 274, ch. 25 ......................................................................Add. 67
1825 N.H. Laws 73, ch. 61 ........................................................................Add. 70
1763-1775 N.J. Laws 346, ch. 539, § 10 ...................................................Add. 73
1776-77 N.J. Laws 6-7, ch. 6 .....................................................................Add. 78
1882 N.J. Acts 52, ch. 44 ...........................................................................Add. 81
1772 N.Y. Laws 682, ch. 1549 ..................................................................Add. 83
1877 Ohio Laws 278, ch. 8, § 60 ...............................................................Add. 87
1794 Pa. Laws 764, ch. 337 ......................................................................Add. 90
1776 R.I. Laws 25 (Oct. Sess) ...................................................................Add. 96
1884 Vt. Acts & Resolves 74, § 1...............................................................Add. 98

# M.G.L.A. 140 § 122

§ 122. Licenses; contents; fingerprints of applicants; procedure on refusal of license; fees; punishment for improper issuance

### Effective: November 4, 2010

Currentness

The chief of police or the board or officer having control of the police in a city or town, or persons authorized by them, may, after an investigation into the criminal history of the applicant to determine eligibility for a license under this section, grant a license to any person except an alien, a minor, a person who has been adjudicated a youthful offender, as defined in section fifty-two of chapter one hundred and nineteen, including those who have not received an adult sentence or a person who has been convicted of a felony or of the unlawful use, possession or sale of narcotic or harmful drugs, to sell, rent or lease firearms, rifles, shotguns or machine guns, or to be in business as a gunsmith. Every license shall specify the street and number of the building where the business is to be carried on, and the license shall not protect a licensee who carries on his business in any other place. The licensing authority to whom such application is made shall cause one copy of said applicant's fingerprints to be forwarded to the department of the state police, who shall within a reasonable time thereafter advise such authority in writing of any criminal record of the applicant. The taking of fingerprints shall not be required in issuing a renewal of a license, if the fingerprints of said applicant are on file with the department of the state police. The licensing authority to whom such application is made shall cause one copy of such application to be forwarded to the commissioner of the department of criminal justice information services. Any person refused a license under this section may within ten days thereafter apply to the colonel of state police for such license, who may direct that said licensing authorities grant said license, if, after a hearing, he is satisfied there were no reasonable grounds for the refusal to grant such license and that the applicant was not barred by the provisions of law from holding such a license. The fee for an application for a license issued under this section shall be $100, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $25 of the fee; $50 of the fee shall be deposited into the general

fund of the commonwealth; and $25 of the fee shall be deposited in the Firearms Fingerprint Identity Verification Trust Fund. A person licensed to sell, rent or lease firearms, rifles, shotguns or machine guns shall not be assessed any additional fee for a gunsmith's license. Whoever knowingly issues a license in violation of this section shall be punished by imprisonment for not less than six months nor more than two years in a jail or house of correction.

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# M.G.L.A. 140 § 123

§ 123. Conditions of licenses

Effective: January 1, 2021

Currentness

A license granted under section one hundred and twenty-two shall be expressed to be and shall be subject to the following conditions:-- First, That the provisions in regard to the nature of the license and the building in which the business may be carried on under it shall be strictly adhered to. Second, That every licensee shall, before delivery of a firearm, rifle or shotgun, make or cause to be made a true, legible entry in a sales record book to be furnished by the commissioner of the department of criminal justice information services and to be kept for that purpose, specifying the complete description of the firearm, rifle or shotgun, including the make, serial number, if any, type of firearm, rifle or shotgun, and designation as a large capacity weapon, if applicable, whether sold, rented or leased, the date of each sale, rental or lease, the license to carry firearms number or permit to purchase number and the identification card number in the case of a firearm or the identification card number or the license to carry firearms number in the case of a rifle or shotgun, the sex, residence and occupation of the purchaser, renter or lessee, and shall before delivery, as aforesaid, require the purchaser, renter or lessee personally to write in said sales record book his full name. Said book shall be open at all times to the inspection of the police. Third, That the license or a copy thereof, certified by the official issuing the same, shall be displayed on the premises in a position where it can easily be read. Fourth, That no firearm, rifle or shotgun, or machine gun shall be displayed in any outer window of said premises or in any other place where it can readily be seen from the outside. Fifth, That the licensee shall submit a record of all sales, rentals and leases forthwith at the time of such sale, rental or lease via electronic communication link to the commissioner of the department of criminal justice information services. Sixth, That every firearm, rifle or shotgun shall be unloaded when delivered. Seventh, That no delivery of a firearm shall be made to any person not having a license to carry firearms issued under the provisions of section one hundred and thirty-one nor shall any delivery of a rifle or shotgun or ammunition be made to any minor nor to any person not having a license to carry firearms issued under the provisions of section one hundred and thirty-one or a firearm identification card issued

under the provisions of section one hundred and twenty-nine B nor shall any large capacity firearm or large capacity feeding device therefor be delivered to any person not having a license to carry firearms issued under section 131 nor shall any large capacity rifle or shotgun or large capacity feeding device therefor be delivered to any person not having a license to carry firearms issued under said section 131; provided, however, that delivery of a firearm by a licensee to a person possessing a valid permit to purchase said firearm issued under the provisions of section one hundred and thirty-one A and a valid firearm identification card issued under section one hundred and twenty-nine B may be made by the licensee to the purchaser's residence or place of business, subject to the restrictions imposed upon such permits as provided under section 131A. Eighth, That no firearm shall be sold, rented or leased to a minor or a person who has not a permit then in force to purchase, rent or lease the same issued under section one hundred and thirty-one A, and a firearm identification card issued under the provisions of section one hundred and twenty-nine B, or unless such person has a license to carry firearms issued under the provisions of section one hundred and thirty-one; nor shall any rifle or shotgun be sold, rented or leased to a person who has not a valid firearm identification card as provided for in section one hundred and twenty-nine B, or has a license to carry firearms as provided in section one hundred and thirty-one; that no large capacity firearm nor large capacity feeding device therefor shall be sold, rented, leased or transferred to any person not having (i) a license to carry firearms issued under section 131 or (ii) a proper permit issued under section 131A and a firearm identification card issued under section 129B; that no large capacity rifle or shotgun nor large capacity feeding device therefor shall be sold to any person not having a license to carry firearms issued under said section 131; and that no machine gun shall be sold, rented or leased to any person who has not a license to possess the same issued under section one hundred and thirty-one. Ninth, That upon the sale, rental or lease of a firearm, subject to a permit to purchase issued under the provisions of section one hundred and thirty-one A, the licensee under section one hundred and twenty-two shall take up such permit to purchase and shall endorse upon it the date and place of said sale, rental or lease, and shall transmit the same to the executive director of the criminal history systems board; and that upon the sale, rental or lease of a machine gun shall endorse upon the license to possess the same the date and place of said sale, rental or lease, and shall within seven days transmit a notice thereof to said executive director. In case of a sale under the provisions of section one hundred and thirty-one E the licensee under section one hundred and twenty-two shall write in the sales record book the number of the license to carry firearms issued the purchaser under the provisions of section one hundred and thirty-one, or the number of the firearm identification card issued the purchaser under the provisions of section one hundred and twenty-nine B, whichever is applicable under the provisions of condition Eighth of this section. Tenth, That this license shall be subject to forfeiture as provided in section one hundred and twenty-five for breach of any of its conditions, and that, if the licensee hereunder is convicted of a violation of any such conditions, this license shall thereupon become void. Eleventh, That the second, fifth, eighth and ninth conditions shall not

apply to a gunsmith with regard to repair or remodeling or servicing of firearms, rifles or shotguns unless said gunsmith has manufactured a firearm, rifle or shotgun for the purchaser, but said gunsmith shall keep records of the work done by him together with the names and addresses of his customers. Such records shall be kept open for inspection by the police at all times. Twelfth, That any licensee shall keep records of each sale, rental or lease of a rifle or shotgun, specifying the description of said rifle or shotgun, together with the name and address of the purchaser, renter or lessee, and the date of such transaction. Thirteenth, That the current validity of any firearm identification card, license to carry firearms or permit to purchase, rent or lease firearms presented, and that the person presenting said card, license or permit is the lawful holder thereof, shall be verified by the licensee prior to any sale, rental or lease of a rifle, shotgun, firearm or large capacity feeding device; and, upon being presented with such card or license that is expired, suspended or revoked, the licensee shall notify the licensing authority of the presentment of such expired, suspended or revoked card, license or permit; and further, the licensee may take possession of such card or license provided that, in such case, such licensee shall: (i) issue a receipt, in a form provided by the commissioner of the department of criminal justice information services, to the holder thereof which shall state that the holder's card or license is expired, suspended or revoked, was taken by such licensee and forwarded to the licensing authority by whom it was issued and such receipt shall be valid for the date of issuance for the purpose of providing immunity from prosecution under section 10 of chapter 269 for unlawfully possessing a firearm, rifle or shotgun or large capacity weapon; (ii) notify the cardholder or licensee of his requirement to renew said card or license; and (iii) forward such expired card or license to the licensing authority forthwith; provided, however, that such licensee shall be immune from civil and criminal liability for good faith compliance with the provisions herein. Fourteenth, That the licensee shall conspicuously post at each purchase counter the following warning in bold type not less than one inch in height: "IT IS UNLAWFUL TO STORE OR KEEP A FIREARM, RIFLE, SHOTGUN OR MACHINE GUN IN ANY PLACE UNLESS THAT WEAPON IS EQUIPPED WITH A TAMPER-RESISTANT SAFETY DEVICE OR IS STORED OR KEPT IN A SECURELY LOCKED CONTAINER.", and that such licensee shall provide said warning, in writing, to the purchaser or transferee of any firearm, rifle, shotgun or machine gun in bold type not less than one-quarter inch in height, and further that the licensee shall conspicuously post and distribute at each purchase counter a notice providing information on suicide prevention developed and provided by the division on violence and injury prevention within the department of public health. The department of public health shall develop and make available on its website for download a sign providing the information on suicide prevention. Fifteenth, That all licensees shall maintain a permanent place of business that is not a residence or dwelling wherein all transactions described in this section shall be conducted and wherein all records required to be kept under this section shall be so kept. Sixteenth, That no licensee shall sell, lease, rent, transfer or deliver or offer for sale, lease, rent, transfer or delivery to any person any assault weapon or large capacity feeding device that

was not otherwise lawfully possessed on September 13, 1994. Seventeenth, That any licensee from whom a rifle, shotgun, firearm or machine gun is lost or stolen shall report such loss or theft to the licensing authority and the executive director of the criminal history systems board forthwith. Such report shall include a complete description of the weapon, including the make, model, serial number and caliber and whether such weapon is a large capacity weapon. Eighteenth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm, to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm has a frame, barrel, cylinder, slide or breechblock that is composed of: (i) any metal having a melting point of less than 900 degrees Fahrenheit; (ii) any metal having an ultimate tensile strength of less than 55,000 pounds per square inch; or (iii) any powdered metal having a density of less than 7.5 grams per cubic centimeter. This clause shall not apply to any make and model of firearm for which a sample of three firearms in new condition all pass the following test: Each of the three samples shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun if required by the cleaning schedule in the user manual, and as needed to refill the empty magazine or cylinder to capacity before continuing. For any firearm that is loaded in a manner other than via a detachable magazine, the tester shall also pause every 50 rounds for ten minutes. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard ammunition of the correct caliber in new condition. A firearm shall pass this test if it fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than six malfunctions and completes the test without any crack or breakage of an operating part of the firearm. The term "crack" or "breakage" shall not include a crack or breakage that does not increase the danger of injury to the user. For purposes of evaluating the results of this test, malfunction shall mean any failure to feed, chamber, fire, extract or eject a round or any failure to accept or eject a magazine or any other failure which prevents the firearm, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the firearm is capable of firing the new round properly. "Malfunction" shall not include a misfire caused by a faulty cartridge the primer of which fails to detonate when properly struck by the firearm's firing mechanism. Nineteenth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearms wholesaler, and the sale, by its terms, prohibits such purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm is prone to accidental discharge which, for purposes of this clause, shall mean any make and model of firearm for which a sample of five firearms in new condition all undergo, and none discharge during, the following test: Each of the five sample firearms shall be: (a) test loaded; (b) set so that the firearm is in a condition such that pulling the trigger and taking any action that

must simultaneously accompany the pulling of the trigger as part of the firing procedure would fire the handgun; and (c) dropped onto a solid slab of concrete from a height of one meter from each of the following positions: (i) normal firing position; (ii) upside down; (iii) on grip; (iv) on the muzzle; (v) on either side; and (vi) on the exposed hammer or striker or, if there is no exposed hammer or striker, the rearmost part of the firearm. If the firearm is designed so that its hammer or striker may be set in other positions, each sample firearm shall be tested as above with the hammer or striker in each such position but otherwise in such condition that pulling the trigger, and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure, would fire the firearm. Alternatively, the tester may use additional sample firearms of the same make and model, in a similar condition, for the test of each of these hammer striker settings. Twentieth, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery, any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler, and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm is prone to: (i) firing more than once per pull of the trigger; or (ii) explosion during firing. Twenty-first, That no licensee shall sell, rent, lease, transfer or deliver or offer for sale, lease, transfer or delivery any firearm to any purchaser in the commonwealth unless such sale is to a business entity that is primarily a firearm wholesaler and the sale, by its terms, prohibits the purchaser from reselling such firearm to a firearm retailer or consumer in the commonwealth if such firearm has a barrel less than three inches in length, unless the licensee discloses in writing, prior to the transaction, to the prospective buyer, lessee, deliveree or transferee the limitations of the accuracy of the particular make and model of the subject firearm, by disclosing the make and model's average group diameter test result at seven yards, average group diameter test result at 14 yards and average group diameter test result at 21 yards. For purposes of this clause, "average group diameter test result" shall mean the arithmetic mean of three separate trials, each performed as follows on a different sample firearm in new condition of the make and model at issue. Each firearm shall fire five rounds at a target from a set distance and the largest spread in inches between the centers of any of the holes made in a test target shall be measured and recorded. This procedure shall be repeated two more times on the firearm. The arithmetic mean of each of the three recorded results shall be deemed the result of the trial for that particular sample firearm. The ammunition used shall be the type recommended by the firearm manufacturer in its user manual or, if none is recommended, any standard ammunition of the correct caliber in new condition. No licensee shall sell any rifle or shotgun, contrary to the provisions of section one hundred and thirty or section 131E.

Clauses Eighteenth to Twenty-first, inclusive, of the first paragraph shall not apply to: (i) a firearm lawfully owned or possessed under a license issued under this chapter on or before October 21, 1998; (ii) a firearm designated by the secretary of public safety, with the advice of the gun control

advisory board, established pursuant to section 131 ½ of chapter 140, as a firearm solely designed and sold for formal target shooting competition; (iii) a stun gun, as defined in section 121; or (iv) a firearm designated by the secretary of public safety, with the advice of the gun control advisory board, established pursuant to section 131 ½ of chapter 140, as a firearm or pistol solely designed and sold for Olympic shooting competition. The secretary of public safety shall compile lists, on a bi-annual basis, of firearms designated as "formal target shooting firearms" and "Olympic competition firearms" in accordance with this paragraph. Such lists shall be made available for distribution by the executive office of public safety and security.

No person licensed under the provisions of section 122 or section 122B shall sell, rent, lease, transfer or deliver any rifle, shotgun or firearm or ammunition or ammunition feeding device contrary to the provisions of section 130 or section 131E; and no such licensee shall sell, rent, lease, transfer or deliver any rifle, shotgun or firearm or ammunition or ammunition feeding device to any person who does not have in his possession the required firearm identification card or proof of exemption therefrom, license to carry firearms or permit to purchase, rent or lease firearms and who does not present such card, proof, license or permit to the licensee in person at the time of purchase, rental or lease. No person licensed under the provisions of section 122 or section 122B shall fill an order for such weapon, ammunition or ammunition feeding device that was received by mail, facsimile, telephone or other telecommunication unless such transaction or transfer includes the in-person presentation of the required card, proof, license or permit as required herein prior to any sale, delivery or any form of transfer of possession of the subject weapon, ammunition or ammunition feeding device. Transactions between persons licensed under section 122 or between federally licensed dealers shall be exempt from the provisions of this paragraph.

The licensing authority shall enter, one time per calendar year, during regular business hours, the commercial premises owned or leased by any licensee, wherein such records required to be maintained under this section are stored or maintained, and inspect, in a reasonable manner, such records and inventory for the purpose of enforcing the provisions of this section. If such records and inventory contain evidence of violations of this section, the inspecting officer shall produce and take possession of copies of such records and, in the event that the licensee subject to inspection does not possess copying equipment, the inspecting officer shall arrange to have copied, in a reasonable time and manner, such records that contain evidence of such violations and the costs for such copying shall be assessed against the owner of such records. Licensees found to be in violation of this section shall be subject to the suspension or permanent revocation of such license issued under section 122 and to the provisions of section 128. Nothing herein shall prohibit the licensing authority or the department of state police from conducting such inspections pursuant to a valid search warrant issued by a court of competent jurisdiction.

Notwithstanding the provisions of this section, a person licensed under the provisions of section one hundred and twenty-two, or section one hundred and twenty-two B, may sell or transfer firearms, rifles, shotguns, machine guns or ammunition at any regular meeting of an incorporated collectors club or at a gun show open to the general public; provided, however, that all other provisions of this section are complied with and that such sale or transfer is in conformity with federal law or regulations applicable to the transfer or sale of firearms, rifles, shotguns, machine guns or ammunition, including the restrictions imposed upon firearm identification cards issued under section 129B, licenses to carry firearms issued under section 131 and permits to purchase, lease or rent firearms issued under section 131A.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

501 CMR 7.00:     APPROVED WEAPON ROSTERS

Section

7.01:  Purpose
7.02:  Definitions
7.03:  Development of Approved Firearms Roster
7.04:  Criteria for Placement on Approved Firearms Roster
7.05:  Compliance with the Approved Roster by Licensees
7.06:  Appeals for Inclusion on or Removal from the Approved Firearms Roster
7.07:  Form and Publication of the Approved Firearms Roster
7.08:  Development of a Large Capacity Weapons Roster
7.09:  Criteria for Placement on Large Capacity Weapons Roster
7.10:  Large Capacity Weapons Not Listed
7.11:  Form and Publication of the Large Capacity Weapons Roster
7.12:  Development of the Formal Target Shooting Firearms Roster
7.13:  Criteria for Placement on the Formal Target Shooting Firearms Roster
7.14:  Appeals for Inclusion on the Formal Target Shooting Firearms Roster
7.15:  Form and Publication of the Formal Target Shooting Firearms Roster
7.16:  Severability

7.01:  Purpose

The purpose of 501 CMR 7.00 is to provide rules and regulations governing the inclusion of firearms, rifles and shotguns on rosters of weapons referred to in M.G.L. c. 140, §§ 123 and 131¾.

7.02:  Definitions

As used in 501 CMR 7.00:

Approved Firearm  means a firearm make and model that passed the testing requirements of M.G.L. c. 140, § 123 and was subsequently approved by the Secretary. Included are those firearms listed on the current Approved Firearms Roster and those firearms approved by the Secretary of Public Safety that will be included on the next published Approved Firearms Roster.

Approved Firearms Roster  means a list of firearms approved by the Secretary which meet or exceed the testing criteria as outlined in M.G.L. c. 140, § 123 clauses Eighteenth, Nineteenth, Twentieth and Twenty-first, and which list is established, maintained and published by the Secretary pursuant to M.G.L. c. 140, § 131¾.

Approved Independent Testing Laboratory  means a testing laboratory that the Secretary has determined is capable of accurately testing firearms in accordance with M.G.L. c. 140, § 123.

Capable of Accepting a Large Capacity Feeding Device  means any firearm, rifle or shotgun in which a large capacity feeding device, as defined by M.G.L. c. 140, § 121, is capable of being used without alteration of the weapon; provided, however, that said feeding device is fully or partially inserted into the weapon or attached thereto, or is under the direct control of a person who also has direct control of a weapon capable of accepting said feeding device.

Certified by Attributes  means the process used by an independent testing laboratory to determine if a particular model firearm is the functional design equivalent of another model already tested.

Firearm  has the same meaning as "firearm" as defined in M.G.L. c. 140, § 121.

Formal Target Shooting Competition  means those target competitions which are sponsored, coordinated or sanctioned by a national organization which regulates the type of firearm or modifications that may be used.

Formal Target Shooting Firearm means those firearms that have been approved by the Secretary as solely designed and sold for formal target shooting competition, pursuant to M.G.L. c. 140, § 123.

Formal Target Shooting Firearms Roster means a list of firearms approved by the Secretary, which are solely designed and sold for formal target shooting competition as provided by M.G.L. c. 140, § 123, and which list is established, maintained and published pursuant to M.G.L. c. 140, § 123.

Functional Design Equivalent means a firearm whose dimensions and material, as well as linkage and functioning of the magazine well, cylinder, barrel, chamber or any components of the firing mechanism do not differ from a firearm which satisfactorily completed the Testing Requirements. A firearm may be deemed the Functional Design Equivalent of a firearm which differs only in caliber if the larger caliber firearm has satisfactorily completed the Testing Requirements.

GCAB means the Gun Control Advisory Board as provided in M.G.L. c. 140, § 131½, whose members are appointed by the Governor to advise the Secretary on matters relating to the implementation of M.G.L. c. 140, §§ 121 through 131P.

Individual Firearm means a specific firearm identifiable by make, model and serial number, and does not refer to an entire make or model line.

Large Capacity Feeding Device has the same meaning as "large capacity feeding" device as defined in M.G.L. c. 140, § 121.

Large Capacity Roster means a list of large capacity firearms, rifles, and shotguns as defined by M.G.L. c. 140, § 121, and which list is established, maintained and published by the Secretary pursuant to M.G.L. c. 140, § 131¾.

Large Capacity Weapon has the same meaning as "large capacity weapon" as defined in M.G.L. c. 140, § 121.

Length of Barrel or Barrel Length have the same meaning as "length of barrel" or "barrel length" as defined in M.G.L. c. 140, § 121.

Licensee means a firearms dealer licensed in Massachusetts under M.G.L. c. 140, § 122, and does not refer to a gunsmith also licensed under M.G.L. c. 140, § 122.

Licensed Gunsmith means a person acting as gunsmith as defined in M.G.L. c. 140, § 121, and who is licensed to conduct gunsmith activity pursuant to M.G.L. c. 140, § 122.

Make of Firearm means the company that manufactured said firearm.

Model of Firearm means the alpha or numeric designation or name given by the manufacturer to a particular line of firearms. Within the model line, firearms may be assigned different alpha or numeric designations or names and still be considered to be the same model provided they are the functional design equivalent.

Readily Modifiable to Accept a Large Capacity Feeding Device means any firearm, rifle or shotgun immediately capable of being altered so as to accept a large capacity feeding device as defined in M.G.L. c. 140, § 121; provided, however, that said feeding device is fully or partially inserted into the weapon or attached thereto, or is under the direct control of a person who also has direct control of a weapon capable of accepting said feeding device.

Secretary means the Secretary of Public Safety and Security.

7.02:   continued

Testing Requirements means the testing requirements as defined in M.G.L. c. 140, § 123 clauses Eighteenth, Nineteenth, Twentieth and Twenty-first.  For clause Eighteen, such requirements shall include a certified statement from the manufacturer regarding the melting point, tensile strength, or density of the metal used in manufacturing the firearm, or the successful completion of the firing tests.  Only firearms with a "length of barrel", as defined by M.G.L. c. 140, § 121, of less than three inches are required to complete the testing in M.G.L. c. 140, § 123, clause Twenty-first.  For all other firearms, the term "testing requirements" shall refer only to clauses Eighteenth, Nineteenth, and Twentieth.

Weapon has the same meaning as "weapon" as defined in M.G.L. c. 140, § 121.

7.03:   Development of Approved Firearms Roster

(1)  A firearm may be considered for placement on the Approved Firearms Roster only after the Secretary has received a final test report from an approved independent testing laboratory certifying that the specified firearm make and model has successfully completed all testing requirements in compliance with M.G.L. c. 140, § 123 and 501 CMR 7.00, or the Secretary has determined that the firearm is the functional equivalent of a previously approved firearm, or has been tested by another state which has identical testing requirements of the commonwealth, pursuant to 501 CMR 7.04.

