No. 22-1478

# In the
# United States Court of Appeals
# for the First Circuit

◆

STEFANO GRANATA, et al.,

*Plaintiffs-Appellants*,

v.

MAURA HEALEY, et al.,

*Defendants-Appellees.*

◆

**Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:21-cv-10960-RWZ (Hon. Rya W. Zobel)**

◆

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

◆

RAYMOND M. DiGUISEPPE
THE DiGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com
*Counsel of Record*

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellants The Gunrunner, LLC and Firearms Policy Coalition have

no parent corporations, and no publicly held corporations hold 10% or

more of their stock.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ............................................................ iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ............... 1

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................ 2

    I.   Regulatory Scheme ............................................................ 2

       A.  Attorney General's Handgun Sales Regulations ....................... 2

       B.  The Approved Firearms Roster .................................................. 4

    II.  Effect on Plaintiffs ............................................................ 6

    III. Proceedings Below ............................................................ 9

SUMMARY OF THE ARGUMENT .................................................. 12

ARGUMENT ............................................................................. 15

    I.   The Second Amendment's plain text protects the right to possess handguns, and Massachusetts burdens that right by banning the commercial sale of common handguns .................. 16

       A.  The Second Amendment protects handguns ............................ 16

       B.  The Second Amendment protects the right to keep arms, which includes the right to acquire arms .................................. 16

       C.  Massachusetts's prohibition on commercial sales is a *de facto* ban. .................................................................................. 19

    II.  Under *Heller*, bans on common arms are inconsistent with the Nation's tradition of firearm regulation and violate the Second Amendment ................................................................ 23

       A.  The Nation's tradition protects arms in common use .............. 23

       B.  Arms in common use cannot be banned. ................................... 25

       C.  Massachusetts has not even claimed that any of the banned arms are "dangerous and unusual" so as to rebut the presumption of protection ......................................................... 27

III.  No relevantly similar historical analogue exists to justify the Handgun Ban as at all consistent with this Nation's historical tradition of firearm regulation.......................................................29

IV.  The "other options" argument is simply no answer. ...................35

V.  Massachusetts cannot claim any "presumptively lawful" status for this presumptively unlawful Ban. ............................38

CONCLUSION .......................................................................................44

CERTIFICATE OF COMPLIANCE......................................................45

CERTIFICATE OF SERVICE...............................................................46

ADDENDUM .........................................................................................47

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State,*
    50 Tenn. 165 (1871) ..................................................................18

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ............................................................. *passim*

*Carey v. Population Servs. Int'l,*
    431 U.S. 678 (1977) ...............................................................20

*Commonwealth v. Caetano,*
    470 Mass. 774 (2015) ...........................................................37

*Craig v. Boren,*
    429 U.S. 190 (1976) ..........................................................22, 23

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................................. *passim*

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ..........................................17, 26

*Frein v. Pennsylvania State Police,*
    47 F.4th 247 (3d Cir. 2022) ...........................................42, 43

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ..............................................21

*Gould v. Morgan,*
    907 F.3d 659 (1st Cir. 2018) ...............................................10

*Ill. Ass'n of Firearms Retailers v. City of Chi.,*
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ...................................16

*Jackson v. City and County of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) ...............................................17

*Luis v. United States,*
    578 U.S. 5 (2016) .................................................................17

iv

*Mance v. Sessions,*
    896 F.3d 699 (5th Cir. 2018) ............................................................ 40

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ...................................................... 16, 25, 26, 33

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    __ U.S. __, 142 S. Ct. 2111 (2022) .............................................. *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ........................................... 27, 29, 38

*NRA v. BATFE,*
    700 F.3d 185 (5th Cir. 2012) ............................................................ 32

*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007) ...................................................... 36

*Pena v. Lindley,*
    898 F.3d 969 (9th Cir. 2018) ............................................................ 40

*Reliable Consultants, Inc. v. Earle,*
    517 F.3d 738 (5th Cir. 2008) ...................................................... 20, 22

*Renna v. Becerra,*
    535 F. Supp. 3d 931 (S.D. Cal. 2021) ........................................ 42

*Richmond Newspapers v. Virginia,*
    448 U.S. 555 (1980) .......................................................................... 17

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    ___ U.S. ___, 141 S. Ct. 63 (2020) .......................................... 43

*Teixeira v. Cty. of Alameda,*
    873 F.3d 670 (9th Cir. 2017) (en banc) .......................... 16, 39

*Tomasella v. Nestle USA, Inc.,*
    962 F.3d 60 (1st Cir. 2020) .......................................... 12, 44

*Tony Kole & Ghost Indus., LLC v. Vill. of Norridge,*
    No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. 2017) .............................. 17

*Tyler v. Hillsdale County Sheriff's Department,*
    837 F.3d 678 (6th Cir. 2016) (en banc) ................................................ 41

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) ................................................................ 41

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ................................................................... 20

*United States v. Miller,*
    307 U.S. 174 (1939) ............................................................................. 24

*United States v. Quiroz,*
    No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. 2022) ......... 18

*Virginia v. Black,*
    538 U.S. 343 (2003) ............................................................................. 27

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................. 23

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019) .................................................................. 10

*Yukutake v. Conners,*
    554 F. Supp. 3d 1074 (D. Haw. 2021) ............................................ 39, 40

## Statutes and Regulations

18 U.S.C. § 922(a)(3) .................................................................................. 6

18 U.S.C. § 922(a)(5) .................................................................................. 6

28 U.S.C. § 1291 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1343 ..................................................................................... 1, 9

28 U.S.C. § 2201 ........................................................................................ 1

28 U.S.C. § 2202 ........................................................................................ 1

42 U.S.C. § 1983 .................................................................................... 1

42 U.S.C. § 1988 .................................................................................... 1

501 C.M.R. 7.00, *et seq.* ....................................................................... 9

501 C.M.R. 7.05 .................................................................................... 5

940 C.M.R. § 16.00, *et seq.* ............................................................... 2, 9

940 C.M.R. § 16.01 ............................................................................. 3, 6

940 C.M.R. § 16.02 ................................................................................ 3

940 C.M.R. § 16.03 ................................................................................ 3

940 C.M.R. § 16.04(1) ........................................................................... 3

940 C.M.R. § 16.04(2) ........................................................................... 3

940 C.M.R. § 16.05(1) ........................................................................... 3

940 C.M.R. § 16.05(2) ........................................................................... 4

940 C.M.R. § 16.05(3) ........................................................................... 4

Fed. R. App. P. 34(a)(1) ......................................................................... 1

Fed. R. Civ. P. 12(b)(6) ........................................................................ 12

Mass. Gen. Laws ch. 140, § 123 ......................................................... 5, 9

Mass. Gen. Laws ch. 140, § 123, cl. 18 .................................................. 4

Mass. Gen. Laws ch. 140, § 123, cl. 19 .................................................. 4

Mass. Gen. Laws ch. 140, § 123, cl. 20 .................................................. 4

Mass. Gen. Laws ch. 140, § 123, cl. 21 .................................................. 4

Mass. Gen. Laws ch. 140, § 128 ............................................................. 9

Mass. Gen. Laws ch. 140, § 131¾ .......................................................... 4

Mass. Gen. Laws ch. 140, § 131K .............................................. 9

## Other Authorities

Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p 218 ............................ 33

BLACK'S LAW DICTIONARY (6th ed. 1990) .................................................. 27

BOSTON EVENING-POST, Oct. 24, 1768, p. 2, cols. 2–3 ............................ 30

BOSTON GAZETTE, June 4, 1770, p. 3, cols. 1–2 ...................................... 30

Johnson, Samuel, DICTIONARY OF THE ENGLISH LANGUAGE,  vol. 1
    (4th ed. 1773) ...................................................................... 18

LAWS OF THE STATE OF MAINE (Calvin Spaulding ed., 1822) ................. 32

Lewis, Meriwether & Clark, William, THE JOURNALS OF THE LEWIS &
    CLARK EXPEDITION, vol. 2 (Aug. 30, 1803 entry) (Gary Moulton ed.,
    1986) (2002 reprint) ............................................................. 31

MARYLAND HISTORICAL MAGAZINE, vol. 52 (Louis Henry Dielman &
    William Hand Browne eds., 1957) ......................................... 31

MASSACHUSETTS GAZETTE, Aug. 3, 1769, p. 1, col. 1 .............................. 30

PENNSYLVANIA JOURNAL, Oct. 25, 1783 .................................................. 30

Petition for a Writ of Cert., *District of Columbia v. Heller*, No. 07-290
    (2007)................................................................................... 37

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE,
    vol. 1 (1828) ....................................................................... 18

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to First Circuit Rule 34.0, Plaintiffs respectfully request oral argument in this case of first impression. This Court has not yet had an opportunity to analyze Massachusetts's ban on the commercial sale of common handguns, or any other Second Amendment matter, since the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, __ U.S. __, 142 S. Ct. 2111 (2022). This case therefore presents significant issues relating to the fundamental right to keep and bear arms, and holding oral argument will further assist the Court in the decision-making process. *See* Fed. R. App. P. 34(a)(1).

