No. 22-1478

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STEFANO GRANATA; JUDSON THOMAS; COLBY CANNIZZARO;
CAMERON PROSPERI; GUNRUNNER, LLC;
FIREARMS POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

---v.---

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the
Commonwealth of Massachusetts; TERRENCE REIDY, in his official capacity
as Secretary of the Executive Office of Public Safety and Security of the
Commonwealth of Massachusetts,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**BRIEF OF GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

Robert M. Buchanan, Jr.
1st Cir. No. 55702
CHOATE, HALL & STEWART, LLP
Two International Place
Boston, MA 02110
617-248-5000
rbuchanan@choate.com

*Attorneys for Amicus Curiae Giffords
Law Center To Prevent Gun Violence*

February 6, 2023

## DISCLOSURE STATEMENT

Amicus curiae Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") hereby certifies that it has no parent corporation. It has no stock, and therefore no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................... i

STATEMENT OF IDENTIFICATION .................................................... 1

SUMMARY OF THE ARGUMENT ........................................................ 3

ARGUMENT ........................................................................................... 8

I.    MASSACHUSETTS'S LAW DOES NOT REGULATE CONDUCT
      PROTECTED BY THE SECOND AMENDMENT'S PLAIN TEXT. .......... 8

      A.    The Conduct At Issue Is The Commercial Sale Of Handguns
            Subject To Commonsense Safety Laws. ............................... 8

      B.    The Plaintiffs Have Failed To Demonstrate That The Second
            Amendment's Plain Text Applies To The Challenged Law. .............. 9

      C.    Laws "Imposing Conditions And Qualifications On The
            Commercial Sale Of Arms" Are "Presumptively Lawful." ............... 14

II.   THE REGULATIONS ARE CONSTITUTIONAL BECAUSE THEY
      ARE CONSISTENT WITH OUR TRADITION OF FIREARM
      REGULATION. ................................................................................ 16

      A.    The Bruen Historical Analogy Test. .................................. 16

            1.    Overview. ................................................................ 16

            2.    The Relevant Timeframe. ........................................ 16

            3.    The Number Of Analogues. ..................................... 18

      B.    The Nation Has A Historic Tradition Of Gun Safety
            Regulation. ..................................................................... 20

            1.    Overview. ................................................................ 20

            2.    Firearm and Gunpowder "Proving" Laws. ............... 21

CONCLUSION .................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.,
910 F.3d 106 (3d Cir. 2018) ..................................................................2

Bauer v. Harris,
94 F. Supp. 3d 1149 (E.D. Cal. 2015), *aff'd on other grounds*, 858
F.3d 1216 (9th Cir. 2017) ....................................................................15

District of Columbia v. Heller,
554 U.S. 570 (2008)......................................................................*passim*

Draper v. Healey,
98 F. Supp. 3d 77 (D. Mass. 2015), *aff'd on other grounds*, 827
F.3d 1 (1st Cir. 2016) ..........................................................................13

Friedman v. City of Highland Park,
784 F.3d 406 (7th Cir. 2015) ...............................................................13

Hirschfeld v. BATFE,
417 F. Supp. 3d 747 (W.D. Va. 2019).....................................................2

Kampfer v. Cuomo,
993 F. Supp. 2d 188 (N.D.N.Y. 2014)...................................................12

McDonald v. City of Chicago,
561 U.S. 742 (2010)......................................................................*passim*

Md. Shall Issue v. Hogan,
353 F. Supp. 3d 400 (D. Md. 2018)........................................................2

Morehouse Enters., LLC v. BATFE,
No. 3:22-cv-116, 2022 U.S. Dist. LEXIS 151356 (D.N.D. Aug. 23,
2022) .....................................................................................................11

N.Y. State Rifle & Pistol Ass'n v. Bruen,
142 S. Ct. 2111 (2022)..................................................................*passim*

Or. Firearms Fed'n, Inc. v. Brown,
    No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391 (D. Or.
    Dec. 6, 2022)......................................................................................9

Peruta v. County of San Diego,
    824 F.3d 919 (9th Cir. 2016) .............................................................2

Reese v. BATFE,
    No. 6:20-CV-01438, 2022 U.S. Dist. LEXIS 230140 (W.D. La.
    Dec. 21, 2022)....................................................................................9

Stimmel v. Sessions,
    879 F.3d 198 (6th Cir. 2018) .............................................................2

Teixeira v. County of Alameda,
    873 F.3d 670 (9th Cir. 2017) .....................................................10, 22

United States v. Cox,
    906 F.3d 1170 (10th Cir. 2018) ........................................................15

United States v. Guzman,
    419 F.3d 27 (1st Cir. 2005)...............................................................18

United States v. Hosford,
    843 F.3d 161 (4th Cir. 2016) ............................................................15

United States v. Love,
    No. 1:21-CR-42-HAB, 2022 U.S. Dist. LEXIS 229113 (N.D. Ind.
    Dec. 20, 2022)..................................................................................20

United States v. Marique,
    No. 8:21-po-02263-AAQ, 2022 U.S. Dist. LEXIS 229608 (D. Md.
    Dec. 14, 2022)..................................................................................19

United States v. Perez-Garcia,
    No. 22-CR-1581-GPC, 2022 U.S. Dist. LEXIS 220123 (S.D. Cal.
    Dec. 6, 2022)....................................................................................15

United States v. Price,
    No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571 (S.D. W. Va.
    Oct. 12, 2022) ..................................................................................11

United States v. Rene E.,
    583 F.3d 8 (1st Cir. 2009)..............................................................14, 18

United States v. Seiwert,
    No. 20 CR 443, 2022 U.S. Dist. LEXIS 175417 (N.D. Ill. Sept. 28,
    2022) ............................................................................................19

