No. 22-1478

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————

STEFANO GRANATA; JUDSON THOMAS; COLBY CANNIZZARO; CAMERON PROSPERI; THE GUNRUNNER, LLC; FIREARMS POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

*v.*

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; TERRENCE REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts,

*Defendants-Appellees*.

———————

Appeal from a Judgment of the United States District Court
for the District of Massachusetts

———————

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

———————

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
wtaylor@everytown.org
(646) 324-8215

February 6, 2023

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

ARGUMENT ............................................................................. 3

    I.    Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Proposed Conduct ............... 3

    II.    The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791 ....................................................................... 8

    III.    This Court Should Reject Any Effort To Dismiss the Commonwealth's Historical Analogues as "Outliers" ...................... 17

CONCLUSION .......................................................................... 21

# TABLE OF AUTHORITIES

## *Cases*

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ................................................................... 2

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007) ............................................................................ 20

*Defense Distributed v. Bonta*,
No. 2:22-cv-6200, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022), *adopted by* 2022
WL 15524983 (C.D. Cal. Oct. 24, 2022) ........................................... 6

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ....................................................................passim

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ....................................................................... 20

*Drummond v. Robinson Twp.*,
9 F.4th 217 (3d Cir. 2021) ................................................................... 9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ......................................................... 9, 14

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ............................................................. 20

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ............................................................... 9

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................ 5, 13, 19

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ..................................................................passim

*Rehaif v. United States*,
139 S. Ct. 2191 (2019) ......................................................................... 2

*Rupp v. Becerra*,
  401 F. Supp. 3d 978 (C.D. Cal. 2019) *vacated and remanded*, No. 19-56004, 2022
  WL 2382319 (9th Cir. June 28, 2022) ................................................................. 2

*Teter v. Connors*,
  460 F. Supp. 3d 989 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May
  19, 2020) .................................................................................................. 2

*United States v. Flores*,
  No. 4;20-cr-00427, 2023 WL 361868 (S.D. Tex. Jan. 23, 2023) ...................... 5, 6

*United States v. Greeno*,
  679 F.3d 510 (6th Cir. 2012) ....................................................................... 9

*United States v. Reyna*,
  No. 3:21-cr-00041, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................... 4

*United States v. Tilotta*,
  No. 3:19-cr-4768, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ........................ 6

### *Other Authorities*

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ............... 12, 13

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n
  v. Bruen*, No. 20-843 (U.S.) ........................................................................ 14, 18

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational
  Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ................. 14, 18

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15,
  2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .... 12, 13

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J.
  1439 (2022) .............................................................................................. 11

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843
  (U.S. Nov. 3, 2021) ..................................................................................... 15

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country, including over 210,000 in Massachusetts. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of 20 Massachusetts cities are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

Over the past several years, Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation. Everytown has drawn on that expertise to file more than 60 amicus briefs in Second

---

[1] No party's counsel authored this brief in whole or part; no party or party's counsel contributed money intended to fund its preparation or submission; and, apart from Everytown, no person contributed money intended to fund its preparation or submission. All parties consent to this brief's filing.

Amendment and other firearms cases, offering historical and doctrinal analysis, as well as social science and public policy research, that might otherwise be overlooked. *See, e.g.*, *United States v. Minor*, No. 20-1903, Dkt. 00117936807 (1st Cir. Oct. 26, 2022); *Antonyuk v. Nigrelli*, No. 22-2908, Dkt. 193 (2d Cir. Jan. 17, 2023); *Miller v. Smith*, No. 22-1482, Dkt. 42 (7th Cir. Oct. 13, 2022). Several courts have expressly relied on Everytown's amicus briefs in deciding Second Amendment and other firearms cases. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8 (3d Cir. 2018); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11 (C.D. Cal. 2019), *vacated and remanded*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022); *Teter v. Connors*, 460 F. Supp. 3d 989, 1002-03 (D. Haw. 2020), *appeal docketed*, No. 20-15948 (9th Cir. May 19, 2020); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Massachusetts's regulations prohibiting the commercial sale of weapons that have not been shown to meet state safety standards is constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the Brief of the Defendants-Appellees ("Commw. Br.").[2] Everytown submits this amicus brief to