(2)  The Secretary shall maintain a list of approved independent testing laboratories in accordance with 501 CMR 7.00.  The Secretary may add or remove a testing laboratory from this list in accordance with 501 CMR 7.00.
(a)  Such approved independent testing laboratory shall not be owned or operated by a firearms manufacturer or by an organization that seeks to promote or restrict firearms ownership.
(b)  Any testing laboratory that seeks to be an approved independent testing laboratory shall provide information to the Secretary regarding its capabilities and objectivity.

(3)  The GCAB shall review the final test report and shall make a recommendation to the Secretary based on the documentation provided.

(4)  The Secretary shall then determine whether the firearm shall be placed on the Approved Firearms Roster.  Addition to the Approved Firearms Roster shall serve as notice of compliance with M.G.L. c. 140, § 123.

(5)  The Secretary, upon his own initiative, or upon the advice of the GCAB, or through petition from an individual, may determine if a firearm shall be removed from the Approved Firearms Roster.  The Secretary shall notify, in writing, the manufacturer of a particular make and model whenever a decision is made to remove such make and model from the Approved Firearms Roster.

(6)  The Executive Office of Public Safety shall maintain a list of all makes and models of firearms which have been approved by the Secretary.  This list shall include firearms listed on the most recently published Approved Firearms Roster, and firearm makes and models which have been approved by the Secretary for inclusion on the next published roster.  This list of approved firearms shall be maintained by the Executive Office of Public Safety on a publicly available web site, and a printed copy shall be available upon request.

7.04:   Criteria for Placement on Approved Firearms Roster

(1)  Testing.  The testing of any firearm for placement on the Approved Firearms Roster shall be done by an approved independent testing laboratory.  The approved independent testing laboratory shall, at the expense of the entity seeking to have the firearm placed on the Approved Firearms Roster, test the firearm in accordance with the testing requirements and submit a copy of the final test report directly to the Secretary and to the GCAB.  Satisfactory completion of the required tests shall mean that a firearm make and model meets or exceeds the testing requirements of M.G.L. c. 140, § 123 and 501 CMR 7.00.

(2)  Functional Equivalent.  A firearm model shall be deemed to satisfy the testing requirements if another firearm model made by the same manufacturer is the functional design equivalent of a firearm model that has satisfactorily completed the required tests, provided that the approved independent testing laboratory certifies that the firearm model is the functional design equivalent of another model already tested, and provides a written explanation for its reasoning appended with all supporting documentation used to reach its conclusion to the Secretary and to the GCAB.

(3)  Tests Required by Other States.
   (a)   If another state requires testing which is identical to the testing required by the Commonwealth of Massachusetts, and such testing is performed by an independent testing laboratory approved by the Secretary, a final test report from the approved independent testing laboratory to the Secretary and the GCAB that the specified firearm make and model satisfactorily completed all testing requirements in compliance with M.G.L. c. 140, § 123 will be sufficient for submission to the GCAB without performing the tests again.
   (b)   If another state requires testing which includes some tests identical to the testing required by the Commonwealth of Massachusetts, and such testing is performed by an independent testing laboratory approved by the Secretary, a final test report from the approved independent testing laboratory that the specified firearm make and model satisfactorily completed all testing requirements in compliance with M.G.L. c. 140, § 123 will be sufficient for submission to the GCAB without performing again the portions of the testing requirements already performed as part of the other state's requirements; provided, however, that any additional tests required by the commonwealth but not required by the other state are in fact performed by an approved independent testing laboratory.

7.05:   Compliance with the Approved Roster by Licensees

Any licensee that sells, rents, leases, delivers or offers for sale, rent, lease, transfer or delivery any firearm not an approved firearm shall be considered in violation of M.G.L. c. 140, § 123, except for:
   (a)   The sale, rental, lease, transfer or delivery of an individual firearm as defined in 501 CMR 7.00 which was lawfully owned or possessed under a license as defined in M.G.L. c. 140, §§ 122, 129B, 131 and 131F prior to October 21, 1998;
   (b)  The delivery of a firearm to a licensed gunsmith for the purposes of service or repair of a firearm or the return of a firearm to its lawful owner after service or repair by a licensed gunsmith;
   (c)  The return of a firearm by a licensee to its lawful owner where that firearm was initially delivered to that licensee for the purpose of consignment; or
   (d)   The sale, rental, lease, transfer or delivery of a firearm listed on the Formal Target Shooting Firearms Roster.

7.06:   Appeals for Inclusion on or Removal from the Approved Firearms Roster

(1)   A person may petition the Secretary to place a firearm on or remove a firearm from the Approved Firearms Roster within 90 days of the Secretary's original denial or approval for inclusion on the Approved Firearms Roster.  The Secretary's original denial or approval shall be considered to take place upon the date of publication of the next edition of the Approved Firearms Roster following the GCAB's recommendation to the Secretary regarding denial or approval of the firearm at issue.

(2)   Said petition shall include a written explanation citing the rationale for the inclusion or removal of a firearm with all documentation used to justify the request appended thereto.

7.06:   continued

(3)   The Secretary shall not consider the inclusion of a firearm on the roster unless the petition includes clear and convincing evidence from an approved independent testing laboratory.

(4)   The Secretary shall, within 45 days of receipt of a petition, notify the petitioner by certified mail whether the petition is approved or denied.  If the petition is approved, the Secretary shall include the make and model of the firearm on its list of all approved firearms and on the next publication of the Approved Firearms Roster.

7.07:   Form and Publication of the Approved Firearms Roster

The form of the Approved Firearms Roster shall contain the following information:

(1)   Title.  Approved Firearms Roster.

(2)   Effective month and year of the publication.

(3)   Notice that the roster replaces all prior published rosters as follows:  "This Roster Supersedes All Previous Rosters."

(4)   Notice of criteria for placement on the roster as follows:  "This roster has been compiled in accordance with M.G.L. c. 140, § 131¾ and 501 CMR 7.00.  It contains weapons determined by Massachusetts approved independent testing laboratories to have satisfactorily completed the testing requirements of M.G.L. c. 140, § 123, clauses Eighteenth, Nineteenth, Twentieth and Twenty-first.  The reports resulting from said tests were reviewed by the Gun Control Advisory Board and those makes and models listed herein were subsequently approved by the Secretary of the Executive Office of Public Safety and Security as having complied with the statutory handgun testing provisions of M.G.L. c. 140, § 123."

(5)   Notice of publication method as follows:  "Modifications to this roster are likely to occur periodically, and licensees and law enforcement personnel should always utilize the most recent roster for the purpose of determining statutory compliance.  The Approved Firearms Roster posted on the website of the Executive Office of Public Safety and Security (www.mass.gov/EOPSS) will contain the most recently approved models".

(6)  Notice of the Regulations of the Office of the Attorney General as follows:  "Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's regulations at 940 CMR 16.00: *Handgun Sales*.  Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of 940 CMR 16.00.  Information about 940 CMR 16.00, as well as the Enforcement Notice may be obtained from the Office of the Attorney General and may be accessed on the website of the Attorney General (www.ago.state.ma.us)."

7.08:   Development of a Large Capacity Weapons Roster

The Secretary shall develop and maintain, with the advice of the GCAB, a list of large capacity weapons, as defined by M.G.L. c. 140, § 121.

7.09:   Criteria for Placement on Large Capacity Weapons Roster

The large capacity weapons roster shall contain a list of weapons approved by the Secretary, upon the advice of the GCAB, or other sources who have petitioned the Secretary, to have been originally manufactured as a large capacity weapon as defined by M.G.L. c. 140, § 121.

## 7.10:  Large Capacity Weapons Not Listed

Weapons not listed on the Large Capacity Roster may also be large capacity weapons if they are semi-automatic, and are capable of accepting or readily modifiable to accept a large capacity feeding device.  Weapons not listed on the Large Capacity Roster shall be considered large capacity weapons in accordance with M.G.L. c. 140, § 121, if they are capable of accepting a large capacity feeding device, or readily modifiable to accept a large capacity feeding device as defined by 501 CMR 7.02.

## 7.11:  Form and Publication of the Large Capacity Weapons Roster

The form of the Large Capacity Weapons Roster shall contain the following information:

(1)  _Title_.  Large Capacity Weapons Roster.

(2)  Effective month and year of the publication.

(3)  Notice that the roster replaces all prior published rosters as follows:  "This Roster Supersedes All Previous Rosters."

(4)  Notice of criteria for placement on the roster as follows:  "This roster has been compiled in accordance with M.G.L. c. 140, § 131¾.  It contains weapons determined to have been originally manufactured for the civilian retail consumer market as large capacity weapons as defined by M.G.L. c. 140, § 121.  Weapons not listed on this roster may also be large capacity weapons if they are semi-automatic and are capable of accepting or readily modifiable to accept a large capacity feeding device.  Definitions of 'capable of accepting' and 'readily modifiable to accept' are defined in 501 CMR 7.02."

(5)  Notice of large capacity weapons and exemption as follows:  "NOTE: Unless otherwise exempted by M.G.L. c. 140, § 121, the term 'large capacity weapon' shall apply to all semiautomatic weapons equipped with a large capacity feeding device, including any such weapons not listed on this roster."

(6)  Part I of the roster shall have the heading "Firearms – Class A LTC Required" followed by a list in order by manufacturers of large capacity firearms meeting the criteria for inclusion on the roster.

(7)  Part II of the roster shall have the heading "Rifles and Shotguns – Class A or B LTC Required" followed by a list in order by manufacturers of large capacity rifles and shotguns meeting the criteria for inclusion on the roster.

## 7.12:  Development of the Formal Target Shooting Firearms Roster

The Secretary shall develop and maintain, with the advice of the GCAB, a list of those weapons designated as formal target shooting firearms as provided by M.G.L. c. 140, § 123.

## 7.13:  Criteria for Placement on the Formal Target Shooting Firearms Roster

The Formal Target Shooting Firearms Roster shall contain firearms designated by the Secretary, with the advice of the GCAB, as solely designed and sold for formal target shooting competition.  The GCAB shall make a recommendation as to whether a firearm should be placed on the Formal Target Shooting Firearms Roster using the following criteria:

(1)  In order for a firearm to be considered for placement on the Formal Target Shooting Roster:
   (a)  the firearm manufacturer shall submit a report to the GCAB that certifies by affidavit that the firearm is solely designed and sold for formal target shooting competition; and
   (b)  the report shall identify specifications and features of the firearm which make it a formal target shooting competition firearm, including but not limited to the component requirements listed in 501 CMR 7.13(5) that are a standard part of that model firearm.

7.13:  continued

(2)   The firearm manufacturer shall submit to the GCAB either a list of the specific types of formal target shooting competition for which the firearm was designed and sold, or documentation indicating that the firearm is recognized by a national organization as a firearm used in formal target shooting competition.

(3)   Such manufacturer shall include any advertising or marketing materials sufficient to demonstrate that the firearm is solely sold for formal target shooting competition.

(4)   The firearm, if it is a pistol, must have a barrel length of at least four inches, and if it is a revolver, must have a barrel length of at least five inches.

(5)   The firearm must have match grade adjustable rear sights, or a match grade optical target sighting system.

(6)   The Firearm.
    (a)   if a pistol, must have four or more of the following components, all produced at match grade:
        1.   A target trigger
        2.   A custom or bull barrel
        3.   A ported barrel or compensator
        4.   A custom barrel bushing
        5.   An adjusted, beveled or improved magazine well
        6.   An extended or custom slide release button
        7.   A target hammer
        8.   A custom feed ramp
        9.   A custom ejection port
        10.   A custom extractor
        11.   Target grips
        12.   A trigger pull weight of less than four pounds; or
    (b)   if a revolver, must have three or more of the following components, all produced at match grade:
        1.   A target trigger
        2.   A custom or bull barrel
        3.   A ported barrel or compensator
        4.   A target hammer
        5.   Target grips.

(7)   After receiving a recommendation from the GCAB, the Secretary shall determine whether the firearm shall be placed on the Formal Target Shooting Firearms Roster.  Addition to the Formal Target Shooting Firearms Roster shall serve as notice that a make and model is in compliance with M.G.L. c. 140, § 123.

7.14:  Appeals for Inclusion on the Formal Target Shooting Firearms Roster

(1)   Any person may petition the Secretary to place a firearm on or remove a firearm from the Formal Target Shooting Firearms Roster within ninety days of the Secretary's original denial or approval for inclusion on the Formal Target Shooting Firearms Roster.  The Secretary's original denial or approval shall be considered to take place upon the date of publication of the next edition of the Formal Target Shooting Firearms Roster following the GCAB's recommendation to the Secretary regarding denial or approval of the firearm at issue.

(2)   Said petition shall include a written explanation citing the rationale for the inclusion or removal of a firearm with all documentation used to justify the request appended thereto.

(3)   The Secretary shall not consider the inclusion of a firearm on the roster unless the petition includes clear and convincing evidence that the firearm meets all of the criteria required in 501 CMR 7.13.

7.14:   continued

(4)   The Secretary shall, within 45 days of receipt of a petition, notify the petitioner by certified mail whether the petition is approved or denied.  If the petition is approved, the Secretary shall include the make and model of the firearm on its list of Formal Target Shooting Firearms Roster.

## 7.15:   Form and Publication of the Formal Target Shooting Firearms Roster

The Formal Target Shooting Firearms Roster shall be published bi-annually and shall be available on the public website of the Criminal History Systems Board.  It shall contain the following information:

(1)   <u>Title</u>.  Formal Target Shooting Firearms Roster.

(2)   Effective month and year of the publication.

(3)   Notice that the roster replaces all prior published rosters as follows:  "This Roster Supersedes All Previous Rosters."

(4)   Notice of criteria for placement on the roster as follows:  "This roster has been compiled in accordance with M.G.L. c. 140, § 123 and 501 CMR 7.00.  It contains firearms which are exempt from the testing requirements described in M.G.L. c. 140, § 123, clauses Eighteenth, Nineteenth, Twentieth and Twenty-first, and which may be sold by Massachusetts licensees pursuant to M.G.L. c. 140, § 123 and 940 CMR 16.00: *Handgun Sales*.  The makes and models listed herein were reviewed by the GCAB and subsequently designated by the Secretary of the Executive Office of Public Safety and Security as being solely designed and sold for formal target shooting competitions."

(5)   Notice of publication method as follows:  "Modifications to this roster are likely to occur periodically, and Massachusetts licensees and law enforcement personnel should always utilize the most recent roster for the purpose of determining statutory compliance.  The Formal Target Shooting Firearms Roster posted on the website of the Executive Office of Public Safety and Security (www.mass.gov/EOPSS) will contain the most recently approved models."

## 7.16:   Severability

If any article, section, subsection, sentence, clause or phrase of 501 CMR 7.00 is for any reason determined to be unconstitutional, contrary to statute, in excess of authority, or otherwise inoperative, such determination shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of 501 CMR 7.00.

REGULATORY AUTHORITY

501 CMR 7.00:  M.G.L. c. 140, §§ 123 and 131¾.

940 CMR 16.00:     HANDGUN SALES

Section

16.01: Definitions
16.02: Unfair or Deceptive Practices: General
16.03: Tamper-Resistant Serial Numbers
16.04: Sale of Handguns Made From Inferior Materials
16.05: Sale of Handguns Without Childproofing or Safety Devices
16.06: Safety Warning/Disclosures
16.07: Transfers of Used Handguns
16.08: Severability
16.09: Enforcement Dates

The Attorney General of the Commonwealth of Massachusetts promulgates 940 CMR 16.00 pursuant to authority granted to him under M.G.L. c. 93A, § 2(c). 940 CMR 16.00 defines certain unfair acts or practices but is not intended to describe all types of practices prohibited by M.G.L. c. 93A, § 2. 940 CMR 16.00 does not legitimize acts that are not specifically prohibited by 940 CMR 16.00, and does not alter or amend common law rights and remedies available to consumers. 940 CMR 16.00 is designed to supplement existing statutes and regulations. References to statutes and other regulations shall include amendments thereto from time to time.

16.01:  Definitions

For purposes of 940 CMR 16.00, the following terms shall have the following meanings:

Average group diameter test result:  shall mean the arithmetic mean of three separate group diameter test results taken from a set distance.

Combination handle lock:  shall mean a device which precludes the use of the handgun unless the combination tumblers are properly aligned. This device may, for example, have the numbers for the combination tumblers protrude from the handle of the handgun.

Educational collector:  shall mean an individual who is properly licensed as a bonafide collector pursuant to 520 CMR 7.00, and whose collection is maintained for purposes of display, research, lecturing, demonstration, or historical significance, as opposed to being maintained for personal enjoyment and/or possible future profit.

Group diameter test result:  shall mean the largest spread in inches between the centers of any of the holes made in a test target after firing five rounds from the handgun in question at the target from a set distance. The ammunition used shall be the type recommended by the handgun manufacturer in its user manual, or if none is recommended, any standard ammunition of the correct caliber in new condition.

Hammer deactivation device:  shall mean a built-in device (or an extension of the hammer) which allows a user manually to lower the handgun's hammer into a deactivated position, and which must be manually re-toggled in order to re-cock the hammer before the handgun can be fired.

Handgun:  shall mean a weapon, designed to be fired by the use of a single hand, from which may be fired or ejected one or more solid projectiles propelled via a chemical ignition, and which has:
   (a)  a smooth bore with a barrel less than 18 inches long;
   (b)  a smooth bore and an overall weapon length of less than 26 inches; or
   (c)  a rifled bore with a barrel less than 16 inches.

Add. 19

16.01: continued

Handgun Drop Test: shall mean a test in which the handgun in question shall be:

(a) test loaded;

(b) set such that the handgun is ready to fire; and

(c) dropped onto a solid slab of concrete from a height of one meter from each of the following positions:

    1. normal firing position,

    2. upside down,

    3. on grip,

    4. on the muzzle,

    5. on either side, and

    6. on the exposed hammer or striker (or if there is no exposed hammer or striker, then the rearmost part of the firearm).

In addition, if the handgun is designed so that its hammer or striker may be set in other positions, the handgun in question shall be tested with the hammer or striker in each such position (but otherwise ready to fire). Alternatively, the tester may use different handguns of the same make and model, in similar condition, for the test of each of these hammer/striker settings.

Handgun Performance Test: shall mean a test in which the handgun in question shall fire 600 rounds, stopping every 100 rounds to tighten any loose screws and to clean the gun (if required by the cleaning schedule in the user manual), and as needed to refill the empty magazine or cylinder to capacity before continuing. For any handgun that loads other than via a detachable magazine, the tester shall also pause every 50 rounds for ten minutes. The ammunition used shall be the type recommended by the handgun manufacturer in its user manual, or if none is recommended, any standard ammunition of the correct caliber in new condition. A handgun shall pass this test if it:

(a) fires the first 20 rounds without a malfunction, and

(b) fires the full 600 rounds with no more than six malfunctions and without any crack or breakage of an operating part of the handgun which increases the danger of injury to the user.

Handgun-purveyor: shall mean any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts. However, handgun-purveyor shall not include any of the aforementioned if:

(a) the person or entity transfers less than five handguns per year,

(b) the transfer in question is for the purpose of, and does, directly or indirectly, supply law enforcement officials or United States military personnel with handguns for their official duties,

(c) the transfer in question is for the purpose of, and does, directly or indirectly, supply museums or educational collectors with the handguns in question,

(d) the transfer in question is undertaken to, and does, result in the surrender of handguns to military or law enforcement personnel,

(e) the transfer in question is of handguns that qualify as antique firearms as defined in 18 U.S.C. § 921, or

(f) the transfer in question is of handguns that are solely designed and sold specifically for formal target shooting competition.

Key activated trigger lock: shall mean a device that when locked in place by means of a key, prevents a potential user from pulling the trigger of the handgun without first removing the trigger lock by use of the trigger lock's key.

Load indicator: shall mean a device which plainly indicates that a cartridge is in the firing chamber within the handgun.

Magazine safety disconnect: shall mean a device that prevents the firing of the handgun when the magazine is detached from the handgun.

Make and model: shall mean any group of handguns, all of which are made by a manufacturer by the same method and according to the same design pattern and specifications.

16.01:  continued

Make and Model Performance Requirements:  shall mean a test in which three handguns in new condition of the make and model being tested shall each pass the Handgun Performance Test.

Make and Model's Average Group Diameter Test Result:  shall mean the arithmetic mean of the results of three Average Group Diameter Tests, each performed on a different handgun in new condition of the make and model being tested.

Malfunction:  shall mean any failure to feed, chamber, fire, extract, or eject a round, or any failure to accept or eject a magazine, or any other failure which prevents the handgun, without manual intervention beyond that needed for routine firing and periodic reloading, from firing the chambered round or moving a new round into position so that the handgun is capable of firing the new round properly.  Malfunction shall not include a misfire caused by a faulty cartridge whose primer fails to detonate when properly hit by the handgun's firing mechanism.

Passive use-limitation device:  shall mean a device that automatically resets itself so that an unauthorized user cannot fire the handgun.  As an example, a key activated trigger lock is not a passive use-limitation device because it needs to be re-locked manually after its key is used to unlock it; thus the next user can fire the handgun without having to unlock the handgun.

Prone to accidental discharge:  shall mean unable to pass the following test: five handguns in new condition of the make and model in question shall each be subjected to, and none shall discharge during, the Handgun Drop Test.

Ready to fire:  shall mean loaded, and in a condition such that pulling the trigger (and taking any action that must simultaneously accompany the pulling of the trigger as part of the firing procedure) will fire the handgun.

Serial number:  shall mean the number stamped, inscribed, or placed upon a handgun by a handgun-purveyor pursuant to M.G.L. c. 269, § 11E.

Solenoid use-limitation device:  shall mean a device which precludes, by use of a magnetically activated relay, the firing of the handgun unless a magnet of the appropriate strength is placed in proximity to the handle of the handgun.  Such magnet may be imbedded in a ring which can be worn on the user's gun hand.

Test loaded:  shall mean loading each chamber of the handgun in question with an empty case with a primer installed.

Transfer:  shall mean sell, rent, or lease.  Transfer shall not include a sale to a business entity that is primarily a firearm wholesaler, so long as the sale, by its terms, prohibits the purchaser from reselling the handgun to a handgun retailer or consumer in the Commonwealth.

16.02:  Unfair or Deceptive Practices: General

(1)  It shall be an unfair or deceptive practice for any handgun-purveyor, in conjunction with the transfer (or offer to transfer) of a handgun to a consumer in the Commonwealth, to fail to comply with M.G.L. c. 93A, 940 CMR 16.00 *et seq.*, or any other existing local, state, or federal statute, rule or regulation whose implementation serves to protect consumers from unfair and deceptive practices by means including, but not limited to, regulating conditions of sale, precluding the sale of products when such sale will place purchasers in violation of the law, demanding the disclosure of information, and ensuring the satisfactory condition and non-contraband status of goods proffered for sale.  Examples of the above include laws, regulations, and rules that:
    (a)  forbid the sale of handguns to juveniles, addicts, or mentally incompetent individuals,
    (b)  forbid the sale of silencers, armor penetrating bullets, or machine-gun pistols (when possession by purchasers will be unlawful),
    (c)  forbid participation in any way in the obliteration of serial numbers from handguns prior to sale,
    (d)  forbid the sale of handguns whose serial numbers have been defaced,

16.02: continued

    (e) require sellers to keep records of handgun sales,

    (f) forbid sellers from delivering or transporting handguns loaded, or

    (g) forbid the delivery of handguns to the custody of a minor.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to make material misrepresentations or make false certifications regarding any handgun offered for transfer.

### 16.03: Tamper-Resistant Serial Numbers

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun on which the serial number has been placed solely in a location on the handgun that results in the number's susceptibility to eradication. A serial number shall be deemed not susceptible to eradication for purposes of 940 CMR 16.00 if:

(1) it is placed on the interior of the handgun, and the handgun-purveyor provides information regarding the location of the interior serial number to the Office of the Attorney General and other law enforcement officials upon request; or

(2) it is placed on the exterior of the handgun in a way that is not visible to the unaided eye, but is visible with the aid of an infrared detector or other device, and the handgun-purveyor provides information regarding the location of the nonvisible serial number or any method by which this number can be made viewable to the Office of the Attorney General and other law enforcement officials upon request.

### 16.04: Sale of Handguns Made From Inferior Materials

It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any make and model of handgun that:

(1) has a frame, barrel, cylinder, slide or breechblock:

    (a) composed of any metal having a melting point of less than 900°F,

    (b) composed of any material having an ultimate tensile strength of less than 55,000 pounds per square inch, or

    (c) composed of any powdered metal having a density of less than 7.5 grams per cubic centimeter; or

(2) is prone to repeated firing based on a single pull of the trigger, prone to the explosion of the handgun during firing with standard ammunition, or prone to accidental discharge.