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States and seeks relief under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983 and 1988. The district court entered judgment on May 19, 2022, and Appellants timely noticed their appeal on June 15, 2022, Addendum [Dkt. Nos. 24 & 25].[1] The appeal is from a final judgment that

---

[1]      Pursuant to Local Rule 28.0, the Addendum contains the district court's Order of Dismissal and Memorandum & Order explaining its reasons for dismissal of the Complaint. These documents are included

disposes of all parties' claims. *Id.* This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Did the district court err in finding that Plaintiffs' Complaint fails to state a plausible case for relief against Massachusetts's ban on the commercial sale of handguns commonly used for lawful purposes across the country?

## STATEMENT OF THE CASE

### I.   Regulatory Scheme

Massachusetts forbids licensed retailers from transferring a firearm unless it is both (1) compliant with the Attorney General's Handgun Sales Regulations, and (2) included on the legislature's Approved Firearms Roster.

### A.  Attorney General's Handgun Sales Regulations

Massachusetts's Attorney General regulates "transfers" of handguns by "handgun purveyors." 940 C.M.R. § 16.00, *et seq.* "Transfer" is defined

---

only in the Addendum and are not reproduced in the Appendix, consistent with Local Rule 28.0(b)(2). Therefore, they are referenced in accordance with the pagination of the Addendum (i.e., "A-1," "A-2," etc.), while the documents in the Appendix are referenced as paginated in the Appendix (i.e., "App. at p. __ (Dkt. No. __ [Docket Item] at __).").

2

as "sell, rent, or lease"; "Handgun purveyor" is defined as "any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts," excluding those who transfer fewer than five handguns per year. 940 C.M.R. § 16.01. Under 940 C.M.R. § 16.02, the regulations make it "an unfair or deceptive practice for any handgun purveyor" to transfer a handgun that:

- Does not have a tamper-resistant serial number, 940 C.M.R. § 16.03;

- Is made of metal that does not meet certain melting point, tensile strength, or density requirements, 940 C.M.R. § 16.04(1);

- Is prone to exploding, accidental discharge, or repeated firing from a single trigger pull, 940 C.M.R. § 16.04(2);

- Does not have a safety device that prevents unauthorized use of the firearm, 940 C.M.R. § 16.05(1);

- Does not contain a mechanism to preclude an average five year old child from operating the handgun, including but not limited to: trigger resistance of at least a ten pound pull; altering the firing mechanism so that an average five year old child's hands are too

small to operate the handgun; requiring a series of multiple motions in order to fire the handgun, 940 C.M.R. § 16.05(2); and

- Does not contain a load indicator or magazine safety disconnect, if it is a semiautomatic handgun, 940 C.M.R. § 16.05(3).

## B.  The Approved Firearms Roster

Massachusetts's legislature has codified its own requirements for handgun sales by licensed firearm dealers. These include requirements regarding the melting point, tensile strength, and density requirements for metal parts of firearms; proneness to accidental discharge; proneness to exploding or repeated firing from a single trigger pull; and firearms with barrels less than three inches in length. Mass. Gen. Laws ch. 140, § 123, cl. 18–21. The Secretary of the Executive Office of Public Safety and Security is directed by Mass. Gen. Laws ch. 140, § 131¾ to "compile and publish a roster" of handguns that meet the requirements set forth in Mass. Gen. Laws ch. 140, § 123, cl. 18–21. This is the Approved Firearms Roster. As of June 2021, the Roster consisted of roughly 1,000 handguns from only 29 manufacturers. A-4.

It is illegal for a licensed firearms dealer to sell or otherwise transfer any firearm that is not on the Approved Firearms Roster.[2] 501 C.M.R. 7.05. But as the Roster's disclaimer warns, "Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations." App. at p. 9 (Dkt. No. 1 [Complaint] at ¶ 30). For example, Enforcement Notice #3 declares that handguns made available for lawful commercial sale must also comply with the Attorney General's Regulations on child proofing, load indicators, and tamper-resistant serial numbers. App. at p. 9 (Dkt. No. 1 [Complaint] at ¶ 30).[3] So, a firearm must be on the Roster to lawfully be sold, but being on the Roster does not make it lawful to sell. Rather, it must be on the Roster *and* comply with the Attorney General's Regulations (collectively referred to as the "Handgun Ban").

Additionally, federal law requires the use of an in-state licensed dealer to facilitate the purchase or delivery of a handgun from an out-of-state

---

[2] Only firearms lawfully owned or possessed under a license issued before October 21, 1998, are exempted from this prohibition. Mass. Gen. Laws ch. 140, § 123.

[3] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download.

seller, 18 U.S.C. §§ 922(a)(3), (a)(5), so Massachusettsans cannot simply acquire non-Roster and non-Attorney General approved arms from out-of-state sellers; they are necessarily bound by the limitations of the Roster and Regulations in their ability to lawfully acquire handguns.

Only unlicensed individuals can transfer a handgun that is not on the Approved Firearms Roster and compliant with the Attorney General's Regulations, but they are limited to four such transfers per year. 940 C.M.R. § 16.01. And because unlicensed individuals have the same limited selection from retailers, the secondary market of non-Roster and non-Attorney General approved firearms is inherently limited as well.

## II. Effect on Plaintiffs

Plaintiffs Stefano Granata, Judson Thomas, Colby Cannizzaro, and Cameron Prosperi ("Individual Plaintiffs") have all been granted a License to Carry Firearms, App. at pp. 16–17 (Dkt. No. 1 [Complaint] at ¶¶ 47–50), which allows them to lawfully purchase, own, and publicly carry firearms in Massachusetts, App. at pp. 8, 11–12 (Dkt. No. 1 [Complaint] at ¶¶ 27, 34). They all wish to acquire and keep for self-defense handguns that are widely sold and commonly owned across the

country but forbidden for sale or transfer by licensed firearms dealers in Massachusetts. App. at pp. 16–17 (Dkt. No. 1 [Complaint] at ¶¶ 47–50).

But for Massachusetts's restrictions, Plaintiff Granata would purchase new from a licensed retailer a fifth generation Glock 19, Sig Arms Model 1911 "We the People" edition, and/or Sig Arms Model 1911 "TacOps" edition. App. at p. 16 (Dkt. No. 1 [Complaint] at ¶ 47).

But for Massachusetts's restrictions, Plaintiff Thomas would purchase new from a licensed retailer a fifth generation Glock 19 and/or Glock 17, CZ-USA DW Kodiak 10mm, CZ-USA 75 Compact 9mm, CZ-USA P-10 9mm, Magnum Research Desert Eagle XIX .50AE, Kimber Ultra Carry II .45, Kimber KHX custom .45, Kimber Desert Warrior .45, and/or Nighthawk Custom Heinie Signature Recon. App. at pp. 16–17 (Dkt. No. 1 [Complaint] at ¶ 48).

But for Massachusetts's restrictions, Plaintiff Cannizzaro—an Air Force veteran and law enforcement officer, App. at p. 17 (Dkt. No. 1 [Complaint] at ¶ 49)—would purchase new from a licensed retailer a Kimber Ultra Carry II 1911, CZ P-09, and/or Sig P365XL, *id.*

But for Massachusetts's restrictions, Plaintiff Prosperi—an experienced law enforcement officer, App. at pp. 17–18 (Dkt. No. 1

[Complaint] at ¶ 50)—would purchase new from a licensed retailer a CZ Tactical Sport, CZ Tactical Sport Orange, Beretta 92X Performance, and/or CZ P-10F, *id.*

But for Massachusetts's restrictions, Plaintiff The Gunrunner, LLC, would make available for sale and sell to law-abiding citizens, like the individual Plaintiffs in this case, handguns that are widely sold and commonly owned throughout the country yet forbidden for sale or transfer by licensed firearms dealers in Massachusetts. App. at pp. 3, 18 (Dkt. No. 1 [Complaint] at ¶¶ 11, 51).

Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware, whose essential purposes include defending and promoting the People's rights under Second Amendment rights. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the Commonwealth of Massachusetts, including Plaintiffs Granata, Thomas, Cannizzaro, Prosperi, and The Gunrunner. FPC is suing on behalf of its members, who include individual gun owners and other law-abiding persons, like the Individual Plaintiffs here who wish to purchase

new from a licensed retailer, like Plaintiff The Gunrunner, handguns that are banned from commercial sale in Massachusetts. App. at pp. 3–4, 18–19 (Dkt. No. 1 [Complaint] at ¶¶ 12, 52–54).

## III.   Proceedings Below

Plaintiffs filed suit on June 8, 2021, challenging the laws and regulations underlying Massachusetts's restriction on handgun transfers—including Mass. Gen. Laws ch. 140, §§ 123, 128, 131K, 131¾; 501 C.M.R. 7.00, *et seq.*; and 940 C.M.R. § 16.00, *et seq.*—as unconstitutional under the Second Amendment, incorporated against Massachusetts through the Fourteenth Amendment. App. at p. 1 (Dkt. No. 1 [Complaint]). On August 20, 2021, Defendants moved to dismiss Plaintiffs' Complaint, with prejudice, for failure to state a claim. App. at p. 26 (Dkt. No. 14 [Motion to Dismiss]). After a hearing on November 18, 2021, App. at pp. 85–121 (Transcript, pp. 1–37), the district court dismissed Plaintiffs' Complaint with prejudice on May 19, 2022, A-1–17.