United States v. Tilotta,
    No. 3:19-cr-04768-GPC, 2022 U.S. Dist. LEXIS 156715 (S.D. Cal.
    Aug. 30, 2022) ...............................................................10, 11, 13

United States v. Tita,
    No. RDB-21-0334, 2022 U.S. Dist. LEXIS 231140 (D. Md. Dec.
    22, 2022) ......................................................................................21

## Statutes

1890 Va. Acts 118, ch. 152...................................................................28

1856 Ala. Acts 17, No. 26....................................................................28

1804 Mass. Acts 111, ch. 81 ...........................................................6, 25

1808 Mass. Acts 444, ch. 52 ...............................................................25

1809 Mass. Acts 205, ch. 118 .............................................................26

1810 Mass. Acts 303, ch. 72 ...............................................................27

1814 Mass. Acts 464, ch. 192 .............................................................27

1881 Mass. Acts 373, ch. 27 ...............................................................25

1884 Mass. Acts. 57, ch. 76 ................................................................28

1911 Mass. Acts 484, ch. 495 .............................................................25

Mass. Gen. Laws ch. 140, § 123 ....................................................*passim*

Mass. Gen. Laws ch. 140, § 131 ¾ .......................................................8

1821 Me. Laws 546, ch. 162................................................................27

1820 N.H. Laws 274, ch. 25 .......................................................24

1776-1777 N.J. Laws 6, ch. 6 ....................................................23

1794 Pa. Laws 764, ch. 337 .......................................................24

1776 R.I. Pub. Laws 25..............................................................24

**Constitutional Provisions**

U.S. CONST. Amend. II ..........................................................5, 10

**Rules and Regulations**

501 C.M.R. § 7.05......................................................................8

940 C.M.R. § 16.00................................................................4, 9

940 C.M.R. § 16.04(2)..............................................................27

940 C.M.R. § 16.05(1) ..........................................................5, 28

940 C.M.R. § 16.05(2) ..........................................................5, 28

940 C.M.R. § 16.05(3) ..............................................................13

**Miscellaneous**

*8 Documents and Records Relating to the State of New Hampshire
   During the Period of the American Revolution, from 1776-1783*
   (Nathaniel Bouton ed. 1874) (Jan. 12, 1775) ......................23

John D. Hamilton, *Arms Makers in the Pioneer Valley*, AM. SOC'Y OF
   ARMS COLLECTORS BULLETIN 94:17-32 (2006) ..................26

The Massachusetts Register and United States Calendar for 1837 ........26

Resolutions of the Maryland Council Of Safety, Aug. 29, 1775,
Archives of Maryland, 11:75 ................................................................21

Resolutions of the Pennsylvania Committee On Safety, Oct. 27, 1775
Col. Rec. Penn., 10:383 ......................................................................21

Resolutions of the Pennsylvania Committee On Safety, Apr. 4, 1776,
Min. Sup. Penn., 10:535 ......................................................................22

Richard W. Stewart, The London Gunmakers and the Ordnance
Office, 1590-1637, AM. SOC'Y OF ARMS COLLECTORS
BULLETIN 55 at 25 (1986) ................................................................22

William Burdick, *The Massachusetts Manual: or Political and
Historical Register, For the Political Year from June 1814 to June
1815* (1814)..........................................................................................26

Wolseley, *The Charter of the Company of Gunmakers*, J. OF THE SOC'Y
FOR ARMY HIST. RSCH., (1927), http://www.jstor.org/stable/44219314 .................22

## STATEMENT OF IDENTIFICATION

Giffords Law Center is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.

Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.[1]

Giffords Law Center has contributed technical expertise and informed analysis as an amicus in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, District of Columbia v.

---

[1]    Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

Heller, 554 U.S. 570 (2008); McDonald v. City of Chicago, 561 U.S. 742 (2010);

N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022).  Several courts

have cited research and information from Giffords Law Center's amicus briefs in

Second Amendment rulings.  *See, e.g.*, Ass'n of N.J. Rifle & Pistol Clubs v. Att'y

Gen. N.J., 910 F.3d 106, 122 (3d Cir. 2018); Hirschfeld v. BATFE, 417 F. Supp. 3d

747, 754, 759 (W.D. Va. 2019); Md. Shall Issue v. Hogan, 353 F. Supp. 3d 400, 403-

05, 410 (D. Md. 2018); Stimmel v. Sessions, 879 F.3d 198, 204, 208, 210 (6th Cir.

2018); Peruta v. County of San Diego, 824 F.3d 919, 943 (9th Cir. 2016) (en banc)

(Graber, J., concurring).[2]

Giffords Law Center files this brief pursuant to Rule 29(a)(2) of the Federal

Rules of Appellate Procedure.  All parties to the appeal have consented to the filing

of this brief.[3]

---

[2]    Giffords Law Center filed the briefs in Stimmel and Peruta under its former
name, the Law Center to Prevent Gun Violence.

[3]    No party's counsel authored this brief in whole or in part.  No party or its
counsel contributed financial support intended to fund the preparation or submission
of this brief.   No person contributed money that was intended to fund preparing or
submitting this brief.

## SUMMARY OF THE ARGUMENT

The Second Amendment does not ban commonsense safety conditions applying to the commercial sale of handguns. There are hundreds of handgun models available for lawful purchase in Massachusetts. Plaintiffs do not have a right to the unsafe models they seek to access.

The Supreme Court's recent Second Amendment decisions confirm this outcome. From 2008 to 2022, the Supreme Court found unconstitutional blanket bans on the *possession* of handguns. *See* District of Columbia v. Heller, 554 U.S. 570 (2008) ("Heller") (District of Columbia complete handgun ban); McDonald v. City of Chicago, 561 U.S. 742 (2010) ("McDonald") (City of Chicago complete handgun ban); N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022) ("Bruen") (complete ban on public possession of handguns without special permit).