---

[2] This amicus brief addresses only aspects of Plaintiffs' Second Amendment claim. The Court should deny Plaintiffs' motion for a preliminary injunction in its entirety for the reasons the Commonwealth set out.

expand on three methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that their proposed conduct—purchasing eighteen specific handgun models and special editions from licensed dealers—falls within the plain text of the Second Amendment, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified, not 1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also relevant. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. Although not directly implicated here, given the Commonwealth's robust historical record, we highlight that point in case the Court chooses to address it.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden to Establish that the Second Amendment's Plain Text Covers Their Proposed Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. The "people" challenging a gun

regulation, the "weapons" they put at issue, and their "proposed course of conduct" *all* must fall within the Second Amendment's plain text. *See id.* at 2134. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, weapons, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See, e.g.*, *United States v. Reyna*, No. 3:21-cr-00041, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) (dismissing defendant's challenge to indictment and plea because "§ 922(k)'s regulated conduct [possession of a firearm with an obliterated serial number] is outside [the] scope of the Second Amendment" and that fact "is enough to decide" the case; declining to reach historical inquiry).

As the Commonwealth notes, *see* Commw. Br. at 26-28, the burden to satisfy the initial, textual inquiry is on the plaintiff challenging a law. *Bruen* itself makes this clear, by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said that the presumption exists from the outset. Placing the initial

burden on the plaintiff also accords with the Court's approach to other constitutional issues. *See* Comm. Br. at 27-28. Accordingly, multiple courts have read *Bruen* to place the burden on the plaintiff to establish that the Second Amendment's plain text cover their conduct. *See id.* at 26-27; *see also United States v. Flores*, No. 4;20-cr-00427, 2023 WL 361868, at *4 (S.D. Tex. Jan. 23, 2023) (explaining that "[u]nder *Bruen* the identification of protected conduct is driven by the Second Amendment's plain text," and holding that evidence presented by defendant challenging conviction for engaging in firearms business without a license was "too sparse and too weak to justify recognizing an unwritten right to commercially sell arms").

Plaintiffs make virtually no effort to carry their textual burden. They refer to Massachusetts's safety regime as a "Handgun Ban," comparing it to the laws at issue in *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*, without ever justifying that nomenclature. *See, e.g.*, Compl. ¶¶ 1-2, 26, 40, Appendix (App.) 2, 8, 14; Plaintiffs' Opening Brief ("Pl. Br.") at 5, 25-26. Nor could they justify it: the safety measures here do not remotely "amount to a prohibition of an *entire class* of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]." *Heller*, 554 U.S. at 628 (emphasis added); *see also McDonald*, 561 U.S. at 750 (law "effectively bann[ed] handgun possession by almost all private citizens"); *Bruen*, 142 S. Ct. at 2159 (Alito, J., concurring) (law made it

"virtually impossible" to carry a handgun outside the home). As the

Commonwealth explains, Plaintiffs retain the ability to purchase and carry over a

thousand handgun models that meet the safety requirements.[3] Commw. Br. at 25.

Indeed, Plaintiffs do not allege that they have been prevented from lawfully

purchasing or carrying handguns. *See* Compl. ¶¶ 47-50, App. 16-18. They cannot

meet their textual burden by insisting, though word choice alone, that

Massachusetts's safety laws amount to a total ban.

Put differently, it is not enough for Plaintiffs to assert that handguns as a

category are "arms" protected by the Second Amendment. They must also show

---

[3] In addition, Plaintiffs have failed to carry their burden to connect their desire to *purchase* non-approved handguns to the constitutional text, "keep and bear." *Cf. United States v. Tilotta*, No. 3:19-cr-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (explaining that, "textually, the ordinary meaning of 'keep and bear' does not include 'sell or transfer'"); *Defense Distributed v. Bonta*, No. 2:22-cv-6200, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022) (concluding that the Second Amendment's plain text "quite-clearly" does not include any "implicit[]" right to "acquire and manufacture firearms" or "to purchase arms" (internal quotation marks omitted)), *adopted by* 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022). This is particularly so where, as here, a law does not prohibit the purchase and sale of non-approved handguns altogether, but only the sale of those handguns by licensed dealers. *See Flores*, 2023 WL 361868, at *5. Although Plaintiffs (incorrectly) argue that the prohibition on commercial sales of non-approved handguns is a "de facto ban" on the possession of those handguns, Pl. Br. at 19, they do not allege that they have tried and failed to acquire their preferred models and special editions through lawful private purchases. *See* Compl. ¶¶ 47-50, App. 16-18. Regardless, Plaintiffs have not established (and cannot establish) that the Second Amendment's plain text grants a right to purchase the specific handgun of one's choosing from the seller of one's choosing, when over a thousand other handguns are readily available.

that their "proposed course of conduct" is constitutionally protected. *See Bruen*, 142 S. Ct. at 2134. They have not made—and cannot make—that showing.