(3) 940 CMR 16.04(1) shall not apply to any make and model of handgun which satisfies the Make and Model Performance Requirements. The Attorney General may require that the handgun-purveyor, or the entity testing the make and model in question on behalf of the handgun-purveyor, provide a sworn certification verifying that the make and model met the performance requirements. At the Attorney General's discretion, he may, upon 60 days notice, require that any such test be performed again by an independent testing entity chosen by the Attorney General, upon three test guns of the make and model purchased at retail. In such a case, the prior certification shall be prospectively invalid at the conclusion of the notice period and the make and model in question may henceforth only meet the Make and Model Performance Requirements by obtaining a certification from the independent tester. A handgun-purveyor may resubmit a make and model to the independent tester for testing an unlimited number of times.

### 16.05: Sale of Handguns Without Childproofing or Safety Devices

(1) It shall be an unfair or deceptive practice to sell a handgun without a safety device in violation of M.G.L. c. 140, § 131K.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain

16.05: continued

a mechanism which effectively precludes an average five year old child from operating the handgun when it is ready to fire; such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun.

(3) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun which does not contain a load indicator or magazine safety disconnect.

(4) 940 CMR 16.05(2) shall not apply to handguns which have a hammer deactivation device. 940 CMR 16.05(3) applies only to handguns that have a mechanism to load cartridges via a magazine.

16.06: Safety Warning/Disclosures

(1) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any handgun unless that handgun is accompanied by the following warning, provided on a separate sheet of paper included within the packaging enclosing the gun, which, in at least 12 point type, states the following:

"WARNING FROM THE MASSACHUSETTS ATTORNEY GENERAL: This handgun is not equipped with a device that fully blocks use by unauthorized users. More than 200,000 firearms like this one are stolen from their owners every year in the United States. In addition, there are more than a thousand suicides each year by younger children and teenagers who get access to firearms. Hundreds more die from accidental discharge. It is likely that many more children sustain serious wounds, or inflict such wounds accidentally on others. In order to limit the chance of such misuse, it is imperative that you keep this weapon locked in a secure place and take other steps necessary to limit the possibility of theft or accident. Failure to take reasonable preventive steps may result in innocent lives being lost, and in some circumstances may result in your liability for these deaths."

Failure to include this warning in the packaging enclosing the gun shall not be a violation of 940 CMR 16.00 if the handgun in question complies with 940 CMR 16.05(1) by means of a built-in passive use-limitation device, including but not limited to a nondetachable solenoid use-limitation device.

(2) It shall be an unfair or deceptive practice for a handgun-purveyor to transfer a handgun directly to a retail customer located within the Commonwealth without demonstrating how to load, unload, and safely store the handgun, and how to engage and disengage all safety devices on the handgun. This shall include an explanation of the circumstances for which the safety devices are designed to prevent the firing of the handgun. The handgun-purveyor shall also note for the retail customer the absence, if any, of the following: a load indicator, a magazine safety disconnect or an internal safety.

(3) It shall be an unfair or deceptive practice for a handgun purveyor to transfer to a customer located within the Commonwealth a handgun that has a barrel shorter than three inches, unless the handgun purveyor discloses the limits of the accuracy of the make and model of handgun for sale by providing in writing to the customer (prior to sale) the make and model's average group diameter test result at seven yards, average group diameter test result at 14 yards, and average group diameter test result at 21 yards.

16.07: Transfers of Used Handguns

(1) 940 CMR 16.03 and 16.05(2) and (3) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer and that was manufactured prior to the enforcement date for those provisions.

16.07: continued

(2) 940 CMR 16.06(3) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.06(3), and for which the handgun-purveyor discloses the limits of the accuracy of the specific handgun for sale by providing in writing to the customer(prior to sale) the handgun's average group diameter test result at seven yards, average group diameter test result at 14 yards, and average group diameter test result at 21 yards.

(3) 940 CMR 16.04(2), as it pertains to any make and model prone to accidental discharge, shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.04(2), and for which the handgun-purveyor provides to the buyer a sworn certification that the handgun-purveyor has performed the Handgun Drop Test on the handgun in question in fully cocked position, and on the same handgun (or on other handguns of the same make and model in similar condition) in all other hammer/striker positions, and that there were no discharges during the test.

(4) 940 CMR 16.04(1) shall not apply to the transfer of (or offer to transfer) any handgun that previously has been sold at retail to a consumer, was manufactured prior to the enforcement date for 940 CMR 16.04(1), and for which the handgun-purveyor provides a sworn certification to the buyer that the specific handgun purchased passed the Handgun Performance Test.

16.08: Severability

If any section or subsection of 940 CMR 16.00 shall be held invalid, the validity of the remainder of 940 CMR 16.00 shall not be affected thereby. If the application of any section or subsection of 940 CMR 16.00 to any person or circumstance shall be held invalid, the applicability of such section or subsection to any other person or circumstance shall not be affected thereby.

16.09: Enforcement Dates

940 CMR 16.00 shall apply as follows:

(1) 940 CMR 16.01, 16.02, and 16.08, and 940 CMR 16.06(1) and (2) shall apply to acts committed or practices in force as of January 15, 1998;

(2) 940 CMR 16.04 and 940 CMR 16.06(3), 16.07(2), (3) and (4) shall apply to acts committed or practices in force as of June 30, 1998; and

(3) 940 CMR 16.03 and 16.05, and 940 CMR 16.07(1) shall apply to acts committed or practices in force as of September 30, 1998.

REGULATORY AUTHORITY

940 CMR 16.00: M.G.L. c. 93A, § 2(c).

(PAGES 125 THROUGH 130 ARE RESERVED FOR FUTURE USE.)

# RECORDS

OF

# PLYMOUTH COLONY.

## LAWS.

## 1623—1682.

# RECORDS

### OF THE

# COLONY

### OF

# NEW PLYMOUTH

### IN

## NEW ENGLAND.

PRINTED BY ORDER OF THE LEGISLATURE OF THE
COMMONWEALTH OF MASSACHUSETTS.

EDITED BY

## DAVID PULSIFER,

CLERK IN THE OFFICE OF THE SECRETARY OF THE COMMONWEALTH,

MEMBER OF THE NEW ENGLAND HISTORIC-GENEALOGICAL SOCIETY, FELLOW OF THE AMERICAN STATISTICAL ASSOCIATION,
CORRESPONDING MEMBER OF THE ESSEX INSTITUTE, AND OF THE RHODE ISLAND, NEW YORK,
CONNECTICUT, WISCONSIN AND IOWA HISTORICAL SOCIETIES.

## LAWS.

## 1623–1682.



## BOSTON:

### FROM THE PRESS OF WILLIAM WHITE,

PRINTER TO THE COMMONWEALTH.

## 1861.

Add. 26

[PART III.]     It was att this Court voated and generally agreed on by the Court;
that our Confeaderation with two Collonies: viz: Massachusetts and Conecticott
shall stand and remaine as It did formerly with three;

It is enacted by the Court and the authoritie therof that a Comittee
be chosen to puse all our lawes; and to gather vp from them or any other
healpes they can gett and compose therfrom a body of Lawes; and p^rsent the
same to the next election Court for a further settlement therof and the charge
therof to be bourne and defrayed by the Treasurer

The Comitttee appointed by the court were    the Gou^r    } and M^r Walley healp
                                             The Major    } to be requested
                                             and M^r Hinckley
and if any of the deputies or others shall propose any thinge to this Com-
ittee for theire consideration when they meet together it shalbe well accepted;

Wheras seuerall psons haue bine greatly Indangered by seting of Guns
It is enacted by the Court and the authoritie therof that none shall sett any
Guns except in Inclosures and that the gun be sufficiently enclosed soe as it
be Cecure from hurting man or beast and that hee that seteth the gun doe
giue warning or notice therof to all the Naighbours on the penaltie of paying
a fine of fiue pounds to the vse of the Collonie for euery default;

It is enacted by the Court that if there be any psons that will buy all
Repealed June   the Tarr that shalbe made within this Collonie and will pay eight shillings a
9th 167i.      barrell for itt in mony; and for euery halfe hogshed twelue shillings for it in
mony; they shall haue it soe; for the tearme of two yeares from the date
heerof; and to receiue it att a place appointed in euery Township and it is
further enacted by the Court that if any others except those that soe engage
to buy all the Tarr shall carry or cause any to be carryed out of the Col-
lonie within the aforsaid tearme of two yeares they shall forfeite either the
Tarr or the vallue therof; the one halfe to the Collonie and the other halfe
to those that are engaged to buy all the said Tarr.

*120        *fforasmuch as seuerall Townes in this Collonie are alreddy much
Straightened for building timber and through Gods prouidence some other
townes are well accomodated to afford them a supply that townes soe straight-
ened be not nessessitated to fech theire supplyes from another Jurisdiction;
whilst wee haue of our owne;

                                June i672.
Be it Inacted by this Court and the Authoritie therof That noe timber
of any sort may or shall within the tearme of seauen yeares next after the
first of Nouember next ensueing; be att any time transported or carryed
away by land or water out of any Township in this Jurisdiction into any other

# ACTS

## PASSED AT THE SESSION BEGUN AND HELD AT BOSTON,

## ON THE FOURTEENTH DAY OF OCTOBER, A.D. 1713.

### CHAPTER 6.

#### AN ACT TO PROHIBIT SHOOTING OR FIRING OFF GUNS NEAR THE ROAD OR HIGHWAY ON BOSTON NECK.

WHEREAS the limbs and lives of several persons have been greatly endangered, in riding over Boston Neck, by their horses throwing of them, being affrighted, and starting at the firing of guns by gunners that frequent there after game; for preventing whereof for the future,—

*Be it enacted by His Excellency the Governour, Council and Representatives in General Court assembled, and by the authority of the same,*

Penalty.    [SECT. 1.] That no person or persons, from and after the publication of this act, may presume to discharge or fire off any gun upon Boston Neck, within ten rods of the road or highway leading over the same, on pain of forfeiting and paying the sum of twenty shillings for each gun so fired or discharged, one moiety thereof to be to and for the use of the poor in the said town of Boston, and the other moiety to him or them that shall inform, complain and sue for the same; to be recovered before the court of general sessions of the peace within the county, or before any one or more of her majesty's justices of the peace out of court.

Guns to be seized.    [SECT. 2.] And, for the better conviction of persons offending against this act, it shall be lawful, to and for any freeholder, to arrest and take into custody any gun so fired off, and render the same to one of the next justices in Boston, in order to its being produced at the time of tryal. [*Passed October* 23 ; *published November* 2.

### CHAPTER 7.

#### AN ACT AGAINST HAWKERS, PEDLARS, AND PETTY CHAPMEN.

WHEREAS complaint is made of great hurt to and the decay of trade, occasioned by hawkers, pedlars and petty chapmen passing to and fro through the country to vend goods, wares and merchandizes, much of which was probably obtained by robbery and stealing in the time of the late great desolation by fire in the town of Boston (to the grievous loss and oppression of her majesty's good subjects, sufferers in the said calamity), and by frequent robberies and thefts since committed ; so that divers men of trades, handycraft men and others, none of the best fame, having left off the exercise of their trades and business, turn hawkers, pedlars and petty chapmen ; for remedy of which mischief,—

itants, in order to chuse such officers as, by law, towns are [c][i]pow-
ered to chuse in the month of March, annually; at which said first
meeting all the then present inhabitants shall be admitted to vote.
[*Passed July 4\**; *published July* 5.]

# CHAPTER 8.

AN ACT FOR REVIVING AND CONTINUING AN ACT MADE TO PREVENT
DAMAGE BEING DONE ON THE LANDS CALLED NOBSCUSSET, IN THE
TOWNSHIP OF YARMOUTH.

WHEREAS the act made and passed in the thirtieth year of his
late majesty, King George the Second, intitled "An Act to prevent
damage being done on the lands lying in the township of Yarmouth,
called Nobscusset," which act has been found useful and beneficial,
is expired, —
    *Be it therefore enacted by the Governor, Council and House of
Representatives,*
    [SECT. 1.] That the aforesaid act, and every clause, matter and
thing therein contained, be and the same is, hereby, revived and shall
continue in force until the first day in July, which will be in the year
of our Lord one thousand seven hundred and eighty-one, and to the
end of the then next session of the general court, and no longer.
    *And be it further enacted,*
    [SECT. 2.] That such person or persons as may have been chosen
at the anniversary meeting of the inhabitants of the town of Yar-
mouth, in March last, to see to the observance of said act and to
prosecute the breakers thereof, or that may, at any time during the
continuance of the said hereby-revived act, be chosen or appointed
by said town for that purpose, are hereby as fully impowered (being
first sworn to the faithful discharge of such trust) to take effectual
care that said act be duly observed, and the transgressors thereof
duly prosecuted, as if said act had not expired; and upon his or their
refusing to accept of and be sworn to such office or trust, shall be
subject to the same forfeiture, to be applied to the same use, as is
therein mentioned; and upon such refusal the inhabitants of said
town may, and they are hereby, authorized to appoint another person
or persons to that trust, and so, *toties quoties,* during the continuance
of said act. [*Passed July 4\**; *published July* 5.]

*Preamble.*
1757–58, chap. 6.

*Act of 30th
George II., re-
vived.*

*Persons chosen
at Yarmouth,
empowered.*

# CHAPTER 9.

AN ACT FOR ERECTING TWO PUBLICK MAGAZINES FOR THE SAFE
KEEPING OF POWDER; THE ONE IN THE TOWN OF BOSTON, AND THE
OTHER IN THE TOWN OF WATERTOWN.

WHEREAS it is with good reason apprehended that the present situation
of the magazine or powder-house on the common or training-field in
Boston is unsafe for lodging and keeping the great quantities of gun-

*Preamble.*

* Signed July 5, according to the record.

powder which are commonly placed therein, and that it is also expedient to have another public magazine out of the town of Boston, in addition to that in Charlestown, —

*Be it therefore enacted by the Governor, Council and House of Representatives,*

Two powder-houses to be built; one in Boston, one in Watertown.

[SECT. 1.] That two public[k] magazines, or powder-houses, be built of stone or brick, and suitably finished, as soon as may be, at the publick expence, fit for stor[e]ing and safe keeping of gunpowder; the one in the town of Boston, behind, or at the north-western end of, the hills on the northern side of the common, or training-field, there; and the other, within the town of Watertown, in the county of Middlesex, in such place in said town as may be agreed upon by a committee that may be appointed by the general assembly to build said magazine; and that from and after the finishing such new magazines, all the gunpowder in the present magazine[s] shall, without delay, at the

Powder to be removed as the commander-in-chief shall direct.

expence of the respective owners thereof, be removed from thence into one of the new magazines, or into both of them, or into the magazine at Charlestown, in such proportions as the commander-in-chief shall order; and that all the gunpowder which shall be imported and landed, in the port of Boston aforesaid, after finishing such new magazines, or either of them, shall be carried into and placed in one

Forfeiture, in case.

or both of them, or in the magazine at Charlestown, according to such order as aforesaid, and not el[e]s[e]where, on pain of forfeiting all such gunpowder as shall be lodged or kept in any other place; one moiety thereof to and for the use of this province, and the rest, to the informer; to be recovered by bill, plaint or information in any court of record in this province. And the owner or owners of such gunpowder shall also forfeit the sum of ten pounds for every half-barrel of such gunpowder, and after that rate for every greater quantity, lodged in any other place; to be recovered by action of debt, in any court proper for the trial thereof, by him that shall sue for the same:

Town stocks to be under the direction of the selectmen.

*saving, nevertheless,* that the ordinary town stocks of gunpowder, of each and every town or district within this province, may be placed and kept in any other suitable place or places, as the selectmen thereof, respectively, shall appoint; and that a quantity of gunpowder, not

Quantity that may be kept in private shops.

exceeding five-and-twenty pounds, may be kept in any shop for sale (provided it be kept in brass or tin tunnels): *saving,* likewise, all needful stocks and gunpowder for any fort, fortress or garrison within this province; which may, nevertheless, be lodged and kept in such fortress: *saving, also,* all such public[k], or provincial, stocks of gunpowder as by the commander-in-chief, for the time being, shall be ordered to be lodged in any other place or places.

*And be it further enacted,*

Keeper to be appointed by the commander-in-chief;

[SECT. 2.] That a keeper shall, from time to time, be appointed by the commander-in-chief, [by] for each of the said magazines, who shall duly attend, each one, his respective magazine, at such hours and times as shall be directed and ordered by the commander-in-chief, for taking in and delivering out, all such gunpowder as shall, from time to time, be wanted by the respective owners thereof; and whose duty it shall be, in all respects, to take due care of all the gunpowder therein, for the preservation thereof, and not to neglect turning the

— his duty;

same, once [in] every month, at least, as long as it shall remain therein: and that no powder be taken in or delivered out, but between the hours of sun-rising and sun-s[i][e]tting.

*And be it further enacted,*

— his allowance.

[SECT. 3.] That for all gunpowder which shall be put into the said magazines, or either of them, *saving* such as belong to the public

stock, there shall be paid into the hands of the respective keepers thereof, for the use of the province, one shilling for each barrel, upon receipt thereof ; and sixpence for each barrel, by the month, for three months after the first month from the receipt thereof ; and fourpence for each barrel, for every month afterwards ; as long as it shall remain therein : which monies, to be received by the several keepers of the said magazines, respectively, they shall each of them account for, upon oath, to the commander-in-chief and the council ; and the same shall be applied towards defr[e]aying the charges of keeping and attending the said magazines, managing and taking due care of the gunpowder therein ; and if there shall, at any time, be a deficiency for those purposes, it shall be made up and paid out of the province treasury ; and if, at any time, there should be a surplusage, it shall be paid into the province treasury.   [*Passed and published July 5.*

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same,* That a Sum not exceeding *Two Thousand Pounds* be raised by a Lottery or Lotteries, for and to the Purpose of re-building the said Mills; and that *John Pitts* and *John White*, Esquires, and Mr. *William Paine*, or any two of them, shall be Managers of the said Lottery or Lotteries, who shall be sworn to the faithful Performance of their Trust; which said Managers shall make and publish in such News Papers as they shall judge proper, a Scheme for the said Lottery or Lotteries, as soon as may be; and they shall also publish therewith all necessary Rules and Regulations for the Management thereof. And all Prizes which may be drawn in the said Lottery or Lotteries, shall be paid without any Deduction, provided they are demanded within Six Months after the Drawing of the said Lottery or Lotteries, otherwise the Money arising from such Prizes, shall be appropriated to the Purpose aforesaid.

*And be it further enacted,* That if any Person shall forge, counterfeit, or alter any Lottery Ticket issued by Virtue of this Act, or shall pass or utter any such forged, counterfeited or altered Ticket, knowing the same to be false, forged, counterfeited or altered, or shall advise or assist in forging, altering, or counterfeiting the same, every Person so offending, and being thereof convicted before the Supreme Judicial Court of this Commonwealth, shall be punished by being set on the Gallows for the Space of one Hour, with a Rope round his Neck, or shall pay a Fine not exceeding *One Hundred Pounds*, to the Use of this Commonwealth, or suffer not more than Twelve Months Imprisonment, nor less than Two, or be publicly whipped, not exceeding Thirty-nine Stripes, at the Discretion of the said Supreme Judicial Court, according to the Nature and Circumstances of the Offence.

*February 26, 1783.*

*£2000 to be raised by Lottery.*

*Names of the Managers.*

*Persons guilty of Forgery.*

*Penalty.*

---

## 1782. — Chapter 46.

[January Session, ch. 13.]

AN ACT IN ADDITION TO THE SEVERAL ACTS ALREADY MADE FOR THE PRUDENT STORAGE OF GUN POWDER WITHIN THE TOWN OF *BOSTON.*

*Chap.* 46

*Whereas the depositing of loaded Arms in the Houses of the Town of* Boston, *is dangerous to the Lives of those who*

Preamble.

*are disposed to exert themselves when a Fire happens to break out in the said Town :*

*Be it enacted by the Senate and House of Representatives in General Court assembled, and by the Authority of the same,* That if any Person shall take into any Dwelling House, Stable, Barn, Out House, Ware House, Store, Shop, or other Building within the Town of *Boston,* any Cannon, Swivel, Mortar, Howitzer, Cohorn, or Fire Arm, loaded with, or having Gun Powder in the same, or shall receive into any Dwelling House, Stable, Barn, Out House, Store, Ware House, Shop, or other Building, within the said Town, any Bomb, Grenade, or other Iron Shell, charged with, or having Gun Powder in the same, such Person shall forfeit and pay the Sum of *Ten Pounds,* to be recovered at the Suit of the Firewards of the said Town, in an Action of Debt, before any Court proper to try the same ; one Moiety thereof to the Use of the said Firewards, and the other Moiety to the Support of the Poor of the Town of *Boston.*

*And be it further enacted by the Authority aforesaid,* That all Cannon, Swivels, Mortars, Howitzers, Cohorns, Fire Arms, Bombs, Granades, and Iron Shells of any Kind, that shall be found in any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building, charged with, or having in them any Gun Powder, shall be liable to be seized by either of the Firewards of the said Town : And upon Complaint made by the said Firewards to the Court of Common Pleas, of such Cannon, Swivels, Mortars, or Howitzer, being so found, the Court shall proceed to try the Merits of such Complaint by a Jury ; and if the Jury shall find such Complaint supported, such Cannon, Swivel, Mortar, or Howitzer, shall be adjudged forfeit, and be sold at public Auction ; and one Half of the Proceeds thereof shall be disposed of to the Firewards, and the other Half to the Use of the Poor of the Town of *Boston.* And when any Fire Arms, or any Bomb, Granade, or other Shell, shall be found in any House, Out House, Barn, Stable, Store, Warehouse, Shop, or other Building, so charged, or having Gun Powder in the same, the same shall be liable to be seized in Manner aforesaid ; and on Complaint thereof, made and supported before a Justice of the Peace, shall be sold and disposed of as is above provided for Cannon.

*Be it further enacted,* That Appeals shall be allowed in Prosecutions upon this Act as is usual in other Cases.

*March 1, 1783.*

Persons prohibited taking into their Dwellings, &c. any piece of Ordnance loaded with Gun Powder.

Penalty.

Pieces of Ordnance charged with Gun Powder found in any Dwelling-House, &c. liable to be seized.

How disposed of in Cases of Forfeiture.

Appeals allowed.

other Towns within this Commonwealth are required by
law to choose in the Months of March or April annually;
And the Officers so chosen shall be qualified as other
Town Officers are.      *Approved March 8, 1805.*

---

### 1804. — Chapter 81.

[January Session, ch. 35.]

AN ACT TO PROVIDE FOR THE PROOF OF FIRE ARMS MANU-
FACTURED WITHIN THIS COMMONWEALTH.

*Whereas no provision hath been made by law for the* Preamble.
*proof of Fire Arms manufactured in this Commonwealth*
*by which it is apprehended that many may be introduced*
*into use which are unsafe and thereby the lives of the Cit-*
*izens be exposed, to prevent which*

Sect. 1st. *Be it enacted by the Senate and House of*
*Representatives in General Court assembled, and by the*
*authority of the same* That the Governor by and with Provers of fire-
the advice and consent of the Council be and he hereby arms to be appointed.
is empowered to appoint in any part of this Common-
wealth where the Manufacture of fire Arms is carried on,
suitable persons to be provers of fire arms not exceeding
two in any County who shall be sworn to the faithful dis-
charge of their trust, whose duty it shall be to prove all
Musket Barrels and Pistol barrels which being sufficiently
ground bored and breeched shall be offered to him to be
proved — who shall prove the Musket barrels twice in
manner following vizt. first with a charge consisting of Method of
one eighteenth part of a pound of Powder, one ounce of proving.
which in a five & an half inch Howitz at an elevation
of forty five degrees will carry a twenty four pound shot,
eighty Yards — with a ball suited to the bore of the bar-
rel — the second proof to be with a charge consisting of
one twenty second part of the same powder with a ball
suited to the bore of the barrel, and shall prove the pistol
barrels once with a charge consisting of one twenty sec-
ond part of a pound of Powder, one ounc of which in a
five and half inch Howitz at an elevation of forty five
degrees, will carry a twenty four pound shot seventy
Yards, with a ball suited to the bore of the barrel —
which said powder and ball it shall be the duty of the
prover to provide — And if the said musket and pistol Proof marks
barrels shall stand the proof aforesaid and shall in no re-
spect fail, then it shall be the duty of the said prover to

stamp the same on the upper side and within one and an half inches of the breech of said barrels with a stamp consisting of the initial letters of the provers name & over those letters the letter P. also in the line of the said initial letters and further up said barrel the figures designating the Year of our Lord in which the proof is made and over the said figures the letter M. which said letters and figures shall be so deeply impressed on said barrel as that the same cannot be erased or disfiguered and shall be in the form following $\overset{P}{A}\overset{M}{B}$ 1805 and when any barrels shall burst or shall in any manner fail in the proving as aforesaid so that in the opinion of the prover they are unfit for use they shall not be stamped but the said prover

**Fees.**

shall suffer the owner to take them away — & any prover so proving musket or pistol barrels as aforesaid shall be entitled to recieve from the owner for each musket barrel thirty three Cents, and for each pistol barrel twenty five Cents, whether the same stand proof and are Stamped or not.