The district court applied a "two-step approach" in which, "[a]t the first step," the court asked "'whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee,'"—a "'backward-looking inquiry, which seeks to determine whether the

9

regulated conduct was understood to be within the scope of the right at the time of ratification.'" A-7 (quoting *Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018)). The district court did not actually conduct any historical inquiry, and instead, "by assuming, without deciding, that the challenged regulations touch on conduct protected by the Second Amendment," A-7, proceeded to "the next step" of the analysis, where it "determine[d] the appropriate level of scrutiny and whether the challenged law survives that determination," A-8. In step two, the court concluded that the Handgun Ban survived "intermediate scrutiny," A-9–16—a test that, according to the then-prevailing First Circuit authority, applied when the "'challenged regulation either fails to implicate the core Second Amendment right or fails to impose a substantial burden on that right,'" A-9 (quoting *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019)).

The district court held that the Handgun Ban imposed a "limited burden on individuals' ability to exercise their Second Amendment rights" because it does not "result in a total prohibition against keeping a handgun for self-defense in the home," other handguns may be lawfully acquired, and Plaintiffs have not shown that those other handguns are "inadequate to exercise their core Second Amendment right." A-10–11.

On the other hand, the court reasoned, the Commonwealth has "important" interests "in public safety and crime prevention," the restraints imposed by the Handgun Ban "reasonably support[]" those interests, and that was sufficient to pass constitutional muster under the First Circuit's two-step test because the courts must defer to the Commonwealth's judgment of the "appropriate means to pursue its important interests." A-12–16.

Plaintiffs timely noticed their appeal on June 15, 2022. App. at pp. 122–24 (Dkt. No. 26 [Notice of Appeal]). Days later, the Supreme Court invalidated the two-step test that the district court had applied to uphold the Handgun Ban and commanded that courts follow the methodology laid down in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which "expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," and instead "centered on constitutional text and history." *Bruen*, 142 S. Ct. at 2126, 2128–29 (internal quotations omitted).

## SUMMARY OF THE ARGUMENT

In deciding a motion to dismiss for failure to state a claim for relief under Fed. R. Civ. P. 12(b)(6), a court must "construe all factual allegations in the light most favorable to the non-moving party to determine if there exists a plausible claim upon which relief may be granted." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 70 (1st Cir. 2020). If so, the plaintiffs have earned their day in court. That is surely the case here.

As the Supreme Court explained in *Bruen*, under the proper test of a firearm regulation's constitutionality, if the regulation affects conduct covered by the Second Amendment's plain text, the regulation is presumptively unconstitutional, and the government can justify it only by demonstrating that it is consistent with America's historical tradition of firearm regulation. *Bruen* both invalidates the two-part test the district court applied here and makes clear that the dictum in *Heller* discussing categories of "presumptively lawful" regulations cannot rescue this Ban.

The Supreme Court conducted the essential plain text analysis of the Second Amendment in *Heller*. It determined that "keep Arms" means to

12

"have weapons," and that "Arms" include "all bearable arms." Therefore—as the Court's precedents now firmly establish—the Amendment covers the right to possess handguns. And because the right to possess handguns includes the act of acquiring handguns—according to the Court's recognition of implicit fundamental rights, the dictionaries used in its plain text analysis, and several lower court holdings it cited approvingly—the Second Amendment's plain text covers Plaintiffs' acquisition and possession of the handguns Massachusetts bans.

To be sure, Massachusetts's prohibition on the commercial sale of common handguns qualifies as a ban. Massachusettsans—including Plaintiffs—are left only with the hopes of finding such arms through a secondhand market, where they lack knowledge of the seller or control over the price or condition of the firearm, if the firearm is available at all.

Because the Handgun Ban affects conduct covered by the Second Amendment's plain text, it is presumptively unconstitutional. Massachusetts can overcome that presumption only by demonstrating that its regulation is consistent with the Nation's historical tradition of firearm regulation. It is not.

First, the Supreme Court has already held that bans on common arms are inconsistent with the Nation's historical tradition of firearm regulation and flatly unconstitutional. And Massachusetts does not deny that the banned handguns are common. Moreover, all bearable arms are prima facie protected, and—especially without making such an argument—Massachusetts cannot overcome that presumption by proving that the banned arms dangerous *and* unusual as they must be to lose constitutional protection.

Second, to the extent that a deeper historical analysis may be required, Massachusetts has not and cannot point to any "relevantly similar" historical analogue that would justify the Handgun Ban as consistent with this Nation's tradition of firearms regulations.

Additionally, the Supreme Court has repeatedly made clear that the right to obtain and possess other weapons or exercise self-defense through other means is no answer to a ban on the possession of common arms. So, the availability of the handguns that Massachusetts happens to approve cannot justify its ban on handguns commonly owned and used across the country.

While Plaintiffs' Complaint makes out a strong case against the Handgun Ban, the reality is, they need only state a *plausible* case for relief at this early stage of the litigation, and they have surely done so.

## ARGUMENT

Quite unlike the "interest-balancing" test that the district court applied in readily deferring to the judgment of the Massachusetts Legislature and Attorney General that the Handgun Ban "substantially relate[s]" to promoting public safety and preventing crime, A-12–13, the proper "standard for applying the Second Amendment is as follows":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S.Ct. at 2129–30 (internal quotations omitted).

The targeted conduct is unquestionably covered, and Massachusetts cannot carry its burden to justify the Handgun Ban.

I.   **The Second Amendment's plain text protects the right to possess handguns, and Massachusetts burdens that right by banning the commercial sale of common handguns.**

A.   **The Second Amendment protects handguns.**

Interpreting "Arms," the *Heller* Court concluded that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. By striking down handgun bans in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and New York's "good cause" limitation on the right to carry handguns in public in *Bruen*, the Court has firmly established that handguns—including those subject to the Handgun Ban at issue here—are covered by the Second Amendment's plain text.

B.   **The Second Amendment protects the right to keep arms, which includes the right to acquire arms.**

The Second Amendment "right must also include the right to *acquire* a firearm," *Ill. Ass'n of Firearms Retailers v. City of Chi.*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014), because, as the en banc Ninth Circuit acknowledged well before *Bruen*, "the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms," *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (quotation marks omitted); *see also Tony Kole &*

16

*Ghost Indus., LLC v. Vill. of Norridge*, No. 11 C 3871, 2017 WL 5128989, at *28 (N.D. Ill. 2017) ("the Second Amendment right to keep and bear arms for self-defense necessarily includes the right to acquire a firearm").

"[T]he [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980). "[F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Id.* at 580. When it comes to the Second Amendment, one of those indispensable fundamental rights is the right to acquire arms:

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. . . . The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco*, 746 F. 3d 953, 967 (CA9 2014) (internal quotation marks omitted), and "to acquire and maintain proficiency in their use," *Ezell* v. *Chicago*, 651 F. 3d 684, 704 (CA7 2011). . . . Without protection for these closely related rights, the Second Amendment would be toothless.

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

Further, looking to Samuel Johnson and Noah Webster's dictionaries, the *Heller* Court observed that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582.

17

Therefore, the Court held, the Second Amendment's text protects "handgun possession." *Id.* at 635.

*Heller* thus establishes that the Second Amendment's plain text covers Plaintiffs' right to "have" the "weapons" that Massachusetts bans. And this must include both the possession and acquisition of such weapons, because as both Johnson and Webster recognized, the act of acquiring is inherent in the act of "having." Johnson defined "have" as, most relevantly, "[t]o obtain; to enjoy; to possess" and "[t]o take; to receive." 1 Samuel Johnson, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[4] Webster defined it as "[t]o gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated).[5] "The right to keep arms," therefore, "necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871)[6]; *see also United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *7–8 (W.D. Tex. 2022)

---

[4] *Heller* relied on Johnson to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

[5] *Heller* relied on Webster to define "arms," *id.* at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "militia," *id.* at 595.

[6] *Heller* thrice cited *Andrews* approvingly. 554 U.S. at 608, 614, 629.

18

(Because "the plain meaning of the verbs 'have' or 'possess' include the act of receipt. . . . 'to have weapons' would encompass the past receipt and the current possession of those weapons.").

Because the Second Amendment's explicit right "to keep . . . Arms" includes the right to possess and acquire handguns, Massachusetts impermissibly burdens that right by outlawing the commercial sale of the arms it targets.

### C. Massachusetts's prohibition on commercial sales is a *de facto* ban.

Massachusetts's ban on the commercial sale of common handguns is a *de facto* ban on their acquisition and possession. Massachusettsans can only possibly acquire such handguns through unlicensed sellers. This effectively limits the market to secondhand firearms with no manufacturer's warranty or safety guarantees that licensed dealers can offer, and the scarcity of supply increases the purchase costs for any prohibited handguns that *might* be available on the secondary market. Moreover, because unlicensed sellers in Massachusetts can only purchase new handguns through licensed firearms dealers who are prohibited from transferring non-Roster and non-Attorney General

approved firearms, the possibility that such an arm is actually available for purchase through an unlicensed seller is slim at best.

The Supreme Court has cautioned that "bans on commercial transactions involving a product can unconstitutionally burden individual substantive due process rights" and "restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008). And clearly, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

In fact, the Supreme Court has determined that sales bans can be even more destructive than direct bans:

> Restrictions on the distribution of contraceptives clearly burden the freedom to make . . . decisions [regarding matters of childbearing]. A total prohibition against sale of contraceptives, for example, would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use. Indeed, in practice, a prohibition against all sales, since more easily and less offensively enforced, might have an even more devastating effect upon the freedom to choose contraception.