However, the Supreme Court repeatedly confirmed that -- unlike laws prohibiting the *possession* of handguns -- regulations placing *conditions* on the commercial *sale* of guns are "presumptively lawful." *See* Heller, 554 U.S. at 626-27, 627 n.26; McDonald, 561 U.S. at 786; Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). As Justice Scalia stated in Heller: "[T]he right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep

and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626 (citations omitted).

In Bruen, the Supreme Court moved away from means-end scrutiny and instead articulated a two-step process for Second Amendment analysis focused on text and history. 142 S. Ct. at 2129-30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). Under either step, this Court should conclude that Massachusetts's safety regulations applying to commercial gun sales are constitutional.

Under the first step, the Plaintiffs must establish that they are part of "the people" to whom the Second Amendment's protections attach, and that the Second Amendment's plain text protects the conduct at issue. Bruen, 142 S. Ct. at 2129-30. If not, then the Second Amendment does not bar the challenged regulation. Id. Here, the Plaintiffs challenge the constitutionality of Massachusetts laws that place safety conditions on the commercial sale of handguns (the "Regulations"). Specifically, the Regulations require that firearm models sold by licensed dealers possess certain safety features, and pass minimum safety tests. See Mass. Gen. Laws ch. 140, § 123, cl. 18-21; 940 Code Mass. Regs. ("C.M.R.") §§ 16.00 et seq.

- 4 -

For example, firearms sold by dealers in Massachusetts should not be "prone to… explosion during firing"; should possess a "safety" switch to prevent accidental discharge; and should "contain a mechanism which effectively precludes an average five year old child from operating the handgun when it is ready to fire".  Mass. Gen. Laws ch. 140, § 123, cl. 20; 940 C.M.R. § 16.05(1)-(2).  As a result, the relevant conduct at issue is the commercial sale of handguns subject to safety conditions.

The plain text of the Second Amendment does not cover this conduct.  The Second Amendment protects "the right of the people to keep and bear Arms," which the Supreme Court has interpreted to "guarantee the individual right to possess and carry weapons in case of confrontation."  U.S. CONST. Amend. II; Heller, 554 U.S. at 592.  The Regulations do not prohibit or regulate the *possession* or *carrying* of firearms in any way.  Instead, the laws require simply that handguns sold in Massachusetts possess certain safety features.  Plaintiffs' argument that Massachusetts has a "de facto handgun ban" is just false -- Massachusetts citizens can legally purchase *hundreds* of different handgun models.

The Supreme Court has repeatedly confirmed that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." Heller, 554 U.S. at 626-27, 627 n.26; McDonald, 561 U.S. at 786; Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).  Against this backdrop,

this Court should rule that the Second Amendment's plain text does not apply to the Regulations.

If this Court did reach *Bruen's* second step, Massachusetts has met its burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." <u>Bruen</u>, 142 S. Ct. at 2130. The government can make this demonstration by identifying "a well-established and representative historical *analogue*" to the modern regulation. *Id.* at 2133 (emphasis in original). Here, there are more than twenty closely-analogous historical regulations from the colonial period through 1900 that set safety conditions on firearms sales. Collectively, these laws recognized that firearms are dangerous products and that limits on the commercial sale were an effective means for protecting public safety. Massachusetts's law today strikes the same balance as historical laws.

As explained below, both before and after the ratification of the Second Amendment in 1791, states enacted laws requiring that firearms, as well as accessories like gunpowder, meet certain safety standards prior to their sale. In 1805, for example, Massachusetts passed a law designed to prevent the sale of firearms "which are unsafe and thereby the lives of the Citizens be exposed." 1804 Mass. Acts 111, ch. 81. The law required that each "musket" and "pistol" (i.e. handgun) meet certain manufacturing and safety standards prior to sale. *Id.* § 1. The

act also prohibited sales unless the gun passed a "proof" test in which a government-appointed inspector ("provers of fire arms") repeatedly tested the firing of the gun to ensure its safe operation. *Id.* §§ 1-3.

This 1805 Massachusetts law and similar "proving" laws passed by six other states are sufficiently analogous to the Massachusetts Regulations under <u>Bruen</u>. These historical laws condition gun sales on specified manufacturing standards and inspections in much the same way as the laws at issue. Although the government does not need to identify any "historical twin," these laws are near twins to the Massachusetts Regulations.

The Court should conclude that both text and history support the constitutionality of the Regulations. The Court should affirm the District Court's dismissal of the Plaintiffs' Second Amendment challenge.

## **ARGUMENT**

## I.    **MASSACHUSETTS'S LAW DOES NOT REGULATE CONDUCT PROTECTED BY THE SECOND AMENDMENT'S PLAIN TEXT.**

### A.    **The Conduct At Issue Is The Commercial Sale Of Handguns Subject To Commonsense Safety Laws.**

The Plaintiffs challenge the constitutionality of certain portions of a Massachusetts law applying safety conditions to the commercial sale of handguns by licensed firearms dealers. Mass. Gen. Laws ch. 140, § 123, cl. 18-21. This law does not prohibit or regulate the *possession* or *carrying* of handguns.

Instead, under Mass. Gen. Laws ch. 140, § 131 ¾, the Massachusetts Secretary of the Executive Office of Public Safety and Security is directed to publish a roster of handguns that meet the requirements set forth in Mass. Gen. Laws ch. 140, § 123, cl. 18-21 (the "Approved Firearms Roster"). With certain exceptions not relevant here, a licensed firearms dealer can only sell a gun listed on the Approved Firearms Roster. *See* 501 C.M.R. § 7.05. To appear on the Approved Firearms Roster, a handgun model must satisfy the following conditions:

- Possess certain melting point, strength, and density requirements, unless the make and model of firearm passes a "test" where an inspector "fires the first 20 rounds without a malfunction, fires the full 600 rounds with not more than six malfunctions and completes the test without any crack or breakage of an operating part of the firearm." Mass. Gen. Laws ch. 140, § 123, cl. 18.