Plaintiffs' proposed course of conduct is to "purchase new from a licensed retailer" eighteen specific handgun models and special editions that have not been shown to meet Massachusetts's safety standards. Compl. ¶¶ 47-50, App. 16-18. But the Supreme Court has repeatedly stressed that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*). There is simply no basis in the Second Amendment's text for a right to purchase new each specific model and special-edition handgun of one's choosing.[4] As Plaintiffs themselves explain, the Second Amendment covers handguns as a general category; it does not concern itself with every single *specific* model a manufacturer might dream up:

> [T]he *Heller* Court paid no special attention to the Colt Buntline nine-shot revolver that Dick Heller sought to possess in challenging the District of Columbia's handgun ban, and instead focused on the commonality of handguns in general. Similarly, in *McDonald*, the Court noted only that the plaintiffs "are Chicago residents who would like to keep handguns," without focusing on the *specific types* of handguns they may have sought. 561 U.S. at 750. And in *Bruen*, the Court cared only that the plaintiffs wanted to carry handguns, and

---

[4] As the Commonwealth notes, Plaintiffs "make no allegations whatsoever that the handgun models they seek to purchase are better suited for self-defense than the over 1,000 models of handguns that are available for purchase in Massachusetts." Commw. Br. 30.

that no "party dispute[s] that handguns are weapons 'in common use' today for self- defense." 142 S. Ct. at 2134.

Pl. Br. at 24-25. Consistent with the Second Amendment, states may establish safety standards for handguns—and prohibit the commercial sale of models that fall below those standards—provided that responsible, law-abiding adults can still keep and carry handguns for self-defense in general.[5]

In sum, because Plaintiffs have failed to establish that the conduct in which they seek to engage is protected by the Second Amendment's text, they have failed to state a claim and their Complaint must be dismissed.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, it should first conclude that the most relevant time period for that inquiry centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states.

Several circuits, including the First Circuit, reached that conclusion in analyzing state and local laws under the Second Amendment at the first, historical

---

[5] Similarly, as the Commonwealth explains, states remain free to impose "conditions and qualifications on the commercial sale of arms" and to prohibit "dangerous and unusual weapons," *Heller*, 554 U.S. at 627. *See* Commw. Br. at 33-36, 49-51.

step of the framework that applied prior to *Bruen*.[6] *See Ezell v. City of Chicago*, 651

F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state

or local law, the 'scope' question asks how the right was publicly understood when

the Fourteenth Amendment was proposed and ratified."); *Gould*, 907 F.3d at 669

("Because the challenge here is directed at a state law, the pertinent point in time

would be 1868 (when the Fourteenth Amendment was ratified)."); *United States v.*

*Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v.*

*Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second *and*

*Fourteenth* Amendments' ratifiers approved [the challenged] regulations …."

(emphasis added)).

Bruen does not alter that conclusion. The Supreme Court expressly left open

the question "whether courts should primarily rely on the prevailing understanding

of an individual right when the Fourteenth Amendment was ratified in 1868"—as

opposed to 1791, when the Second Amendment was ratified—"when defining its

scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue

---

[6] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

because public understanding "for all relevant purposes" in case before it was the same in 1791 and 1868). Moreover, although *Bruen* disapproved the second, scrutiny-based step of the predominant framework the lower courts had applied, it declared that "[s]tep one of" that framework "is broadly consistent with *Heller*." *Id.* at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the Commonwealth's brief, this Court can uphold the challenged ordinance under a historical analysis without deciding whether it should focus that analysis on the period around 1791 or the period around 1868. The historical tradition, from the colonial era through the late nineteenth century, is consistent in demonstrating the constitutionality of safety requirements like Massachusetts's. *See* Commw. Br. at 39-43 (firearms and ammunition inspection laws), 43-46 (firearms and gunpowder safe storage laws), 46-48 (laws banning the sales of firearms to minors), 48-51 (bans on trap guns).[7] But if this Court prefers to settle the issue the Supreme Court left open, it should conclude that 1868 is the primary focus of the Court's inquiry.