**Penalty for not having arms proved.**

SEC. 2D. *And be it further enacted,* that if any person after the first day of June next shall manufacture within this Commonwealth any musket or pistol without having the barrels proved and stamped as aforesaid, except such as are or may be Manufactured in the Armory of the United States, or in fulfilment of some contract made and entered into or that may hereafter be made and entered into for the Manufacturing of fire arms for the United States, shall forfiet and pay for every such Musket or pistol the sum of ten dollars to be recovered in an action of Debt before any Court proper to try the same by any person who shall sue for and recover the same to his own use.

**Penalty for selling or buying arms not proved.**

SEC. 3D. *And be it further enacted* that if any person after the said first day of June next, shall sell and deliver or shall knowingly purchase any Musket or Pistol which shall have been manufactured within this Commonwealth after the said first day of June next, which shall not have the marks of proof above required the person so selling and the person so purchasing, shall each forfiet the sum of Ten Dollars, to be recovered by action of debt before any Court proper to try the same to the use of any person who shall sue for and recover the same.

**Penalty for forging stamp.**

SEC. 4TH. *And be it further enacted,* that if any person, shall falsely forge or alter the stamp of any prover

of Fire arms, so appointed as aforesaid impressed on any musket or Pistol Barrel pursuant to this Act, and be convicted thereof before the Supreme Judicial Court he shall be punished by fine not exceeding Fifty Dollars nor less than twenty dollars, according to the nature and agravation of the offence. *Approved March 8, 1805.*

## 1804. — Chapter 82.

[January Session, ch. 36.]

AN ACT TO INCORPORATE A NUMBER OF THE INHABITANTS IN THE TOWN OF LIMINGTON, IN THE COUNTY OF YORK, INTO A SEPERATE RELIGIOUS SOCIETY, BY THE NAME OF THE FIRST BAPTIST SOCIETY IN LIMINGTON.

SEC. 1. *Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same,* That Ebenezer Clarke, James Marrs, Solomon Stone, William Chick, Barzillai Small, Nathaniel Clark, Paul Gray, James Sawyer, John Gray, Ebenezer Sawyer, Jeremiah Small, Lemuel Sawyer, Peter Chick, James Small, Daniel Rounds, Amos Chase, Robert Hooper, David Nason, Jonathan Nason, Daniel Small, Frethe Spencer, John Lord, John Sutton, Stephen Webber, George Stone, James Lord, John Andrews, John Finnix, Enoch Nason, Nathaniel Adams, Benjamin Norton, Edward Norton, John Greenlaw, Amos Thompson, Joseph Sawyer, William Sawyer, Ebenezer Walker, William Wentworth, Hurd Hubbard, James Heard, Joshua Durgon, Levi Cole, William Manning, George Finnix, Isaac Small, Ezekiel Small, Jacob Small, Josiah Chase, Thomas Spencer, Abraham Parker, Amos Chase Junior, Nathan Chick, and Jonathan Nason Junior, members of said Religious Society, with their polls and estates, be, and they are hereby incorporated by the name of the First Baptist Society in Limington, with all the priviledges and immunities which parishes or Religious Societies in this Commonwealth are by Law intitled to, *provided however,* that all such persons, shall be holden to pay their proportion of all Monies assessed in said town of Limington for Parochial purposes, previous to the passing of this Act.

SEC. 2D. *And be it further enacted,* that any person in said town of Limington who may at any time within one year from the passing of this Act, actually become a Member of, and unite in religious worship with the said

*Persons incorporated.*

*Corporate name.*

*Method of joining the society.*

tors, then the said proprietors, for the purpose of paying such delinquent's assessment, are hereby authorized and fully empowered, to direct their Collector, Clerk, or Treasurer from time to time, at publick vendue to sell and convey so much of such delinquent's land as near as may be to said causeway, as will be sufficient to defray the sum assessed on him, and all reasonable charges attending such sale ; notice of such sale, and of the time and place being given, by publishing an advertisement thereof, in two of the newspapers printed in Boston, five weeks successively before the time of sale. And the proprietors may, by their Clerk, execute a deed of conveyance of the land thus sold, unto the purchaser ; wherein shall be conveyed all the right and title which said delinquent proprietor formerly had in said land thus sold and conveyed. *Provided nevertheless*, that the person whose land shall be sold, shall have liberty to redeem the same, at any time within one year after such sale, by paying the sum his land was sold for, and charges, together with twelve per centum on the sum produced by such sale.

Land of delinquent to be sold for taxes.

Proviso.

Sect. 4. *Be it further enacted*, that the proprietors of said causeway, and of the land thereto adjacent, are hereby empowered to order and manage all affairs relative to the making and maintaining the said causeway, in such way and manner, as shall be concluded and agreed on, by the major part of those who are therein interested, present at any legal meeting ; the votes to be collected and accounted according to the number of acres owned by the proprietors of said causeway.

[This act passed *Feb.* 27, 1809.]

---

## CHAP. LII.

An act providing for the appointment of Inspectors, and regulating the manufactory of Gun-Powder.

Sect. 1. Be *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same*, That his Excellency the Governour, by and with the advice of Council, be, and he is hereby authorized to appoint an Inspector of gun-powder for every publick powder magazine, and at every manufactory of gun-powder in this Commonwealth, and at such other places, as may by him be thought necessary ; and his Excellency the Governour, by and with the advice of Council,

Governour to appoint inspectors,

is

is hereby further authorized and empowered to remove said Inspectors, or any of them at pleasure, and may by new appointments from time to time fill any vacancy, or vacancies which may happen.

Sect. 2. *Be it further enacted*, That from and after the first day of July next, all gun powder which shall be manu- Materials. factured within this Commonwealth shall be composed of the following proportions, and quality of materials, that is, every one hundred parts of gun powder, shall be composed of fourteen parts of fresh burnt coal, made from wood which forms the least ashes, and which has been carefully and well prepared, and made into coal, after being stripped of its bark, ten parts of pure sulphur, and seventy six parts of purified nitre.

Sect. 3. *Be it further enacted*, That it shall be the duty of each of said Inspectors, to inspect, examine and prove Duty of inspec- all gun-powder, which after the first day of July next, shall tors. be deposited at any publick powder magazine, or manufactured in this Commonwealth, before the same shall be removed from the manufactory, or received into such publick powder magazine, and if upon such inspection and examination it shall appear to the Inspector, that such gunpowder is well manufactured, and composed of pure materials, and of the proper proportions of materals, and such gun-powder shall be of the proof herein after mentioned the Inspector shall mark each cask, containing gun-powder by him inspected, examined and proved as aforesaid, with the words Massachusetts Inspected Proof ; and with his christian and sur-name, and shall also mark in figures upon each cask the quantity of powder contained therein, and the year in which the inspection is made.

Sect. 4. *Be it further enacted*, That no gun-powder within this Commonwealth, shall be considered to be of proof unless one ounce thereof placed in the chamber of a Powder to be four and an half inch howitzer, with the howitzer elevated proved. so as to form an angle of forty five degrees with the horizon, will, upon being fired, throw a twelve pound shot, seventy five yards at the least.

Sect. 5. *Be it further enacted*, That whenever any of said Inspectors, shall discover any gun-powder, deposited at any publick powder magazine, or any other place within this Commonwealth, which is not well manufactured, or which is composed of impure materials, or of an improper proportion of materials, and which shall not be of the proof herein before mentioned, the inspector in such case shall Casks of bad mark each cask containing such impure ill manufactured or powder to be marked. deficient

deficient gun-powder, with the word "Condemned" on both heads of the cask, and with the same words on the side thereof, with the christian and sur-name of the inspector on one head of the cask.

SECT. 6. *Be it further enacted*, That if any person shall knowingly sell any condemned gun powder as, and for, good gun-powder, or shall fraudulently alter, or deface any mark, or marks, placed by any Inspector upon any cask or casks containing gun-powder, or shall fraudulently put any gun-powder, which shall not have been inspected, or which has been condemned, into any cask or casks, which shall have been marked by any Inspector, agreeably to the provisions contained in the third section of this act, every such person so offending shall forfeit and pay not less than

<span style="float:left">Fines.</span>

two hundred, nor more than five hundred dollars, for each and every offence, to be recovered in an action of debt in any Court of competent jurisdiction ; one half to the use of the Commonwealth, the other half to the use of him or them, who shall sue, and prosecute for the same.

SECT. 7. *Be it further enacted*, That each Inspector who may be appointed by virtue of this act, shall before he

<span style="float:left">Inspector to be sworn.</span>

acts as Inspector, be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gun-powder by him examined, inspected, and proved, whether the same be by him approved or condemned, to be paid by the owner or owners of the gun-powder.

SECT. 8. *Be it further enacted*, That if any manufacturer of gun-powder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export, or cause to be exported without the limits of this Commonwealth, any powder of his manufacture, before the same has been inspected, and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act.

<span style="float:left">Fines.</span>

SECT. 9. *Be it further enacted*, That if any person within this Commonwealth, after the first day of July next shall knowingly sell, expose, or offer for sale within this Commonwealth any gun-powder which is not well manufactured, or which is composed of impure materials, and which shall not be of the proof herein before required, shall forfeit and pay not less than five dollars, nor more than fifty dollars ; for each and every offence, to be recovered in the manner provided in the sixth section of this act.

[This act passed *March* 1, 1809.]      CHAP.

Add. 39

# LAWS

## OF THE

## Commonwealth of Massachusetts,

### PASSED BY THE GENERAL COURT,

AT THEIR SESSION, WHICH COMMENCED ON WEDNESDAY THE 12th
DAY OF JANUARY, AND WHICH ENDED ON MONDAY
THE 28th DAY OF FEBRUARY, 1814.

---

Published agreeably to a Resolve of 16th January, 1812.

---





### BOSTON:

PRINTED BY RUSSELL, CUTLER, AND CO.

1814.

Town incor-
porated.

county of Essex, by the name of Lynnfield," be, and the
same hereby is incorporated into a town, by the name of
Lynnfield, with all the powers, privileges, and immunities,
and liable to all the duties and requisitions of other towns
in this Commonwealth.

[Approved by the Governor, February 28, 1814.]

## CHAP. CXCII.

An Act in addition to an act, entitled "An act to provide
for the proof of Fire Arms, manufactured within this
Commonwealth."

Manner of
proving.

SEC. 1. BE *it enacted by the Senate and House of
Representatives, in General Court assembled, and by the
authority of the same,* That from and after the passing of
this act, all musket barrels and pistol barrels, manufactured
within this Commonwealth, shall, before the same shall be
sold, and before the same shall be stocked, be proved by
the person appointed according to the provisions of an act,
entitled "An act to provide for the proof of Fire Arms,
manufactured within this Commonwealth," to which this
is an addition, in manner following, viz : with a charge of
powder equal in weight to the ball which fits the bore of
the barrel to be proved ; and the powder used in such proof
one ounce thereof in a howitzer of four and a half inch
caliber, at an elevation of forty-five degrees, shall be of
sufficient power to carry a twelve pound shot one hundred
and thirty yards ; or one ounce thereof in a howitzer of
five and a half inch caliber, at an elevation of forty-five de-
grees, shall be sufficient to carry a twenty-four pound shot
eighty yards, and the ball used in such proof shall be suit-
ed to the bore of the barrel to be proved as aforesaid.

Restrictions.

SEC. 2. *Be it further enacted,* That if any person or
persons, from and after the passing of this act, shall man-
ufacture, within this Commonwealth, any musket or pis-
tol, or shall sell and deliver, or shall knowingly purchase
any musket or pistol, without having the barrels first prov-
ed according to the provisions of the first section of this
act, marked and stamped according the provisions of the
first section of the act to which this is an addition ; or if

any person or persons shall sell, stock or finish, or shall knowingly purchase any musket barrel or pistol barrel manufactured within this Commonwealth, which shall not have been first proved, marked and stamped according to the provisions aforesaid, the person or persons who shall so manufacture, sell and deliver, or knowingly purchase any musket or pistol without causing the same to be first proved, marked and stamped as aforesaid, and the person or persons who shall sell, stock or finish, or shall knowingly purchase any musket barrel or pistol barrel, which shall not have been proved, marked and stamped as afore- *Forfeitures.* said, shall severally forfeit the sum of ten dollars, to be recovered by an action of debt before any court proper to try the same, by any person who shall sue for and recover the same, to his own use : *Provided however,* That the *Proviso.* foregoing provisions and penalties shall not extend to any muskets or pistols, or musket or pistol barrels, manufactured in any armoury of the United States, for their use, or in execution of any contract made or to be made with the United States, for the manufacture of fire arms.

SEC. 3. *Be it further enacted,* That the second and third sections of the act to which this is in addition, and *Sections re-* also so much of the first section thereof as prescribes the *pealed.* mode of proving musket barrels and pistol barrels, and the power of the powder to be used in such proof, be, and the same are hereby repealed.

[Approved by the Governor, February 28, 1814.]

---

## CHAP. CXCIII.

An Act to incorporate The President, Directors and Company of the Lynn Mechanicks Bank.

SEC. 1. BE *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That Daniel Silsbe, Joseph Fuller the third, John D. Atwell, Thomas Rich, Samuel Brimble- *Persons in-* cum, Micajah Burrill, Parker Mudge, Oliver Fuller, Jon- *corporated.* athan Conner, John Alley, jr. Stephen Oliver, John Mudge, and Jonathan Bachellor, their associates, successors, and assigns shall be, and hereby are created a Cor-

*Chap.* 268   An Act to provide for the correction of omissions in the registration of voters.

*Be it enacted, etc., as follows:*

Name on voting list the preceding year, if omitted by mistake the current year, may be placed on list by order of assessors.

If a qualified voter of any city or town whose name was on the voting list of such city or town for the preceding year, who has been assessed for a poll tax for the current year, and who has paid a state or county tax assessed upon him for the preceding or current year, finds after the close of registration that his name is not placed on the voting list of the current year by reason of the same being omitted by clerical error or mistake from the list of polls as assessed and transmitted by the board of assessors to the board charged with the preparation of the voting list, the board of assessors shall, upon the personal application of such voter, correct such omission or mistake, and give to him a certificate of such correction, to be presented by him in person to the board charged with the preparation of the voting list, who shall, on the receipt thereof, place the name of such voter on the voting list of the precinct, ward or town in which he was entitled to be registered;

Certificate to be issued if application is made on the day of election.

or if application is made on the day of election the said board last mentioned shall give to such voter a certificate, on presentation of which to the election officers of his precinct, ward or town he shall be allowed to vote therein; and such certificate shall be returned and preserved in like manner as the ballots cast in such precinct, ward or town.            *Approved May 26, 1882.*

---

*Chap.* 269   An Act to provide for notice of the place of storage of gunpowder and other explosive compounds.

*Be it enacted, etc., as follows:*

Notice to be given to chief engineer of fire department, of place of storage of explosive compounds.

Section 1.   Any person who shall hereafter store or keep for sale gunpowder or any other explosive compound above the quantity of one pound in any building in any city or town of this Commonwealth shall, immediately on the receipt of such gunpowder or other explosive compound, deliver to the chief engineer of the fire department of such city or town, except in Boston, and in Boston to

Special provision applicable to Boston.

the board of fire commissioners, a statement in writing of the amount of such gunpowder or other explosive compound kept, or proposed to be kept, together with a description of the building and part of the building in which the same is kept, or proposed to be kept, sufficiently accurate for identification; and no person shall store or keep for sale gunpowder or any other explosive compound in

any other place : *provided*, that in any town where there is no fire department such statement shall be delivered to one of the fire wards in such town.

SECTION 2. Any person violating any of the provisions of this act shall be punished by a fine not exceeding one hundred dollars.

*Penalty.*

SECTION 3. This act shall take effect upon its passage.

*Approved May 26, 1882.*

---

AN ACT FOR THE BETTER PROTECTION OF CHILDREN.

*Chap.* 270

*Be it enacted, etc., as follows :*

SECTION 1. Whoever, being the parent of a child less than two years old, abandons it within or without any building in this Commonwealth, or, having made a contract or provision for the board or maintenance of such child, absconds or fails to perform any such contract or provision, and for a period of four weeks after such absconding or failure neither visits nor removes such child, nor during said period notifies the overseers of the poor of the city or town where such parent resides of his or her inability to support such child, shall be punished by imprisonment, if a man, in the house of correction, and if a woman in the reformatory prison for women not exceeding two years, or, in case death shall result from such abandonment, not exceeding five years ; but this act shall not apply to cases in which the omission to visit, remove or support such child, or to give such notice, arises from physical or mental disability.

*Penalty on parent for abandonment of child less than two years old.*

SECTION 2. Every person who knowingly and with wrongful intent aids or abets the abandonment of any such child, as set forth in the preceding section, shall be punished by a fine not exceeding one hundred dollars or by imprisonment not exceeding two years in the house of correction.

*Penalty for aiding or abetting.*

SECTION 3. Every person who receives for board a child under the age of one year, knowing or having reason to believe it to be illegitimate, shall forthwith notify the overseers of the poor of the city or town in which he resides of the fact of such reception, and, if requested by such overseers, shall also so notify the state board of health, lunacy and charity. The parent or parents of such child shall, when called upon by said board, or such overseers, give to said board or such overseers satisfactory security for the maintenance of such child. The parents of such children shall, when called upon, give true answers

*Person receiving for board an illegitimate child under age of one year to notify overseers of the poor.*

structures thereon and otherwise improve the same as may be deemed expedient.

Section 5. The power conferred by this act shall not be exercised except in furtherance of the objects and purposes for which said corporation is organized.

Power confined to furtherance of purposes for which organized.

Section 6. This act shall take effect upon its passage.

*Approved March 12, 1884.*

---

An Act to prohibit the sale of firearms and other dangerous weapons to minors.

*Chap.* 76

*Be it enacted, etc., as follows:*

Section 1. No person shall sell or furnish to a minor under the age of fifteen years, any firearms or other dangerous weapon : *provided*, that instructors and teachers may furnish military weapons to pupils for instruction and drill.

Dangerous weapons not to be furnished to minors under fifteen.

Section 2. Whoever violates the provisions of this act shall for each offence be punished by fine not less than ten nor more than fifty dollars.

Penalty.

Section 3. All acts and parts of acts inconsistent herewith are hereby repealed ; but such repeal shall not affect any prosecutions or suits now begun, nor prevent the institution of any suit, prosecution or proceedings to enforce penalties and liabilities already incurred under existing laws.

Repeal.

*Approved March 12, 1884.*

---

An Act to authorize the Boston Young Women's Christian Association to hold additional real and personal estate.

*Chap.* 77

*Be it enacted, etc., as follows:*

Section 1. The Boston Young Women's Christian Association is hereby authorized to hold real and personal estate, for the purposes set forth in its charter, to an amount not exceeding four hundred thousand dollars in value.

May hold additional real and personal estate.

Section 2. This act shall take effect upon its passage.

*Approved March 12, 1884.*

---

An Act to provide for the appointment of trustees by churches or religious societies in certain cases.

*Chap.* 78

*Be it enacted, etc., as follows:*

Section 1. Churches or religious societies may appoint trustees, not exceeding five in number, who shall with their successors be a body corporate, for the purposes

Trustees may be appointed by churches and religious societies.

# ACTS AMENDATORY

OF THE

# CODES OF CALIFORNIA,

PASSED AT THE

TWENTY-SECOND SESSION OF THE LEGISLATURE,

1877-8.

BEGAN ON MONDAY, DECEMBER THIRD, EIGHTEEN HUNDRED AND SEVENTY-SEVEN, AND ENDED ON MONDAY, APRIL FIRST, EIGHTEEN HUNDRED AND SEVENTY-EIGHT.



SAN FRANCISCO:
A. L. BANCROFT & COMPANY,
LAW BOOK PUBLISHERS, BOOKSELLERS AND STATIONERS,
1878.

or substances, or who sells or keeps for sale any candy or candies adulterated with terra alba or any other deleterious substance or substances, is guilty of a misdemeanor.

SEC. 2. This Act shall take effect from and after its passage.

---

CHAP. CCXCIX.—*An Act amending section four hundred and fifteen of the Penal Code, in relation to crimes against the public peace.*

[Approved March 20, 1878.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

SECTION 1. Section four hundred and fifteen of the Penal Code of this State is hereby amended so as to read as follows:

**415.** Every person who maliciously and willfully dis- Disturbing turbs the peace or quiet of any neighborhood or person, by the peace. loud or unusual noise, or by tumultuous or offensive conduct, or threatening, traducing, quarreling, challenging to fight, or fighting, or who, on the public streets of any unincorporated town, or upon the public highways in such unincorporated town, run any horse race, either for a wager or for amusement, or fire any gun or pistol in such unincorporated town, or use any vulgar, profane, or indecent language within the presence or hearing of women or children, in a loud and boisterous manner, is guilty of a misdemeanor, and upon conviction by any Court of competent jurisdiction shall be punished by fine not exceeding two hundred dollars, or by imprisonment in the County Jail for not more than ninety days, or by both fine and imprisonment, or either, at the discretion of the Court.

SEC. 2. This Act shall be in force from and after its passage.

---

CHAP. XVIII.—*An Act to amend the Penal Code.*

[Approved January 19, 1878.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

SECTION 1. The following is added as a new section to the Penal Code, and must be inserted in said Code after section four hundred and nineteen, and designated as section four hundred and twenty, as follows:

**420.** Any person who, in the presence or hearing of Inciting twenty-five or more persons, shall utter any language with riots. intent either to incite a riot at the present or in the future, or any act or acts of criminal violence against person or property, or who shall suggest, or advise, or encourage any

shall not be construed to apply or extend to any vessel arriving or coming from any foreign port, or place, or from any port or place in the United States, south of the Capes of the Delaware, which shall have entered any port or place in the United States, north of the said Capes of the Delaware, where there are quarantine regulations, and have been visited by a health officer, received a clean bill of health, and shall have been permitted to go to the wharves and unload thereat. <span style="float:right">Limitation of former act.</span>

*Provided,* such clean bill of health, or a certified copy thereof, shall be left with the collector of the port within twenty-four hours after the arrival of such vessel. <span style="float:right">Proviso.</span>

MARTIN WELLES,
Speaker of the House of Representatives.
THADDEUS BETTS,
President of the Senate.

May 31st, 1832—Approved.

JOHN S. PETERS

# CHAP. XXV.

## An Act regulating the mode of keeping of Gun Powder.

SEC. 1. **B**E *it enacted by the Senate and House of Representatives, in General Assembly convened,* That hereafter it shall be lawful for the select-men of each and every town within this State, or a majority of them, by their order, in writing, directed to the owners or persons having charge of the same, to cause to be removed to some safe and convenient place within said town, and within such time, as in said order may be prescribed, any quantity of gun powder so deposited or kept, within the limits of said town, as in the opinion of said select-men, or a majority of them, may endanger the persons or dwellings of any individuals whatsoever. Whereupon it shall become the duty of the persons thus notified, to remove the said gun powder within the time, and to the place specified in said order. <span style="float:right">Order for removal of gun powder.</span> <span style="float:right">Duty of persons notified.</span>

SEC. 2. That in case the said gun powder shall not be removed pursuant to said order, as is hereinbefore prescribed, the said select-men, or a majority of them, may remove or cause the same to be removed to such place within said town, as in their opinion shall be deemed safe and convenient. And they shall have and retain a lien upon the said powder for all necessary expenses in removing and keeping the same. <span style="float:right">Authority of select-men to remove.</span> <span style="float:right">Lien.</span>

SEC. 3. That those persons who may hereafter wish to

4

Place of deposite for gunpowder, how designated.

deposit, or keep, within the limits of any town in this State, gunpowder in quantity exceeding fifty pounds, may require the select-men of such town, or a majority of them to designate some safe and convenient place for that purpose ; and it shall thereupon become the duty of such selectmen, or a majority of them, in writing, to designate and appoint a suitable place within their respective towns, for such purpose ; at which place, thus designated, it shall be lawful thenceforth to deposit and keep gunpowder according to the true intent and meaning of this Act, until the select-men of said town, or a majority of them, for the time being, shall order the same to be removed pursuant to the foregoing provisions of this Act.