*Carey v. Population Servs. Int'l*, 431 U.S. 678, 687–88 (1977). Given that this has been recognized in the context of unenumerated contraception

rights, it must apply with even greater force to enumerated rights like those expressly secured under the Second Amendment.

Massachusetts's ban intrudes upon the people's freedom to choose the arms best suited for their defense. Yet the Second Amendment ensures that the people have the right to make that choice—hence the Amendment's protection for arms in "common use." *See Heller*, 554 U.S. at 627. Whether the government agrees with the choices made by the people is immaterial. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634. Indeed, "[t]o limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition." *Friedman v. City of Highland Park*, 784 F.3d 406, 413 (7th Cir. 2015) (Manion, J., dissenting). It is the "interest balancing by the people"— "struck by the traditions of the American people" at the time of the Founding—"that demands our unqualified deference." *Bruen*, 142 S.Ct. at 2131.

Massachusetts's prohibition against the sale of new handguns commonly owned for lawful purposes across the country is tantamount to a ban on common arms, which upsets the balance that demands our deference.

The Handgun Ban not only violates the *individual* Second Amendment rights of Individual Plaintiffs and all those similarly situated to them who seek to acquire the targeted arms for lawful purposes, but it also upsets the necessary balance on the other side of the transaction as well: Again, "restricting the ability to purchase an item is tantamount to restricting that item's use," and "Supreme Court cases hold that businesses can assert the rights of their customers" impacted by the restriction. *Reliable Consultants, Inc.*, 517 F.3d at 743; *see also Craig v. Boren*, 429 U.S. 190, 195 (1976) ("As a vendor with standing to challenge the lawfulness of [the challenged law], appellant Whitener is entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force."). The Handgun Bun has this very effect on Plaintiff Gunrunner and all similarly situated licensed vendors prohibited from selling or transferring the banned handguns.

22

Therefore, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," for otherwise "the threatened imposition of governmental sanctions might deter [the vendor] and other similarly situated vendors from selling [the prohibited items], thereby ensuring that 'enforcement of the challenged restriction against the (vendor) would result indirectly in the violation of third parties' rights.'" *Id.* at 195 (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). The two-dimensional impact of the Handgun Ban, represented by Plaintiffs on both sides of the transaction with standing to challenge it, underscores its injurious effect and the need for the judicial relief that Plaintiffs seek through this action.

## II. Under *Heller*, bans on common arms are inconsistent with the Nation's tradition of firearm regulation and violate the Second Amendment.

### A. The Nation's tradition protects arms in common use.

"Drawing from" America's "historical tradition," *Heller* held that "the Second Amendment protects" arms that are "'in common use at the time.'" *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). This

represents America's historical tradition because in the Founding era, "when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (brackets omitted).

Therefore, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (emphasis omitted).

To be sure, the specific make and model of a particular arm need not be popular. Rather, to be protected, the arm need only be among "the sorts of weapons" or "of the kind" that are "in common use at the time." *Heller*, 554 U.S. at 624, 627. The function of the arm is what matters. Thus, the *Heller* Court paid no special attention to the Colt Buntline nine-shot revolver that Dick Heller sought to possess in challenging the District of Columbia's handgun ban, and instead focused on the commonality of handguns in general. Similarly, in *McDonald*, the Court noted only that the plaintiffs "are Chicago residents who would like to keep handguns," without focusing on the *specific types* of handguns they

24

may have sought. 561 U.S. at 750. And in *Bruen*, the Court cared only that the plaintiffs wanted to carry handguns, and that no "party dispute[s] that handguns are weapons 'in common use' today for self-defense." 142 S. Ct. at 2134. Here, therefore, the only question is whether the category of arms targeted by Massachusetts's ban—i.e., handguns—are in common use for lawful purposes. And the Supreme Court has repeatedly held that they are, as recently as this year. *See id.* at 2143 (quoting *Heller*, 554 U.S. at 629) ("[H]andguns . . . are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'"); *id.* ("even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

## B. Arms in common use cannot be banned.

Supreme Court precedents mandate that the Handgun Ban be held categorically unconstitutional. *Heller* so held. Because "handguns are the most popular weapon chosen by Americans" and therefore in common use, the Court explained, "a complete prohibition of their use is invalid."

554 U.S. at 629. *McDonald* similarly invalidated a handgun ban when applying the Second Amendment to the states. As the Seventh Circuit noted, "*Heller* and *McDonald*" held "the handgun bans at issue in those cases . . . categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011).

Justice Alito's concurrence in *Caetano*, joined by Justice Thomas, confirms this categorial approach to a ban on arms in common use. Concurring in the Court's *per curiam* opinion summarily reversing and remanding an opinion of the Massachusetts Supreme Judicial Court that upheld a ban on stun guns, Justice Alito reasoned simply, but fundamentally, that "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." 136 S.Ct. at 1033 (Alito, J., concurring). Of course, numerous *other* arms and means for self-defense exist besides stun guns, but that was beside the point—*stun guns* are protected as arms in common use, so they cannot be banned regardless.

As in *Heller*, *McDonald*, *and Caetano*, Massachusetts effectively bans arms in common use. Its ban should likewise be held categorically

unconstitutional. Arms are either protected under the Second Amendment or they are not. If they are, they cannot be banned, period.

**C. Massachusetts has not even claimed that any of the banned arms are "dangerous and unusual" so as to rebut the presumption of protection.**

"The Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. "In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015); *see Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted . . . sufficient to sustain a judgment in favor of the issue which it supports") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)). Thus, in *Cuomo*, the Second Circuit struck a ban on a Remington 7615 pump-action rifle because the state focused on semiautomatic weapons and "failed to make any argument that this pump-action rifle is dangerous, unusual, or otherwise not within the ambit of Second Amendment protection." 804 F.3d at 257 n.73. Therefore,

"the presumption that the Amendment applies remain[ed] unrebutted." *Id.*

Here, Massachusetts has not and cannot overcome the presumption of protection for the arms it targets through the Handgun Ban. "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring); *see also Heller*, 554 U.S. at 627 (Noting "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"); *Bruen*, 142 S. Ct. at 2143 ("At most, respondents can show that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'—a fact we already acknowledged in *Heller*."). Massachusetts has not even attempted to demonstrate that any of the banned handguns are dangerous *or* unusual. Indeed, because "this is a conjunctive test" that requires a weapon to be "*both* dangerous *and* unusual," *Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring), an arm "in common use" *cannot* be "dangerous and unusual." After all, a weapon that is "unusual" is the antithesis of a weapon that is "common." *See Bruen* at 2128 (quoting *Heller*, 554 U.S. at 627) ("we found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"' that the Second Amendment

28

protects the possession and use of weapons that are 'in common use at the time'") (quotation marks omitted). Thus, Massachusetts has not and cannot overcome the "presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *Cuomo*, 804 F.3d at 257 n.73.

## III.   No relevantly similar historical analogue exists to justify the Handgun Ban as at all consistent with this Nation's historical tradition of firearm regulation.

That Massachusetts bans common handguns is dispositive of this case—the Second Amendment's plain text covers handgun possession and acquisition, and Supreme Court precedent establishes that bans on common arms violate the Nation's tradition of firearm regulation. But to the extent that a deeper historical analysis is required, a "straightforward" application of *Bruen*'s test seals the Ban's fate:

> In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

29

*Bruen*, 142 S. Ct. at 2131.

Firearm accidents were well-known societal problems in the 18th century—including those involving children. In 1768, the Boston Evening-Post reported that "a girl, about 13 years of age" was killed when "a sudden blast of wind" knocked over and set off "a loaded gun in the corner of the room, near the window." BOSTON EVENING-POST, Oct. 24, 1768, p. 2, cols. 2–3.[7] The following year, also in Massachusetts, a soldier grabbed a pistol from a person loading it and accidentally fired the ramrod "into the Belly of a young Lad," who passed away the following day. MASSACHUSETTS GAZETTE, Aug. 3, 1769, p. 1, col. 1. In 1770, "a lad of about 13 years old, took [a gun] not knowing it to be loaded, and snapped it at a girl in order to frighten her" and fatally shot a woman behind her. BOSTON GAZETTE, June 4, 1770, p. 3, cols. 1–2.[8] In 1783 Maryland, "three boys . . . went into the yard to clean their pistols," when "[o]ne of them carelessly fired his pistol near" some gunpowder stored in the yard, "causing it to blow up." PENNSYLVANIA JOURNAL, Oct. 25, 1783,

---

[7] https://www.masshist.org/dorr/volume/2/sequence/310.

[8] https://www.masshist.org/dorr/volume/3/sequence/176.