- Is not "prone to accidental discharge," which is determined by subjecting five sample firearms of the same make and model to a battery of discharge tests specified in the statute. *Id.* cl. 19.

- 8 -

- Is not "prone to: (i) firing more than once per pull of the trigger; or (ii) explosion during firing." *Id.* cl. 20.

- Does not have a barrel of less than three inches in length, unless the dealer discloses to the prospective buyer "the limitations of the accuracy of the particular make and model of the subject firearm… ." *Id.* cl. 21.

The Plaintiffs also challenge certain similar -- and at times overlapping -- Massachusetts Attorney General safety regulations placing safety conditions on the commercial sale of guns. *See* 940 C.M.R. §§ 16.00, *et seq*. These regulations do not prohibit or regulate the *possession* or *carrying* of any handguns.

### B.     The Plaintiffs Have Failed To Demonstrate That The Second Amendment's Plain Text Applies To The Challenged Law.

Under <u>Bruen</u>'s first step, a party challenging the law bears the burden of demonstrating that the Second Amendment's plain text applies to the conduct the challenger wishes to engage in, which here is the commercial sale of handguns not subject to safety requirements. *See* <u>Reese v. BATFE</u>, No. 6:20-CV-01438, 2022 U.S. Dist. LEXIS 230140, at *13 n.66 (W.D. La. Dec. 21, 2022) ("the challenger of a firearm restriction bears the initial burden of showing the challenged conduct is protected by the Second Amendment."); <u>Or. Firearms Fed'n, Inc. v. Brown</u>, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391, at *31 (D. Or. Dec. 6, 2022) (citing <u>Bruen</u>, 142 S. Ct. at 2127) ("if Plaintiffs demonstrate that their conduct is covered by the text of the Second Amendment, the Constitution presumptively

protects that conduct and the burden shifts to the government to demonstrate that the regulation is part of the historical tradition").

The Plaintiffs cannot meet their burden. The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. Amend. II. In Heller, the Supreme Court concluded that "keep" means "possess" and that "bear arms" means "carrying for a particular purpose -- confrontation." 554 U.S. at 583-84. As a result, the Court concluded that the Second Amendment guarantees an "individual right to possess and carry weapons" for self-defense. Bruen, 142 S. Ct. at 2135 (citing Heller, 554 U.S. at 592).

That individual right, however, does not extend a corresponding freestanding right to gun sales. See Teixeira v. County of Alameda, 873 F.3d 670, 682 (9th Cir. 2017) (en banc) ("the Second Amendment does not confer a freestanding right . . . upon a proprietor of a commercial establishment to sell firearms . . . [because] the right of gun users to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them."); United States v. Tilotta, No. 3:19-cr-04768-GPC, 2022 U.S. Dist. LEXIS 156715, at *13 (S.D. Cal. Aug. 30, 2022) ("The plain text of the Second Amendment does not cover [the] proposed course of conduct to commercially sell and transfer firearms").

Safety regulations applying to commercial gun sales do not infringe on Second Amendment rights. Unlike the laws challenged in Heller, McDonald, and

Bruen, the Massachusetts Regulations do not prohibit or regulate an individual's right to possess or carry a handgun for self-defense. Instead, the laws simply require that guns sold in Massachusetts possess minimum safety features.

After Bruen, federal courts have repeatedly concluded that the Second Amendment's plain text does not extend to safety requirements applying to commercial gun sales. For example, the U.S. District Court for the Southern District of California held that the Second Amendment's text did not apply to a law restricting the "commercial sale and transfer" of handguns to those listed on California's roster of approved handguns, because "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer.'" Tilotta, 2022 U.S. Dist. LEXIS 156715, at *13.

Similarly, the U.S. District Court in North Dakota confirmed: "There is a longstanding distinction between the right to keep and bears arms and commercial regulation of firearm sales." Morehouse Enters., LLC v. BATFE, No. 3:22-cv-116, 2022 U.S. Dist. LEXIS 151356, at *27 (D.N.D. Aug. 23, 2022) (citations omitted); see also United States v. Price, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571, at *6 (S.D. W. Va. Oct. 12, 2022) ("commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession.").

Plaintiffs argue that because the laws prevent them from buying certain *unsafe* handgun models, the laws impose a "de facto" handgun ban.  This argument has two critical flaws.  First, as detailed above, firearm sale and possession are constitutionally distinct.  Second, Plaintiffs admit that the Massachusetts Approved Firearms Roster contains approximately 1,000 handguns that comply with Mass. Gen. Laws ch. 140, § 123, cl. 18-21.  Although gun sales must also comply with the Massachusetts Attorney General regulations, Plaintiffs have not argued that those regulations eliminated the lawful purchase of any significant number of handguns (much less all handguns) listed on the Approved Firearms Roster.

Notably, Plaintiffs have never argued that they are unable to purchase a handgun in Massachusetts.  There are hundreds of makes and models of handguns available to them.  Plaintiffs even concede that it is legal to purchase their preferred handguns (i.e. without safety features) from individuals not subject to the Regulations.

Rather, Plaintiffs cannot purchase eighteen specific un-rostered handgun models from commercial firearms dealers.  Plaintiffs do not have a constitutional right to purchase a specific handgun when hundreds of other, *safer* handguns are available to them.  *See* Kampfer v. Cuomo, 993 F. Supp. 2d 188, 195-96 (N.D.N.Y. 2014) (citing McDonald, 561 U.S. at 767) ("the restrictions and prohibitions do not create a categorical ban on an entire class of weapons, and ample firearms remain

available to carry out the 'central component' of the Second Amendment right: self-defense."); Friedman v. City of Highland Park, 784 F.3d 406, 411 (7th Cir. 2015) (upholding assault rifle regulation because it did not leave individuals without the "means to exercise the 'inherent right of self-defense' that the Second Amendment protects.") (citation omitted).