---

[7] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the Commonwealth's evidence), it should rely on 19th-century history to clarify that meaning. *See* Commw. Br. at 45-49.

To begin with, in a case involving a state or local law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states or local governments under the U.S. Constitution until 1868; as *Bruen* observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. In a case against a state government, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect.

To be sure, if the public understanding of the Bill of Rights changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. *Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the

States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id.* But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And the Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)).

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[8] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against states and localities does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See* 561 U.S. at 770-78 (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding

---

[8] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Any claim that the founding era is the only relevant period is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that restrictions on guns in legislative assemblies, polling places, and courthouses found in "18th- *and 19th-century*" laws are adequate to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[9]

---

[9] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (disputing relevance of 19th-century laws but (at 16

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and former Solicitor General Paul Clement as counsel for the NRA's New York affiliate:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

In sum, any historical inquiry this Court chooses to conduct should focus on the period around 1868, not 1791. But 1868 is neither a sharp starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45; accordingly, the earlier history the Commonwealth submitted in this case remains relevant to how the right was understood in 1868. And *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its

---

n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right.

Here, state laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the Commonwealth's safety measures. *See* Comm. Br. at 45-49.[10] And even if this Court were to conclude (contrary to the

---

[10] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

scholars the Supreme Court cited) that the relevant date is 1791, not 1868, it should then consider later historical evidence and recognize that this evidence "settle[s] the meaning of" the right as one that allows for regulations like the Commonwealth's.

## III. This Court Should Reject Any Effort To Dismiss the Commonwealth's Historical Analogues as "Outliers"

Plaintiffs attempt to discredit the Commonwealth's historical laws by suggesting that they are too few to establish a tradition of firearms regulation. *See* Pl. Br. at 33-34.[11] That is manifestly inaccurate: the Commonwealth has presented a robust and extensive record of historical laws. *See* Commw. Br. at 39-49. But to the extent this Court wishes to address the issue here, to guide district courts in cases where a government might present a less extensive record, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative

---

[11] Challengers in other recent Second Amendment cases have similarly sought to dismiss historical regulations as "outliers" insufficient to satisfy the requirements of *Bruen*. *See, e.g.*, Pls.' Suppl. Br. at 14-15, *Teter v. Shikada*, No. 20-15948 (9th Cir. Sept. 16, 2022), Dkt. 67 (arguing that as many as fifteen historical laws should be dismissed as "outliers").

assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[12] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae at 11-12, *Bruen* (No. 20-843).[13] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient

---

[12] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, *Bruen*, 142 S. Ct. at 2133.

[13] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 19-20 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[14]

Concluding that a small number of state laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir.

---

[14] Plaintiffs appear to suggest that *Bruen* rejected the laws New York had offered in support of its licensing regime as too few in number to establish a historical tradition. *See* Pl. Br. at 34-35. That is incorrect. For the most part, as Plaintiffs acknowledge in a footnote, *see id.* at 34 n.10, *Bruen* simply disagreed with New York's interpretation of those laws. *See, e.g.*, 142 S. Ct. at 2142-43. To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given *Bruen*'s discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to purchase from a licensed dealer a specific model of handgun.

2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[15]

---

[15] Indeed, any such inference would be untenable in light of the Court's statement the day after *Bruen*—with five of the same justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" a category of conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: February 6, 2023

Respectfully submitted,

/s/ William J. Taylor, Jr.
Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Ave, P.O. Box 4184
New York, NY 10017
Phone: (646) 324-8215
Fax: (917) 410-6932
wtaylor@everytown.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 5,316 words,

excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of

Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally

spaced typeface using Microsoft Word in 14-point Baskerville font.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2023, I electronically filed this amicus

brief with the Clerk of the Court for the United States Court of Appeals for the

First Circuit using the CM/ECF system, which will send notice of such filing to all

registered CM/ECF users.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.