Penalty.

Sec. 4. That if any person shall violate the provisions of this act as hereinbefore specified, he shall forfeit the sum of fifty dollars, one half thereof to the treasury of the town within which the offence is committed, and the other half to the person who may sue for and recover the same, in an action of debt.

Proviso.

*Provided,* if any person shall consider himself aggrieved by the doings of the select-men, he may petition the next county court, which may grant the proper relief.

MARTIN WELLES,
Speaker of the House of Representatives.
THADDEUS BETTS,
President of the Senate.

May 30th, 1832—Approved.

JOHN S. PETERS.

# CHAP. XXVI.

## An Act in addition to an Act entitled " An Act to regulate the Inspection of Provisions."

Hundred of staves and hoops.

BE *it enacted by the Senate and House of Representatives in General Assembly convened,* That in all sales of staves or hoops which shall be made subsequently to the first day of July next, one hundred staves, and not the number of one hundred and twenty, and one hundred hoops, and not the number of one hundred and twenty, shall constitute the hundred of each of said articles ; and the aliquot parts of a hundred shall be reckoned accordingly ; any law, usage or custom to the contrary notwithstanding.

MARTIN WELLES,
Speaker of the House of Representatives.
THADDEUS BETTS,
President of the Senate.

May 31st, 1832—Approved.

JOHN S. PETERS.

# ACTS AND RESOLUTIONS

OF THE

## GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA.

## 1882-83.

COMPILED AND PUBLISHED BY AUTHORITY.

ATLANTA, GA.:
JAS. P. HARRISON & CO., PRINTERS.
1883.

Add. 50

## GIVING TO THE OWNERS OR KEEPERS OF STALLIONS, JACKS AND BULLS A LIEN ON THE GET OF THE SAME.

### No. 352.

An Act giving to owners or keepers of stallions, jacks and bulls a lien upon the get of such stallion, jack or bull, and providing for the enforcement thereof.

Section 1. *Be it enacted by the General Assembly of the State of Georgia,* That from and after the passage of this Act, the owner or keeper of any stallion, jack or blooded or imported bull in this State shall have a lien upon the get thereof for the service of such stallion, jack or blooded or imported bull for the period of one year from the birth of such get, which lien shall be superior to all other liens, except liens for taxes; *provided,* the fee for such service is not paid within said time; *provided,* the lien herein provided for shall not become operative unless the same be recorded in the office of the clerk of the superior court of the county wherein the owner of the mother resides within thirty days after the performance of the service, and said clerks shall keep a book in which all such liens are to be recorded, and said clerks shall receive twenty-five cents each for recording such liens. *(margin: Lien of owners or keepers good for twelve months on said "gets" from birth of same)*

Sec. II. *Be it further enacted,* That the liens provided for in the preceding section shall be enforced in the manner prescribed in section 1991 of the Code of 1882 of this State, providing for the enforcement of liens on personal property. *(margin: Liens, how enforced.)*

Sec. III. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved September 26, 1883.

---

## TO PREVENT DISCHARGE OF FIRE-ARMS ON AND NEAR PUBLIC HIGHWAYS.

### No. 378.

An Act to prevent the discharge of fire-arms on the public highways of this State and within fifty yards of the same; to make such an act a misdemeanor, and prescribe a punishment therefor.

Section I. *Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same,* That from and after the passage of this Act, it shall be unlawful for any person between dark and daylight willfully and wantonly to fire off or discharge any loaded gun or pistol on any of the public highways in this State, and within fifty yards of any such public highway, except in defense of person or property or on his own premises. *(margin: Discharge of fire-arms when and where unlawful.)*

Add. 51

# LAWS

OF THE

# STATE OF MAINE;

TO WHICH ARE PREFIXED

THE

## CONSTITUTION OF THE U. STATES

AND OF SAID STATE,

## WITH AN APPENDIX.

———o———

HALLOWELL:
PUBLISHED BY CALVIN SPAULDING.
............
1822.
——oo——
GOODALE, GLAZIER & CO.—PRINTERS.

cial Court, to parties and witnesses, as are allowed in the regular Courts of law; and that the said two Justices, *quorum unus*, shall have the same fees, and be allowed the same sums for the trial aforesaid, as are allowed to Justices in the process of forcible entry and detainer.

[Approved March 8, 1821.]

————:oo:————

## CHAPTER XXV.

An Act for the prevention of damage by Fire, and the safe keeping of Gun Powder.

Selectmen to make regulations as to the keeping of gun powder in certain towns.

SEC. 1. BE it enacted by the Senate and House of Representatives, in Legislature assembled, That the Selectmen of each town within this State, containing not less than fifteen hundred inhabitants, be, and they hereby are, authorized and empowered to make rules and regulations, from time to time, in conformity with which, all gun powder which is or may be within such town, shall be kept, had or possessed therein ; and no person or persons shall have, keep or possess within such town, any gun powder, in any quantity, manner, form or mode, other than may be prescribed by the rules and regulations aforesaid.

Penalty for violating such regulations.

SEC. 2. *Be it further enacted*, That any person or persons who shall keep, have or possess any gun powder, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding one hundred dollars, for each and every offence, to be recovered by action of debt in any Court proper to try the same.

Mode of recovery.

Powder kept contrary to regulations may be seized and libelled.

SEC. 3. *Be it further enacted*, That all gun powder which shall be had, kept or possessed, within any town, contrary to the rules and regulations which shall be established by the Selectmen of such town, according to the provisions of this Act, may be seized by any one or more of the Selectmen of

Proceedings on such libel.

such town, and shall within twenty days next after the seizure thereof, be libelled, by filing with any Justice of the Peace in such town, a libel, stating the time, place and cause of seizure, and the time and place when and where trial shall be had before said Justice, and a copy of said libel shall be served by the Sheriff, or his deputy, on the person or persons, in whose possession the said gun powder shall have been seized, by delivering a copy thereof to each such person, or leaving such copy at his or her usual place of abode, seven days at least, before the time which shall be specified in said libel, for the trial thereof, that such person may appear, and show cause why the gun powder, so seized or taken, should not be adjudged forfeit ; and if any person shall appear to show cause why the same should not be adjudged forfeit, such ap-

pearance shall be entered on record, by said Justice; and if the gun powder, seized as aforesaid, shall be adjudged forfeit, the person or persons, whose appearance shall have been recorded as aforesaid, shall pay all costs of prosecution, and execution shall issue therefor: *Provided however*, That the person or persons, whose appearance shall have been recorded, may appeal from the judgment rendered by said Justice *Appeal from* of the Peace, to the next Court of Common Pleas to be holden *Justice's judg-* for the County where such town is situated; and the party so appealing, before such appeal shall be allowed, shall recognize, with sufficient surety or sureties to the libellant, to prosecute his said appeal and to pay all costs as may arise after said appeal; and no further proceedings shall be had upon the judgment appealed from; and in case the party appealing shall neglect to enter his appeal, the Court *after proceed-* appealed to, may, upon complaint, proceed to affirm the *ings.* judgment of the Justice, with additional costs.

Sec. 4. *Be it further enacted*, That any person who shall *Persons dam-* suffer injury by the explosion of any gun powder, had or *nged by explo-* possessed, or being within any town, contrary to the rules and *illegally kept,* regulations which shall be established in such town, accord- *dress.* ing to the provisions of this Act, may have an action of the case in any Court proper to try the same, against the owner or owners of such gun powder, or against any other person or persons, who may have had the possession or custody of such gun powder, at the time of the explosion thereof, to recover reasonable damages for the injury sustained.

Sec. 5. *Be it further enacted*, That it shall, and may be *Selectmen may* lawful for any one or more of the Selectmen of any town to *enter buildings* enter any building, or other place, in such town, to search *powder.* for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

Sec. 6. *Be it further enacted*, That when any stove, chim- *Penalty for suf-* ney or stove pipe, within any town containing not less than *fering stoves,* fifteen hundred inhabitants, shall be defective, or out of re- *stove pipes to* pair, or so constructed or placed, that any building, or other *&c.* property shall be in danger of fire therefrom, the Selectmen of said town shall give notice, in writing, to the possessor or possessors of such stove, chimney or stove pipe, to remove or repair the same; and if such possessor shall for the term of six days after the giving of such notice, unnecessarily neglect to remove, or effectually repair such stove, chimney or stove pipe, such possessor shall, for each and every such neglect, forfeit and pay a fine of not less than ten dollars, nor more than fifty dollars, to be recovered by action of the *Action of case.* case, in any Court proper to try the same.

Sec. 7. *Be it further enacted*, That the fines, forfeitures

*Appropriation of fines. &c.* and penalties, which shall arise under this Act, shall accrue, one moiety thereof to the use of the town within which the offence shall be committed, and the other moiety to the use of the person who shall prosecute or sue for the same.

*Above regulations not to be in force till published by Selectmen, &c.* SEC. 8. *Be it further enacted,* That the rules and regulations, which shall be established in any town, according to the provisions of this Act, shall be of no force or effect, until such rules and regulations, together with this Act, shall have been published by the Selectmen of such town, three weeks successively, by printing in some newspaper printed within the County, or by posting up attested copies in three several public places in said town.

[Approved March 19, 1821.]

———:00:———

## CHAPTER XXVI.

An Act to prevent damage from firing Crackers, Squibs, Serpents and Rockets, within this State.

BE *it enacted by the Senate and House of Representatives, in Legislature assembled,* That if any person shall offer *Crackers, squibs, &c. not to be fired without license.* for sale, set fire to, or throw any lighted cracker, squib, rocket or serpent within this State, without the license of the Selectmen of the several towns, respectively, first obtained therefor, he shall forfeit, for every such offence, the sum of *Punishment.* five dollars; one moiety to the use of the poor of that town, in which the offence shall be committed, and the other moiety to the use of the prosecutor; to be recovered by action of debt, or by information before any Justice of the Peace of the County, in which the offence shall be committed, with the costs of suit.

[Approved Feb. 20, 1821.]

———:00:———

## CHAPTER XXVII.

An Act more effectually to secure Fire Engines from being injured.

BE *it enacted by the Senate and House of Representatives, in Legislature assembled,* That if any person shall *Persons wantonly injuring fire engines,* wantonly or maliciously, spoil, break, injure, damage or render useless, any engine, or any of the apparatus thereto belonging, prepared by any town, society, person or persons, for the extinguishment of fire, and shall be convicted thereof, *punished on conviction in S. J. Court.* before the Supreme Judicial Court, he shall be punished by a fine not exceeding five hundred dollars, or by imprisonment, not exceeding two years, at the discretion of the Court; and be further ordered to recognize, with sufficient surety or sureties, for his good behaviour for such term as the Court shall order.

[Approved March 2, 1821.]

## CHAPTER CLXII.

### An Act to provide for the proof of Fire Arms.

Sec. 1. **BE** *it enacted by the Senate and House of Repre-*

<span style="font-variant:small-caps">Governor to appoint provers of gun barrels.</span> *sentatives, in Legislature assembled,* That the Governor, by and with the consent of the Council, be, and he hereby is empowered to appoint suitable persons, to be provers of the barrels of all new, or unused fire arms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all fire arms which shall be offered him for that purpose, in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and num- <span style="font-variant:small-caps">Barrels to be marked and certificate given.</span> ber every barrel by him so proved, and make, and deliver to the person applying to have the same proved, a certificate for each barrel proved, and found good in the form following:

I certify that on this        day of        A. D. 18        I proved for        , a musket, pistol, or rifle barrel, (as the case may be,) and which is numbered and marked as in the margin, and that the same is good and strong.

A. B. Prover of fire arms.

<span style="font-variant:small-caps">Prover's fees.</span> Sec. 2. *Be it further enacted,* That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty-five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not.

<span style="font-variant:small-caps">Penalty for selling guns or pistols, not proved and marked.</span> Sec. 3. *Be it further enacted,* That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified according to the provisions of this Act, he shall forfeit for each barrel so sold, the sum of ten dollars, to be recovered by an action of debt before any <span style="font-variant:small-caps">How recovered.</span> Court proper to try the same; to the use of any person who shall sue for and recover the same, or by indictment to the use of the State.

<span style="font-variant:small-caps">Penalty for altering marks or certificates.</span> Sec. 4. *Be it further enacted,* That if any person shall falsely alter the stamp or mark or the certificate of any prover of fire arms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars, according to the nature and aggravation of the offence, for the use of the State.

[Approved March 10, 1821.]

——:o:——

## CHAPTER CLXIII.

### An Act regulating the packing and selling of Paper within this State.

Sec. 1. **BE** *it enacted by the Senate and House of Repre-* <span style="font-variant:small-caps">Paper made or offered for sale</span> *sentatives, in Legislature assembled,* That all paper, excepting

# PUBLIC ACTS

AND

## JOINT AND CONCURRENT RESOLUTIONS

OF

# THE LEGISLATURE

OF THE

## STATE OF MICHIGAN,

PASSED AT THE

## REGULAR SESSION OF 1875,

WITH AN APPENDIX.

———◆———



BY AUTHORITY.

LANSING:
W. S. GEORGE & CO., STATE PRINTERS AND BINDERS.
1875.

erection or construction of said State house of correction or the furnishing of labor or materials for the same.

**Commissioners may draw from general fund for immediate use.** SEC. 12. Said board of commissioners are hereby authorized at any time to draw from the general fund of the State Treasury such amounts of money within the appropriation made by this act, as they shall deem necessary for the immediate commencement and carrying on of the erection of said State house of correction. The amounts so drawn shall be considered as an advance to the said State house of correction upon the appropriation made by **Reimbursement.** this act, and such amounts shall be deducted from said State house of correction fund and returned to the general fund when such appropriation shall have been collected and paid into the State Treasury.

SEC. 13. This act shall take immediate effect.

Approved April 22, 1875.

[ No. 97. ]

AN ACT to prevent the setting of guns and other dangerous devices.

**Setting of a spring gun, etc., deemed a misdemeanor.** SECTION 1. *The People of the State of Michigan enact,* That if any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be **Killing of person by gun so set deemed manslaughter.** deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

SEC. 2. This act shall take immediate effect.

Approved April 22, 1875.

[ No. 98. ]

AN ACT to amend section twelve of article two, and sections one, two, four, seven, thirteen, and fifteen of article four of act number one hundred and ninety-eight, of the session laws of eighteen hundred and seventy-three, entitled "An act to revise the laws providing for the incorporation of railroad companies, and to regulate the running and management, and to fix the duties and liabilities of all railroad and other corporations owning or operating any railroad in this State," approved May one, eighteen hundred and. seventy-three.

**Sections amended.** SECTION 1. *The People of the State of Michigan enact,* That section twelve of article two, and sections one, two, four, seven, thirteen, and fifteen, of article four of act number one hundred and ninety-eight of the session laws of eighteen hundred and seventy-three, entitled "An act to revise the laws providing for the incorporation of railroad companies, and to regulate the running

# GENERAL LAWS

OF THE

# STATE OF MINNESOTA,

PASSED DURING THE

## ELEVENTH SESSION OF THE STATE LEGISLATURE,

COMMENCING JANUARY FIFTH, ONE THOUSAND EIGHT HUNDRED
AND SIXTY-NINE, AND TERMINATING MARCH FIFTH,
ONE THOUSAND EIGHT HUNDRED
AND SIXTY-NINE.

---

5,000 COPIES ORDERED PRINTED.

---

SAINT PAUL:
PRESS PRINTING COMPANY.
1869.

of the general statutes, is hereby amended, so as to read as follows:

**Disposition of surplus estray moneys.** Sec. 12. The county treasurer shall, after deducting two per cent. for his fees, pay such surplus money, if claimed within one year after such sale, to the owner of such estray, if not claimed within that time, to the school fund of the county in which the estray was kept.

**When act to take effect.** SEC. 2. This act shall be in force from and after its passage.

Approved March 3, 1869.

---

## CHAPTER XXXIX.

Feb'y 27, 1869. *An Act to prohibit the setting of traps or spring guns, rifles, or other deadly weapons.*

SECTION 1.  The setting of a spring gun, pistol, or other deadly weapon declared unlawful.

2.  Punishment for violation of foregoing section.

3.  When act to take effect.

*Be it enacted by the Legislature of the State of Minnesota:*

SECTION 1.  The setting of a so-called trap or spring
**Unlawful to set spring guns, &c.** gun, pistol, rifle or other deadly weapon in this state, is hereby prohibited and declared to be unlawful.

SEC. 2.  Any person offending against the foregoing
**Punishment for violating the foregoing Section.** section shall be punished as follows:  If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county, for a period not less than six (6) months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment at the discretion of the court.  If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the

state prison for a term not exceeding fifteen, nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

SEC. 3. This act shall take effect and be in force from and after its passage.

*When act to take effect.*

Approved Feb. 27, 1869.

---

## CHAPTER XL.

*An Act to repeal Chapter thirty-nine of the General Laws of one thousand eight hundred and sixty-seven, relating to an act to prevent the killing of muskrat, mink or otter.*

Feb'y 24, 1869.

SECTION 1. Repeal of Chapter thirty-nine (39) of the General Laws of 1867.
2. When act to take effect.

*Be it enacted by the Legislature of the State of Minnesota:*

SECTION 1. That chapter thirty-nine of the general laws of the year one thousand eight hundred and sixty-seven, be and the same is hereby repealed.

*Repeal of chapter thirty-nine of Laws of 1867.*

SEC. 2. This act shall take effect and be in force from and after its passage.

*When act to take effect.*

Approved Feb. 24, 1869.

## CHAP. XXV.

Passed June
21, 1820.

AN ACT to provide for the appointment of Inspectors and regulating the manufactory of Gunpowder.

Inspectors of gunpowder to be appointed. SEC. 1. BE *it enacted by the senate and house of representatives in general court convened,* That his excellency the governor by and with the advice of council, be, and he is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and at such other places as may by him be thought necessary; and his excellency the governor by and with the advice of council is hereby further authorized and empowered to remove said inspectors or any of them at pleasure, and may by new appointments from time to time fill any vacancy or vacancies which may happen.

Proportion & quality of materials for the manufacture of gunpowder. SEC. 2. *And be it further enacted,* That from and after the first day of July next, all gunpowder which shall be manufactured within this state, shall be composed of the following proportions and quality of materials, that is, every one hundred parts of gunpowder shall be composed of fourteen parts of fresh burnt coal, made from wood which forms the least ashes, and which has been carefully and well prepared and made into coal, after being stripped of its bark; ten parts of pure sulphur, and seventy-six parts of purified nitre.

Duty of inspectors. SEC. 3. *And be it further enacted,* That it shall be the duty of each of said inspectors to inspect, examine and prove all gun powder which after the first day of July next shall be deposited at any publick powder magazine, or manufactory in this state, before the same shall be removed from the manufactory or received into such public powder magazine, and if upon inspection and examination it shall appear to the inspector that such gunpowder is well manufactured and composed of pure materials, and such gunpowder shall be of the proof hereinafter mentioned, the inspector shall mark each cask containing gunpowder by him inspected, examined, and proved as aforesaid, with the words " *New-Hampshire inspected proof,*" and with his christian and surname, and shall also in figures mark upon each cask the quantity of powder contained therein, and the year in which the inspection is made.

SEC. 4. *And be it further enacted,* That no gunpowder within

this state shall be considered to be of proof unless one ounce
thereof, placed in the chamber of a four and an half inch
howitzer, with the howitzer elevated so as to form an angle
of forty-five degrees with the horizon, will, upon being fired,
throw a twelve pound shot seventy-five yards at the least.

Sec. 5. *And be it further enacted,* That whenever any of
said inspectors shall discover any gunpowder, deposited at
any public powder magazine, or any other place within this
state, which is not well manufactured, or which is composed
of impure materials, or of any improper proportion of mate-
rials, and which shall not be of the proof herein before men-
tioned, the inspector in such case, shall mark each cask con-
taining such impure, ill manufactured, or deficient gunpow-
der, with the word " *Condemned,*" on both heads of the cask,
and with the same words on the side thereof, with the chris-
tian and surname of the inspector on one head of the cask.

Sec. 6. *And be it further enacted,* That if any person shall
knowingly sell any condemned gunpowder, or shall fraudu-
lently alter or deface any mark or marks, placed by any in-
spector upon any cask or casks containing gunpowder, or
shall fraudulently put any gunpowder, which shall not have
been inspected, or which has been condemned, into any cask
or casks, which shall have been marked by any inspector
agreeably to the provisions contained in the third section of
this act, every such person, so offending, shall forfeit and
pay not less than two hundred nor more than five hundred
dollars, for each and every offence, to be recovered in an
action of debt, in any court of competent jurisdiction, one
half thereof to the use of the state, the other to the use of
him or them who shall sue and prosecute for the same.

Sec. 7. *And be it further enacted,* That each inspector who
may be appointed by virtue of this act, shall, before he acts
as inspector, be sworn to the faithful and impartial discharge
of the duties of his office, and each inspector shall be allowed
one cent for each pound of gunpowder, by him examined,
inspected and proved, whether the same be by him approved
or condemned, to be paid by the owner or owners of the
gunpowder.

Sec. 8. *And be it further enacted,* That if any manufacturer
of gunpowder shall sell or dispose of, or shall cause or per-

mit to be sold or disposed of, or shall export or cause to be exported without the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act.

Penalty for selling powder made of impure materials

Sec. 9. *And be it further enacted,* That if any person within this state, after the first day of January next, shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

Approved June 21, 1820.

## CHAP. XXVI.

Passed June 22, 1820.

RESOLVED, That the sum of four hundred dollars be and the same hereby is appropriated for the purpose of furnishing each artillery company in this state, organized according to law, with powder and port-fire, and for the ordinary repairs of field pieces, agreeably to the sixth section of a law of this state passed July 1, 1820.* And his excellency the governor is hereby authorized to draw on the treasury in favour of the adjutant general for the above sum, and the adjutant general is hereby directed to pay to the captain or commanding officer of the different companies of artillery or their orders, the sum of twelve dollars each.

Approved June 22, 1820.

## CHAP. XXVII.

Passed June 22, 1820.

RESOLVED, That the Selectmen, or a major part of them at the charge of the town, parish or place, to which they belong, shall transmit and return an Inventory of the polls and

* This act passed July 1, 1819.

# Plan for Providing Fire-Arms for the Colony

## v5:7

The Committee to draw a plan for providing Fire-Arms for a Colony stock, report as follows, viz:

## v5:8

That for every good Fire-Arm manufactured in this Colony, made after the following manner, viz: A barrel three feet nine inches long, to carry an ounce ball, a good bayonet with blade eighteen inches long, iron ramrod, with a spring to retain the same, the maker' s name engraved on the lock, which shall be delivered at *Exeter*, to *Nicholas Gilman*, Esq´, Receiver-General, on or before the 1st of *May* next, the owner of such fire-arms receive three pounds for each, of said Receiver-General, after having tried said gun in the presence of the said Receiver-General with four inches and a half of powder, well wadded, at the owner' s own risk. And that there be appointed one good man, well approved, in each County, to receive any fire-arms so made in said County, on the same condition, (as before-mentioned for the Receiver-General to receive them,) and the persons so appointed to receive the money for the number of guns so delivered.

Which Report being read and considered,

*Voted*, That the same be received and established as a resolve of this House.

And, *Voted*, That Colonel *Evans*, for the County of *Strafford; Samuel Emerson*, for the County of *Grafton*; Major *John Bellows*, for the County of *Cheshire*; and Deacon *Nahum Baldwin*, for the County of *Hillsborough*, be Receivers of Fire-Arms, according to the aforesaid Resolve.

## Details

| | |
|---|---|
| **Title** | Plan for providing Fire-Arms for the Colony, considered and adopted |
| **Creator** | New-Hampshire, House of Representatives |
| **Editor** | New-Hampshire, House of Representatives |
| **Resource Type** | text |
| **Genre/Form** | documents (object genre) |
| **Date Created** | 1776-01-10 |
| **Recipient** | New-Hampshire, House of Representatives |
| **Presentation Location** | Exeter, New-Hampshire, North America |
| **Before Whom** | New-Hampshire, House of Representatives |
| **Subject** | Key people, events, and institutions: meetings, provincial conventions and assemblies<br>Military action: military organization and discipline<br>Military action: militias and irregular forces |
| **Document ID** | S4-V5-P01-sp01-D0016 |
| **Series** | S4 |
| **Volume** | S4-V5 |
| **Part** | S4-V5-P01 |
| **Sub-Part** | S4-V5-P01-sp01 |
| **Usage Conditions** | |

This work is in the Public Domain, and as such is not subject to copyright restrictions. Users are free to copy, use, and redistribute it in whole or in part without permission.