*in* 52 MARYLAND HISTORICAL MAGAZINE 189 (Louis Henry Dielman &
William Hand Browne eds., 1957). "One boy was killed and the other two
seriously injured." *Id.* And in the first entry of the Lewis & Clark
Journals, Meriwether Lewis details an incident in which his friend
mishandled Lewis's new gun, "suffer[ing] her to discharge herself
accidentally," shooting a bystander in the head (who, fortunately, quickly
recovered). 2 Meriwether Lewis & William Clark, THE JOURNALS OF THE
LEWIS & CLARK EXPEDITION 65 (Aug. 30, 1803 entry) (Gary Moulton ed.,
1986) (2002 reprint).[9]

There is no evidence, however, that any colony or state ever banned
arms in common use—via a government roster or otherwise—to address
such concerns. In fact, the only "safety" regulations to which
Massachusetts cites are "laws regulating the storage of gun powder, laws
keeping track of who in the community had guns, laws administering gun
use in the context of militia service . . . , laws prohibiting the use of
firearms on certain occasions and in certain places, and laws disarming
certain groups and restricting sales to certain groups." App. at p. 42 (Dkt.

---

[9] https://lewisandclarkjournals.unl.edu/item/lc.jrn.1803-08-
30#lc.jrn.1803-08-30.01.

No. 15 [Memorandum of Law in Support of Defendants' Motion to Dismiss] at p. 12 (quoting *NRA v. BATFE*, 700 F.3d 185, 200 (5th Cir. 2012)). None of these restrictions is remotely analogous to the Handgun Ban at issue here. To the extent they could bear any relation to the public safety interests that Massachusetts claims here, this can only undermine any defense Massachusetts could mount by showing that governments addressed those issues through materially different means.

Massachusetts cites no other analogous law from the colonial or founding eras or any other evidence that governments addressed its claimed public safety interests in a materially similar way. The only other regulation it cites is a single *post*-founding era law from 1821, through which Maine required "any new, or unused musket, rifle or pistol barrel" to be "proved, marked, and certified" before being sold or offered for sale. App. at p. 42 (Dkt. No. 15 [Memorandum of Law in Support of Defendants' Motion to Dismiss] at p. 12); LAWS OF THE STATE OF MAINE 546 (Calvin Spaulding ed., 1822). But again, this is not analogous.

*Bruen* emphasizes that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*'" considerations

32

when engaging in an analogical inquiry." 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767 and *Heller*, 554 U.S. at 599).

Like the founding-era regulations Massachusetts cites, Maine's 1821 law does not impose a comparable burden to the Handgun Ban, as Plaintiffs detailed in their opposition to the motion to dismiss. App. at pp. 61–62 (Dkt. No. 18 [Plaintiffs' Opposition to Defendants' Motion to Dismiss] at pp. 8–9). Maine's law did not restrict access to or possession of any firearm whatever. Nor are the regulations comparably justified. Modern-day product liability laws and quality control systems provide safety guarantees that did not exist in 1821.

In any event, one law, decades beyond the Founding era, cannot justify a ban on constitutionally protected arms. Indeed, the "1783 Massachusetts law [that] forbade the residents of Boston to 'take into' or 'receive into' 'any . . . Building' loaded firearms" could not justify the handgun ban in *Heller*. 554 U.S. at 631 (quoting Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p 218). Rather, the *Heller* Court explained that "we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for

defense of the home." *Id.* at 632; *see also Bruen*, 142 S. Ct. at 2142 ("we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation"); *id.* at 2153 ("we will not give disproportionate weight to a single state statute and a pair of state-court decisions").

*Bruen* demonstrates that establishing a historical tradition of firearm regulation is a difficult burden for the government to carry. *Bruen* held that "the historical record compiled by respondents d[id] not demonstrate a tradition," *id.* at 2138, where the respondents produced three colonial statutes (1686 East New Jersey, 1692 Massachusetts, 1699 New Hampshire), *id.* at 2142–44, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one late-19th-century Western State law (1881 Kansas), *id.* at 2155–56.[10] If *that* is not enough

---

[10] The Court did not necessarily agree with the government's reading of these colonial laws or the early state laws, but the Court stated that

to establish a binding "tradition" under *Bruen*, surely a *single* late-in-the-game regulation cannot suffice—especially when it bears no resemblance to the law at issue.

## IV.    The "other options" argument is simply no answer.

Instead of proffering a relevantly similar historical analogue for its Ban or attempting to show that the targeted arms are otherwise unprotected, Massachusetts attempts to circumvent the problem by claiming that "Plaintiffs make no allegation that the eighteen identified handguns are more effective for self-defense than the hundreds of other handguns they could buy." App. at p. 45 (Dkt No. 15 [Memorandum of Law in Support of Defendants' Motion to Dismiss] at p. 15); App. at pp. 77–78 (Dkt. No. 22 [Defendants' Reply in Support of Motion to Dismiss] at pp. 2–3). As noted, the district court likewise relied on the notion that Plaintiffs can "freely choose from over a thousand handguns listed on the June 2021 Roster that also meet the Attorney General safety regulations"

---

"even if" the government's reading were correct, the record would not justify the challenged regulation. *Bruen*, 142 S. Ct. at 2144.

in finding a "limited burden." A-11. But the existence of other options is entirely beside the point.

"[T]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano*, 577 U.S. at 421 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 629). The District of Columbia made the same argument in defense of its handgun ban. It contended "that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).

The D.C. Circuit rejected the argument as "frivolous":

> It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined—as we have done—that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them.

*Id.*

Undeterred, the District of Columbia petitioned for certiorari, with the question presented as, "Whether the Second Amendment forbids the District of Columbia from banning private possession of handguns while

36

allowing possession of rifles and shotguns." Petition for a Writ of Cert.,

*District of Columbia v. Heller*, No. 07-290 (2007).

The Supreme Court also rejected the argument:

> It is no answer to say, as petitioners do, that it is permissible
> to ban the possession of handguns so long as the possession of
> other firearms (*i.e.*, long guns) is allowed. It is enough to note,
> as we have observed, that the American people have
> considered the handgun to be the quintessential self-defense
> weapon.

*Heller*, 554 U.S. at 629.

In *Caetano*, "[t]he [Massachusetts] Supreme Judicial Court suggested

that Caetano could have simply gotten a firearm to defend herself." 577

U.S. at 421 (Alito, J., concurring) (citing *Commonwealth v. Caetano*, 470

Mass. 774, 783 (2015)). But the Court again dismissed the relevance of

the availability of alternative arms. Instead, the concurrence reiterated

that "the right to bear other weapons is 'no answer' to a ban on the

possession of protected arms." *Id.* (quoting *Heller*, 554 U.S. at 629).

Similarly, in *Bruen*, the Court held handgun carry restrictions

unconstitutional without regard to whether long guns could be carried.

*See* 142 S.Ct. at 2169 (Breyer, J., dissenting) (noting that New York "does

not require a license to carry a long gun (i.e., a rifle or a shotgun over a

certain length) in public").

37

Consistent with Supreme Court precedent, the Second Circuit struck down the ban on the Remington 7615 pump-action rifle in *Cuomo* based only on the government's lack of evidence regarding its ban on *that* firearm. The court did not consider the fact that other arms—including other pump-action rifles—could be lawfully acquired and possessed. 804 F.3d at 257. And rightly so, since that makes no difference.

Plaintiffs have identified 18 commonly owned handguns they prefer to keep for self-defense but that Massachusetts forbids. Just as "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed," *Heller*, 554 U.S. at 629, it is no answer to say that it is permissible to ban citizen-preferred handguns so long as government-preferred handguns are allowed. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Id.* at 636. Which common arms the people can keep is one such choice.

## V.    Massachusetts cannot claim any "presumptively lawful" status for this presumptively unlawful Ban.

As discussed, the principles laid down in *Heller* and reaffirmed in *Bruen* as black letter law make clear that the Handgun Ban is

38

presumptively unlawful, and Massachusetts has not even attempted to overcome this presumption. It would therefore be perverse to rely on *Heller*'s dictum about "presumptively lawful" "conditions and qualifications on the commercial sale of arms" to hold that the Ban falls within the opaquely defined category of "longstanding prohibitions" on which the Supreme Court's jurisprudence has not (yet) "cast doubt." *Heller*, 554 U.S. at 626–27 & n.26; *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring).

Even the Ninth Circuit, during the hay day of its tiered scrutiny analysis that succeeded in upholding virtually every challenged firearm regulation that came before it, placed no stock in this language: "The Ninth Circuit has held the phrase 'conditions and qualifications on the commercial sale of arms' 'sufficiently opaque' to prohibit reliance on it alone, instead opting to conduct a 'full textual and historical review' of the scope of the Second Amendment." *Yukutake v. Conners*, 554 F. Supp. 3d 1074, 1082 (D. Haw. 2021) (quoting *Teixeira*, 873 F.3d at 683). As the district court here itself noted, the First Circuit has followed suit, as neither it nor the Supreme Court "has interpreted the full confines of the phrases 'presumptively lawful' or 'conditions and qualifications on the

commercial sale of arms,' thus leading courts to assume without deciding that the regulation burdens protected conduct, "rather than delving into the question whether the regulation into the exception of 'conditions and qualifications on the commercial sale of arms.'" A-8 (citing *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018)).