Under similar reasoning, the U.S. District Court for the District of Massachusetts upheld the constitutionality of the Massachusetts Attorney General safety regulation 940 C.M.R. § 16.05(3) -- also at issue here -- requiring that guns for sale possess a "load indicator." *See* Draper v. Healey, 98 F. Supp. 3d 77 (D. Mass. 2015), *aff'd on other grounds*, 827 F.3d 1 (1st Cir. 2016). The District Court reasoned that the Second Amendment did not apply in part because the regulation "in no way prevents citizens from obtaining a wide array of firearms." *Id.* at 85 (citations omitted).

Because the Regulations do not prohibit the *possession* or *carrying* of handguns, but instead permit the purchase of hundreds of models of handguns bearing commonsense safety features, the plain text of the Second Amendment does not apply. On this basis alone, this Court should affirm. *See, e.g.*, Tilotta, 2022 U.S. Dist. LEXIS 156715, at *15 (foregoing historical inquiry after concluding Second Amendment's text did not apply).

- 13 -

**C.    Laws "Imposing Conditions And Qualifications On The Commercial Sale Of Arms" Are "Presumptively Lawful."**

Because the Second Amendment's text centers on an individual's right to possess and carry a firearm for self-defense, the Supreme Court has repeatedly confirmed that laws imposing conditions on the commercial *sale* of firearms are "presumptively lawful."  In <u>Heller</u>, the Supreme Court stated that "nothing in our opinion should be taken to cast doubt on …laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.]."  554 U.S. at 626-27, 627 n.26.  The Supreme Court confirmed the status of "presumptively lawful" measures in two subsequent decisions.  *See* <u>McDonald</u>, 561 U.S. at 786; <u>Bruen</u>, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

When upholding a federal ban on juvenile possession of handguns, this Court acknowledged the constitutionality of the "presumptively lawful" categories of regulation.  *See* <u>United States v. Rene E.</u>, 583 F.3d 8, 12 (1st Cir. 2009) ("The <u>Heller</u> Court was careful to note that the rights guaranteed by the Second Amendment were 'not unlimited.'… The Court identified limits deriving from various historical restrictions on possessing and carrying weapons. …  As examples of 'longstanding' restrictions that were 'presumptively lawful' under the Second Amendment, the Court listed … ***laws imposing conditions and qualifications on***

***the commercial sale of arms*** … .These restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment and by <u>Heller</u>.") (emphasis added).

In light of the Supreme Court's guidance, "[i]f a challenged law is a 'presumptively lawful regulatory measure' as identified in <u>Heller</u>… the inquiry ends -- the challenged law does not violate the Second Amendment." <u>Bauer v. Harris</u>, 94 F. Supp. 3d 1149, 1153-54 (E.D. Cal. 2015), *aff'd on other grounds*, 858 F.3d 1216 (9th Cir. 2017). Moreover, "[c]ourts pre-and post-<u>Bruen</u> have cited <u>Heller</u>'s 'presumptively lawful' regulations to uphold statutes . . . regulating the commercial sale of firearms." <u>United States v. Perez-Garcia</u>, No. 22-CR-1581-GPC, 2022 U.S. Dist. LEXIS 220123, at *9 (S.D. Cal. Dec. 6, 2022) (citations omitted).[4]

Because the Massachusetts Regulations are conditions on the commercial sale of guns, they are presumptively lawful, and for this additional reason, this Court should conclude that the Second Amendment's text does not apply here.

---

[4]    *See also* <u>United States v. Hosford</u>, 843 F.3d 161, 167 (4th Cir. 2016) ("the prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of firearms. As a result, Hosford's facial Second Amendment challenge fails."); <u>United States v. Cox</u>, 906 F.3d 1170, 1187 (10th Cir. 2018) ("The NFA's requirements that firearms dealers and manufacturers register and pay taxes annually fit neatly into that category of 'presumptively lawful regulatory measures.' …Those requirements, therefore, don't infringe the right to bear arms.").

II.   **THE REGULATIONS ARE CONSTITUTIONAL BECAUSE THEY ARE CONSISTENT WITH OUR TRADITION OF FIREARM REGULATION.**

A.   **The Bruen Historical Analogy Test.**

1.   **Overview.**

If the Second Amendment's plain text applies, then the burden shifts from the party challenging the law to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Bruen, 142 S. Ct. at 2129-2130. The government must demonstrate that the law at issue is "relevantly similar" to historical firearms regulation. *Id.* at 2132. Courts should use "analogical reasoning" and compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Specifically, the government should "identify a well-established and representative historical *analogue*," but the government is not required to identify "a historical *twin*." *Id.* at 2133 (emphasis in original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

2.   **The Relevant Timeframe.**

The Supreme Court has not established a black-letter rule concerning the relevant timeframe for historical analysis. In fact, in Bruen, the Court expressly declined to address "whether courts should primarily rely on the prevailing understanding of an individual right" at the time of the Second Amendment's

ratification in 1791, the Fourteenth Amendment's ratification in 1868, or some other time.  142 S. Ct. at 2138.

Instead, the Bruen Court examined regulations from various time periods: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries."  *Id.* at 2135-36.  The Court did not flatly reject evidence from any of these periods.  It advised that historical analysis should "not [] go too far back into antiquity … unless evidence shows that medieval law survived to become our Founders' law."  *Id.* at 2136 (quotation omitted).  The Court also confirmed that "how the Second Amendment was interpreted from immediately after its ratification [in 1791] through the end of the 19th century represented a critical tool of constitutional interpretation."  *Id.* at 2136 (quotation omitted).  The Supreme Court also intimated that late 19th century and early 20th century evidence could be probative to the extent it corroborated "earlier evidence."  *Id.* at 2154, n.28; *see also* Heller, 554 U.S. at 614 (post-Civil War legislation can be "instructive").