**Rights Statement**                                    No Copyright - Public Domain

## Share

   

## In collections

A. D. 1820.

CHAP. XXV.

Passed June 21, 1820.

AN ACT to provide for the appointment of Inspectors and regulating the manufactory of Gunpowder.

Inspectors of gunpowder to be appointed.

SEC. 1. **B**E *it enacted by the senate and house of representatives in general court convened,* That his excellency the governor by and with the advice of council, be, and he is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and at such other places as may by him be thought necessary; and his excellency the governor by and with the advice of council is hereby further authorized and empowered to remove said inspectors or any of them at pleasure, and may by new appointments from time to time fill any vacancy or vacancies which may happen.

Proportion & quality of materials for the manufacture of gunpowder.

SEC. 2. *And be it further enacted,* That from and after the first day of July next, all gunpowder which shall be manufactured within this state, shall be composed of the following proportions and quality of materials, that is, every one hundred parts of gunpowder shall be composed of fourteen parts of fresh burnt coal, made from wood which forms the least ashes, and which has been carefully and well prepared and made into coal, after being stripped of its bark; ten parts of pure sulphur, and seventy-six parts of purified nitre.

Duty of inspectors.

SEC. 3. *And be it further enacted,* That it shall be the duty of each of said inspectors to inspect, examine and prove all gun powder which after the first day of July next shall be deposited at any publick powder magazine, or manufactory in this state, before the same shall be removed from the manufactory or received into such public powder magazine, and if upon inspection and examination it shall appear to the inspector that such gunpowder is well manufactured and composed of pure materials, and such gunpowder shall be of the proof hereinafter mentioned, the inspector shall mark each cask containing gunpowder by him inspected, examined, and proved as aforesaid, with the words " *New-Hampshire inspected proof,*" and with his christian and surname, and shall also in figures mark upon each cask the quantity of powder contained therein, and the year in which the inspection is made.

SEC. 4. *And be it further enacted,* That no gunpowder within

Digitized from Best Copy Available

this state shall be considered to be of proof unless one ounce thereof, placed in the chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired, throw a twelve pound shot seventy-five yards at the least.

*Proof of quality of gunpowder.*

SEC. 5. *And be it further enacted,* That whenever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured, or which is composed of impure materials, or of any improper proportion of materials, and which shall not be of the proof herein before mentioned, the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word " *Condemned,*" on both heads of the cask, and with the same words on the side thereof, with the christian and surname of the inspector on one head of the cask.

*Inspectors to mark bad powder.*

SEC. 6. *And be it further enacted,* That if any person shall knowingly sell any condemned gunpowder, or shall fraudulently alter or deface any mark or marks, placed by any inspector upon any cask or casks containing gunpowder, or shall fraudulently put any gunpowder, which shall not have been inspected, or which has been condemned, into any cask or casks, which shall have been marked by any inspector agreeably to the provisions contained in the third section of this act, every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars, for each and every offence, to be recovered in an action of debt, in any court of competent jurisdiction, one half thereof to the use of the state, the other to the use of him or them who shall sue and prosecute for the same.

*Penalty for selling condemned powder.*

SEC. 7. *And be it further enacted,* That each inspector who may be appointed by virtue of this act, shall, before he acts as inspector, be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved, whether the same be by him approved or condemned, to be paid by the owner or owners of the gunpowder.

*Inspector's fees and oath of office.*

SEC. 8. *And be it further enacted,* That if any manufacturer of gunpowder shall sell or dispose of, or shall cause or per-

*Penalty for selling uninspected powder.*

Digitized from Best Copy Available

mit to be sold or disposed of, or shall export or cause to be exported without the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act.

Sec. 9. *And be it further enacted,* That if any person within this state, after the first day of January next, shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

Approved June 21, 1820.

## CHAP. XXVI.

RESOLVED, That the sum of four hundred dollars be and the same hereby is appropriated for the purpose of furnishing each artillery company in this state, organized according to law, with powder and port-fire, and for the ordinary repairs of field pieces, agreeably to the sixth section of a law of this state passed July 1, 1820.* And his excellency the governor is hereby authorized to draw on the treasury in favour of the adjutant general for the above sum, and the adjutant general is hereby directed to pay to the captain or commanding officer of the different companies of artillery or their orders, the sum of twelve dollars each.

Approved June 22, 1820.

## CHAP. XXVII.

RESOLVED, That the Selectmen, or a major part of them at the charge of the town, parish or place, to which they belong, shall transmit and return an Inventory of the polls and

* This act passed July 1, 1819.

# THE

# LAWS

OF THE

## STATE OF NEW-HAMPSHIRE,

PASSED

## JUNE SESSION, 1825.

PUBLISHED BY AUTHORITY.

**CONCORD:**

PRINTED BY ISAAC HILL.

**1825.**

Add. 70

election," passed December 16, 1824, be and the same is hereby repealed. .        *Approved July* 2, 1825.

## CHAPTER LXI.

*AN ACT to regulate the keeping and selling, and the trans-*
*porting of gun-powder.*

SECT. 1. BE *it enacted by the Senate and House of Representatives in General Court convened,* That there shall not at any time be kept in any ware-house, store, shop, or other building in the compact part of any town or village in this State, a greater quantity of gun-powder than three quarter cask or seventy-five pounds; and any person or persons so keeping a greater quantity, shall forfeit and pay for every day during which such greater quantity of gun-powder shall be kept as aforesaid, a sum not exceeding five dollars, nor less than one dollar, to be recovered by any person sueing for the same in an action of debt before any justice of the peace, or court proper to try the same, with costs of suit, one half for the use of the prosecutor and the other half for the use of the town in which such gunpowder is kept; or, if sued for by the firewards or selectmen of any town, then the whole of said forfeiture shall be kept for the use of said town, to be expended by said firewards or selectmen in purchasing materials necessary and proper for extinguishing fires. And the said firewards or selectmen are hereby authorized and empowered to seize any gunpowder kept as aforesaid in a greater quantity than one quarter cask, and cause the same to be condemned in any court proper to hear and try the same, the avails of which shall be expended for the purposes aforesaid.

SECT. 2. *And be it further enacted,* That every person keeping gunpowder to sell by retail in less quantity than seventy-five pounds, and who shall not at all times keep the same in a tin canister or canisters or other incombustible vessel or vessels, covered and secured from fire, or in casks which shall be enveloped in substantial and close leathern bags or sacks, shall forfeit and pay for each and every day, he, she or they shall so keep it, a sum not exceeding five dollars nor less than one dollar, to be sued for and recovered with costs of suit in the manner and for the uses and purposes aforesaid.

SECT. 3. *And be it further enacted,* That gunpowder shall not be transported or carried through the compact part of any town or village, in any cart, waggon or other open carriage, in a greater quantity than one hundred pounds at any one time, nor unless the casks containing the gunpowder so transported, if more than twenty-five

pounds be enveloped in substantial and close leathern bags or sacks; and any person or persons transporting gunpowder as aforesaid, in a greater quantity and without being enveloped as aforesaid, except the same be conveyed in a closely covered carriage, shall forfeit and pay a sum not more than fifty dollars nor less than ten dollars, to be sued for and recovered with costs of suit, in the manner and for the uses and purposes aforesaid.

**Penalty for not so transporting.**

Sᴇᴄᴛ. 4. *And be it further enacted*, That no person shall at any time transport or carry from town to town or from place to place any gunpowder for the purpose of peddling, or selling it by retail, on penalty that the owner or owners, or person or persons selling it, or offering it for sale, shall forfeit and pay a sum not exceeding five dollars nor less than one dollar for each cask of gunpowder so transported or carried and sold or offered for sale, to be recovered with costs of suit and applied to the same uses and purposes as herein before directed.

**Shall not be peddled.**

**Penalty against peddling.**

Sᴇᴄᴛ. 5. *And be it further enacted*, That if any person or persons shall sell or offer for sale by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on any parade or common, such person so offending shall forfeit and pay for each and every offence a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

**Shall not be sold by retail in any street, &c.,**

Sᴇᴄᴛ. 6. *And be it further enacted*, That if any person or persons shall within this State, in the night time between sunsetting and sunrising, sell or offer to sell by retail, or deal out any gunpowder, such person so offending shall forfeit and pay for each and every such offence a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid.

**nor in the night time.**

Sᴇᴄᴛ. 7. *And be it further enacted*, That all prosecutions for offences against this act shall be commenced within three months after the offence shall have been committed, and not afterwards.

**Limitation of prosecutions.**

*Approved July 2, 1825.*

---

## CHAPTER LXII.

**Passed July 2, 1825.**

*AN ACT to alter the names of sundry persons therein mentioned.*

Wʜᴇʀᴇᴀs certain persons have petitioned the legislature to alter their names, and their request appearing reasonable; Therefore,

Bᴇ *it enacted by the Senate and House of Representatives in General Court convened*, That Elis Leathers of Barnstead, shall hereafter be called and known by the

# At a GENERAL ASSEMBLY held at

Burlington from the Twentieth Day of November to the Twenty-firft Day of December 1771, in the Twelfth Year of the Reign of King George the Third, the following Laws were paffed.

## SESSION THE FOURTH.

### CHAP. DXXXIX.

*An* ACT *to continue and amend an* Act, *entitled,* An Act *for better fettling and regulating the* Militia *of this Colony of* New-Jerfey ; *for the repelling Invafions, and fuppreffing Infurrections and Rebellions.* *

Paffed Dec. 21, 1771.

WHEREAS the Act paffed in the Nineteenth Year of the Reign   Preamble. of our late Sovereign Lord King *George* the Second, entitled, *An* Act *for better fettling and regulating the Militia of this Colony of* New-Jerfey ; *for the repelling Invafions, and fuppreffing Infurrections and Rebellions,* will expire at the End of this Seffion of Affembly ;

Sect. 1. BE IT ENACTED *by the Governor, Council and General Affem-*   Limitation, *bly, and it is hereby Enacted by the Authority of the fame,* That the faid Act, entitled, *An* Act *for better fettling and regulating the Militia of this Colony of* New-Jerfey ; *for the repelling Invafions, and fuppreffing Infurrections and Rebellions,* * fhall be, and hereby is continued, and every Article and Claufe therein contained fhall be and remain in full Force, from the Publication hereof, to the firft Day of *May* which will be in the Year of our Lord One Thoufand Seven Hundred and Seventy-feven, and from thence to the End of the next Seffion of the General Affembly of this Colony, and no longer.

2. AND WHEREAS it has been a Cuftom of late, in fome of the Counties of this Colony, to choofe the Militia Officers Conftables ; for preventing the fame for the Future, BE IT ENACTED *by the Autho-*   Commiffion-*rity aforefaid,* That, during the Continuance of this Act, it fhall not be   ed Officers lawful for any Court of General Quarter-Seffions of the Peace, or for   not to be cho-any of the Inhabitants of this Colony, at their annual Town-meetings,   fen Confta-to appoint or choofe any commiffioned Officer, while in Commiffion,   bles. to be a Conftable ; any Law, Ufage or Cuftom to the contrary notwithftanding.

### • CHAP. DXL.

*An* ACT *for the Prefervation of* Deer *and other Game, and to prevent trefpaffing with Guns.*

Paffed Dec. 21, 1771.

WHEREAS the Laws heretofore paffed in this Colony for the   Preamble. Prefervation of Deer and other Game, and to prevent trefpaff-

* Chap. CC.    ing

Digitized from Best Copy Available

ing with Guns, Traps and Dogs, have, by Experience, been found infufficient to anfwer the falutary Purpofes thereby intended ; Therefore,

*No Perfon to carry a Gun on Lands not his own, except, &c.*

Sect. 1. BE IT ENACTED *by the Governor, Council and General Affembly of this Colony of* New-Jerfey, *and it is hereby Enacted by the Authority of the fame,* That if any Perfon or Perfons fhall prefume, at any Time after the Publication hereof, to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from the Owner or Owners or legal Poffeffor, every fuch Perfon fo offending, and convicted thereof, either upon the View of any Juftice of the Peace within this Colony, or by the Oath or Affirmation of one or more Witneffes, before any Juftice of the Peace of either of the Counties, Cities or Towns-corporate of this Colony, in which the Offender or Offenders may be taken or refide, he, fhe or they, fhall, for every fuch Offence, forfeit and pay to the Owner of the Soil, or his Tenant in Poffeffion, the

*Penalty.*

Sum of *Forty Shillings*, with Cofts of Suit ; which Forfeiture fhall and may be fued for and recovered by the Owner of the Soil, or Tenant in Poffeffion, before any Juftice of the Peace in this Colony, for the Ufe of fuch Owner or Tenant in Poffeffion.

*No Perfon to drive Deer or other Game, except, &c.*

2. AND BE IT ENACTED *by the Authority aforefaid,* That if any Perfon fhall prefume, at any Time after the Publication of this Act, to hunt or watch for Deer with a Gun, or fet in any Dog or Dogs to drive Deer, or any other Game, on any Lands not his own, and for which the Owner or Poffeffor pays Taxes, or is in his lawful Poffeffion, unlefs he hath Licenfe or Permiffion in Writing from fuch Owner or Owners or legal Poffeffor ; every fuch Perfon fo offending, and being convicted thereof in Manner aforefaid, fhall, for every fuch Offence, forfeit and pay to the Owner of the Soil, or Tenant in Poffeffion, the

*Penalty.*

Sum of *Forty Shillings*, with Cofts of Suit ; provided, that nothing herein contained fhall be conftrued to extend to prevent any Perfon carrying a Gun upon the King's Highway in this Colony.

*Penalty on Non-Refidents.*

3. AND BE IT FURTHER ENACTED *by the Authority aforefaid,* That if the Perfon or Perfons offending againft this Act be Non-Refidents of this Colony, he or they fhall forfeit and pay for every fuch Offence *Five Pounds*, and fhall forfeit his or their Gun or Guns to any Perfon or Perfons who fhall inform and profecute the fame to Effect, before any Juftice of the Peace in any County of this Colony, wherein the Offender or Offenders may be taken or apprehended.

*Penalty for killing, &c. Deer out of Seafon.*

4. AND BE IT ENACTED *by the Authority aforefaid,* That if any Perfon or Perfons fhall kill, deftroy, hunt or take any Doe, Buck, Fawn, or any Sort of Deer whatfoever, at any other Time or Seafon, except only between the firft Day of *September* and the firft Day of *January* yearly and every Year, he, fhe or they fo offending, fhall forfeit and pay the Sum of *Forty Shillings* for each and every Offence ; to be fued for, recovered and applied as hereafter is directed.

*What fhall be Evidence of fuch Killing, &c.*

5. AND, for the better and more effectual convicting of Offenders againft this Act, BE IT ENACTED *by the Authority aforefaid,* That any and every Perfon or Perfons in whofe Cuftody fhall be found, or who fhall

Digitized from Best Copy Available

shall expose to Sale, any green Deerskins, or fresh Venison killed at any Time after the first Day of *January*, and before the first Day of *September* aforesaid, and shall be thereof convicted by the Oath or Affirmation of one or more credible Witnesses, shall be deemed guilty of offending against this Act, and be subjected to the Penalties of killing Deer out of Season.

6. AND WHEREAS great Numbers of idle and disorderly Persons make a Practice of hunting on the waste and unimproved Lands in this Colony, whereby their Families are neglected, and the Publick is prejudiced by the Loss of their Labour, BE IT THEREFORE ENACTED *by the Authority aforesaid*, That, from and after the first Day of *January* next, no Person or Persons whatsoever (except such Persons as are by the Laws of this Colony qualified to vote for Representatives in General Assembly, in Right of their Freeholds, and their Sons being of the Age of eighteen Years or upwards, and living with their Parent or Parents, or being Freeholders) shall, on any Pretence whatever, hunt on the waste and unimproved Lands in this Colony ; and if any Person or Persons, not qualified as aforesaid, shall presume to hunt as aforesaid, he or they so offending shall forfeit and pay, for every such Offence, the Sum of *Twenty Shillings* ; to be recovered by Action of Debt, with Costs, by any Person who shall sue for the same ; to be applied one Half to the Prosecutor, and the other Half to the Use of the Poor of the Township or Precinct where the Fact was committed. *Who may hunt on unimproved Lands.* *Penalty on Offenders.*

7. AND BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall set any Trap or other Device whatsoever, larger than what is usually and commonly set for Foxes and Muskrats, such Person, setting such Trap or other Device, shall pay the Sum of *Five Pounds*, and forfeit the Trap or other Device, shall suffer three Months Imprisonment, and shall also be liable to make good all Damages any Person shall sustain by setting such Trap or other Device, and the Owner of such Trap or other Device, or Person to whom it was lent, shall be esteemed the Setter thereof, unless it shall be proved, on Oath or Affirmation, what other Person set the same, or that such Trap or other Device was lost by said Owner or Person to whom it was lent, and absolutely out of his Power ; and if the Setter of the Trap or other Device be a Slave, and it be his own voluntary Act, he shall (unless the Master or Mistress shall pay the Fine) in Lieu of such Fine, be publickly whipped with thirty Lashes, and committed till the Costs are paid ; and that the said Trap or other Device shall be broken and destroyed in the View and Presence of the Justice of the Peace before whom they are brought : And if any Person or Persons shall have Possession of, or there shall be found in his or their House, any Trap or Traps, Device or Devices whatsoever, for taking of Deer, such Person or Persons shall be subjected to the same Penalty as if he or they were convicted of setting such Trap or Traps, or other Device. *Penalty on setting Traps, &c.* *Penalty on a Slave setting such Trap, &c.* *Penalty on keeping such Trap, &c.*

8. AND, for encouraging the Destruction of such Traps and Devices, BE IT ENACTED *by the Authority aforesaid*, That if any Person shall seize any Trap or other Device for the taking Deer, and shall carry such Trap or other Device to any Magistrate of the County where such Trap or Device was seized, such Person shall be entitled to *Reward for seizing a Trap, &c.*

4 Q      an

an Order from the said Magistrate to the Collector of such County, to pay him the Sum of *Ten Shillings*, out of any Money in his Hands raised for the Use of the County; which Sums shall be allowed to such Collector on the Settlement of his Accounts.

Penalty on a Smith making or mending such Trap, &c.

Penalty on bringing such Trap, &c. into the Colony.

9. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That every Smith or other Artificer, who shall hereafter make or mend any such Trap or other Device aforesaid, he shall forfeit and pay the Sum of *Forty Shillings*; and the Person carrying such Trap or other Device to the Artificer aforesaid, shall forfeit and pay the Sum of *Twenty Shillings*. And every Person who shall bring into this Colony any such Trap or Device as aforesaid shall forfeit and pay the Sum of *Forty Shillings*. And if the Person who shall carry the same to the Smith or Artificer shall be so poor as that he shall not be able to pay the Forfeiture aforesaid, he shall be committed to the common Gaol, until he shall prove who is Owner of such Trap or Device, or who delivered the same to him; and in such Case the Forfeiture aforesaid shall be levied on the Goods, or in Failure of Goods, on the Body of the Owner of such Trap or Device, or the Person who delivered the same to the Pauper, and the Trap or Device shall be forfeited and destroyed.

Penalty for setting loaded Guns.

10. AND WHEREAS a most dangerous Method of setting Guns has too much prevailed in this Province, BE IT ENACTED *by the Authority aforesaid*, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of *Six Pounds*; and on Non-payment thereof shall be committed to the common Gaol of the County for six Months.

Application of Penalties.

Jurisdiction given to one Magistrate.

11. AND BE IT FURTHER ENACTED *by the Authority aforesaid*, That the Fines and Forfeitures in this Act expressed, and not particularly appropriated, shall be paid, one Half to the Prosecutor, and the other Half to and for the Use of the Poor of the Town, Precinct or District, where the Offence is committed; and that the Execution of this Act, and every Part thereof, shall be within the Cognizance and Jurisdiction of any one Magistrate or Justice of the Peace, without any Reference to the Act for Trial of small Causes in this Colony.

This Act not to affect Parks.

12. AND BE IT ENACTED, That nothing in this Law shall be construed to extend to restrain the Owners of Parks, or of tame Deer, from killing, hunting or driving their own Deer.

Penalty on Magistrate neglecting his Duty.

13. AND BE IT ALSO ENACTED *by the Authority aforesaid*, That if any Justice of the Peace or other Magistrate, within this Province, shall have Information of any Persons offending against this Act, in killing Deer out of Season, setting and making Traps, Non-Residents killing Deer, and Persons setting of Guns, and shall not prosecute the same to Effect within two Months after such Information, he shall forfeit and pay the Sum or Sums to which the Offender against this Act would have been liable.

14. AND

Add. 76
Digitized from Best Copy Available

14. AND BE IT ENACTED *by the Authority aforefaid*, That the Juf- <span style="float:right">This Act to be published and executed.</span> tices at every Quarter-Seffions of the Peace fhall caufe this Act to be publickly read; and give in Charge to the Grand-Jury to particularly inquire and prefent all Perfons for killing Deer out of Seafon, fetting or making Traps, and all Non-Refidents killing, deftroying, hunting and taking any Sort of Deer, and all Perfons fetting of Guns; and, upon Conviction for either of the faid Offences, the faid Juftices fhall fet and impofe the Fines and Penalties herein before-mentioned, with Cofts of Suit.

15. AND BE IT ENACTED *by the Authority aforefaid*, That if any <span style="float:right">Appeal given to next Seffions.</span> Perfon or Perfons whatfoever, whether the Accufed or Accufer, Plaintiff or Defendant, fhall think themfelves aggrieved by any of the Judgments given by the faid Juftices or other Magiftrates, for any Suit commenced by Virtue of this Act; then it fhall and may be lawful for fuch Perfon or Perfons to appeal, on giving fufficient Security for the Forfeitures and Cofts, to the next Court of General Quarter-Seffions, held for fuch County where fuch Judgment fhall be given; which Court is hereby empowered to hear and determine all and every fuch Appeal or Appeals.

16. AND BE IT ENACTED *by the Authority aforefaid*, That if any <span style="float:right">Penalty for watching in the Night near a Road.</span> Perfon or Perfons, within this Colony, fhall, after the Publication of this Act, watch with a Gun, on any uninclofed Land within two Hundred Yards of any Road or Path, in the Night Time, whether the faid Road is laid out by Law or not, or fhall ftand or ftation him or themfelves upon or within two Hundred Yards of any Road as aforefaid, for fhooting at Deer driven by Dogs, he or they fo offending, fhall, on Conviction, forfeit and pay the Sum of *Five Pounds* for every fuch Offence; to be recovered by Action of Debt, or Prefentment of the Grand-Jury as aforefaid, and pay all Damages.

17. PROVIDED ALWAYS, That the fixth Section of this Act fhall <span style="float:right">Not to affect *Indians*, nor *Effex, Bergen, Morris* or *Suffex*.</span> not be conftrued to affect any Native *Indian;* and that nothing in this Act fhall be conftrued to prevent the Inhabitants of *Effex, Bergen, Morris* and *Suffex*, from making, having in their Houfes, or fetting Traps of five Pounds Weight or more for Bears, Wolves, Foxes, or any other wild Beafts, Deer only excepted.

18. AND BE IT FURTHER ENACTED *by the Authority aforefaid*, That <span style="float:right">Repeal of Former Laws.</span> all former Laws made in this Colony for the Prefervation of Deer and other Game, and to prevent trefpaffing with Guns, and regulating the Size of Traps, fhall be, and they are hereby repealed.

## C H A P.   DXLI.

*An* ACT *declaring the River* Delaware *a common* Highway, *and for improving the* Navigation *in the faid River*.

Paffed Dec. 21, 1771.

WHEREAS the improving the Navigation in Rivers is of great <span style="float:right">Preamble.</span> Importance to Trade and Commerce; AND WHEREAS the River
<span style="float:right">*Delaware*</span>

# ACTS

OF THE

# GENERAL ASSEMBLY

OF THE

## STATE OF NEW-JERSEY,

At a SESSION begun at PRINCETON on the 27th Day
of *August* 1776, and continued by Adjournments.