And, again pre-*Bruen*, these courts recognized that early 20th century regulations do not suffice to support any such claim of "presumptively lawful" status. The government must show the law is "sufficiently similar to historical regulations to demonstrate that the law's restrictions accord with historical understanding of the scope of the Second Amendment right." *Yukutake*, 554 F. Supp. 3d, at 1087; *see id.* at 1082 ("a handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions"); *Mance v. Sessions*, 896 F.3d 699, 713–14 (5th Cir. 2018) (rejecting the government's reliance on laws from 15 states enacted between 1909 and 1939 as demonstrating "presumptively lawful" status, because it offered no evidence the challenged regulation had "a founding-era analogue or was historically understood to be within the ambit of the permissible

regulation of commercial sales of firearms at the time the Bill of Rights was ratified"). The law at issue in *Bruen* itself had been in place for more than 100 years and yet that provenance clearly did not purge the law of its unconstitutionality. *Bruen*, 142 S.Ct. at 2122. The law at issue here was first enacted in 1997—about a century after the latest law that *Bruen* considered, 86 years after New York's unconstitutional carry law, and 22 years after the handgun ban invalidated in *Heller*.

Indeed, "treat[ing] *Heller's* listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor,' . . . 'approximates rational-basis review, which has been rejected by *Heller*.'" *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686 (6th Cir. 2016) (en banc) (quoting *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)). Thus, *Heller* clearly "did not invite courts onto an analytical off-ramp to avoid constitutional analysis" or insulate firearms regulations from constitutional scrutiny. *Id.* at 686–87.

Even if a firearms regulation could be considered "longstanding" in any sense, it makes little sense to say that it must be kept permanently beyond the reach of constitutional scrutiny simply because of its age. An invalid restriction may have eluded any viable challenge in the past

simply because the Second Amendment was not recognized as securing an *individual* right until the *Heller* decision in 2008, which was necessary to confer Article III standing. And, when subject to such scrutiny, it may well contravene the law of the Second Amendment.

What is more, for any presumption of lawfulness that *might* arise, courts have recognized, again before *Bruen*, that "a plaintiff may rebut a presumptively lawful regulation on the commercial sales of firearms 'by showing that the regulation [has] more than a de minimis effect upon his [Second Amendment] right.'" *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021). And it has never been the case that the government can defend a restriction on the exercise of constitutional rights by pointing to the existence of *other* channels through which the same rights might alternatively be exercised. Rather, it is the government's burden to *justify* cutting off the channel it has foreclosed. *Bruen*, 142 S.Ct. at 2130 (the Court has long enforced the general rule that "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"); *see also Frein v. Pennsylvania State Police*, 47 F.4th 247, 256 (3d Cir. 2022) (rejecting the government's argument that "seizures do not burden Second Amendment rights as long

as citizens can 'retain[ ] or acquir[e] other firearms'"); *id.* ("We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere.").

"With other constitutional rights, we scrutinize not only total bans but also lesser restrictions and burdens." *Id.* at 254. "Even if the government has not entirely prevented citizens from speaking or worshipping, its burdens on speech and worship may violate the First Amendment." *Id.* "Thus, we may be skeptical of public-health rules that cap how many people may physically attend church, even if the rules do not ban them from worshipping." *Id.* (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63, 68 (2020)). We may, and should, be similarly skeptical of the Handgun Ban, even if it does not ban *all* firearms from commercial sale. The government cannot rest its case on what it has *not* banned (yet); it must justify what it *has* banned, and it must do so by showing that the prohibition is consistent with this Nation's historical tradition of firearms regulation. In no event can Massachusetts claim "presumptively lawful" status for this law and any

presumption that could possibly arise evaporates in the face of this reality.

## CONCLUSION

For all these reasons, Plaintiffs have mounted a strong case for relief against the Handgun Ban as violative of the Second Amendment. And again, that is *more* than they have to do, as they need only plead enough to show that "there exists a plausible claim upon which relief may be granted." *Tomasella*, 962 F.3d at 70. The district court erred in granting the motion to dismiss in the face of this reality, and it must be reversed.

Respectfully submitted,

/s/ *Raymond M. DiGuiseppe*
RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com
*Counsel of Record*

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,359 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2022, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the First Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 14th day of November 2022.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

## ADDENDUM

District Court Memorandum & Order……………………….……………….A-1

District Court Order of Dismissal………………………………………..A-17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 1:21-CV-10960-RWZ


STEFANO GRANATA, JUDSON THOMAS, COLBY CANNIZZARO, CAMERON
PROSPERI, THE GUNRUNNER, LLC, and FIREARMS POLICY COALITION, INC.

v.

MAURA HEALY, in her official capacity as Attorney General of the Commonwealth of
Massachusetts, and THOMAS TURCO, in his official capacity as Secretary of the
Executive Office of Public Safety and Security of the Commonwealth of Massachusetts


MEMORANDUM & ORDER

May 19, 2022

ZOBEL, S.D.J.

Plaintiffs brought this action to challenge enforcement of the handgun regulatory

scheme established by Mass. Gen. Laws ch. 140, § 123, together with the regulations

promulgated by the Massachusetts Attorney General and codified at 940 C.M.R.

§§ 16.00 *et seq.*  The challenged scheme sets forth safety requirements for handguns

sold within the Commonwealth, to prevent unnecessary death and injury from unsafe

and defective handguns, particularly in the hands of children.  Plaintiffs assert that they

violate the Second Amendment to the Constitution by effectively banning the sale of

eighteen makes and models of handguns that are in common use and sold in other

states.  Defendants move to dismiss the complaint for failing to state a claim.  The

motion is allowed.

1

A-1

## I. Background

### A. The Challenged Handgun Safety Regulations

In 1997, the Attorney General of Massachusetts promulgated regulations applicable to "transfers" of handguns by "handgun purveyors" to customers in Massachusetts,[1] codified at 940 C.M.R. § 16.00 *et seq.*, pursuant to his authority under the Massachusetts Consumer Protection Act, Gen. Laws Ch. 93A, § 2(c). They followed national research and recognition of the need for additional safety restrictions on firearms, especially to protect children. U.S. Gov't Accountability Office, Report to the Chairman, Subcomm. on Antitrust, Monopolies, and Business Rights, Comm. on the Judiciary, U.S. Senate, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented (1991) ("GAO Report").

The regulations make it "an unfair or deceptive practice for any handgun-purveyor" to transfer to a consumer in the Commonwealth a handgun that does not comply with the minimum safety requirements and performance standards set forth. 940 C.M.R. § 16.02. Their purpose is "to protect responsible gun owners and their families from firearms that are unsafe by design or manufacture." Massachusetts Attorney General, July 16, 2004 Consumer Advisory on Glock Handguns at 8. They do not apply to private sellers, defined as someone who transfers fewer than five handguns per year. 940 C.M.R. § 16.01. The majority of the regulations also do not apply to

---

[1] "Transfer" means "sell, lease, or rent" and excludes sales to firearm wholesalers who cannot resell the firearm to a retailer or consumer in the Commonwealth. 940 C.M.R. § 16.01. "Handgun purveyor" means "any person or entity that transfers handguns to a customer located within the Commonwealth" and excludes any entity that transfers fewer than five handguns per year; transfers for the purpose of supplying law enforcement, military personnel, museums, and other educational collectors; transfers of handguns considered antiques; and transfers of handguns designed and sold specifically for formal target shooting. Id.

2

transfers of handguns manufactured on or before October 21, 1998.  Enforcement

Notice #2: Attorney General's Handgun Safety Regulations at 3.

In 1998, soon after the Attorney General's regulations were promulgated, the

Massachusetts Legislature codified certain handgun safety requirements at Mass. Gen.

Laws ch. 140, § 123, cl. 18-21, making it unlawful for a retailer to sell within the

Commonwealth a handgun that does not meet the prescribed safety features.  Mass.

Gen. Laws ch. 140, § 128.  Several of these features overlap with those promulgated by

the Attorney General.  Like the former, the statutory requirements exempt private

sellers, and apply only to "firearm dealer[s] in Massachusetts" as defined at 501 C.M.R.

§ 7.02.  They also do not apply to the sale of firearms that were lawfully owned or

possessed on or before October 21, 1998.  Mass. Gen. Laws ch. 140, § 123.

Taken together, the Attorney General's regulations and § 123 require that

handguns lawfully sold within the Commonwealth:

- Not be made of "inferior materials," they must be made of materials that meet specified minimum melting points, tensile strength, and density; or pass a make and model performance test (940 C.M.R. §§ 16.01, 16.04(1) and (3); Mass. Gen. Laws ch. 140, § 123, cl. 18);

- Not be prone to either repeated firing from a single trigger pull or explosion upon firing (940 C.M.R. § 16.04(2); Mass. Gen. Laws ch. 140, § 123, cl. 20);

- Not be prone to accidental discharge (940 C.M.R. §§ 16.01, 16.04(2); Mass. Gen. Laws ch. 140, § 123, cl.19);

- Have a "safety device" that prevents unauthorized use of the firearm (940 C.M.R. § 16.05(1));

- Have a mechanism that "effectively precludes an average five-year-old child from operating the handgun when it is ready to fire" (i.e., a form a childproofing), "such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun" (940 C.M.R. § 16.05(2));

3

A-3

- Have a tamper-resistant serial number (940 C.M.R. § 16.03); and

- For semi-automatic handguns, have either "a load indicator or a magazine safety disconnect" (940 C.M.R. § 16.05(3) and (4)).[2]

In conjunction with Mass. Gen. Laws ch. 140, § 123, the Legislature directed the Secretary of the Executive Office of Public Safety and Security to "compile and publish a roster" of handguns that meet the § 123 requirements, known as the "Approved Firearms Roster" (the "Roster").  Mass. Gen. Laws ch. 140, § 131-3/4; 501 C.M.R. § 7.00; see also Enforcement Notice #3: Attorney General's Handgun Safety Regulations at 5.  To be listed on the Roster, the Secretary must receive a final test report from an approved testing laboratory certifying that the handgun satisfies the § 123 requirements. 501 C.M.R. § 7.03(1).  As of June 2021, the Roster listed over 1,000 handgun models from twenty-nine manufacturers, often with multiple models for each manufacturer. Approved Firearms Roster: 06/2021.  It is unlawful for a retailer to sell a firearm that is not so listed.  501 C.M.R. § 7.05; see also Enforcement Notice #3: Attorney General's Handgun Safety Regulations at 5.