Against this backdrop, courts should employ a holistic approach to the appropriate timeframe for historical analysis.  Indeed, unlike other circuits, this Court has binding pre-Bruen precedent that demonstrates how to use history when

- 17 -

evaluating a Second Amendment challenge.[5]  In <u>Rene E.</u>, this Court upheld the federal ban on juvenile handgun possession against a Second Amendment challenge. *See* <u>Rene E.</u>, 583 F.3d at 8.  In so doing, this Court did not use the means-end scrutiny test rejected in <u>Bruen</u>.  Instead, this Court relied on a range of relevant historical sources, including evidence of "the Founders' attitudes" on the Second Amendment, to "state laws of the nineteenth century," to federal laws from the 1930s up to the 1990s. *See id.* at 13-16.

This Court should again review historical evidence from a broad timeframe, and should consider various, diverse histories and traditions, not all of which have had access to positions of power or voices in conversations impacting their own safety.  Below, we cite historical laws from the colonial period through the 19th century.

### 3.    The Number Of Analogues.

The Supreme Court has not specified how many analogous historical regulations are necessary to uphold a law.  In fact, the Supreme Court's guidance in <u>Bruen</u> was conflicting.    On one hand, the Supreme Court stated:

---

[5]    *See* <u>United States v. Guzman</u>, 419 F.3d 27, 31 (1st Cir. 2005) ("In a multi-panel circuit . . . newly constituted panels ordinarily are constrained by prior panel decisions directly (or even closely) on point.") (citations omitted).  While <u>Bruen</u> would constitute intervening authority for prior panel decisions that invoked means-end scrutiny to justify a law, it does not call into question a decision like <u>Rene E.</u> that properly focused on the text and history of the Second Amendment.

"we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." <u>Bruen</u>, 142 S. Ct. at 2142 (emphasis in original).  On the other hand, the Supreme Court suggested that the government could meet its burden by identifying "a well-established and representative historical *analogue*," which suggests that one relevantly-similar historical law would suffice.  *Id.* at 2133 (emphasis in original).

In fact, some courts have upheld the constitutionality of modern regulations without analogizing to *any* specific historic regulation.  Instead, courts have analogized modern laws to categories of "longstanding prohibitions" that the Supreme Court concluded are "presumptively lawful."  *See* <u>Heller</u>, 554 U.S. at 626-27, 627 n.26 (listing "presumptively lawful" categories); <u>Bruen</u>, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (same); <u>United States v. Seiwert</u>, No. 20 CR 443, 2022 U.S. Dist. LEXIS 175417, at *5 (N.D. Ill. Sept. 28, 2022) (upholding a federal law prohibiting gun possession by individuals addicted to drugs because the law was "relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness."); <u>United States v. Marique</u>, No. 8:21-po-02263-AAQ, 2022 U.S. Dist. LEXIS 229608, at *24-30 (D. Md. Dec. 14, 2022) (upholding constitutionality of regulation banning guns on the National Institutes of

Health campus by analogizing to "presumptively lawful" category of laws forbidding the carrying of firearms in sensitive places).

This Court should adopt a flexible standard concerning the necessary number of analogues, where fewer are required when either a specific historical law or a category of "presumptively lawful" gun regulation is closely analogous to the modern regulation. *See* United States v. Love, No. 1:21-CR-42-HAB, 2022 U.S. Dist. LEXIS 229113, at *7 (N.D. Ind. Dec. 20, 2022) ("And how many analogues are necessary? While some of the language in Bruen suggests the answer is one -- the Supreme Court repeatedly uses the singular 'analogue' when discussing the required evidence -- at other times the Supreme Court suggests two or even three historical analogues are not enough. …Each district court must determine whether the proposed analogues are analogue-enough, or if they require the presence of the analogue cavalry to carry the day.").

Below, we cite twenty laws and resolutions that are closely analogous to the Massachusetts Regulations, which is far more than a sufficient amount.

**B.    The Nation Has A Historic Tradition Of Gun Safety Regulation.**

**1.    Overview.**

The Nation has a historic tradition of laws that are "relevantly similar" to the contemporary Massachusetts Regulations. Bruen, 142 S. Ct. at 2132. As detailed below, firearm and gunpowder "proving" laws are especially close analogues. These

historic laws share the same "how" (imposing conditions on commercial gun sales) and the same "why" (ensuring the safety and functionality of commercially sold firearms) as the Regulations.

As a result, the government can easily meet is burden to identify a "representative historical analogue" to the Massachusetts Regulations. *Id.* at 2133 (emphasis omitted); *see also* <u>United States v. Tita</u>, No. RDB-21-0334, 2022 U.S. Dist. LEXIS 231140, at *18-19 (D. Md. Dec. 22, 2022) ("As the Government aptly notes, 'governments have been regulating the sale, possession, and transfer of firearms' since the Founding Era. …States continued to regulate the manufacture, sale, and transport of guns and ammunition in the 18th and 19th centuries, notably in Massachusetts and New Hampshire where guns and storage facilities had to be inspected.").

### 2. Firearm and Gunpowder "Proving" Laws.

The Nation -- and Massachusetts especially -- has a rich history of regulation requiring firearms and gunpowder to meet safety standards prior to their sale. Like the Massachusetts Regulations, these historic laws were plainly designed to prevent gun malfunctions, accidental discharges, explosions, and other safety risks.