TO WHICH IS PREFIXED,

THE

# CONSTITUTION

OF THE

# STATE.

---

BURLINGTON:
Printed by ISAAC COLLINS, M.DCC.LXXVII.

Juftices to tender the Oaths of Abjuration and Allegiance to fufpected Perfons.

4. AND BE IT ENACTED *by the Authority aforefaid,* That any two Juftices of the Peace fhall, and they hereby are empowered and directed to convene by Summons or Warrant any Perfon whatfoever, whom they fhall fufpect to be dangerous or difaffected to the prefent Government, and to tender and adminifter to him the Oaths of Abjuration and Allegiance, fet forth in an Act, entitled, *An Act for the Security of the Government of* New-Jerfey, paffed the nineteenth of *September* One Thoufand Seven Hundred and Seventy-fix. And if any Perfon, to whom the faid Oath fhall be tendered, fhall neglect or refufe to take the fame, the faid Juftices fhall bind him over with fufficient Sureties, to appear at the next Court of General Quarter-Seffions of the Peace, and to be in the mean-while of good Behaviour; and in Default of fufficient Sureties, or on Refufal to be bound, the faid Juftices are hereby empowered and directed to commit fuch Offender to clofe Gaol, and certify the fame, with the Caufe of Commitment, under their Hands and Seals, to the next Court of General Quarter-Seffions of the Peace, where, if fuch Offender refufe to take the faid Oaths, he fhall continue bound to his good Behaviour, or be fined, or imprifoned, as the faid Court fhall deem neceffary.

*Paffed at* Princeton, October 4, *1776.*

---

## C H A P. VI.

### *An* ACT *for the Infpection of Gun-Powder.*

Preamble.

WHEREAS the vending of damaged or bad Gun-Powder within this State, efpecially in the Time of War, may be of the moft dangerous Confequence;

No Gun-Powder to be fold without Infpection, &c.

*Sect.* 1. BE IT THEREFORE ENACTED *by the Council and General Affembly of this State, and it is hereby Enacted by the Authority of the fame,* That any Perfon who, from and after the Publication of this Act, fhall offer any Gun-Powder for Sale, without being previoufly infpected and marked as is herein after directed, fhall forfeit, for every

Penalty.

fuch Offence, the Sum of *Five Shillings* a Pound for every Pound weight fo offered for Sale, and fo in Proportion for greater or leffer Quantity; to be recovered in any Court where the fame may be cognizable, and applied the one Half to the Perfon who fhall profecute therefor, and the other Half to be paid to the Treafurer for the Ufe of the State.

Infpectors;

2. That *Jacob Zabrifkie* of *Bergen* County, *Jonathan Sears* of *Effex, Samuel H. Sullivan* of *Middlefex, Kenneth Henkinfon* and *Jacob Cook* of *Monmouth, Abraham Staats* of *Somerfet, Samuel Day* and *Daniel Lindfly* of *Morris, William Perine* of *Suffex, David Cowell* of *Hunterdon, Jofiah Fofter* and *John Leek* of *Burlington, Jofeph Hugg, John Somers* and *Thomas Clark* of *Gloucefter, Curtis Trenchard* of *Salem, Enos Seeley* of *Cumberland,* and *Jofeph Ludley* and *Abraham Bennet* of *Cape-May,* be, and

their Duty,

they hereby are appointed Infpectors of Gun-Powder; who are directed to pafs or mark no Gun-Powder but fuch as is good as to its Quicknefs in Firing, Strength, Drynefs, and other Qualities; and who, before they

they do any Thing in the Execution of their Office, shall severally take, before any Justice of the Peace for the County in which they reside, the following Oath or Affirmation, *I A B will well and truly execute the* and Qualifi- *Office of Inspector of Gun-Powder for this State, according to the best of* cation. *my Skill and Understanding, and agreeable to the Directions of an Act, entitled,* An Act for the Inspection of Gun-Powder.

3. That every Inspector shall mark each Cask of Gun-Powder, by Inspector to him approved, with the Letters S N I, and such other Marks as are mark. necessary to distinguish the several Sorts of Gun-Powder.

4. That every Maker of Gun-Powder shall pack his Powder in dry Maker to well-seasoned Casks, and mark every Cask in which he shall pack pack, &c. the same with the initial Letters of his Name.

5. That every Inspector who shall neglect or refuse to do any of the Penalty. Duties enjoined by this Act, shall forfeit for each Offence the Sum of *Five Pounds,* to be recovered and applied in like Manner and Form as the Fines and Penalties herein before-mentioned.

6. That every Inspector shall be allowed the one Eighth Part of a Inspector's Dollar for every Hundred Weight of Gun-Powder he shall examine, to Wages. be paid by the Owner of said Powder; provided, that no Inspector shall be obliged to ride more than ten Miles to inspect any Quantity of Gun-Powder less than one Thousand Weight, without being allowed by the Owner thereof the Sum of *Three-pence* a Mile for going, and *Three-pence* a Mile for returning, over and above the Fees of Inspection allowed by this Act. PROVIDED ALSO, That Powder inspected by Order of the Continental Congress, or by any Person legally authorised for that Purpose, in any of the neighbouring States, shall be subject to Inspection by Virtue of this Act, any Thing herein to the contrary notwithstanding.

7. That in case of the Death, Removal, Disability or Resignation of Inspector dy- any Inspector, the Court of General Quarter-Sessions of the County ing, &c. who where the same shall happen, are hereby authorised to appoint an In- another. spector to supply such Vacancy, who shall take the Oath or Affirma- tion, perform the Duty, and be subject to the Forfeitures in and by this Act prescribed.

*Passed at* Princeton, October 4, 1776.

<hr />

C H A P. VII.

*An* A C T *for establishing a Court of Admiralty and Custom-Houses within the State of* New-Jersey.

*Sect.* 1. BE IT ENACTED *by the Council and General Assembly of this State, and it is hereby Enacted by the Authority of the same,* That it shall and may be lawful for the Governor or Commander in Chief for the Time being, with the Consent of the Council, any

E three

# ACTS

OF THE

# Ⓞne Hundred & Ninth Legislature

OF THE

## State of New Jersey,

AND

### FORTY-FIRST UNDER THE NEW CONSTITUTION;



CAMDEN, N. J.,
THE COURIER PUBLISHING ASSOCIATION.
1885.

## CHAPTER XLIV.

An Amendment to "An act to prevent vending, using or exploding of guns, pistols, toy pistols, or other fire-arms to or by persons under the age of fifteen years in this state."

Section amended.

1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey,* That the second section of the act approved February tenth, one thousand eight hundred and eighty-two, entitled as above set forth, be and the same hereby is amended so as to read as follows:

Unlawful to sell fire-arms to persons under fifteen years of age, &c.

[2. *And be it enacted,* That it shall not be lawful to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school.]

Penalty.

2. *And be it enacted,* That any person offending against the provisions of this act shall be punished by a fine not exceeding twenty-five dollars.

Approved March 2, 1885.

12th *GEORGE* III.
A. D. 1772.

as aforefaid; that evey fuch Perfon and Perfons, fhall forfeit *Three-pence per* Pound, for every Pound of Flax fo fold, contrary to this Act, and at and after that Rate for every greater Quantity, to be fued for and recovered by Action of Debt, with Cofts of Suit, in a fummary Way, by any Perfon who will fue for and profecute the fame before any Juftice of the Peace within the City of *New-York*, to be levied by Procefs, to be directed to either of the Conftables, or other proper Officer of the City, commanding them, or either of them, to levy the fame by Diftrefs and Sale of the Offenders Goods and Chattels; which Forfeiture when recovered as aforefaid,

And for counterfeiting Labels or Marks.

to be applied by the Perfon recovering the fame, to his or her own Ufe; and if any Perfon or Perfons, fhall prefume to counterfeit the Label or Mark of the faid Infpector, he, fhe, or they fo offending, fhall forfeit for every fuch Offence, the Sum of *Five Pounds*, to be fued for, recovered and applied in Manner aforefaid.

IV. **And be it further Enacted,** That *Obadiah Wells*, fhall be, and hereby is appointed Infpector of Flax within the City of *New-York*; which faid Infpector before he does any Thing in Execution of the faid Office, fhall take an Oath before the Mayor or Recorder of the City of *New-York*, in the Words following, *to wit. I A. B. do fwear, that I*

Infpector's Oath.

*will faithfully, truly and impartially, according to the beft of my Judgment, Skill and Underftanding, execute, do and perform, the Office and Duty of an Infpector and Examiner of Flax, according to the true Intent and Meaning of an Act, entitled,* An Act for the Infpection of Flax in the City of *New-York*; *and I will not directly or indirectly, buy or fell any Flax, during the Time I continue Infpector of the fame, except for the private Ufe of my Family.* So help me G O D. And if the Officer hereby appointed, fhall

If the Officer is rendered incapable of acting, the Mayor, &c. to appoint *another.*

by any Accident be rendered incapable, or neglect to execute the faid Office, or mifbehave himfelf therein, or fhall happen to die, then and fo often, and from Time to Time, in fuch Cafes, it fhall and may be lawful, to and for the Mayor, Recorder, and Aldermen of the City of *New-York*, or the major Part of them, to fupply his Place by fome other fit and capable Perfon, who fhall thereupon be the Officer for putting this Act in Execution, until another be appointed by Act or Acts hereafter to be paffed for that Purpofe; which Officer fo appointed, fhall take the Oath abovementioned, have the fame Powers, and be liable to the fame Penalties, as the Officer particularly appointed by this Act; any Law, Ufage, or Cuftom to the contrary notwithftanding.

Infpector to provide a Store near the Water.

V. **Provided always, and be it Enacted** *by the Authority aforefaid,* That the faid Infpector fhall be obliged to procure a Houfe or Store proper for the Infpection of the faid Flax, to be fituated near the Water, between *Peck's* and *Burling-Slips*, in this City.

Act of Force until 1ft *Feb.* 1774.

This Act to continue in Force, from the tenth Day of *April* next, until the firft Day of *February*, One thoufand feven hundred and feventy-four.

---

C H A P. MDXLIX.

*An* A C T *to prevent the Danger arifing from the pernicious Practice of lodging Gun-Powder in Dwelling-Houfes, Stores, or other Places within the City of* New-York, *or on board of Veffels within the Harbour.* Pafs'd the 24th March, 1772.

W**HEREAS the City of *New-York* has lately been greatly endangered by the ftoring of Gun-Powder to the Southward of *Frefh-Water*,

Preamble.

contrary to Law, notwithftanding the Corporation have long fince provided a Powder-Houfe for that Purpofe.

I. **Be**

I. **Be it therefore Enacted** *by his Excellency the Governor, the Council, and the General Affembly, and it is hereby Enacted by the Authority of the fame,* That from and after the paffing of this Act, it fhall not be lawful for any Perfon or Perfons, other than Shop-keepers and Retailers of Gun-Powder, to have or keep in any Place within two Miles of the City-Hall of the faid City, more than Six Pounds of Gun-Powder, nor for Shop-keepers and Retailers more than Twenty-eight Pounds Weight of Gun-Powder, and that in four feparate Stone Jugs, or Leathern Bags, each of which fhall not contain more than Seven Pounds of Gun-Powder, upon Pain of forfeiting all fuch Gun-Powder; and the Sum of *Forty Pounds* for every Hundred Weight, and in that Proportion for a greater or lefs Quantity; and upon Pain of forfeiting all fuch Quantities which any Perfon may lawfully keep as aforefaid, and which fhall not be feparated as above directed, with full Cofts of Suit to any Perfon or Perfons who will inform and fue for the fame, by any Action, Bill, or Information, in any of his Majefty's Courts of Record in this Colony; which Courts are hereby impowered and required to give fpecial Judgment in fuch Actions, Bills, or Informations to be brought upon this Act, as well for the Recovery of fuch Gun-Powder in Specie, as for the Penalty aforefaid, befides Cofts, and to award effectual Execution thereon.

12th *GEORGE* III. A. D. 1772.

Retailers of Gunpowder not to keep more than 28 lb. within 2 Miles of the City-Hall, and other Perfons not more than 6 lb.

on Forfeiture of the Gun-powder, and alfo of £. 40, for each C. wt.

II. **And be it further Enacted** *by the Authority aforefaid,* That it fhall be lawful for the Mayor or Recorder, or any two Juftices of the Peace of the City and County of *New-York,* upon Demand made by any one or more Houfholder or Houfholders, being an Inhabitant or Inhabitants of the faid City, within two Miles of the City-Hall of the faid City, affigning a reafonable Caufe of Sufpicion, on Oath; of the Sufficiency of which Caufe the faid Mayor or Recorder, or Juftices, is and are to judge, to iffue his or their Warrant or Warrants, under his or their Hands and Seals, for fearching in the Day-Time for Gun-Powder within the Limits aforefaid, any fuch Building or Place whatfoever, or any fuch Ship or Veffel within twelve Hours after her Arrival and faftening to the Wharf, or to any other Ship or Veffel along Side of the Wharf or Key, of which Building, Place, Ship or Veffel fuch reafonable Caufe of Sufpicion fhall be affigned, on Oath, as aforefaid; and that upon every or any fuch Search, it fhall be lawful for the Searchers or Perfons finding the fame, immediately to feize, and then, or at any Time within twelve Hours after fuch Seizure, to amove, or Caufe to be amoved, all fuch Gun-Powder as fhall be found within the Limits aforefaid, or on board of fuch Veffel as aforefaid, upon any fuch Search, exceeding the Quantity allowed by this Act, to fome proper Magazine, now or to be built for the Purpofe of Storing of Gun-Powder; and the fame being fo amoved, it fhall be lawful to detain and keep the fame until it fhall be determined in one of his Majefty's Courts of Record of this Colony, whether the fame fhall be forfeited by Virtue of this Act; and the Perfon or Perfons fo detaining the fame, fhall not in the mean Time be fubject or liable to any Action or Suit for the keeping or detaining the fame, until it fhall be determined, whether the fame be forfeited as aforefaid.

Warrants to iffue to fearch Ships or Places where Gunpowder is fufpected to be lodged, contrary to this Act.

Power to feize and remove all above the Quantity allowed.

Perfons feizing, not fubject to any Suit for the Detenfion, until it fhall be determined whether forfeited or not.

III. **Provided always, and be it Enacted** *by the fame Authority,* That nothing is this Act contained, fhall be conftrued to countenance or authorize any Perfon having fuch Warrant, to take Advantage of the fame, for ferving any civil Procefs of any kind whatfoever, but that all fuch Service fhall be abfolutely null and void.

Service of civil Procefs at the Time of fearching, void.

IV. **Provided**

12th *GEORGE* III.
A. D. 1772.

No Suit to be maintained on this Act by Collusion with the Owners of the Gun-powder.

IV. Provided also, and it is hereby further enacted *by the Authority aforesaid,* That it shall not be lawful for any Person or Persons interested in such Gun-Powder, or any Person or Persons by Collusion with the Owners or Proprietors thereof, to have or maintain any Action, Bill, or Information, upon this Act; any Thing herein contained to the contrary notwithstanding.

V. And for preventing the dangerous Carriage of Gun-Powder, in and through the Streets of the City of *New-York,* within two Miles of the City Hall of the said City: Be it Enacted *by the Authority aforesaid,* That from and after the passing of this Act, it shall not be lawful for any Person or Persons, to carry or convey in or through any of the Streets or Lanes within the Limits aforesaid, more than Five Hundred Pounds Weight of Gun-Powder at a Time; and that all Gun-Powder which shall be carried or conveyed in any Carts or Carriages, or by Hand or otherwise, in or thro' any of the Streets or Lanes aforesaid, after the Time aforesaid, shall be in tight Casks, well headed and hooped, and shall be put into Bags or Cases of Leather, and intirely covered therewith, so as that no such Gun-Powder be spilt or scattered in the Passage thereof; and if at any Time after the passing of this Act, any Gun-Powder shall be carried or conveyed by any Person or Persons, in or through any of the Streets or Lanes aforesaid, in any greater Quantity, or in any other Manner than as aforesaid, all such Gun-Powder shall be forfeited, and shall and may be seized by any Person or Persons, to his or their own Use and Benefit, the Person or Persons so offending, being thereof lawfully convicted before two Justices of the Peace. *Provided always,* That this Act or any Thing herein contained, shall not extend or be construed to extend in any wise, to affect any Ship of War, Storehouse, or Magazine belonging to his Majesty, his Heirs or Successors, wherein Gun-Powder or other Stores shall be kept, for the Use of the Public or the Powder House above-mentioned.

Not more than Five C. wt. to be carried at a Time, thro' the Streets.

and that to be covered with Bags or Leather Cases,

on Penalty of forfeiting the Gun-powder.

Act not to extend to Ships of War or the King's Stores.

General Issue.

VI. And be it further Enacted *by the Authority aforesaid,* That if any Suit or Action shall be commenced or prosecuted against any Person or Persons, for any Thing done in Pursuance of this Act, in every such Case, such Person or Persons, shall and may plead the general Issue, and give this Act and the special Matter in Evidence, at any Tryal to be had thereupon, and that the same was done in Pursuance, or by the Authority of this Act; and if a Verdict shall pass for the Defendant or Defendants, or the Plaintiff or Plaintiffs, shall become non-suit or discontinue his, her, or their Suit or Action after Issue joined, or if upon Demurrer or otherwise, Judgment shall be given against the Plaintiff or Plaintiffs, the Defendant or Defendants, shall and may recover treble Costs, and shall have the like Remedy for the same, as any Defendant or Defendants, hath or have in any other Case by Law.

Limitations of Actions to be brought against Persons executing this Act.

VII. Provided always, and be it Enacted *by the Authority aforesaid,* That all Suits, Actions, and Prosecutions to be brought, commenced or prosecuted against any Person or Persons, for any Thing done or to be done, in Pursuance or by Authority of this Act, shall be laid and tryed in the County where the Fact was committed, and shall be commenced and prosecuted without wilful Delay, within six Calendar Months next after the Fact committed, and not otherwise.

Firemen may seize for their own Use, Gun-powder found during any Fire.

VIII. And be it further Enacted *by the Authority aforesaid,* That if any Powder other than such Quantity as any Person by this Act, may lawfully keep in his Custody, shall be found during any Fire, or Alarm of
Fire

Fire in the faid City, by any of the Firemen of the faid City, it fhall be lawful for him to feize the fame, without Warrant from a Magiftrate, and to hold and have the fame to his own Ufe; any Thing in this Act to the contrary notwithftanding.

This Act to be and continue of Force from the paffing thereof, until the Twenty-fifth Day of *March*, One Thoufand Seven Hundred and Seventy-four.

---

## C H A P. MDL.

*An* A C T *for the better Support of the Hofpital to be erected in the City of* New-York, *for fick and indigent Perfons.*

Pafs'd the 24th March, 1772.

WHEREAS his Majefty has been gracioufly pleafed by Letters Patent or Charter, under the Great Seal of this Colony, to eftablifh a Corporation under the Name of, *The Society of the Hofpital in the City of* New-York *in* America; for the benevolent Defign of healing fuch fick ..fons, who from their extreme Indigence, are become Objects of Charity. *And whereas* the faid Society have by their Petition to the General Affembly, not only fuggefted, that without the Aid of the Public, the Inftitution is in Danger of failing; but given the fulleft and moft explicit Affurances, that the Benefits thereof fhall not be denied to any poor difeafed Perfons, and that they mean to proceed uninfluenced by any contracted or partial Attachments, and without civil or religious Diftinctions of any Kind. *And whereas* a Society eftablifhed for Ends, fo laudable, and conducted by Principles fo generous, humane and benevolent, deferves the Encouragement of the Public;

> Preamble.

I. **Be it therefore Enacted** *by his Excellency the Governor, the Council, and the General Affembly, and it is hereby Enacted by the Authority of the fame,* That the Treafurer of this Colony for the Time being, fhall, out of any Fund in the Treafury, pay, and he is hereby required to pay unto the Treafurer, for the Time being, of the faid Society of the Hofpital in the City of *New-York*, in *America*, the Sum of *Eight Hundred Pounds* annually, for and during the Term of Twenty Years, to be computed from the firft Day of *February* next; which Sum of *Eight Hundred Pounds*, fo to be paid, fhall become chargeable upon the Duty of Excife, laid or to be laid, on ftrong Liquors retailed in the City of *New-York*.

> £. 800, to be paid annually for 20 Years, chargeable on the Excife in New-York, for the Ufe of the Hofpital.

II. **And be it alfo Enacted** *by the fame Authority,* That the Monies that may hereafter arife by the Duty of Excife to be laid on ftrong Liquors retailed in the feveral Cities, Counties, Towns, Boroughs, and Manors within this Colony, for and during the Term of Twenty Years, to be computed from the firft Day of *February* next, and not appropriated by this Act, fhall be paid by the Commiffioners to be appointed for collecting the Duty of Excife on ftrong Liquors retailed within this Colony, unto the Treafurer of the Counties feverally, where fuch Duty fhall be collected, to be annually difpofed of and applied to the Ufe of fuch Counties, in fuch Manner as the Majority of the Supervifors of the Counties refpectively, fhall think proper. *Provided always,* That if the Duty on Excife in. the City of *New-York*, fhould in any Year exceed the faid Sum of *Eight Hundred Pounds*, that fuch Excefs fhall be paid, and the Commiffioner to be

> The Excife in the other Counties appropriated to repairing Highways during 20 Years.

8 L
appointed,

# THE STATE OF OHIO.

# General and Local Laws

AND

# JOINT RESOLUTIONS,

PASSED BY THE

# SIXTY-SECOND GENERAL ASSEMBLY,

AT THE ADJOURNED SESSION,

Held in the City of Columbus, commencing Tuesday, January 2, 1877.

# VOLUME LXXIV.

COLUMBUS:
NEVINS & MYERS, STATE PRINTERS.
1877

sentenced to hard labor in the jail of the county until the fine and the costs of prosecution and accruing costs are paid; and for his labor such convict shall receive credit upon such fine and costs at the rate of seventy-five cents per day. [72 v. 165, § 1.]

**Connecting river bridges to Ohio shore of Ohio river.**

SEC. 55. Whoever connects any bridge over the Ohio river with, or attaches the same to, the Ohio shore of said river, unless the same have an unbroken and continuous span of not less than four hundred feet over the main channel of said river, shall be fined ten thousand dollars. [66 v. 71, §§ 1, 2.]

**Tavern-keeper permitting rioting, drunkenness, etc., in his house. Pawnbroker failing to take out license, or to keep register.**

SEC. 56. A tavern-keeper who permits any kind of rioting or reveling, intoxication, or drunkenness, in his house or on his premises, shall be fined not more than one hundred nor less than five dollars. [64 v. 25, § 1; S. & S. 749.]

SEC. 57. A person engaged in the business of pawnbroker, who fails to take out a license therefor, or receives and advances money upon, any property pledged, and fails to keep a register thereof, or of any property bought, as required by law, or who refuses to exhibit such register, or any property pledged, or property bought, if in his possession, to the chief of police, or to a police officer lawfully deputed to inspect the same, shall be fined not more than one hundred nor less than ten dollars. [66 v. 224, § 451 ]

**Keeper of public house keeping or permitting ball or nine-pin alley.**

SEC. 58. Whoever, being the keeper of a public house, or retailer of spiritous liquors, establishes, keeps, or permits to be kept upon his lot or premises, any ball or nine-pin alley, or is interested in any ball or nine-pin alley upon the premises of another, shall be fined not more than one hundred nor less than ten dollars; and this section shall be construed to extend to any alley denominated a nine-pin alley, whether such alley is used for playing therein a greater or less number than nine pins. [21 v. 161, § 7; S. & C. 448.]

**Suffering Canada thistles to grow on land and vending seed thereof.**

SEC. 59. Whoever knowingly vends any grass or other seed, in or among which there is any seed of the Canada thistle, white or yellow daisy, and whoever, being the owner or possessor of any land, suffers any Canada thistle to grow and ripen seed thereon, or on the highway adjoining the same, shall be fined twenty dollars. [42 v. 37, § 2; S. & C. 451.]

**Firing cannon or exploding gunpowder on public street.**

SEC. 60. Whoever, except in case of invasion by a foreign enemy, or to suppress insurrection or a mob, or for the purpose of raising the body of a person drowned, or for the purpose of blasting or removing rock, fires any cannon, or explodes at any time more than four ounces of gunpowder, upon any public street or highway, or nearer than ten rods to the same, shall be fined not more than fifty nor less than five dollars. [43 v. 117, § 1; S. & C. 451.]