The Roster lists firearms that meet the statutory requirements of § 123 but not necessarily the Attorney General's regulations on childproofing, load indicators, and tamper-resistant serial numbers.  See Enforcement Notice #3: Attorney General's Handgun Safety Regulations at 5-6.  Nonetheless, to be legally sold by a retailer in Massachusetts, a handgun must appear on the Roster and comply with the Attorney General's regulations.  Id.

---

[2] The Attorney General's regulations also include certain safety warnings and disclosure requirements at the time of sale.  See 940 C.M.R. § 16.006.  Because Plaintiffs do not allege any injuries related to these requirements, they will not be addressed.

4

A-4

### B.    The Complaint

Plaintiffs challenge both the Attorney General's regulations and the § 123 statutory requirements (collectively, the "Handgun Safety Regulations"). They are: four individuals, all of whom claim to have a valid Massachusetts license that allows them to purchase handguns and carry them in public (Docket # 1 ¶¶ 47-50); one retail seller, The Gunrunner, LLC, who is alleged to be a licensed handgun purveyor (id. ¶ 51); and one organization, the Firearms Policy Coalition, Inc. ("FPC"), which includes as members the four individual plaintiffs (id. ¶ 52). The two defendants, Maura Healey and Thomas Turco, are both sued in their official capacities, as Attorney General of Massachusetts and Secretary of the Executive Office of Public Safety and Security of Massachusetts, respectively.

The complaint asserts a single cause of action under 42 U.S.C. § 1983 and the United States Constitution that the Handgun Safety Regulations infringe Plaintiffs' Second Amendment right "to keep and bear arms." Docket # 1 ¶¶ 56-73. The individual plaintiffs specifically object to the limitations on handguns incorporated into the roster. They assert that they would purchase eighteen specific models of handguns, "new from a licensed retailer[] for self-defense and other lawful purposes," but for the challenged Handgun Safety Regulations. Id. ¶¶ 47-50. The Gunrunner, the retailer, asserts for itself and "on behalf of all similarly situated licensed retailers," that it would "make available for sale to all of its law-abiding customers all commercially available handguns in common use for self-defense and other lawful purposes that are widely sold and possessed outside of Massachusetts" but for the challenged Handgun Safety

Regulations.[3]  Id. ¶ 51.  FPC, the organization, asserts, on behalf of its members and

similarly situated members of the public, that they "have been adversely and directly

harmed by Defendants' enforcement" of these challenged regulations.  Id. ¶¶ 52-55.

Plaintiffs do not dispute that individual licensed consumers within Massachusetts can

still purchase or possess an operational handgun for self-defense or other lawful

purposes.

Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' complaint

for failing to state a claim.  Docket # 14.  They contend that the challenged Handgun

Safety Regulations are constitutional and thus enforceable because they do not burden

conduct falling within the scope of the Second Amendment, but, even if they did, they

easily withstand heightened scrutiny.  Id.; Docket # 15.

## II.     Discussion

### A.     Legal Standard

To survive a motion to dismiss, a complaint must contain "sufficient factual

matter" to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

The Court must accept all factual allegations in the complaint as true and draw all

reasonable inferences in the plaintiff's favor.  Langadinos v. Am. Airlines, Inc., 199 F.3d

68, 69 (1st Cir. 2000).  It need not however, accept legal conclusions as true.  Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009).

---

[3] Defendants argue that "there is no textual or historical basis upon which to suggest that the Second Amendment protects a right to *sell* firearms," thus "any claim that the challenged regulations impinge upon a purported right of dealers to *sell* firearms must be rejected."  Docket # 15 at 8 n.15 (emphasis in original).  Whether there is a right to sell firearms does not impact the analysis, wherefore the Court declines to weigh in on this question.

**B.    Second Amendment Legal Framework**

The Second Amendment states: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  The U.S. Supreme Court has held that the Second Amendment protects an individual's right "to keep and bear arms (unconnected to service in the militia)" and the protection applies to the states through the Fourteenth Amendment.  Gould v. Morgan, 907 F.3d 659, 667 (1st Cir. 2018); see also McDonald v. City of Chicago, 561 U.S. 742, 750 (2010); District of Columbia v. Heller, 554 U.S. 570, 592 (2008).  The law challenged in District of Columbia v. Heller constituted an "absolute prohibition of handguns held and used for self-defense in the home," which the Court determined does violate the Second Amendment.  554 U.S. at 635-36. Although it has not yet examined "the full scope of the Second Amendment" right, it made clear in Heller that the right "is not unlimited."  Id. at 626.  Certain "longstanding prohibitions" are "presumptively lawful," including "laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-27.  The Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id.

The First Circuit has adopted a two-step approach for analyzing Second Amendment claims.  Gould, 907 F.3d at 668-69.  At the first step, the court asks "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee."  Id.  "This is a backward-looking inquiry, which seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification . . ."  Id.  If the challenged law imposes no such burden, it is valid.  "If, however, it burdens conduct falling within the scope of the Second

7

A-7

Amendment," the court moves to the next step at which it determines the appropriate level of scrutiny and whether the challenged law survives that determination. Id.

### C.    Scope of the Second Amendment Right

The Supreme Court recognizes that "laws imposing conditions and qualifications on the commercial sale of arms" are a category of regulations that are "presumptively lawful." Heller, 554 U.S. at 626-27. However, neither the First Circuit nor the Supreme Court has interpreted the full confines of the phrases "presumptively lawful" or "conditions and qualifications on the commercial sale of arms." Accordingly, courts have been inclined to assume without deciding that a regulation burdens conduct protected by the Second Amendment for purposes of analysis, rather than delving into the question whether the regulation falls into the exception of "conditions and qualifications on the commercial sale of arms." See, e.g., Pena v. Lindley, 898 F.3d 969, 976 (9th Cir. 2018) ("The opaqueness of the presumption of legality for 'conditions and qualifications on the commercial sale of arms' likely explains why we and other courts often have assumed without deciding that a regulation does burden conduct protected by the Second Amendment rather than parse whether the law falls into that exception. . . . We, too, follow this well-trodden and 'judicious course.'"); see also Worman v. Healey, 922 F.3d 26, 35 (1st Cir. 2019) (deciding case at second rather than first step of inquiry, explaining that "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures").

The same approach is taken here, by assuming, without deciding, that the challenged regulations touch on conduct protected by the Second Amendment. "By making this assumption, [the court] bypass[es] the constitutional obstacle course of

defining the parameters of the Second Amendment's individual right in the context of commercial sales." Pena, 898 F.3d at 976.

**D.    Scrutiny**

Because the challenged Handgun Safety Regulations are assumed to implicate Plaintiffs' Second Amendment rights, the analysis turns to the second step to determine the appropriate level of scrutiny and then to use it to assess the regulations. See Gould, 907 F.3d at 668-69.

1.    Level of Scrutiny

Plaintiffs argue that strict scrutiny applies because the Handgun Safety Regulations implicate the core of the Second Amendment right, Docket # 18 at 11-12, while Defendants assert that only intermediate scrutiny is required, Docket # 15 at 13-15.  Intermediate scrutiny is appropriate here.

"The appropriate level of scrutiny 'turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right.'" Worman, 922 F.3d at 36 (quoting Gould, 907 F.3d at 670-71).  "[I]ntermediate scrutiny is appropriate as long as a challenged regulation either fails to implicate the core Second Amendment right or fails to impose a substantial burden on that right." Worman, 922 F.3d at 39 ("[I]ntermediate scrutiny is the appropriate level of scrutiny for evaluating a law . . . that arguably implicates the core Second Amendment right to self-defense in the home but places only a modest burden on that right.").

The First Circuit has established "that the core Second Amendment right is limited to self-defense in the home" by "responsible, law-abiding individuals." Id. (quoting Gould, 907 F.3d at 671).  Plaintiffs here contend that the regulations do affect

their ability to defend themselves in their homes. Assuming in Plaintiffs' favor that the regulations implicate the core of the Second Amendment right, the inquiry then focuses on "how heavily [they] burden[] that right." Worman, 922 F.3d at 36 (quoting Gould, 907 F.3d at 671).