As early as the 17th century, England regulated the firearms industry to ensure the safety and quality of firearms sold and manufactured for its citizenry. In 1637, King Charles I granted the London Proof House a royal charter, which empowered

the Proof House to set safety and quality standards for firearms sold or manufactured in London.[6]  The 1637 royal charter prohibited the sale of any firearms that had not been proved and stamped with a proofing mark "upon pain of the Loss and Forfeiture" and authorized the seizure of firearms that had not been proved.[7]

Prior to the Nation's founding, "colonial governments substantially controlled the firearms trade. The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers." Teixeira, 873 F.3d at 685 (citation omitted).

During the Revolutionary War, colonial "Councils of Safety" or "Committees of Safety" -- which helped manage the War effort -- required that muskets meet certain manufacturing and "proving" standards prior to their purchase. *See, e.g.*, Resolution of the Maryland Council Of Safety, Aug. 29, 1775, Archives of Maryland, 11:75 (approving purchase of muskets with detailed manufacturing specifications and requiring that they be "proved" prior to their purchase);

---

[6]     *See* Richard W. Stewart, The London Gunmakers and the Ordnance Office, 1590-1637, AM. SOC'Y OF ARMS COLLECTORS BULLETIN 55 at 25 (1986) ("[T]he arrangement benefited the government because it provided the security of a guaranteed and expandable production base for weapons of a standard type and quality . . . . Standards could be maintained, weapons proofed systematically, proof marks established for better accountability . . . and enforcement powers vested in a recognized organization.").

[7]     Wolseley, *The Charter of the Company of Gunmakers*, J. OF THE SOC'Y FOR ARMY HIST. RSCH., 79–94 (1927), http://www.jstor.org/stable/44219314.

Resolutions of the Pennsylvania Committee On Safety, Oct. 27, 1775, Col. Rec. Penn. 10:383 (requiring that all muskets be "proved" prior to their purchase); Apr. 4, 1776, Min. Sup. Penn., 10:535 (approving "musketball" purchase "to prove the Firelocks making by him for the use of this province").

In 1775, the New Hampshire House of Representatives passed a resolution requiring that each firearm sold to the colony possess certain specifications and pass an inspection involving the safe firing of the gun. *See 8 Documents and Records Relating to the State of New Hampshire During the Period of the American Revolution, from 1776-1783 at 15-16* (Nathaniel Bouton ed. 1874) (Jan. 12, 1775) ("That for every good firearm Manufactured in this Colony, made after the following manner (viz) a Barrel three feet nine Inches long, to carry an ounce ball, a good Bayonet, with blade Eighteen inches long … the owner of Such firearms, receive Three pounds for Each… after having Tried said gun in the Presence of the said receiver General with four Inches & a half of Powder well wadded, at the owner's own Risk…").

In 1776, New Jersey passed an "Act For The Inspection Of Gun-Powder," whose preamble stated that the "vending of damaged or bad Gun-Powder within this State, especially in a Time of War, may be of the most dangerous Consequence." 1776-1777 N.J. Laws 6, ch. 6. The act required the inspection of gunpowder prior

to its sale. *Id.* § 1. The act also appointed state inspectors and directed them to "mark" lots that passed inspection. *Id.* §§ 2-3.

In 1780, General George Washington ordered the Continental Army to ensure that all arms be "sufficiently proved" in order to avoid the purchase of guns of poor and unsafe quality. *See* Letter from George Washington to Henry Knox (Nov. 30, 1780), *in* The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, *ed.*) ("I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. … Lee charges Mr. Deane[']s Agent with purchasing.").

Following the Revolutionary War, states passed laws to ensure the safety of firearms and gunpowder for sale. In 1795, Pennsylvania passed "An Act Providing for the Inspection of Gun-Powder," whose preamble identified the risks of gunpowder "found to vary much in its strength" and to possess "defects". 1794 Pa. Laws 764, ch. 337. Among other safety precautions, the act appointed state gunpowder inspectors and set mandatory standards for the composition and strength of gunpowder to be sold within the state. *Id.* §§ 1-3.[8]

---

[8]     Rhode Island and New Hampshire also passed laws requiring that before gunpowder could be sold, it needed to pass state inspection or adhere to certain specifications. *See* 1776 R.I. Pub. Laws 25 (Oct. Sess.) ("An Act for the Inspection of Gunpowder Manufactured within this State"); 1820 N.H. Laws 274, ch. 25 ("An

In 1805, Massachusetts passed "An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth."  The Act's preamble specified that the Act's purpose was "to prevent" the sale of firearms "which are unsafe and thereby the lives of the Citizens be exposed."  1804 Mass. Acts 111, ch. 81 ("1805 Act"). The Act required the appointment of inspectors to ensure that all muskets and pistols met certain standards prior to their sale, including that they be "sufficiently ground bored and breeched."  *Id.*§ 1.  Among other things, the 1805 Act required that each firearm undergo testing to show that it could carry a shot over a certain distance and "shall in no respect fail."  *Id.*  The Act further required inspectors to mark the barrels of the weapons to show that they complied with state requirements, only after which the guns were fit for sale.  *Id*. §§ 1-3. The Act provided that anyone who knowingly sold firearms that did not meet the state's regulatory standards could be fined. *Id*. § 3.[9]

In 1809, Massachusetts passed "An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder."  1808 Mass. Acts 444, ch. 52 ("1809 Act").  The 1809 Act was similar to the 1805 Act, except that it focused

---

Act to Provide for the appointment of Inspectors and regulating the manufacture of gunpowder").