**Exhibiting puppet shows, etc., for money.**

SEC. 61. Whoever exhibits any puppet show, wire-dancing, or tumbling, juggling, or sleight-of-hand, and asks and receives any money or other property for exhibiting the same, shall be fined not more than ten dollars. [29 v. 161, § 8; S. & C. 449.]

sentenced to hard labor in the jail of the county until the fine and the costs of prosecution and accruing costs are paid; and for his labor such convict shall receive credit upon such fine and costs at the rate of seventy-five cents per day. [72 v. 165, § 1.]

**Connecting river bridges to Ohio shore of Ohio river.**

SEC. 55. Whoever connects any bridge over the Ohio river with, or attaches the same to, the Ohio shore of said river, unless the same have an unbroken and continuous span of not less than four hundred feet over the main channel of said river, shall be fined ten thousand dollars. [66 v. 71, §§ 1, 2.]

**Tavern-keeper permitting rioting, drunkenness, etc., in his house. Pawnbroker failing to take out license, or to keep register.**

SEC. 56. A tavern-keeper who permits any kind of rioting or reveling, intoxication, or drunkenness, in his house or on his premises, shall be fined not more than one hundred nor less than five dollars. [64 v. 25, § 1; S. & S. 749.]

SEC. 57. A person engaged in the business of pawnbroker, who fails to take out a license therefor, or receives and advances money upon, any property pledged, and fails to keep a register thereof, or of any property bought, as required by law, or who refuses to exhibit such register, or any property pledged, or property bought, if in his possession, to the chief of police, or to a police officer lawfully deputed to inspect the same, shall be fined not more than one hundred nor less than ten dollars. [66 v. 224, § 451 ]

**Keeper of public house keeping or permitting ball or nine-pin alley.**

SEC. 58. Whoever, being the keeper of a public house, or retailer of spirituous liquors, establishes, keeps, or permits to be kept upon his lot or premises, any ball or nine-pin alley, or is interested in any ball or nine-pin alley upon the premises of another, shall be fined not more than one hundred nor less than ten dollars; and this section shall be construed to extend to any alley denominated a nine-pin alley, whether such alley is used for playing therein a greater or less number than nine pins. [21 v. 161, § 7; S. & C. 448.]

**Suffering Canada thistles to grow on land and vending seed thereof.**

SEC. 59. Whoever knowingly vends any grass or other seed, in or among which there is any seed of the Canada thistle, white or yellow daisy, and whoever, being the owner or possessor of any land, suffers any Canada thistle to grow and ripen seed thereon, or on the highway adjoining the same, shall be fined twenty dollars. [42 v. 37, § 2; S. & C. 451.]

**Firing cannon or exploding gunpowder on public street.**

SEC. 60. Whoever, except in case of invasion by a foreign enemy, or to suppress insurrection or a mob, or for the purpose of raising the body of a person drowned, or for the purpose of blasting or removing rock, fires any cannon, or explodes at any time more than four ounces of gunpowder, upon any public street or highway, or nearer than ten rods to the same, shall be fined not more than fifty nor less than five dollars. [43 v. 117, § 1; S. & C. 451.]

**Exhibiting puppet shows, etc., for money.**

SEC. 61. Whoever exhibits any puppet show, wire-dancing, or tumbling, juggling, or sleight-of-hand, and asks and receives any money or other property for exhibiting the same, shall be fined not more than ten dollars. [29 v. 161, § 8; S. & C. 449.]

be paid by the Treafurer on the warrants of the Governor ; and the accounts of all difburfements, fervices and expences, made and incurred in purfuance of this act, fhall be exhibited and fettled agreeably to the laws for fettling other public accounts.

Repeal of two former acts re-fpecting the town at Prefqu' Ifle. SECT. XVI. *And be it further enacted by the authority aforefaid,* That the act, entituled " An Act for laying out a town at Prefqu'-" Ifle," paffed the eighth day of April, one thoufand feven hundred and ninety-three, and the fupplement thereto, paffed the eighteenth day of April, one thoufand feven hundred and ninety-four, fhall be, and the fame are hereby, repealed. *(s)*

GEORGE LATIMER, *Speaker of the Houfe of Reprefentatives.*

ROBERT HARE, *Speaker of the Senate.*

*Approved, April the eighteenth,* 1795.

THOMAS MIFFLIN, *Governor of the commonwealth of Pennfylvania.*

---

CHAPTER CCCXXXVII.

*An* ACT *providing for the Infpection of Gun-powder.*

WHEREAS gun-powder imported from abroad, and manufactured within this ftate, hath frequently been found to vary much in its ftrength, and fometimes of inferior qualities, and its defects not difcovered until brought into actual ufe : And whereas the modes heretofore ufed to prove the force thereof have been found uncertain and variable : And whereas Jofeph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch-pall, by which it is conceived that the force of gun-powder may be proved by experiment, and the article reduced to certain and uniform ftandards of ftrength, whereby the manufacture may be advanced towards ultimate perfection, and the purchafer and confumer protected againft fraud and impofition :

Gun-powder manufactured in this ftate, how to be pack-ed in calks. SECTION I. *Be it therefore enacted by the* SENATE *and* HOUSE *of* REPRESENTATIVES *of the commonwealth of Pennfyl-vania, in General Affembly met, and it is hereby enacted by the au-thority of the fame,* That, from and after the firft day of October next, all gun-powder manufactured within this ftate, with in-
tent

*(s)* For the acts referred to in this fection, fee *ant.* pages 346, 518 ; and for another act relating to the town at Prefqu'-Ifle, fee *ant.* page 639.

tent to fell the fame within the city or county of Philadelphia,
fhall be put in good and tight kegs or cafks of twenty-five, fifty,
or one hundred pounds neat weight, each made of well feafoned
timber, bound together with at leaft twelve hoops, and having
a hole bored in each head, of the diameter of one fourth part of
an inch, well ftopped with corks, and having the tare weight of
each cafk marked thereon, and that all fuch gun-powder, and
all other gun-powder, wherefoever manufactured, imported into
the port of Philadelphia, or brought into the city or county of
Philadelphia for fale, fhall be depofited, forthwith on fuch im-
portation or bringing in by land or by water, in the public maga-
zine in the faid city, and delivered to the care of the keeper of
the fame, who fhall give his receipt for the fame, deliverable
to the order of him or them who fhall fo depofit the fame.  *(t)*

*All gun-pow-
der manufac-
tured, or im-
ported, to be
depofited in the
magazine.*

SECT. II. *And be it further enacted by the authority aforefaid,*
That David Rittenhoufe, Francis Gurney and Thomas Procter
be, and they are hereby, appointed Commiffioners, to procure
at leaft two pendulum powder proofs, upon the conftruction in-
vented by the faid Jofeph Leacock, as nearly uniform in the
length of the radius and weight of pendulum, and in length of
caliber and weight of the piftol, as they can procure the fame,
and therewith make experiments of the refpective ftrength or
force of the feveral fpecies of gun-powder imported from abroad,
and manufactured within this ftate, fufficient in number to afcer-
tain the quality and force of three different degrees of ftrength
in explofion, and marking the number of degrees on the gradu-
ated arch of the faid engine, to which equal quantities by weight
of the faid three fpecies of gun-powder, rammed with equal
force into the piftol, fhall elevate the faid pendulum; and the
powder, which fhall be barely capable of raifing the faid pendu-
lum to the loweft rate of elevation, fhall be the ftandard for the
ftate of Pennfylvania for gun-powder of the firft or loweft proof;
and the powder, which fhall be capable of raifing the faid pen-
dulum to the higheft rate of elevation, fhall be the ftandard of
gun-powder for the ftate of Pennfylvania of the third or higheft
proof; and the middle or fecond proof ftandard of gun-powder
fhall be afcertained by the number of degrees on the faid gradu-
ted arch, to which the fame quantity by weight in equal moie-
ties of the firft and third proof powder fhall be capable of raifing
the faid pendulum; and the faid ftandard being fo fixed and afcer-
tained, the faid Commiffioners fhall make report thereof in
writing, by indentures under their hands and feals, one part
thereof, together with one of the faid two pendulum powder
proofs, and as accurate a draft and defcription thereof as can be
made fhall be returned to the Governor, to be filed and remain in
the office of the Secretary of the commonwealth; one other part
fhall be returned to the Mafter of the Rolls, to be recorded in his
office, and fixed among the laws of the ftate; and the other part,

*Commiffioners
appointed to
procure pendu-
lum powder
proofs.*

*Standard proofs
of gun-powder.*

*The Commif-
fioners to re-
port, and re-
turn accurate
draft of the
two pendulum
powder proofs;*

*where the fame
fhall be de-
pofited.*

9 II                                            together

*(t)* See *ant.* pages 87, 171.

together with the other pendulum powder proofs, shall be delivered to the first Infpector of gun-powder to be appointed in purfuance of this act, and by him, and his fucceffors in office, to his and their fucceffors, as often as another officer shall be appointed.

SECT. III. *And be it further enacted by the authority aforefaid,*

How the pendulum in the keeping of the Infpector may be repaired, or a new one made.

That fo often as the faid pendulum powder proofs in the poffeffion of the Infpector shall, by natural wear, or by accident, be rendered unfit for ufe, or its accuracy doubted, the fame shall be compared with the other remaining in the Secretary's office, and, if found neceffary, a new one conftructed, and made conformably thereto in meafure and weight, for the ufe of the Infpector, at his own cofts and charges.

SECT. IV. *And be it further enacted by the authority aforefaid,*

A fuitable building to be erected, for the ufe of the Infpector.

That the faid Commiffioners shall prepare and report a plan for the neceffary buildings, and an eftimate of the expence thereof, and the fame being laid before and approved by the Governor, he shall caufe to be erected and built, on the moft proper part of the lot belonging to the public magazine aforefaid, a brick building, for the ufe of the Infpector, with two apartments, one for the purpofe of keeping his engine apparatus and for making proofs, and the other for the purpofe of keeping the famples of powder in fafety, the expence of which building shall be paid and defrayed by warrants to be drawn by the Governor on the State Treafurer, which shall be allowed him, on fettlement of his accounts, out of the fund for the fupport of government:

Limitation of the expence.

*Provided,* That the whole amount of the expence thereof do not exceed the fum of five hundred dollars.

SECT. V. *And be it further enacted by the authority aforefaid,*

An Infpector of gun-powder to be appointed.

That it shall and may be lawful for the Governor of this commonwealth, and he is hereby required, as foon as conveniently may be after the paffing of this act, and as often afterwards as the office shall become vacant by death, refignation or otherwife, to appoint one fuitable and fkilful perfon to be Infpector of gunpowder in and for the city, port and county of Philadelphia,

His qualification.

who, before he enters on the duties of his office, shall take and fubfcribe the oath. or affimation required by law for the fupport of the conftitutions of the United States and of this ftate; and moreover shall take and fubfcribe, before the Governor, an oath or affirmation, that he will well and faithfully perform all and fingular the duties required by this act, according to the beft of his knowledge, fkill and ability, and without prejudice or partiality.

SECT. VI. *And be it further enacted by the authority aforefaid,*

Duties of the Infpector.

That it shall be the duty of the Infpector of gun-powder fo to be appointed, for the time being, to attend at the faid public magazine, and his office fo to be built, as often as shall be neceffary,

ceffary, to infpect and examine all gun-powder there to be de-
pofited, to draw famples from each cafk of powder which fhall
be fo as aforefaid bored, and to open or otherwife get famples
of cafks of powder not bored as aforefaid, and removing fuch
famples to his office, there to prove the fame by the pendulum
proof aforefaid, and note the ftandard quality of each cafk, to
provide himfelf with cedar plugs ftamped on the outer end with
the letters S. P. and the figures number one, number two, and
number three, to defignate the firft, fecond and third proofs of
ftandard gun-powder of the ftate of Pennfylvania, and another
ftamped with the letters S. P. to defignate condemned gun-pow-
der, and therewith carefully to plug up the holes opened or made
for the purpofe with fuch marked plugs, as the proof quality of
the powder in each cafk refpectively contained, and occafionally
to weigh the faid cafks; and if upon weighing the fame fufpicion
fhould arife that the cafks are falfe tared, or do not contain the
quantity herein above mentioned for each cafk, to empty the
fame, and weigh the cafk and powder feparately, to afcertain
the deficiency, if any, in the neat weight, and to fill the fame
to its due weight out of any other cafk belonging to the fame
perfon, marking the weight taken on the ullage cafks, and keep-
ing an exact account in his books thereof, and of the names of
the owners, and the perfons bringing and depofiting the fame.

SECT. VII. *And be it further enacted by the authority aforefaid,*
That every cafk of gun-powder infpected as aforefaid fhall be
plugged up with a plug marked with the number next below the
ftandard number of degrees to which the pendulum fhall not be
elevated in the proof, and that every cafk of gun-powder in-
fpected as aforefaid, which fhall not elevate the pendulum to the
ftandard of the firft or loweft proof, fhall be condemned, and one
pint of clean water for every twenty-five pounds of powder
therein contained fhall be poured thereinto, and the hole plugged
up with the plug marked S. P. before the fame fhall be delivered
over to the owner to be refined and re-manufactured; and to
prevent a failure in the infpection by the temporary indifpofition
of the Infpector, it fhall and may be lawful for him to execute
all the duties hereby required by a Deputy, to be appointed by
him, and approved by the Governor, the Deputy firft taking
and fubfcribing the like oaths or affirmations hereby required
from the principal.

SECT. VIII. *And be it further enacted by the authority afor f.i.,*
That the Keeper of the faid magazine fhall at all feafonable times
in every juridical day in the year admit the faid Infpector, and
his Deputy and Affiftants, into the faid magazine, to do and per-
form the feveral duties hereby required of him and them, and
fhall not deliver any powder from the faid magazine until the
fame fhall be infpected as aforefaid. SECT.

*Margin notes:*
To infpect, exa-
mine and prove
the gun-pow-
der;

to mark the
ftandard quali-
ty;

to mark con-
demned gun-
powder;

to weigh the
gun-powder oc-
cafionally;

and to fupply
any deficiency
from other
cafks.

Rule for mark-
ing or con-
demning gun-
powder.

The Infpector,
may appoint a
Deputy.

The Infpector
&c. to be ad-
mitted into the
magazine.

Powder not to
be delivered, till
infpected.

Sᴇᴄᴛ. IX. *And be it further enacted by the authority aforesaid*,

Penalty, if the Inspector or his Deputy are concerned in manufacturing or selling gunpowder

That no person appointed to the office of Inspector, or his Deputy, shall, during the time of holding or exercising the said office, be concerned directly or indirectly in manufacturing, buying or selling gun-powder in grofs, or by retail, under penalty of forfeiting the sum of five hundred dollars for every such offence, to be recovered by any person who will sue for the same in any court having competent jurisdiction, one moiety for the use of this commonwealth, and the other to the use of him or them who shall sue for the same; and upon conviction thereof shall be removed from the said office, and wholly disqualified to take or hold any office of trust or profit under this commonwealth.

Sᴇᴄᴛ. X. *And be it further enacted by the authority aforesaid*,

Penalty on not depositing gunpowder in the magazine, or felling th. fame without inspection.

That if any person, from and after the said first day of October next, importing or bringing into the port or city, or county of Philadelphia, any quantity of gun-powder exceeding twenty-five pounds, with intent to sell the same, shall neglect to deposit the same for inspection in the magazine aforesaid, or shall sell the same before it be inspected and marked as aforesaid, or shall sell any gun-powder that shall be condemned as aforesaid as and for merchantable gun-powder, every person so offending shall forfeit all such gun-powder as aforesaid.

Sᴇᴄᴛ. XI. *And be it further enacted by the authority aforesaid*,

Fees of the Inspector.

That the Inspector shall be entitled to demand and receive of and from the owner and poffeffor of all gun-powder deposited in the said magazine, and by him or his Deputy examined, proved and plugged, as aforesaid, the following fums or rates, whether the same be approved or condemned, paid or secured, before the same shall be removed from the magazine, if the Inspector shall fo require; for every cafk of powder, manufactured in this ſtate, or any of the United States, bored, and ſtopped with corks by the manufacturer, containing twenty-five pounds neat weight, seven cents; for every like cafk containing fifty pounds, eight cents; for every like cafk containing one hundred pounds, nine cents; and for every cafk of foreign powder, or powder manufactured in the United States, not bored and ſtopped with corks as aforesaid, double the said price or rates; and for every cafk which he shall find deficient one per cent. in weight, and ſhall fill up, fifty cents.

Sᴇᴄᴛ. XII. *And be it further enacted by the authority aforesaid*,

How disputes between the owner of gunpowder and the Inspector shall be decided.

That if any dispute should arise between the owner, poffeffor or consignee of any such powder and the Inspector, touching the proof or condemnation thereof, or of the good efs of the materials and manner in which the cafks are made, upon application by the owner, poffeffor or consignee of such powder to o..e of
the

the Magiftrates of the city or county of Philadelphia, where the difpute fhall arife, the faid Magiftrate fhall iffue his warrant to three indifferent judicious perfons to be triers thereof, one of them to be named by the faid owner, poffeffor or confignee, one by the faid Infpector, and the third by the faid Magiftrate, directing the faid triers to view and examine the faid powder, and make report to him forthwith touching the condition thereof, and that if they fhall find the faid powder not merchantable, that they certify to him the caufe thereof, and the faid Magiftrate fhall thereupon give his judgment agreeably to the report of the faid triers, or any two of them; and in cafe the faid Magiftrate fhall on fuch report adjudge the powder not to be merchantable, he fhall award the owner, poffeffor or confignee thereof, to pay all cofts; but in cafe the faid powder fhall be found merchantable, the Infpector fhall be adjudged to pay all cofts which may have accrued, and fhall thereupon caufe the powder to be marked as of the ftandard to be directed by the faid triers.

GEORGE LATIMER, *Speaker of the Houfe of Reprefentatives.*

ROBERT HARE, *Speaker of the Senate.*

*Approved, April the eighteenth,* 1795.

THOMAS MIFFLIN, *Governor of the commonwealth of Pennfylvania.*

---

## CHAPTER CCCXXXVIII.

*An* ACT *fupplementary to the feveral Acts of Affembly for eftablifhing the Judicial Courts of this commonwealth, in conformity to the alterations and amendments in the conftitution. (u)*

WHEREAS the times directed for holding the Supreme Court of this commonwealth are inconvenient: Therefore,

SECTION I. *Be it enacted by the* SENATE *and* HOUSE OF REPRESENTATIVES *of the commonwealth of Pennfylvania, in General Affembly met, and it is hereby enacted by the authority of the*

9 I *fame,*

*(u)* For the feveral acts refpecting the Judicial Department, fee *ant.* pages 92, 402, 409; and the Index to the feveral Volumes of the prefent edition.

A the GENERAL ASSEM-
BLY of the GOVERNOR and
COMPANY of the STATE
of *Rhode-Island*, and *Provi-
dence Plantations*, begun and
holden at *South-Kingstown*,
within and for the State afore-
said, on the last Monday of
*October*, in the Year of our
LORD, One Thousand, Se-
ven Hundred and Seventy-
six.

PRESENT,

The Honorable

## *William Bradford*, Esq; Deputy-Governor.

JOHN COLLINS, Esq;  
SIMEON POTTER, Esq;  
JOHN JEPSON, Esq;  
JAMES ARNOLD, jun. Esq;  } Assistants.  
PETER PHILLIPS, Esq;  
WILLIAM POTTER, Esq;  
THOMAS CHURCH, Esq;  

ROWSE J. HELME, Esq; Deputy-Secretary.

ed by this Assembly, *It is Voted and Resolved,* That the Sum aforesaid be paid to the said *Gromel Child,* out of the General Treasury.

✕ ✕ ✕ ✕ ✕ ✕ ✕

AN ACT for the Inspection of GUNPOWDER, manufactured within this State.

*B*E *it Enacted by this General Assembly, and, by the Authority thereof, it is Enacted,* That if any Person or Persons, within this State, shall vend or expose to Sale any Gunpowder, manufactured within the same, unless said Gunpowder be packed in a good dry Cask, marked with the two first Letters of the Manufacturer's Name, and hath been examined and approved by the Inspector of Gunpowder, for said State, and by him marked with the Letters *U. S. A.* and such other Marks as are necessary to distinguish the several Sorts of Gunpowder ; the Person or Persons so offending, shall forfeit and pay six Pounds, lawful Money, for every Cask so exposed to Sale, to be recovered by Bill, Plaint or Information, upon Conviction before any Court of Record within this State ; which Forfeiture shall one Moiety thereof be given to the Informer, and the other be paid into the General Treasury of this State : *And be it further Enacted by the Authority aforesaid,* That the said Inspector be paid, out of the General Treasury, nine Pence, lawful Money, for every Cask so marked and inspected by him.

Act regulating the Inspection of Gunpowder;

✕ ✕ ✕ ✕ ✕ ✕

AN ACT for punishing Persons counterfeiting the Bills or Notes of either of the Continental Loan-Offices, within the *United States of America.*

*B*E *it Enacted by this General Assembly, and, by the Authority thereof, it is Enacted,* That if any Person or Persons, within this State, shall counterfeit the Bills or Notes of either of the Continental Loan-Offices, within the *United States of America,* or utter or pass the same, Knowing them to be such, and be thereof duly convicted, shall suffer the Pains of Death.

Persons counterfeiting the Bills or Notes of either of the Continental Loan-Offices, to be punished with Death.

IT

# ACTS AND RESOLVES

PASSED BY THE

## GENERAL ASSEMBLY

—OF THE—

# STATE OF VERMONT,

AT THE

## EIGHTH BIENNIAL SESSION, 1884.



## PUBLISHED BY AUTHORITY.



RUTLAND:

THE TUTTLE CO., OFFICIAL PRINTERS TO THE STATE OF VERMONT.

1885.

Add. 98

### No. 74.—AN ACT RELATING TO BEAR TRAPS.

*It is hereby enacted by the General Assembly of the State of Vermont:*

SEC. 1. A person who sets or causes to be set a bear trap, shall cause to be built and maintained, three-fourths around the same in a substantial manner, a railing or guard not less than three feet high and shall protect the entrance to such trap against domestic animals by placing a pole horizontally, at a height of three feet from the ground, across the points between which it is designed that the bear should enter the trap. A person who violates the provisions of this section shall be fined not less than ten dollars nor more than thirty dollars.

SEC. 2. Justices of the county shall have jurisdiction of offenses under this act.

Approved November 25, 1884.

---

### No. 75.—AN ACT IN ADDITION TO SECTION THREE THOUSAND EIGHT HUNDRED AND NINETY-FIVE, CHAPTER ONE HUNDRED AND SEVENTY OF REVISED LAWS, TO PROTECT GAME.

*It is hereby enacted by the General Assembly of the State of Vermont:*

SEC. 1. No person in this State shall, at any time, take, kill, purchase or receive, or cause to be taken, killed or received, any woodcock or ruffled grouse, commonly called partridge, for the purpose of shipping or in any manner disposing of them to parties or persons outside of this State, for traffic or gain. Any person violating any of the provisions of this act shall forfeit, for each offense, ten dollars and cost, one-half to go to the person making the complaint and one-half to the State.

SEC. 2. This act shall take effect January 1, 1885.

Approved Nov. 25, 1884.

---

### No. 76.—AN ACT RELATING TO TRAPS.

*It is hereby enacted by the General Assembly of the State of Vermont, as follows:*

SEC. 1. A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more

than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

SEC. 2. This act shall take effect from its passage.

Approved Nov. 25, 1884.

---

No. 77.—AN ACT IN AMENDMENT OF CHAPTER ONE HUNDRED AND SEVENTY OF THE REVISED LAWS, ENTITLED, "PRESERVATION OF FISH, GAME AND BIRDS."

*It is hereby enacted by the General Assembly of the State of Vermont:*

SEC. 1. The word sparrow in section three thousand eight hundred and ninety-six of the Revised Laws relating to the protection of birds, shall not be construed to include English sparrows. Said section is also hereby amended by striking out the word "Woodpecker" from the list of birds protected.

SEC. 2. This act shall take effect from its passage.

Approved Nov. 25, 1884.

---

No. 78.—AN ACT TO REPEAL NO. ONE HUNDRED AND SIXTEEN OF THE LAWS OF 1882, ENTITLED, "AN ACT FOR THE PROTECTION OF MUSKRATS."

*It is hereby enacted by the General Assembly of the State of Vermont :*

SEC. 1. Number one hundred and sixteen of the laws of 1882 is hereby repealed.

SEC. 2. This act shall take effect from its passage.

Approved Nov. 24, 1884.