The Handgun Safety Regulations in this case place, at most, a modest burden on the core Second Amendment right. The regulations only require that handguns lawfully sold within the Commonwealth meet certain safety requirements; they do not restrict the possession of handguns by eligible individuals in the home or elsewhere. See Draper v. Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015) (finding that regulation prohibiting the sale of handguns without a load indicator or magazine safety disconnect "does not substantially burden the right to bear arms in self-defense in one's home" because it "in no way prevents citizens from obtaining a wide array of firearms"). Even though the Handgun Safety Regulations may limit the types of handguns with which individuals can defend themselves, to only those that meet the safety requirements of the regulations—unlike Heller, they do not result in a total prohibition against keeping a handgun for self-defense within the home. See Pena, 898 F.3d at 977-78; see also Worman, 922 F.3d at 40 (finding Massachusetts law banning certain semiautomatic firearms passed intermediate scrutiny because "the Act does not outlaw all semiautomatic firearms and magazines[, n]or does it circumscribe in any way the fundamental right of law-abiding, responsible citizens to possess handguns in their homes for self-defense").

Plaintiffs argue that by prohibiting the sale of handguns that do not meet the safety requirements, the Handgun Safety Regulations in effect result in a total ban on the sale and thus possession of those specific makes and models, thereby running afoul

of the Supreme Court's admonition in Heller that states cannot "ban the possession of handguns." Docket # 18 at 13-14 (citing Heller, 554 U.S. at 629). Plaintiffs' argument, however, stretches Heller beyond the plain meaning of its text without any authority for doing so. Prohibiting the sale of specific makes and models of handguns for safety reasons is not the same as a total prohibition of the sale of handguns. See Pena, 898 F.3d at 978 ("being unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home"); see also Heller, 554 U.S. at 626 ("[T]he right secured by the Second Amendment is not unlimited. . . . [It] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

Eligible individuals within Massachusetts can freely choose from over a thousand handguns listed on the June 2021 Roster that also meet the Attorney General safety regulations. The fact that they cannot purchase every single handgun that may be in common use and available for purchase in other states, does not transform the regulations into a total ban on a category or class of firearms (i.e., handguns in this case). To conclude otherwise would eviscerate Heller's holding that some regulation of firearm possession is permissible. See Worman, 922 F.3d at 32 n.2.

Two additional points reinforce the limited burden placed on individuals' ability to exercise their Second Amendment right: First, the Handgun Safety Regulations carve out private sales of handguns from their safety requirements. Second, Plaintiffs do not claim that the handguns available for purchase in Massachusetts are inadequate to exercise their core Second Amendment right. Thus, there is no basis to conclude that the eighteen handguns specifically identified by Plaintiffs in their complaint, as well as

any other handguns in common use in other states, that allegedly are not available for purchase in the Commonwealth because of the regulations, would in some way enable or enhance an individual's exercise of their right to possess a handgun in their home for self-defense in a way not achievable by the handguns that are available.

Because the Handgun Safety Regulations do not impose a substantial burden on Plaintiffs' core Second Amendment right, intermediate scrutiny is appropriate to assess the enforceability of the regulations.  See e.g., Pena 898 F.3d at 979.

        2.    Application of Intermediate Scrutiny

"To survive intermediate scrutiny, a statute 'must be substantially related to an important governmental objective.'" Worman, 922 F.3d at 38 (quoting Gould, 907 F.3d at 672). "To achieve this substantial relationship, there must be a 'reasonable fit' between the restrictions imposed by the law and the government's valid objectives, 'such that the law does not burden more conduct than is reasonably necessary.'" Id. (quoting Gould, 907 F.3d at 674). In its assessment, a court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." Pena, 898 F.3d at 979 (internal quotation marks omitted). A court cannot substitute "its own appraisal of the facts for a reasonable appraisal made by the legislature." Gould, 907 F.3d at 673.

Plaintiffs concede that the Commonwealth has important objectives in protecting "[p]ublic safety and preventing accidental firearm injuries," see Docket # 18 at 15, and the First Circuit has recently reiterated the Commonwealth's important objective in preventing crime, see Worman, 922 F.3d at 39 ("Massachusetts indubitably 'has compelling governmental interests in both public safety and crime prevention'").

Accordingly, the only remaining question is whether the regulations substantially relate to those interests. Id.

Both § 123 and the Attorney General's regulations, require that handguns sold commercially are (1) not made of inferior materials or, if they are, they nonetheless pass a performance test; (2) not prone to uncontrolled firing or exploding during normal use; and (3) not prone to discharging accidentally when dropped. 940 CMR § 16.04; Mass. Gen. Laws ch. 140, § 123, cls. 18-20. They allow purchasers of handguns to reasonably rely on the assumption that the handgun will not accidently fire, explode, or pose any other threat to their own safety and the safety others who may have access to the firearm, especially children.

In addition, the Commonwealth's interest in public safety and the Attorney General's child-proofing requirements mutually support the regulations in issue. As Defendants noted, the GAO Report "found that all of the accidental firearm fatalities caused by children under the age of six could have been prevented had the firearm been equipped with childproofing features like those required by the regulations." Docket # 15 at 17-18 (citing GAO Report at 3, 34). The childproofing regulations are satisfied by any mechanism that "effectively precludes an average five-year old from operating a handgun when it is ready to fire," thus Plaintiffs' criticism of one such mechanism—a ten-pound trigger pull (see Docket # 18 at 18)—does not alter the analysis. See 940 CMR §§ 16.05(2), (4) ("such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average fire year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun," as well

13

A-13

as a hammer deactivation device). Similarly, the Attorney General's requirement that handguns be sold with a "safety device" that prevents unauthorized use, 940 CMR § 16.05(1), is supported by the GAO Report's finding that one in three accidental firearm deaths in 1988 and 1989 could have been prevented by the addition of a firearm safety device. Docket #15 at 18 (citing GAO Report at 3, 36).

The requirement that handguns contain tamper-resistant serial numbers also reasonably supports the Commonwealth's interests in public safety and crime prevention. See United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010). As the Third Circuit explained in an opinion upholding a law prohibiting the possession of a handgun with an obliterated serial number under intermediate scrutiny, "there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm" which has "value primarily for persons seeking to use [it] for illicit purposes." Id. at 95. The requirement here, is thus also "properly designed to remedy the problem of untraceable firearms." See id. at 101.

Finally, the requirement that semiautomatic pistols contain either a load indicator or magazine safety disconnect easily passes muster. These exact measures have already been deemed constitutional within this jurisdiction and others. See Draper v. Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015 (Gorton, J.) (finding Attorney General's load indicator or magazine safety disconnect requirement enforceable under any level of heightened scrutiny); Pena, 898 F.3d at 980 (finding load indicator or magazine safety disconnect requirement "reasonably fit with California's interest in public safety"). These regulations are further supported by the GAO findings that twenty-three percent of accidental firearm fatalities occurred because individuals incorrectly believed the

14

A-14

firearms were unloaded and that those deaths could have been prevented by a load indicator.  Docket # 15 at 18-19 (citing GAO Report at 3).

Each individual safety requirement set forth in the regulations buttresses the important government interests identified; wherefore the requirement that handguns be pre-approved for sale and listed on the Roster fully passes scrutiny.

The existence of available alternatives that may promote public safety—e.g., "education, training, and public outreach regarding basic rules of firearm safety, storage, and use" identified by Plaintiffs (Docket # 1 ¶ 42)—do not alter the analysis.  Nor is the analysis altered by Plaintiffs' argument that the GAO Report is unsuitable to support the enforceability of the regulations because it showed that the studied safety requirements only prevented some, but not all or enough, accidental deaths.  Docket # 18 at 15-18.  The means for accomplishing the important government interests need not be narrowly tailored nor is there any requirement that regulations prevent all deaths.  See Gould, 907 F.3d at 674 ("a legislature's chosen means need not be narrowly tailored to achieve its ends" when applying intermediate scrutiny); id. at 674-75 (finding requirements for obtaining a license to carry firearm in public passed intermediate scrutiny because states with more restrictive firearm licensing schemes have lower rates of gun-related deaths, even though not all deaths were prevented).  Nor should the Court substitute its own judgment for that of the Attorney General and Legislature in determining the appropriate means to pursue its important interests.  See Worman, 922 F.3d at 40 (it is "the legislature's prerogative . . . to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments," "[t]he role of a reviewing court is

limited to ensuring 'that, in formulating its judgments, [the legislature] has drawn
reasonable inferences based on substantial evidence'").

The Handgun Safety Regulations are well supported and reasonable, a
conclusion reinforced by the fact that Massachusetts "consistently has one of the lowest
rates of gun-related deaths in the nation." See Gould 907 F.3d at 674-75. The
challenged regulations therefore pass intermediate scrutiny.

**III.     Conclusion**

Defendants' Motion to Dismiss Plaintiffs' Complaint (Docket # 14) is ALLOWED.


May 19, 2022
        DATE

RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE

16

A-16

\#                                    \#
\#              **UNITED STATES DISTRICT COURT**
              **DISTRICT OF MASSACHUSETTS**


Stefano Granata, et al.

     Plaintiffs

       V.

                                 CIVIL ACTION

                                 NO.  21-10960-RWZ


Maura Healey, et al.

     Defendants


### **ORDER OF DISMISSAL**


Zobel, D. J.


     In accordance with the Court's Memorandum and Order dated May 19, 2022 ALLOWING the Defendant's Motion to Dismiss, this civil action is hereby DISMISSED.


                                 By the Court,


May 19, 2022                              /s/Douglas Warnock
     Date                                        Deputy Clerk


A-17