[9]    The 1805 Act remained in effect until its repeal in 1881. 1881 Mass. Acts 373, ch. 27. In 1911, Massachusetts passed "An Act Relative to Firearms," which regulated the sale of firearms and created a licensing regime that remains in effect through present day.  *See* 1911 Mass. Acts 484, ch. 495.

on the regulation of gunpowder, rather than gun barrels.  The 1809 Act authorized the governor to "appoint an Inspector of gun-powder for every publick powder magazine, and at every manufactory of gun-powder in this Commonwealth…"  *Id.* § 1.  The inspector was responsible for ensuring that all manufactured gunpowder contained specified quantities and qualities of materials and could safely throw a twelve-pound shot at least seventy-five yards.  *Id.* §§ 2-4.  Under this Act, state inspectors examined each cask of gunpowder and marked it as having passed or failed inspection.  *Id.* § 5.

The 1805 and 1809 Acts did not simply sit on the books.  Rather, historical records show that the Governor of Massachusetts exercised the powers under these acts to appoint provers of firearms and inspectors of gunpowder in counties across the Commonwealth.[10]

From 1810 to 1814, Massachusetts passed a series of additional firearm and gunpowder proving laws.  *See* 1809 Mass. Acts 205, ch. 118 (establishing fines if

---

[10]    *See, e.g.*, William Burdick, *The Massachusetts Manual: or Political and Historical Register, For the Political Year from June 1814 to June 1815*, 137 (Vol. 1, 1814) (listing the provers of firearms, inspectors of firearms, and the inspectors of gunpowder for Worcester County, Hampden County, Franklin County, Berkshire County, and Norfolk County for 1814-15); The Massachusetts Register and United States Calendar for 1837, 48, 68, 71 (identifying the provers of firearms for Suffolk County, Franklin County, and Hampden County for 1837 respectively); *see also* John D. Hamilton, *Arms Makers in the Pioneer Valley*, AM. SOC'Y OF ARMS COLLECTORS BULLETIN 94:17-32 at 25 (2006) (discussing the history of firearms proving in Massachusetts and identifying the prover of firearms for Hampden County in 1805).

manufacturers moved gunpowder prior to inspection); 1810 Mass. Acts 303, ch. 72 (providing that the state should furnish a howitzer to all gunpowder inspectors to assist them in performing their duties); 1814 Mass. Acts 464, ch. 192 (updating the state standards that all muskets and pistols were required to meet prior to manufacture or sale).

In 1821, Maine passed "An Act to Provide for the Proof of Fire Arms." *See* 1821 Me. Laws 546, ch. 162. Like the Massachusetts proving law regime, the Maine act tasked the governor to appoint inspectors of firearms to ensure that they met certain safety standards and to mark compliant firearms prior to their sale. *Id.* §§ 1, 3.

These historic "proving" laws are close analogues to the Massachusetts Regulations. The laws -- both historic and modern -- are designed to protect gun owners, as well as the general public, by ensuring that no firearms are sold that have qualities that would make them unusually dangerous or, for that matter, unable to function properly for the Second Amendment's core purpose of self-defense. For example, the Regulations prohibit the sale of guns that do not meet state-imposed requirements for certain melting point, strength, and density (i.e. standards that ensure that firearms are not made of inferior materials), as well as firearms that are "prone to exploding, accidental discharge, or repeated firing from a single trigger pull." *See, e.g.*, 940 C.M.R. § 16.04(2). The Regulations also require gun sellers to

test (or "proof") their guns to demonstrate compliance with the safety requirements. *See* Mass. Gen. Laws ch. 140, § 123, cl. 18-19 (requiring successful firearm testing).[11]

The historic proving laws are "relatedly similar" because they establish manufacturing and testing requirements intended to ensure that guns can be used safely prior to their sale. Although the government does not need to identify any "historical twin," the Nation's historic firearm "proving" laws closely mirror the Regulations. This Court should conclude that because the Nation has a long history of setting safety conditions on firearm sales, the Massachusetts Regulations are constitutional.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's decision and uphold the constitutionality of the Massachusetts Regulations.

---

[11] Furthermore, handguns must possess both a "safety" device and a mechanism -- such as ten-pound trigger resistance -- "which effectively precludes an average five year old child from operating the handgun when it is ready to fire". *See* 940 C.M.R. § 16.05(1)-(2). To the extent this Court finds this measure distinguishable from the rest, it is worth noting that this law also draws from a long history of protecting children from danger by limiting their access to and use of firearms. *See, e.g.*, 1890 Va. Acts 118, ch. 152 ("An Act to prevent selling or furnishing cigarettes or tobacco in any form, or pistols, dirks, or bowie-knives to minors under sixteen years of age"); 1856 Ala. Acts 17, No. 26 (criminalizing the sale of an "air gun or pistol" to minors); 1884 Mass. Acts. 57, ch. 76 ("An Act to Prohibit the Sale of Firearms and Other Dangerous Weapons to Minors").

Dated:  February 6, 2023

Respectfully submitted,

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE,

By their attorneys,

/s/ Robert M. Buchanan, Jr.
Robert M. Buchanan, Jr.
1st Cir. No. 55702
CHOATE, HALL & STEWART, LLP
Two International Place
Boston, MA 02110
617-248-5000
rbuchanan@choate.com

Of Counsel:

Jean-Paul Jaillet
Julia Hesse
Brian Lenihan
Stephen Meredith
Jennie Wilusz
Genesis Guzman
Sara Ellis
Madeleine Kausel
Kevin Schascheck

CHOATE, HALL & STEWART, LLP
Two International Place
Boston, MA 02110
617-248-5000

## CERTIFICATE OF COMPLIANCE

1.      This amicus brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(g)(1) because the brief contains 6,480 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with 14-point, Times New Roman font.

>   */s/ Robert M. Buchanan*
>   Counsel for Giffords Law Center To Prevent Gun Violence
>   February 6, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this brief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on February 6, 2022.

>   */s/ Robert M. Buchanan*
>   Counsel for Giffords Law Center To Prevent Gun Violence
>   February 6, 2023